# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALLIED PACIFIC FOOD (DALIAN) COMPANY, LIMITED, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )     Civil Action No. 07-1982 (HHK) ) |
| UNITED STATES FOOD AND DRUG ADMINISTRATION, *et. al.*, | ) ) ) |
| Defendants. | ) ) ) |

## DEFENDANTS' MOTION TO DISMISS

Defendants, the United States Food and Drug Administration ("FDA"), Andrew C. von Eschenbach, Commissioner of Food and Drugs, the United States Department of Health and Human Services ("HHS"), and Michael O. Leavitt, Secretary of HHS, respectfully move for the dismissal of this case pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure.

The grounds for this motion are fully set forth in the accompanying Memorandum in Support of Defendants' Motion to Dismiss filed herewith.

Of Counsel:                                  Respectfully submitted,

JAMES C. STANSEL                   JEFFREY S. BUCHOLTZ
Acting General Counsel             Acting Assistant Attorney General

GERALD F. MASOUDI                 C. FREDERICK BECKNER III
Associate General Counsel          Deputy Assistant Attorney General
Food and Drug Division

                                             EUGENE M. THIROLF
ERIC M. BLUMBERG                   Director
Deputy Chief Counsel, Litigation

KAREN E. SCHIFTER
Associate Chief Counsel, Litigation                    _____/s/_____
U.S. Dept. of Health & Human Services          ANDREW E. CLARK
Office of the General Counsel                        Senior Trial Counsel
5600 Fishers Lane                                        Office of Consumer Litigation
Rockville, MD  20857                                   U.S. Department of Justice
(301) 827-1152                                            PO. Box 386
                                                                   Washington, D.C.  20044
                                                                   (202) 307-0067
January 2, 2008                                          andrew.clark@usdoj.gov

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ALLIED PACIFIC FOOD (DALIAN) COMPANY, LIMITED, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 07-1982 (HHK) |
| UNITED STATES FOOD AND DRUG ADMINISTRATION, *et. al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Of Counsel:

JAMES C. STANSEL
Acting General Counsel

GERALD F. MASOUDI
Associate General Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

KAREN E. SCHIFTER
Associate Chief Counsel, Litigation
U.S. Dept. of Health & Human Services
Office of the General Counsel
5600 Fishers Lane
Rockville, MD 20857
(301) 827-1152

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

EUGENE M. THIROLF
Director
Office of Consumer Litigation

ANDREW E. CLARK
Senior Trial Counsel
Office of Consumer Litigation
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
(202) 307-0067
andrew.clark@usdoj.gov

January 2, 2008

**TABLE OF CONTENTS**

                                                                    **Page(s)**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

REGULATORY BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    FDA's Import Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Import Alert Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.    Import Alert 16-131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

PROCEDURAL POSTURE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    I.    FDA'S ADMISSIBILITY AND DETENTION DECISIONS ARE
        COMMITTED TO AGENCY DISCRETION AND NOT SUBJECT
        TO JUDICIAL REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.    Allied's Complaint Is Not Actionable Because FDA's Detention
            and Admissibility Decisions, the Issuance of the Import Alert, and
            the Determination of Whether the Criteria for Removal from
            DWPE are Met, Are Committed to Agency Discretion. . . . . . . . . . . . . . 17

        B.    This Court Lacks Jurisdiction to Enjoin FDA Detention and Import
            Refusal Decisions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    II.    ALLIED'S COMPLAINT IS NOT JUSTICIABLE UNDER DOCTRINES
        OF RIPENESS, FINALITY AND EXHAUSTION.. . . . . . . . . . . . . . . . . . . . . . 25

        A.    Allied's Challenge is Not Ripe for Adjudication, and There has
            Been No Final Agency Action on Allied's Request for Removal
            from DWPE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            1.    Allied's Challenge is Not Fit for Judicial Review Because
                It Does Not Raise Purely Legal Questions and There is No
                Final Agency Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

2.    Withholding Judicial Review Will Not Cause Hardship
to Allied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

B.    Allied Has Failed to Exhaust Administrative Remedies. . . . . . . . . . . . . 32

III.    IMPORT ALERT 16-131 IS NOT A SUBSTANTIVE RULE THAT
REQUIRES NOTICE AND COMMENT RULEMAKING UNDER
THE APA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

IV.    ALLIED CANNOT CHALLENGE THE IMPORT ALERT AS A
VIOLATION OF DUE PROCESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

V.    CONGRESS HAS BARRED PRIVATE PARTIES FROM CHALLENGING
AGENCY ACTION BASED ON INCONSISTENCY WITH WTO POLICIES
AND AGREEMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

\* *Abbott Laboratories v. Gardner*,
    387 U.S. 136 (1967)................................................................................ 23-24, 26, 27, 30

\* *American Mining Congress v. Mine Safety & Health Administration*
    995 F.2d 1106 (D.C. Cir. 1993) ............................................................... 36, 37

*American Mining Congress v. Marshall*,
    671 F.2d 1251 (10th Cir. 1982). .................................................................. 38

*Arjay Associates, Inc. v. Bush*,
    891 F.2d 894 (Fed. Cir. 1989).................................................................... 42

*Association of Flight Attendants-CWA, AFL-CIO v. Chao*,
    493 F.3d 155 (D.C. Cir. 2007)........................................................... 25, 33, 34

*Association of Irritated Residents v. EPA*,
    494 F.3d 1027 (D.C. Cir. 2007). ................................................................. 22

*Ayuda, Inc. v. Thornburgh*,
    948 F.2d 742 (D.C. Cir. 1991), *vacated on other grounds,*
    *509 U.S. 916 (1993).* ............................................................................ 25

*Balmaceda v. United States*,
    815 F. Supp. 823 (E.D. Pa. 1992), *aff'd*, 46 F.3d 279 (3d Cir. 1995). .............................. 3

*Baltimore Gas and Electric Co. v. FERC*,
    252 F.3d 456 (D.C. Cir. 2001). ............................................................. 17, 18

*Bellarno International Ltd. v. FDA*,
    678 F. Supp. 410 (E.D.N.Y. 1988). ......................................................... 40, 41

*Bennett v. Spear*,
    520 U.S. 154 (1997)............................................................................ 29

*Board of Regents v. Roth*,
    408 U.S. 564 (1972)............................................................................ 42

*Authorities upon which we chiefly rely are marked with asterisks*

*Board of Trustees v. United States*,
    289 U.S. 48 (1933) ............................................................................ 42

*Bonterra America, Inc. v. Bestmann*,
    907 F. Supp. 4 (D.D.C. 1995) ........................................................... 6

*Brock v. Cathedral Bluffs Shale Oil Co.*,
    796 F.2d 533 (D.C. Cir. 1986) ................................................ 35, 36, 39

*Burt Lake Band of Ottawa & Chippewa Indians v. Norton*,
    217 F. Supp. 2d 76 (D.D.C. 2002), *appeal dismissed*,
    No. 02-5341, 2002 WL 31778064 (D.C. Cir. Dec. 4, 2002) ............................ 33

\* *Buttfield v. Stranahan*,
    192 U.S. 470 (1903) ..................................................................... 42, 43

\* *Cement Kiln Recycling Coalition v. EPA*,
    493 F.3d 207 (D.C. Cir. 2007) ............................................... 30, 36, 37

*Cleveland Board of Education v. Loudermill*,
    470 U.S. 532 (1985) ......................................................................... 42

*Coalition for Underground Expansion v. Mineta*,
    333 F.3d 193 (D.C. Cir. 2003) .............................................................. 6

*Coker v. Sullivan*,
    902 F.2d 84 (D.C. Cir. 1990) ........................................................ 17, 18

*Community Nutrition Institute v. Young*,
    818 F.2d 943 (D.C. Cir. 1987) ...................................................... 37, 38

*Continental Seafoods, Inc. v. Schweiker*,
    674 F.2d 38 (D.C. Cir. 1982) ............................................................ 20

\* *Devia v. NRC*,
    492 F.3d 421, 424 (D.C. Cir. 2007) ........................................ 26, 27, 30, 31

*Dina v. Attorney General*,
    793 F.2d 473 (2d Cir. 1986) ............................................................. 18

*Drake v. FAA*,
    291 F.3d 59 (D.C. Cir. 2002) ........................................................... 18

*Ethyl Corp. v. EPA*,
    541 F.2d 1 (D.C. Cir.) .................................................................. 16

\* *Ewing v. Mytinger & Casselberry, Inc.*,
    339 U.S. 594 (1950)........................................................................ 17, 22, 23, 24

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)........................................................................ 29

*Ganadera Industrial, S.A. v. Block*
    727 F.2d 1156 (D.C. Cir. 1984)....................................................... 20, 43

*Garlic v. FDA*,
    783 F. Supp. 4 (D.D.C. 1992), *appeal dismissed*,
    *986 F.2d 546 (D.C. Cir. 1993)*...................................................... 34

*Genendo Pharm. v. Thompson*,
    308 F. Supp. 2d 881 (N.D. Ill. 2003)............................................... 24

*General Electric Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002)......................................................... 30, 36

*General Motors Corp. v. EPA*,
    363 F.3d 442 (D.C. Cir. 2004)......................................................... 29

*General Motors Corp. v. Ruckleshaus*,
    742 F.2d 1561 (D.C. Cir. 1984), *cert. denied*,
    471 U.S. 1074 (1985)...................................................................... 35

*Gilda Industrial v. United States*,
    446 F.3d 1271 (Fed. Cir. 2006)....................................................... 42, 44

*Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corp.*,
    589 F.2d 658,(D.C. Cir. 1978) ........................................................ 36

\* *Heckler v. Chaney*,
    470 U.S. 821 (1985)........................................................................ 13, 17, 18, 19, 21

*Herbert v. National Academy of Sciences*,
    974 F.2d 192 (D.C. Cir. 1992).......................................................... 6

*Hudson v. FAA*,
    192 F.3d 1031 (D.C. Cir. 1999)........................................................ 30

*ICC v. Brotherhood of Locomotive Engineers*,
    482 U.S. 270 (1987)........................................................................ 17

*In re Rath*,
    402 F.3d 1207 (Fed. Cir. 2005)........................................................ 44

*K & K Merchandise Group v. Shalala,*
    95 Civ. 10082, 1996 U.S. Dist. LEXIS 4880 (S.D.N.Y. Apr. 15, 1996). ........................ 20

*Land v. Dollar,*
    330 U.S. 731 (1947)................................................................................................. 6

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ............................................................................................... 17

*McCarthy v. Madigan,*
    503 U.S. 140 (1992)............................................................................................... 33

*McInnis-Misenor v. Maine Medical Center,*
    319 F.3d 63 (1st Cir. 2003)................................................................................... 27

* *McKart v. United States,*
    395 U.S. 185 (1969)........................................................................................ 33, 34

*Meserey v. United States,*
    447 F. Supp. 548 (D. Nev. 1977)......................................................................... 20

*Motor Vehicle Manufacturers Association of the United States, Inc., v. State Farm Mutual*
    *Automobile Insurance Co.*, 463 U.S. 29 (1983).................................................... 16

*Myers v. Bethlehem Shipbuilding Corp.,*
    303 U.S. 41 (1938)................................................................................................ 33

*Mytinger & Casselberry, Inc. v. Ewing,*
    87 F. Supp. 650 (D.D.C. 1949). .......................................................................... 23

*National Federation of Federal  Employees v. United States,*
    905 F.2d 400 (D.C. Cir. 1990). ....................................................................... 17-18

*National Gay Rights Advocates v. HHS*
    *No. 87-1735,* 1988 U.S. Dist. LEXIS 17283 (D.D.C. Apr. 26, 1988). .............. 34

*National Medical Enterprises, Inc. v. Shalala,*
    43 F.3d 691 (D.C. Cir. 1995). .............................................................................. 35

*National Park Hospitality Association v. Department of Interior,*
    538 U.S. 803 (2003)............................................................................................... 26

*National Treasury Employees Union v. United States,*
    101 F.3d at 1423 (D.C. Cir. 1996). ...................................................................... 27

*Nebraska HHS v. HHS*,
  435 F.3d 326 (D.C. Cir. 2006). ...................................................... 28

*Nevada v. DOE*,
  457 F.3d 78 (D.C. Cir. 2006). ................................................. 27, 31

*Norsk Hydro Can., Inc. v. United States*,
  472 F.3d 1347 (Fed. Cir. 2006)........................................................ 44

*Nuclear Energy Institute v. EPA*,
  373 F.3d 1251 (D.C. Cir. 2004). ..................................................... 32

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726, 733 (1998) .............................................................. 27

*Pacific Gas & Electric v. FPC*,
  506 F.2d 33 (D.C. Cir. 1974). ............................................. 35, 37, 38

*Panhandle Producers v. ERA*,
  847 F.2d 1168 (5th Cir. 1988 ). ....................................................... 38

*Pfizer v. Shalala*,
  182 F.3d 975 (D.C. Cir. 1999). ........................................................ 26

*Premo Pharm. Laboratories, Inc. v. United States*,
  629 F.2d 795 (2d Cir. 1980)............................................................. 24

*Professionals and Patients for Customized Care v. Shalala*,
  56 F.3d 592 (5th Cir. 1995). .................................................. 37, 39-40

*Public Citizen, Inc. v. Nuclear Regulatory Commission*,
  291 U.S. App. D.C. 248, 940 F.2d 679 (D.C. Cir. 1991). ................. 29

*Reno v. Catholic Social Services, Inc.*,
  509 U.S. 43 (1993)........................................................................... 32

*Ryder Truck Lines, Inc. v. United States*,
  716 F.2d 1369 (11th Cir. 1983). ..................................................... 38

*Schering Corp. v. Heckler*,
  779 F.2d 683 (D.C. Cir. 1985). ....................................................... 18

*Southeastern Minerals, Inc. v. Harris*
  622 F.2d 758 (5th Cir. 1980). ......................................................... 24

\* *Sugarman v. Forbragd*,
   267 F. Supp. 817 (N.D. Cal. 1967), *aff'd*, 405 F.2d 1189
   (9th Cir. 1968), cert. denied, 395 U.S. 960 (1969). ........................................ 4, 19-20, 21

*Sycor International Corp. v. Shalala*,
   127 F.3d 90 (D.C. Cir. 1997). ...................................................................................... 35

*Texas v. United States*,
   523 U.S. 296 (1998)...................................................................................................... 26

*Toilet Goods Association v. Gardner*,
   387 U.S. 158 (1967)...................................................................................................... 27

*United States v. Alcon Laboratories*,
   636 F.2d 876 (1st Cir. 1981)........................................................................................ 24

*United States v. Food, 2,998 Cases*,
   64 F.3d 984 (5th Cir. 1995). ......................................................................................... 5

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
   435 U.S. 519 (1978)...................................................................................................... 16

*W.R. Grace & Co. v. EPA*,
   959 F.2d 360 (1st Cir. 1992)........................................................................................ 27

*Webster v. Doe*,
   486 U.S. 592 (1988).................................................................................................. 17, 18

## STATUTES

5 U.S.C. § 553(b)(3)(A)................................................................................................... 35

5 U.S.C. § 553(d). .......................................................................................................... 35

\* 5 U.S.C. § 701(a)(2)................................................................................ 14, 16, 17, 18, 21

5 U.S.C. § 704 ................................................................................................................ 26

5 U.S.C. § 706(2)(A) ...................................................................................................... 18

19 U.S.C. § 3501(7). ...................................................................................................... 44

19 U.S.C. § 3511(a)(1).................................................................................................... 44

19 U.S.C. § 3511(d). ...................................................................................................... 44

\* 19 U.S.C. § 3512(c)(1)(B). ................................................................................ 44

21 U.S.C. § 334. .......................................................................................... 20, 23, 24

21 U.S.C. § 342(a)(2)(C)(i). .................................................................................... 7

21 U.S.C. § 342(a)(2)(C)(ii). ................................................................................... 6

21 U.S.C. § 348. ......................................................................................................... 7

21 U.S.C. § 360b. ....................................................................................................... 6

\* 21 U.S.C. § 381. ................................................................................................ 2, 10

\* 21 U.S.C. § 381(a). ......................................... 3, 4, 5, 13, 16, 18, 21, 22, 38, 43

21 U.S.C. § 381(b). ................................................................................................ 3, 4

## REGULATIONS

19 C.F.R. § 113.62(d)(l). ......................................................................................... 3

21 C.F.R. § 1.94. .......................................................................................... 3, 4, 29, 43

21 C.F.R. § 1.95. ........................................................................................................ 4

21 C.F.R. § 10.25. ..................................................................................................... 32

21 C.F.R. § 10.33. .................................................................................................. 4, 38

\* 21 C.F.R. § 10.45(b). .................................................................................. 15, 26, 33

21 C.F.R. § 10.75. .................................................................................................. 4, 38

21 C.F.R. § 123.12(a). ............................................................................................... 9

## RULES

Fed. R. Civ. P. 12(b)(1). ................................................................................ 2, 6, 13, 15

Fed. R. Civ. P. 12(b)(6) ................................................................................. 2, 13, 15

**OTHER**

* 40 Cong. Rec. 9002-9003 (daily ed. June 12, 1906) .......................................................... 19, 21

* U.S. Constitution Article III. ......................................................................................... 26, 27, 30

In this action, plaintiff Allied Pacific Food (Dalian) Company, Limited ("Allied"), a Chinese producer of aquacultered (*i.e.*, farmed) shrimp, challenges the discretion of the U.S. Food and Drug Administration ("FDA") to determine the admissibility of foreign seafood into United States commerce. Specifically, Allied asks this Court to enjoin "enforcement" of an FDA "import alert," IA 16-131, under which FDA has advised field offices that they may "detain" without physical examination certain aquacultured seafood products originating in China, and explains the types of information the importer may provide to demonstrate to FDA that their products are free of specific antibiotic and chemical residues. FDA issued this alert as a result of recent information showing that aquaculture from China have frequently tested positive for contaminants such as malachite green, nitrofurans, fluoroquinolones, and gentian violet, which raise significant public health concerns in humans, including antibiotic resistance and increased risk of cancer. This process enables FDA to prevent the entry into domestic commerce of foods that may be dangerous to human health until the owner of the goods can demonstrate that they are safe.

Allied objects in particular to FDA giving its district offices discretion to detain without physical examination ("DWPE") many or all shipments of specified aquacultured seafood products originating in China. Allied's claims represent an unwarranted attempt to constrain FDA's discretion and impede its mission of safeguarding the American food supply. Contrary to Allied's contention, the import alert at issue is not a substantive rule that was required to be promulgated pursuant to notice and comment rulemaking, but is a mechanism for the agency to communicate information to its field personnel, and to suggest priorities for the allocation of resources. The import alert was also made publicly available on FDA's website and thereby provided notice to the affected industry regarding the agency's current views on regulatory

1

priorities related to these products.  FDA's issuance of the import alert, and its actions pursuant thereto (including the detention of shrimp products produced by Allied), are reasonable exercises of the agency's discretion and are not subject to judicial review.  It is also well established that foreign producers have no Constitutional right to have their products enter United States commerce such as would limit the federal government's authority to restrict imports.

As discussed below, Congress has granted FDA broad authority in the import arena, including the ability to deny admission to items that "appear" adulterated based upon inspection "or otherwise."  21 U.S.C. § 381.  The agency has wide latitude to determine the type and amount of information it will consider in deciding whether or not to admit any product offered for import.  Because the FDA actions Allied seeks to challenge are thus committed to agency discretion, Allied's complaint must be dismissed for lack of subject matter jurisdiction. Furthermore, Allied has requested that FDA remove it from DWPE (so as to be relieved of the obligation to provide evidence of compliance on an entry-by-entry basis in the future) and Allied's request for such relief is still pending before the agency.  As such, Allied's lawsuit is premature and subject to dismissal on the additional grounds of ripeness and finality, as well as failure to exhaust administrative remedies. For these reasons, and because Allied has failed to state a claim upon which relief can be granted, the complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## REGULATORY BACKGROUND

### A.    FDA's Import Program

Several federal agencies have overlapping and concurrent jurisdiction over imported products.  Imported foods (including seafood products) that fall under FDA's jurisdiction are required to meet the safety and sanitary standards of the Federal Food, Drug, and Cosmetic Act

2

("FDCA").  *See* Import Program System Information (avail. at www.cfsan.fda.gov/~lrd/imp-info.html.) ("Imp. Program Sys. Info.").  An article of food subject to the FDCA shall be refused admission if it "appears" that (1) the article has been manufactured, processed, or packed under insanitary conditions; (2) the article is forbidden or restricted in sale in the country in which it was produced or from which it was exported; or (3) the article is adulterated or misbranded.  *See* 21 U.S.C. § 381(a).  Under the statute, the appearance of a violation may be based on "the examination of such samples or otherwise."  *Id.*  Accordingly, FDA can refuse admission to an article of food based upon its own examination of the food, or on evidence other than sampling and analytical results.  *See id.*; *see also Balmaceda v. United States*, 815 F. Supp. 823, 827 (E.D. Pa. 1992) ("the language of the statute clearly affords the FDA with the discretion to act without requesting or relying on the results of the testing of samples"), *aff'd*, 46 F.3d 279 (3d Cir. 1995).

FDA coordinates with U.S. Customs and Border Protection ("Customs") to ensure that FDA is notified of all FDA-regulated products imported or offered for import into the United States.  As a first step, the importer, or his/her representative, must file an entry notice and an entry bond with Customs.  *See* 21 U.S.C. § 381(b).  After Customs notifies FDA of the entry, FDA determines initially whether to admit the product into United States commerce, detain the product, conduct a physical examination, or otherwise obtain additional information.  *See* Imp. Program Sys. Info.

FDA "detains" a product when it makes an initial determination that "it appears that an article may be subject to refusal of admission," and issues a notice of detention to notify the owner or consignee of the opportunity for a hearing.  21 C.F.R. § 1.94.[1]  In some instances, FDA

---

[1]  Although referred to as "detention," generally neither FDA nor Customs has physical custody or control of the articles.  However, if Customs demands redelivery and the importer is unable to redeliver, Customs may assess liquidated damages pursuant to the entry bond for failure to hold the product intact.  *See* 19 C.F.R. § 113.62(d) & (l).

may detain a product as soon as it is offered for entry into the United States without first examining it and taking a sample.  *See* Imp. Program Sys. Info.; *see also* FDA's Regulatory Procedure Manual ("RPM") Chap. 9-6 (referring to process by its former name, "automatic detention") (avail. at http://www.fda.gov/ora/compliance_ref/rpm/chapter9/ch.9-6.html).  A detention without physical examination (or "DWPE" as it is commonly known) may be based on past history of that company or product or geographic region, or other information indicating the product may be violative.  *Id.*; *see also* 21 U.S.C. § 381(a).

A hearing on a detention can take many forms, including telephone conversations and letters.  *See* RPM Chap. 9-8.[2]  The owner or consignee may introduce testimony either orally or in writing to demonstrate the admissibility of the food.  21 C.F.R. § 1.94; *see also* 21 U.S.C. § 381(a); *Sugarman v. Forbragd*, 267 F. Supp. 817, 824 (N.D. Cal. 1967), *aff'd*, 405 F.2d 1189 (9th Cir. 1968), *cert. denied*, 395 U.S. 960 (1969).[3]  A decision as to the admissibility of detained goods is made only after the importer has an opportunity to present testimony and that testimony is considered.  If FDA concludes that the product is in compliance, the shipment may be released into United States commerce.  *See* Imp. Program Sys. Info.  If FDA concludes that a violation appears to exist, the product will be refused admission.  *See* 21 U.S.C. § 381(a).  An owner/consignee may seek reconsideration of the decision of an FDA field office to refuse admission of a particular shipment.  *See* 21 C.F.R. §§ 10.33, 10.75; RPM Chap. 9-9.  If the product is ultimately refused, however, the importer is required to either re-export or destroy the

---

[2]  In some circumstances, the owner may instead request authorization to bring the article into compliance or to render it other than a food.  *See* 21 U.S.C. § 381(b); 21 C.F.R. § 1.95.

[3]  Typically, and in the case of Allied, by the time entry is made with Customs, the foreign producer or other foreign shipper has sold or consigned the products to another entity.  Under the FDCA, the opportunity to participate in admissibility proceedings is offered solely to the owner/consignee of the product offered for import, and not the foreign producer.  *See* 21 U.S.C. § 381(a).  Thus, Allied, as the foreign producer, has no statutory right to participate in any admissibility determination relating to its products.

article under Customs or other approved supervision.  *See* 21 U.S.C. § 381(a).

### B.    Import Alert Overview

FDA's Division of Import Operations and Policy ("DIOP") may issue "import alerts" to

the FDA employees located in FDA district offices who review import entries.  RPM Chap. 9-13.

This process is a mechanism for FDA headquarters to efficiently and effectively disseminate

information throughout the field and coordinate FDA's screening efforts.  *See id.* (The purpose of

import alerts is to "identify and disseminate important information (problems, violative trends,

etc.)" to help ensure an "effective import coverage program."); *United States v. Food, 2,998

Cases*, 64 F.3d 984, 986 n.2 (5th Cir. 1995) ("An import alert advises FDA field offices of

ongoing problems with a specific product offered for import and suggests appropriate action,

such as detention for inspection and sampling.").  This mechanism is particularly important given

the large disparity between the volume of imported products within FDA's jurisdiction and

FDA's resources.[4]

Import alerts communicate information and policy to FDA staff.  *See* Imp. Program Sys.

Info.  Usually, they inform FDA field personnel that FDA has sufficient evidence or other

information to refuse admission of future shipments of an imported article (*i.e.*, that future

shipments appear to be violative).  *See id.*  FDA field staff use the information contained in

import alerts, along with other information, to help determine whether they will initiate refusal of

admission in any given case.  *See id.*  Occasionally, when the violative conditions appear to be

geographically widespread, FDA may identify particular products from an entire country or

geographic region for DWPE.  *See id.*  In such event, the agency will issue an import alert to

---

[4]  In recent years, FDA has tested less than 2% of imported seafood products.  *See* GAO Report: Food
Safety – FDA's Imported Seafood Safety Program Shows Some Progress, But Further Improvements Are Needed
(January 2004) at 4 (avail. at http://www.gao.gov/new.items/d04246.pdf).

5

provide information to field personnel regarding the products from that country or region.  *See id.*

C.    **Import Alert 16-131**

The existence of antibiotics and other chemicals in aquacultured seafood products is currently a matter of significant concern to FDA.  The use of such chemicals in the aquatic environment can lead to the presence of drug or chemical residues in the edible portions of the seafood.  These residues raise significant human health concerns:  overuse and unnecessary consumption of antibiotics and antibiotic residues can contribute to antibiotic resistance, which has become a growing problem in medical treatment; and certain of these chemicals have been shown, after prolonged exposure, to have a carcinogenic effect.  *See* Import Alert # 16-131 "Detention without Physical Examination of Aquacultured Catfish, Basa (Pangasius sp), Shrimp, Dace and Eel from the People's Republic of China Due to the Presence of New Animal Drugs and/or Unsafe Food Additives" (avail. at http://www.fda.gov/ora/fiars/ora_import_ia16131.html ("IA 16-131"); Memorandum from Director, Office of Compliance, Center for Food Safety and Applied Nutrition to Associate Commissioner for Regulatory Affairs (June 5, 2007); Memorandum from Compliance Officer, Product Adulteration Branch, Division of Enforcement, Office of Compliance, Center for Food Safety and Applied Nutrition File (November 26, 2007) (attached hereto as Exhibit 1, at 1-9, 10-17, 18-19, respectively).[5]

The presence of malachite green, nitrofurans, fluoroquinolones, or gentian violet in seafood products violates the FDCA in that the residues are (1) unsafe new animal drugs under 21 U.S.C. § 360b that render the seafood adulterated under 21 U.S.C. § 342(a)(2)(C)(ii); and/or

---

[5] When subject matter jurisdiction is challenged under Fed. R. Civ. P. 12(b)(1), the Court may consider evidentiary material outside of the pleadings without treating the motion as one for summary judgment.  *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947); *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003)*; Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197-98 (D.C. Cir. 1992); *Bonterra America, Inc. v. Bestmann*, 907 F. Supp. 4, 5 n.1 (D.D.C. 1995).

6

(2) unsafe food additives under 21 U.S.C. § 348 that render the seafood adulterated under 21 U.S.C. § 342(a)(2)(C)(i). Accordingly, producers of seafood aquaculture who wish to export their products to the United States must not introduce these chemicals into their aquatic environments and must take affirmative steps to prevent contamination by these chemicals.

The United States market for imported seafood is large. Approximately 80% of the seafood consumed in the United States is imported. Ex. 1, at 10. China is the largest producer of aquaculture in the world, and the third largest exporter of seafood to the United States. *Id*.

For several months before it issued IA 16-131, FDA, in monitoring imported aquaculture seafood from China, repeatedly found illegal residues, including nitorfurans, malachite green, genitian violate, and fluoroquinolones. *Id*. at 10-11, 18. Overall, during the period October 1, 2006 through May 31, 2007, FDA found that, of the 89 samples of catfish, basa, shrimp, dace, and eel from China that were tested, twenty-two of the samples (25%) were found to contain an unapproved drug. *Id*. at 18. Testing conducted by Canadian authorities and the Alabama Department of Agriculture also revealed high percentages of Chinese aquacultured seafood containing drug residues. *Id*. at 13.

In September 2006, FDA sent a team of experts to China to evaluate the Chinese government's control over the use of drugs in aquacultured seafood products. *Id*. at 13. The FDA team concluded that China's then current program was not sufficiently effective. *Id*. Indeed, a representative of the Chinese government explained that, although the Chinese authorities test for certain drug residues in legally exported seafood products, a considerable volume was apparently moving through illegal channels. *Id*. at 14.

As a result of the above data and information, FDA issued IA 16-131 on June 28, 2007. *Id*. at 18. IA 16-131 advises FDA district offices responsible for reviewing import entries that

they may detain without physical examination aquacultured catfish, basa, shrimp, dace, and eel

from China.  *Id*. at 4.  Once a shipment has been detained, the importer may provide to FDA the

results of a third-party laboratory analysis of a representative sample of the lot, conducted under

appropriate methods, showing that the lot has been properly tested for the designated drug

residues.  *Id*. at 4-7.  If the results show that the shipment does not contain antibiotic or chemical

residues, the shipment may be released into United States commerce.  If the results show that the

shipment does contain violative residues, the shipment will be refused, subject to administrative

appeal as described above.[6]

Import Alert 16-131 explains how specific manufacturers can request to be removed from

DWPE under IA 16-131.  FDA may remove a firm from DWPE if the agency determines that the

manufacturer has the appropriate controls and processes in place to ensure that aquaculture

produced by that manufacturer no longer appear to be violative due to the presence of illegal drug

residues and/or food additives.  *Id*. at 7-8.  IA 16-131 further describes the information that may

satisfy that standard:  documentation showing five consecutive untainted seafood entries (based

on third-party laboratory analysis using acceptable methodologies); documentation that verifies

the processors' compliance with FDA's Seafood Hazard Analysis Critical Control Point

---

[6] Specifically, IA 16-131 provides:

GUIDANCE:  Districts may detain without physical examination, all shipments of aquacultured catfish, Basa (Pangasius sp), shrimp, dace, and eel from the People's Republic of China (CN) except for the firms identified on the attachment to this alert. . . .  If a firm, shipper, or importer believes that their product should not be subject to detention under this import alert they should forward information supporting their position to FDA . . . .

In order to secure release of an individual shipment subject to this Import Alert, the importer should provide the results of a third-party laboratory analysis of a representative sample of the lot verifying that products do not contain malachite green and its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet or fluoroquinolones. . . .

Ex. 1, at 4.

("HACCP") regulations, 21 C.F.R. part 123, from an "appropriate" third-party that conducted an

inspection of the processor; and documentation that the processor is in compliance with all

Chinese government requirements for exporting aquaculture seafood to the United States.  *Id*.

Requests for removal are evaluated by FDA's Center for Food Safety and Applied Nutrition

("CFSAN") at FDA headquarters in accordance with CFSAN's standards and procedures, as well

as by DIOP.  *See id.* at 8.[7]

Even if FDA decides to remove a company from DWPE under IA 16-131, however, FDA

retains its authority to examine any of that company's aquacultured products before they are

admitted into domestic commerce and to refuse admission to any product that appears violative.

## FACTUAL BACKGROUND

Allied, a foreign limited company with its principal place of business in Dalian, China,

produces aquacultured shrimp products.  Compl. ¶¶ 1, 11.  It exports these products, in particular

---

[7]  Specifically, IA 16-131 states as follows:

In order to remove a firm from detention without physical examination, information should be provided to FDA to adequately assess whether a manufacturer has the appropriate controls and processes in place to ensure the quality of the product, the firm or shipper should provide the following information (In English): 1) Documentation showing that a minimum of five (5) consecutive entries have been released by FDA based on third-party laboratory analysis of a representative sample of the lot verifying that products do not contain malachite green and its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet and fluoroquinolones. The chart provided above identifies which residues should be screened for each species. Third-party laboratory must use methods acceptable to FDA (e.g., see http://www.cfsan.fda.gov/seafood1.html); and
2) Documentation, from an appropriate third-party (e.g. a government inspection authority such as AQSIQ) demonstrating that an inspection of the processor was conducted and that the seafood was processed in accordance with FDA's Seafood HACCP regulations, 21 CFR part 123, including controls for aquaculture drugs. See 21 CFR 123.12(a). Documentation should include test results of any products sampled during the course of the inspection, demonstrating that the products do not contain malachite green or its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet or fluoroquinolones[;] and
3) Documentation that the processor is in compliance with all Chinese government requirements for exporting aquacultured seafood to the U.S. Documentation should include copies of any registration that may be required by the Chinese government.
All requests for removal (exemption) from DWPE will be forwarded by DIOP to CFSAN . . . for evaluation.

Ex. 1, at 7-8.

breaded shrimp, to the United States. Compl. ¶¶ 11-12.

On September 10, 2007, Allied applied to FDA to be removed from DWPE for Chinese

aquaculture products under IA 16-131. Compl. ¶ 36. Since that time, there have been frequent

communications between Allied's representatives and FDA regarding the status of its request and

potential obstacles to approval. *See, e.g.*, Compl. ¶ 38. Specifically, importers of Allied's

products sought to stay any refusal decision on pending imports of such products. *See* Compl.

Ex. 5. For several of Allied's entry lines, the third party laboratory that tested the products for

the presence of drug/food additive residues reported positive findings. *See* Compl. ¶¶ 39-69.[8]

The importers submitted additional information to FDA, including new testing of the same

products from other laboratories. FDA engaged in extensive evaluation of all the submitted data,

and also obtained additional data on its own. Since the filing of the complaint, FDA has reached

determinations to admit into United States commerce all Allied entries that were under

consideration at the time the complaint was filed.

As noted above, HACCP compliance is also a factor that FDA considers relevant in

determining whether a foreign producer should be removed from DWPE under IA 16-131. Ex.

1, at 8. Since its September 2007 request for removal from DWPE, Allied has submitted

additional information to FDA regarding the status of its efforts to demonstrate compliance with

HACCP. *See* Letter from Dominic J. Veneziano, Director, Division of Import Operations &

Policy to Mitchell Fuerst (Dec. 7, 2007) (attached hereto as Exhibit 2, with potentially

confidential information redacted). On November 13, 2007, Allied provided FDA with the

---

[8] The terms "line" and "entry line" refer to each portion of an import shipment that is listed as a separate item on an entry document. A line may consist of several items of the same product, such as a quantity of frozen breaded shrimp. FDA considers a line to be an "article" under 21 U.S.C. § 381, and it may make admissibility decisions on a line-by-line basis.

firm's revised HACCP plans, dated November 12, 2007, for breaded shrimp, breaded skewered shrimp, and pan-fried tempura shrimp. *See id*. at 1. The package also included two letters dated November 12, 2007, from a third-party auditor, attesting to the completion of audit inspections it conducted at the firm on November 3 and 8, 2007. *See id*. On November 21, that auditor provided its inspection reports to FDA. *See id*. In addition, on November 15, 2007, Allied provided additional information to FDA regarding other third-party auditors who had conducted HACCP audits and whose audit reports were part of the September package. *See id*.

On December 7, 2007, FDA sent a letter to Allied's counsel, providing FDA's evaluation of the HACCP compliance information submitted as of that date. *Id*. The letter identified specific deficiencies in both the HACCP plans themselves and the most recent inspection reports. *Id*. at 1-2. FDA explained that the HACCP plans lacked sufficient information regarding the mechanisms for ensuring that the aquaculture did not contain drug/food additive residues, and the auditor's report lacked detailed information regarding the adequacy of controls in place for unapproved veterinary drugs used in aquacultured shrimp. *Id*. FDA further explained that:

> Because many Chinese aquaculture processors may have sufficient HACCP plans on paper but may not appropriately implement them, as has been the case elsewhere, and because FDA does not have the resources to itself inspect every foreign producer on an ongoing basis, FDA believes that third party audits of the foreign processors will play an important role in FDA's assessment whether a manufacturer has the appropriate controls and processes in place. . . . FDA's current view is that, before it can be confident in the quality of a given auditor, it should verify that the auditor understands the science, the product, the processing technology, and the principles of HACCP and can apply them in different processing plant settings. Thus, in addition to reviewing a processing plant's HACCP paperwork and a third-party's credentials, FDA believes it would be prudent, at this early stage of this program, to conduct its own on-site audits of the auditors' work until it gains confidence that the specific auditor or auditors are properly applying HACCP principles.

*Id*. at 3.

Because FDA determined that its needs more information about Allied's HACCP plans

11

and state of compliance, including an on-site evaluation, FDA has not yet made a final decision regarding Allied's request for removal from DWPE under IA 16-131. Allied's request is pending, and FDA's consideration of its merits continues. In its December 7 letter, FDA further explained that the agency's then current intention was to include Allied in its next trip to China to conduct seafood HACCP evaluations, which the agency hoped to make in January or February 2008, but noted that timing was affected by factors outside the agency's control. *Id*. at 4.

## PROCEDURAL POSTURE

Allied filed its complaint on November 2, 2007, less than two months after it initially requested removal from DWPE under IA 16-131, and in the midst of ongoing communications with FDA regarding the status of various import lines. Allied alleges: in *Count One*, that IA 16-131 is a substantive rule that should have been promulgated through notice and comment rulemaking; in *Count Two*, that FDA fails to oversee third party laboratories and its own compliance officers, leading to inconsistent enforcement of IA 16-131; in *Count Three*, that FDA arbitrarily and capriciously has required Allied to provide more information than explicitly set forth in IA 16-131 in order to be removed from DWPE; in *Count Four*, that FDA impermissibly limits the evidence that may be presented as to the admissibility of an import in violation of due process; in *Count Five*, that IA 16-131 was enacted in contravention of World Trade Organization ("WTO") procedure; and in *Count Six*, that FDA's refusals of import entries are unreliable. Allied seeks a declaration that IA 16-131 is unlawful and unconstitutional, was enacted in contravention of WTO procedure, and that FDA's enforcement of IA 16-131 is arbitrary and capricious. Allied also seeks an injunction against FDA's enforcement of IA 16-131 and FDA's posting on its website any import refusal decision with respect to Allied's products.

FDA now moves to dismiss Allied's complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

## ARGUMENT

As discussed more fully below, Allied's claims are meritless and subject to dismissal based on several overlapping and alternative grounds. First and foremost, this lawsuit seeks judicial review of a matter that is committed to the discretion of the agency. When "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," the matter is not subject to judicial review. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Here, the statute confers on FDA the authority to refuse admission to regulated products that "appear" to violate the FDCA based on an examination of the samples "or otherwise." *See* 21 U.S.C. § 381(a). This standard is unreviewable because the "appearance" standard by its very language embodies undefined discretion; the use of the term "otherwise" likewise indicates Congress' intent to delegate discretion to the agency; and FDA's detention and refusal decisions are akin to FDA's exercise of enforcement discretion, which is a category of agency decision-making that courts have long recognized as unreviewable.

Where, as here, the statute affords no judicial review of FDA's ultimate determination to refuse admission of an entry offered for import, Allied has no basis for challenging the agency's preliminary steps and determinations, such as the manner in which FDA goes about making admissibility decisions and gathering sufficient information to determine whether or not to admit particular entries. FDA's decisions regarding how to allocate its resources, what entries to examine or not examine, and what evidence or information to consider in determining whether to admit or deny any particular entry are unquestionably "committed to agency discretion by law,"

13

and thus judicially unreviewable.  5 U.S.C. § 701(a)(2).

Similarly, Allied's request that FDA be enjoined from enforcing IA 16-131 is tantamount to a preemptive injunction against FDA's enforcement of the FDCA, which relief this Court cannot enter.  Indeed, it is well established that courts have no jurisdiction to enjoin enforcement proceedings brought pursuant to the FDCA.  Although import admissibility determinations are not enforcement proceedings *per se*, the line of cases barring pre-enforcement review in the FDCA context applies equally to import proceedings.

Second, even if FDA's actions were otherwise reviewable, this lawsuit is untimely.  FDA was still considering the admissibility of the specific entries referenced in Allied's complaint at the time its complaint was filed.  All of the pending entries have now been admitted, however, rendering those aspects of Allied's complaint moot.  Allied's request to be removed from DWPE under IA 16-131, on the other hand, remains under active consideration by FDA.  As recently as December 7, 2007, FDA requested additional information from the firm and its auditors related to Allied's removal request.  Absent final agency action on Allied's request for removal from DWPE, Allied's claims as to that issue are not ripe for review.  Because there are thus no adverse final decisions for this Court to review, there is no jurisdiction over Allied's claims.

Third, Allied has failed to exhaust administrative remedies by filing a citizen petition as required by FDA regulations.  Allied complains that FDA's detention program for Chinese aquaculture is unjustified and unfairly administered.  Specifically, Allied alleges that FDA should have engaged in rulemaking to issue IA 16-131, inadequately monitors third party laboratories and its own personnel, has failed to clearly identify in the import alert the information that it is requesting from foreign companies, has unfairly limited the information it will consider as to the admissibility of an import line, and has posted the results of unreliable determinations on the

14

internet.  *See* Compl. Counts One - Four, and Six.  These are all matters that should have been

brought to the attention of the Commissioner in the first instance for the agency to consider.

Indeed, FDA regulations require that a party first use the citizen petition process to "request that

the Commissioner take or refrain from taking any form of administrative action," and that request

must "be the subject of a final administrative decision based on [the citizen petition] . . . before

any legal action is filed in a court."  21 C.F.R. § 10.45(b).

   For all of these reasons, Allied's complaint should be dismissed pursuant to Fed. R. Civ.

P. 12(b)(1) for lack of subject matter jurisdiction.  Even if this Court had subject matter

jurisdiction, however, Allied's complaint fails to state a claim upon which relief can be granted.

Allied is not entitled to relief on Count One as a matter of law because IA 16-131 is not a

substantive rule that created new, binding law, and therefore notice and comment rulemaking

was not required.  Allied has similarly failed to state a claim in Count Four, because a private

party has no vested right to import into the United States on which to base a due process

challenge to the government's authority to restrict imports, and in Count Five, because Congress

has precluded private challenges to agency action on the ground that the action is inconsistent

with WTO policies and agreements.  Each of these claims should therefore be dismissed pursuant

to Fed. R. Civ. P. 12(b)(6).

   With respect to Counts Two, Three and Six, it is unclear how this Court would begin to

evaluate FDA's processes for evaluating whether an import line is admissible, including its

consideration of third-party laboratory analysis, the communications among its employees, the

types of information it requests from foreign manufacturers and importers, and the information

that it posts on its website.  To the extent these processes are reviewable at all (and the

government firmly believes that they are not), courts give broad discretion to agencies to develop

procedures and methods of inquiry that are suited for particular matters, and to conduct evaluations of scientific information within its area of technical expertise.  *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978) ("administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties") (internal citations omitted); *Ethyl Corp. v. EPA*, 541 F.2d 1, 34, 36 (D.C. Cir.) (*en banc*) (An agency's decision is presumed to be valid, and the party challenging the decision has the high burden of overcoming that presumption. Courts review scientific judgments of federal agencies "not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.").  Thus, were this case to proceed beyond the instant motion, the government would establish that the agency has acted rationally, based upon relevant factors, and within its authority, and the Court should accordingly defer to the agency's process and determinations. *Motor Vehicle Mfrs. Ass'n of the United States, Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-42 (1983).

## I.  FDA'S ADMISSIBILITY AND DETENTION DECISIONS ARE COMMITTED TO AGENCY DISCRETION AND NOT SUBJECT TO JUDICIAL REVIEW

Allied's compliant should be dismissed in its entirety because it challenges FDA determinations that are "committed to agency discretion by law," and therefore not subject to judicial review.  5 U.S.C. § 701(a)(2).  In directing FDA to refuse the admission of imported products that "appear" to be adulterated or misbranded based on an examination of samples "or otherwise," 21 U.S.C. § 381(a), Congress committed such decisions to the agency's complete discretion and designated those decisions as unreviewable.  Nor may Allied challenge the manner

in which FDA goes about making admissibility decisions.  As discussed below, FDA has broad

discretion to allocate its resources as it deems appropriate, including deciding what entries to

examine or not examine, which entries to detain because they appear likely to be subject to

refusal of admission, and what evidence to require or information to consider in determining

whether to admit or deny any particular entry.  Allied's request for an injunction against FDA's

"enforcement" of IA 16-131 (*i.e.*, detaining Chinese aquaculture without physical examination)

fares no better.  Indeed, the law is well-settled that the district courts lack jurisdiction to enjoin

enforcement proceedings brought pursuant to the FDCA.  *Ewing v. Mytinger & Casselberry, Inc.*,

339 U.S. 594 (1950).

> A.    **Allied's Complaint Is Not Actionable Because FDA's Detention and
> Admissibility Decisions, the Issuance of the Import Alert, and the
> Determination of Whether the Criteria for Removal from DWPE are Met,
> Are Committed to Agency Discretion**

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701(a)(2), precludes judicial

review when "the statute is drawn so that a court would have no meaningful standard against

which to judge the agency's exercise of discretion.  In such a case, the statute ('law') can be

taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Heckler v.*

*Chaney*, 470 U.S. 821, 830 (1985).  The Supreme Court has applied section 701(a)(2) "to

preclude judicial review of certain categories of administrative decisions that courts traditionally

have regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)

(citations and quotation marks omitted).[9]  The non-reviewability of such decisions is not simply a

---

[9]  Courts have applied section 701(a)(2) to a variety of agency decisions.  *See, e.g.*, *Lincoln*, 508 U.S. at 191-93 (decision to discontinue allotment of program funds); *Webster v. Doe*, 486 U.S. at 599-601 (decisions regarding employee termination); *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 280 (1987) (agency refusal to reconsider its decision); *Baltimore Gas and Elec. Co.*, 252 F.3d at 458 (decision to settle enforcement action); *National Federation of Federal Employees*, 905 F.2d at 405-06 (decision to close military bases); *Coker v. Sullivan*, 902 F.2d 84, 88-89 (D.C. Cir. 1990) (monitoring and taking enforcement action against state programs);

question of deference – it is jurisdictional. *Baltimore Gas and Elec. Co. v. FERC*, 252 F.3d 456, 458 (D.C. Cir. 2001).

When review is precluded under section 701(a)(2), there is no review at all, even for an abuse of discretion: "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for abuse of discretion." *Chaney*, 470 U.S. at 830. *See also Webster v. Doe*, 486 U.S. 592, 600 (1988) ("complete discretion" of the agency where statute provides "no substantive standards on which a court could base its review"); *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002) ("§ 701(a)(2) encodes the principle that an agency cannot abuse its discretion, and thus violate § 706(2)(A), where its governing statute confers such broad discretion as to essentially rule out the possibility of abuse.").

Where the statute does not provide firm substantive standards, the agency instead makes policy decisions relying on its specialized knowledge and expertise and by balancing numerous considerations. As the *Chaney* Court explained: "[The] agency decision . . . involve[d] a complicated balancing of a number of factors which are peculiarly within its expertise . . . . The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." 470 U.S. at 831-32. *See also Nat'l Fed'n of Fed. Employees v. United States*, 905 F.2d 400, 405-06 (D.C. Cir. 1990) (issues related to capacity and military policy should be left to experts in the agency); *Coker*, 902 F.2d at 88-89 (agency decision required balancing of resources and priorities); *Schering Corp. v. Heckler*, 779 F.2d 683, 687 (D.C. Cir. 1985) (the "balancing of agency priorities and objectives, informed by judgments

---

*Dina v. Attorney Gen.*, 793 F.2d 473, 475 (2d Cir. 1986) (decision regarding waiver of residency requirement related to immigration status).

based on agency expertise, . . . absent some law to apply, should not be second-guessed by a court").

Here, as in *Chaney*, the FDA actions Allied challenges exclusively involve the exercise of agency discretion. Indeed, both the issuance of the import alert itself and the agency's detention of Allied's products pursuant thereto are discretionary actions that fall squarely within the holding of *Chaney*, and beyond the scope of judicial review.

As noted above, the FDCA vests broad authority in the Secretary of HHS to determine whether import products within FDA jurisdiction should be admitted into United States commerce, *e.g.*, 21 U.S.C. § 381(a), and the Secretary has delegated that authority to the Commissioner of Food and Drugs. FDA Staff Manual Guide 1410.10.[10] An article of food subject to the FDCA shall be refused admission if it "appears," *inter alia*, adulterated or misbranded, based on an examination of the samples "or otherwise." *See* 21 U.S.C. § 381(a). In using the terms "appear" and "otherwise," which are undefined, Congress delegated discretionary authority to the agency to use its expertise and judgment to assess imports and determine their admissibility, without judicial review. Congress made this intent clear more than 100 years ago, when the statute was first enacted: "[U]nder this provision, the Secretary . . . has power to decide whether a cargo of goods imported from a foreign country is adulterated or misbranded, . . . *his decision is final*, and the goods must be destroyed or exported and returned *without* further investigation or power of *review*." *See* 40 Cong. Rec. 9002-9003 (daily ed. June 12, 1906) (statement of Rep. Crumpacker) (emphasis added).

As the court explained sixty years later in *Sugarman v. Forbragd*:

---

[10] The authority to make admissibility decisions has been redelegated to the Regional Food and Drug Directors and District Directors. FDA Staff Manual Guide 1410.801, para. A.2.

> [T]he mere *appearance of adulteration* is enough to compel refusal to admit. There is no requirement that the food actually be adulterated or that the Secretary find, as a fact, that the food is adulterated. Nor is the Secretary directed to rely upon testimony offered at the hearing. On the contrary, his conclusion that the food "appears" to be adulterated may derive "*from the examination of such samples or otherwise.*" There is no provision for judicial review. Clearly, this is an instance where "agency action is committed to agency discretion by law."
>
> *    *    *
>
> Congress intended that the Secretary, or the employees to whom his authority is delegated, should make the final determination whether a food offered for import *appears* to be adulterated - without judicial review.

267 F. Supp. 817, 824-26 (N.D. Cal. 1967) (emphasis in original), *aff'd*, 405 F.2d 1189 (9th Cir. 1968), *cert. denied*, 395 U.S. 960 (1969). *See also Cont'l Seafoods, Inc. v. Schweiker*, 674 F.2d 38, 42-43 (D.C. Cir. 1982) (noting "FDA's broad authority to prohibit import of any food that 'appears' to be adulterated"); *K & K Merch. Group v. Shalala*, 1996 U.S. Dist. LEXIS 4880, 22-23 (S.D.N.Y. 1996) (noting "the wide discretionary power FDA enjoys to determine the factors regarding its decision to grant or refuse admission of imported goods"); *Meserey v. United States*, 447 F. Supp. 548, 555 (D. Nev. 1977) (an FDA order excluding material from import under the appearance standard is committed to FDA's discretion).[11]

This broad standard reflects Congress' recognition of the critical importance of protecting the nation's food supply and the inherently limited information available to the agency on foreign producers and products. Further, given the current vast disparity between FDA's relatively modest resources and the huge volume of imported products within its jurisdiction, FDA could

---

[11] In contrast, in *Ganadera Indus., S.A. v. Block*, the D.C. Circuit rejected the argument that decisions of the Department of Agriculture to restrict imports of beef were committed to agency discretion and were therefore unreviewable. 727 F.2d 1156, 1159 (D.C. Cir. 1984). Significantly, however, the statute in question had a judicially reviewable standard: imports of meat were not permitted where the meat was adulterated or misbranded. *Id*. There was no "appearance" or "otherwise" language or standard in the applicable provisions. Indeed, the statutory standard governing meat imports is equivalent to the FDA standard for domestic seizures. *See* 21 U.S.C. § 334. The government does not dispute that FDA seizure actions under section 334 are subject to judicial review.

20

not effectively monitor and control the influx of foreign foods into domestic commerce if the agency were required to prove an actual violation of the FDCA, subject to judicial review, every time it sought to refuse admission to an article offered for import.  By granting the agency authority to refuse admission to any product that "appears" adulterated based on actual inspection or "otherwise," Congress enabled the agency to exercise its discretion in a broad and flexible manner, thereby promoting the most efficient and effective use of the agency's limited resources and information.

At the same time, Congress shielded FDA's admissibility determinations, and the steps leading up thereto, from judicial review.  *See* 21 U.S.C. § 381(a); 40 Cong. Rec. at 9003; *Sugarman*, 405 F.2d at 1190.  Indeed, Congress' use of such a broad standard for admissibility – whether an item appears in any way to be noncompliant – provides no meaningful standard by which a court *could* review FDA's actions.  *See Chaney*, 470 U.S. at 830; *Sugarman*, 405 F.2d at 1190.  Where, as here, the statute affords no judicial review of FDA's ultimate determination to *refuse* admission of an entry offered for import, it goes without saying that Allied cannot challenge FDA's decision to *detain* products without physical examination while FDA determines whether or not to allow their admission into domestic commerce.  FDA's interim decisions regarding the allocation of its resources – including what entries to examine or detain, what evidence to require, and what information to consider in determining whether to admit or deny any entry offered for import – are, like the admissibility decision itself, "committed to agency discretion by law," and thus judicially unreviewable.  5 U.S.C. § 701(a)(2).  Accordingly, the entire complaint is barred by section 701(a)(2) of the APA and must be dismissed.

**B.     This Court Lacks Jurisdiction to Enjoin FDA Detention and Import Refusal Decisions**

Allied's request to enjoin FDA from enforcing IA 16-131 is also unavailing because it is tantamount to an attempt to preemptively enjoin FDA's enforcement of the FDCA.  Indeed, IA 16-131 does not impose any new obligations or requirements beyond the existing statutory requirements on foreign producers or importers, or on FDA personnel.  Whether or not any particular import alert is in effect, a foreign producer may not legally import adulterated food into the United States, and FDA is obliged to refuse admission to any product that "appears" to be adulterated or otherwise violative of the FDCA.  21 U.S.C. § 381(a).  IA 16-131 thus does not alter the legal regime in any way.  Any FDA district office could detain on an individual basis any entry that Allied might offer for import, or, indeed, all aquacultured seafood entries originating in China – irrespective of the existence of IA 16-131 or any other import alert.[12]  And it is this detention of its products to which Allied truly objects and which Allied seeks to enjoin.

Thus, Allied's underlying concern in this case is not that IA 16-131 was issued without notice and comment rulemaking or that it is being inconsistently implemented, but that, as a result of IA 16-131, its products are more likely to be detained pending proof of FDCA compliance.  In this sense, Allied's request to enjoin "enforcement" of IA 16-131 is, in reality, an attempt to preemptively enjoin the exercise of FDA's enforcement discretion.  It has long been established, however, that courts lack jurisdiction to enjoin FDA from initiating enforcement proceedings under the FDCA.  *See Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950).

---

[12]  Given FDA's unquestioned the authority to detain imported products on an individual basis, the agency likewise has discretion to implement its enforcement authority with greater efficiency through the use of DWPE.  *See Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1031-32 (D.C. Cir. 2007) ("EPA could have pursued enforcement actions against each individual [company], but determined that a broader strategy would lead to quicker industry-wide compliance.  These judgments -- arising from considerations of resource allocation, agency priorities, and costs of alternatives -- are well within the agency's expertise and discretion.") (citations omitted).

*Ewing* involved FDA's execution of eleven seizures of a "food supplement" on grounds that it was misbranded under the FDCA because its labeling was misleading with respect to potential injuries from the product.  *Id.* at 596-97.  Alleging that the multiple seizure provision of the FDCA violated the Due Process Clause of the Fifth Amendment, the claimant sought and obtained an injunction from the district court enjoining FDA "from instituting or maintaining any action or proceeding raising issues of fact or law that Nutrilite Food Supplement is misbranded under the [FDCA] . . . ."  *Mytinger & Casselberry, Inc. v. Ewing*, 87 F. Supp. 650, 661 (D.D.C. 1949).  On direct appeal, the Supreme Court held that district courts do not have jurisdiction to review an FDA determination that there is probable cause to believe that a product violates the FDCA because Congress, in enacting the FDCA, did not intend to permit pre-enforcement judicial review:

> Judicial review of this preliminary phase of the administrative procedure does not fit the statutory scheme nor serve the policy of the [FDCA].  Congress made numerous administrative determinations under the Act reviewable by the courts. But it did not place the finding of probable cause under [21 U.S.C. § 334] in that category.  This highly selective manner in which Congress has provided for judicial review reinforces the inference that the only review of the issue of probable cause which Congress granted was the one provided in the libel [seizure and condemnation] suit.

*Ewing*, 339 U.S. at 600-01 (footnote omitted).  Furthermore, the speedy protection afforded the public by civil seizure actions would be impaired if district courts could intercede and enjoin FDA officials from initiating enforcement proceedings.  *Id.* at 601.

The Supreme Court reaffirmed the *Ewing* principle in *Abbott Labs. v. Gardner*, 387 U.S. 136 (1967), calling the *Ewing* decision "quite clearly correct."  *Id.* at 147.  As the Court observed, "[t]he drug manufacturer in *Ewing* was quite obviously seeking an unheard-of form of relief which, if allowed, would have permitted interference in the early stages of an

23

administrative determination as to specific facts, and would have prevented the regular operation of the seizure procedures established by the [FDCA]." *Id.* at 148.

The rule of *Ewing* has also been "consistently and strictly observed" by the lower courts, which have interpreted the decision to "preclude[] judicial interference with the FDA's decision to institute enforcement actions, *whatever the precise context*." *United States v. Alcon Labs.*, 636 F.2d 876, 881-82 (1st Cir. 1981) (emphasis added). In *Southeastern Minerals, Inc. v. Harris*, for instance, the Fifth Circuit held that the jurisdictional prohibition of *Ewing* "expresses a total and complete proscription on the district court's power both to undertake a pre-enforcement review of the FDA's determination of probable cause and to enjoin federal officials from acting upon that determination *by seizing products or initiating enforcement proceedings* under the Act." 622 F.2d 758, 764 n.10 (5th Cir. 1980) (emphasis added); *see also Premo Pharm. Labs., Inc. v. United States*, 629 F.2d 795, 801 (2d Cir. 1980) (stating that it is "well settled" that federal courts "lack jurisdiction to enjoin seizure actions instituted by the FDA"); *Genendo Pharm. v. Thompson*, 308 F. Supp. 2d 881, 882-83 (N.D. Ill. 2003) (dismissing for lack of jurisdiction a case seeking to enjoin FDA from continuing to seize drugs).

Although *Ewing* arose in the context of domestic seizure actions under 21 U.S.C. § 334, it applies with equal force to FDA's detention of imports because Congress likewise did not provide for judicial review of FDA's initial decision to initiate refusal of admission proceedings.[13] Indeed, a decision to detain a product offered for import is even more preliminary

---

[13] The *Ewing* Court noted that a claimant would eventually have the opportunity to litigate any constitutional, statutory, or factual claims in the of the seizure action itself, thereby satisfying procedural due process. *See Ewing*, 339 U.S. at 598-99. In the import detention and refusal context, however, the government does not actually seize the goods but merely denies them access to United States commerce. As explained more fully below, a foreign producer does not have any due process right to have its goods enter domestic commerce. *See infra*, at IV.

than a seizure, in that detention simply indicates FDA's tentative view that the detained article

may be refused admission and allows an opportunity for an administrative hearing.  In accord

with *Ewing* and its progeny, this Court has no jurisdiction to make a determination that, as a

matter of law, FDA cannot issue a detention notice and thereby initiate refusal proceedings under

the FDCA against imported Chinese aquaculture.  Accordingly, for this reason as well, Allied's

complaint must be dismissed.

## II.    ALLIED'S COMPLAINT IS NOT JUSTICIABLE UNDER DOCTRINES OF RIPENESS, FINALITY AND EXHAUSTION

Allied's complaint is also subject to dismissal because it is premature under the doctrines

of ripeness, finality, and exhaustion of administrative remedies.  The three doctrines overlap and

are all designed to limit challenges to agency action in federal court before the agency has fully

decided issues of administrative law and policy.  *Ass'n of Flight Attendants-CWA, AFL-CIO v.*

*Chao*, 493 F.3d 155, 160 (D.C. Cir. 2007); *Ayuda, Inc. v. Thornburgh*, 948 F.2d 742, 754 (D.C.

Cir. 1991), *vacated on other grounds*, 509 U.S. 916 (1993).  As noted above, the import alert at

issue in this case relates to the initial detention of an imported product and not its ultimate

admissibility into United States commerce; thus, it has only a tentative and interlocutory effect

and is in no sense "final agency action" with respect to the admissibility of any particular product

or type of product offered for import.[14]  Moreover, the agency is still in the process of evaluating

the information submitted in support of Allied's request to be removed from DWPE under IA 16-

131.  Accordingly, the doctrines of ripeness and finality preclude judicial review of Allied's

claims at this time.  Allied's claims are also premature under the exhaustion of administrative

---

[14]  Indeed, to the extent Allied's claims concern the admissibility of any specific products offered for import, all of the entries under consideration at the time Allied's complaint was filed have been resolved in Allied's favor, rendering those aspects of the complaint moot.

remedies doctrine because FDA regulations require the filing of a citizen petition before bringing a challenge to federal court.  21 C.F.R. § 10.45(b).  This lawsuit is therefore premature under all three of these doctrines and must be dismissed for lack of subject matter jurisdiction.

### A.    Allied's Challenge is Not Ripe for Adjudication, and There has Been No Final Agency Action on Allied's Request for Removal from DWPE

Both Article III of the U.S. Constitution and the APA, 5 U.S.C. § 704, require that the agency complete its decision-making process before a plaintiff seeks judicial review.[15]  The doctrine of ripeness is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-149 (1967)).

The ripeness doctrine precludes premature adjudication of issues that might not require judicial review:  "[a] claim is not ripe for adjudication if its rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Pfizer v. Shalala*, 182 F.3d 975, 978 (D.C. Cir. 1999) (citing *Texas v. United States*, 523 U.S. 296, 300 (1998)).  As the D.C. Circuit candidly elaborated:

> [T]he "usually unspoken element of the rationale" is this: "If we do not decide [the claim] now, we may never need to. Not only does this rationale protect the expenditure of judicial resources, but it comports with our theoretical role as the

---

[15]  The ripeness doctrine is based on Article III of the Constitution.  *See Devia v. NRC,* 492 F.3d 421, 424 (D.C. Cir. 2007) ("The Supreme Court has noted that '[r]ipeness is a justiciability doctrine' that is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'") (quoting *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807-08).  The APA likewise authorizes judicial review only with respect to "final agency action."  5 U.S.C. § 704.  The requirement of final agency action is both part of the Article III ripeness inquiry, as discussed below, as well as an independent basis for dismissal under the APA.

governmental branch of last resort. Article III courts should not make decisions unless they have to." *Nat'l Treasury Emples. Union*, 101 F.3d at 1431 (citation omitted) . . . Federal courts cannot – and should not – spend their scarce resources on what amounts to shadow boxing. Thus, if a plaintiff's claim, though predominantly legal in character, depends on future events that may never come to pass, or that may not occur in the form forecasted, then the claim is unripe. *McInnis-Misenor*, 319 F.3d at 72 (internal quotation marks omitted); *see W.R. Grace & Co. v. EPA*, 959 F.2d 360, 366 (1st Cir. 1992) ("[P]remature review not only can involve judges in deciding issues in a context not sufficiently concrete to allow for focus and intelligent analysis, but it also can involve them in deciding issues unnecessarily, wasting time and effort.").

*Devia,* 492 F.3d at 424-25.  The D.C. Circuit's cautionary explanation is particularly apt in this case, where Allied's request for removal from DWPE was made only in September 2007 and remains pending before FDA, and the specific product admissibility determinations pending at the time Allied filed its complaint have since been resolved in Allied's favor.  Should Allied's request for removal from DWPE be granted, it would no longer have a motivational, much less a jurisdictional, basis for pursuing this lawsuit.  Thus, the rationale underlying the ripeness doctrine provides a particularly compelling argument for dismissal in this case.

Ripeness turns upon two primary considerations: (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration."  *Abbott Laboratories*, 387 U.S. at 149; *accord Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 162 (1967); *see also Nevada v. DOE*, 457 F.3d 78, 84 (D.C. Cir. 2006) (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

1.    **Allied's Challenge is Not Fit for Judicial Review Because It Does Not Raise Purely Legal Questions and There is No Final Agency Action**

Whether Allied's claims are fit for judicial resolution turns upon (a) whether the claims raise purely legal questions, and (b) whether the decisions Allied wishes to challenge constitute final agency action.  *Toilet Goods Ass'n*, 387 U.S. at 163-64; *Abbott Laboratories*, 387 U.S. at

27

149.  In this case, Allied's complaint purports to challenge both the facial validity of IA 16-131

and its specific application to Allied's products.  As discussed below, however, neither Allied's

"facial" attack nor its "as applied" claims are currently ripe for judicial review.

First, Allied's "as applied" claims do not raise purely legal questions, but are essentially

challenges to FDA's manner of implementing of IA 16-131.  For example, in Count Two, Allied

alleges that FDA fails to adequately oversee third party laboratories and its own compliance

officers.  Compl. ¶¶ 76-82.  In Count Four, Allied alleges that FDA has implemented a "One

Test-One Report" policy, under which FDA allegedly accepts only one laboratory report per

import entry.  Compl. ¶¶ 91-96.  By their very nature, these claims cannot be evaluated in a

vacuum without factual context.  Here, however, the admissibility of entry lines for products

produced by Allied referred to in the complaint have now been resolved in Allied's favor and are

thus moot.  Thus, there is no concrete, factual context to enable the Court to conduct an

appropriate review.[16]

Furthermore, whether, when, and how FDA determines it should remove Allied from

DWPE, and whether the existing data provide the agency with adequate assurance of the safety

of Allied's processes and procedures, are not purely legal issues that can be resolved by the Court

at this stage of proceedings, but instead are fact-intensive inquiries that must be resolved by the

agency in the first instance.  *See, e.g., Neb. HHS v. HHS*, 435 F.3d 326, 331 (D.C. Cir. 2006)

(holding that where an agency decision requires the exercise of expertise and discretion, the court

---

[16]  The record of administrative proceedings with respect to the entries discussed in the complaint demonstrate that Allied's claims are, in any event, ill-founded:  FDA conducted detailed analyses of initial reports indicating the presence of illegal drug/food additive residues relating to products produced by Allied, including review of more than one third-party laboratory report for particular shipments, and considered such matters as the methodologies used, possibilities of false positive from contaminants, and improper tabulation.  Thus, the factual record belies Allied's allegations that FDA has relied on "rogue laboratories us[ing] intrepid methods," capricious compliance officers, or a "One Test-One Report" rule.  *See* Compl. ¶¶ 79-81, 95-96.

reviews the agency's final determinations as an appellate court based on the record before the agency at the time the final decision is made).

Second, there has been no adverse final agency action. Final agency action "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). FDA's detention decisions are tentative and interlocutory. *See* 21 C.F.R. 1.94. After a product has been detained, the owner/consignee has the opportunity to overcome FDA's initial views regarding the appearance of a violation by submitting, for example, third-party laboratory results verifying that the lot at issue does not contain violative residues. It is only after these proceedings conclude that the agency issues a final decision either admitting or refusing to admit a product into United States commerce. FDA did not refuse *any* of the lines discussed in Allied's complaint. Nor has FDA yet reached a decision on Allied's DWPE removal request. Thus, there is no adverse final agency action related to any of Allied's "as applied" challenges.

Allied's facial challenge to IA 16-131 is likewise unfit for judicial resolution at this juncture and thus unripe. In similar circumstances, the D.C. Circuit has held facial attacks unripe under the fitness for resolution prong due to the lack of factual context necessary to evaluate such challenges. As the court recently explained:

> "[W]here we believed the agency's practical application of a statement would be important, we have found the issue not" fit for judicial determination. *Public Citizen, Inc. v. Nuclear Regulatory Comm'n*, 291 U.S. App. D.C. 248, 940 F.2d 679, 683 (D.C. Cir. 1991). . . . *See GMC v. EPA*, 361 U.S. App. D.C. 6, 363 F.3d 442, 451 (D.C. Cir. 2004) (holding that, "to the extent [the] petition challenges the

> application of EPA's regulatory interpretation to [petitioner's] plants, the
> challenge is unripe"); *Hudson v. FAA*, 338 U.S. App. D.C. 194, 192 F.3d 1031,
> 1034-35 (D.C. Cir. 1999) ("[W]e have often held that an early procedural
> challenge to a purported policy statement [on the ground that it is actually a
> legislative rule] is not ripe because it is not yet demonstrable that the agency
> intends to treat it as having the characteristics of a rule.").

*Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207, 216 & n.5 (D.C. Cir. 2007). *See also*

*Devia*, 492 F.3d at 424 ("when an agency decision may never have 'its effects felt in a concrete

way by the challenging parties,' *Abbott Labs.*, 387 U.S. at 148-49, the prospect of entangling

ourselves in a challenge to such a decision is an element of the fitness determination as well").

Here too, FDA's "practical application" of IA 16-131 would inform the Court's analysis

and provide critical context to an evaluation of the import alert's legal status. Indeed, given the

clearly non-mandatory, discretionary language of IA 16-131, Allied would be hard pressed to

prove its claim that the alert is actually a legislative rule without producing evidence

demonstrating that the agency has, in practice, treated the alert's terms as binding and mandatory.

*See Hudson v. FAA*, 192 F.3d 1031, 1034 (D.C. Cir. 1999) (policy statement typically "will only

reveal itself as something more than a policy statement when the agency subsequently relies on it

as if it were binding *law*") (emphasis in original). As discussed below (*see infra* at III), one of

the key distinctions between a substantive rule and a policy statement is whether the

decisionmaker retains some discretion in making the ultimate decision, or whether the agency

pronouncement "binds private parties or the agency itself with the force of law." *Cement Kiln*

*Recycling Coalition*, 493 F.3d at 215-16 (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382

(D.C. Cir. 2002)). Absent evidence of FDA's actual implementation of IA 16-131, including, at

a minimum, the completion of FDA's decision-making process with respect to Allied's DWPE,

evaluation of Allied's claim that the alert is a substantive rule that required notice and comment

rulemaking is manifestly premature.[17]

Because the agency's communications with Allied to date regarding its DWPE removal request do not represent the consummation of the agency's process (which is still ongoing), did not finally determine any legal rights or obligations, and did not affect relevant actors' legal rights, those activities and communications do not constitute final agency action that is ripe for review.

### 2.    Withholding Judicial Review Will Not Cause Hardship to Allied

Allied also has not established that it will be substantially harmed by allowing the agency's administrative process to continue – the second element of the ripeness test. "In order to outweigh institutional interests in the deferral of review, the hardship to those affected by the agency's action must be immediate and significant." *Devia,* 492 F.3d at 427-28 (citation omitted).

Any hardship to Allied from withholding judicial review in this case would arise solely from the wait necessitated by FDA's further review of information supporting Allied's DWPE request. But this precise situation is presented by FDA review of *any* request for removal from DWPE under an import alert (as well as many other applications and requests that require FDA consideration). There will always be a time delay while FDA reviews necessary data and information, particularly when it needs to rely on third party evaluations about a foreign company. That time-lag is an unavoidable part of the administrative review process and does not, by itself, constitute substantial hardship. *See Nevada*, 457 F.3d at 86 ("[R]equiring a party to participate in further administrative or judicial proceedings is not a hardship sufficient to

---

[17] Further, given the concerns of judicial economy and efficiency that underlie the ripeness and finality doctrines, *see Devia*, 492 F.3d at 424-25, it would make little sense to consider Allied's "facial" challenges (Count One (APA) and Count Five (WTO)) while so many other aspects of this case remain under administrative review.

outweigh a determination that an issue is unfit for review.") (quoting *Nuclear Energy Inst.*, 373 F.3d at 1313).

Here, at the very most, the challenged policy "limit[s] access to a benefit created by the [statute] but not automatically bestowed" upon foreign producers. *See Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 (1993).[18] Indeed, the import alert has not itself caused any "irremediabl[y] adverse consequences." *Id*. Instead, FDA retains the statutorily delegated "task of determining on a case-by-case basis" whether each shipment offered for import that has been produced by Allied or any other Chinese producer qualifies for admission to this country. *Id*. at 59. Where, as here, the administrative delay necessitated by the agency's process presumably causes only a financial burden, the issuance of the import alert is not itself a proper subject for judicial review unless and until it affects Allied in a "more acute fashion." *Id*. at 58.[19]

For these reasons, Allied's claims are unripe and therefore not justiciable under Article III of the Constitution. Its complaint, accordingly, must be dismissed.

### B.      Allied Has Failed to Exhaust Administrative Remedies

Allied's complaint is also subject to dismissal for failure to exhaust administrative remedies. Indeed, Allied has made no attempt to avail itself of, much less exhaust, the administrative remedy available to it under FDA regulations: filing a citizen petition with FDA pursuant to 21 C.F.R. § 10.25. Under FDA regulations, a party must first use the citizen petition process to "request that the Commissioner take or refrain from taking any form of administrative

---

[18] As noted above, only the owner/consignee, not a foreign producer such as Allied, can receive the benefit created by statute.

[19] Allied's complaint alludes to damages that would allegedly occur should FDA ultimately refuse entry of its shrimp products, *see* Compl. ¶¶ 71-72, but does not specify in other than conclusory legal terms any alleged harm from the detention of such products pending FDA's admissibility determinations. *See id.* ¶ 75.

action," and that request must "be the subject of a final administrative decision based on [the citizen petition] . . . before any legal action is filed in a court."  21 C.F.R. § 10.45(b).

"The [exhaustion of administrative remedies] doctrine provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'"  *McKart v. United States*, 395 U.S. 185, 193 (1969) (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938)).  The purpose of the exhaustion requirement is to "avoid[] [the] premature interruption of the administrative process . . . to let the agency develop the necessary factual background upon which decisions should be based, [a]nd since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise."  *McKart*, 395 U.S. at 193-94; *Burt Lake Band of Ottawa & Chippewa Indians v. Norton*, 217 F. Supp. 2d 76, 78 (D.D.C. 2002) ("In cases where Congress has allocated decision-making responsibility to the Executive branch, petitioning parties are required to exhaust all available administrative remedies before seeking judicial relief.") (citation omitted), *appeal dismissed*, No. 02-5341, 2002 WL 31778064 (D.C. Cir. Dec. 4, 2002).  The exhaustion requirement also promotes judicial efficiency because the agency may decide the matter in favor of the plaintiff and obviate the need for judicial review.  *McKart*, 395 U.S. at 195.[20]

Here, where Allied has not even attempted to comply with the agency's citizen petition requirement, the exhaustion doctrine applies with particular force.  As the D.C. Circuit recently explained:

[E]xhaustion ensures that imminent or ongoing administrative proceedings are

---

[20]  The regulatory exhaustion requirement is not jurisdictional, and courts decline to apply it in certain circumstances.  *See McCarthy v. Madigan*, 503 U.S. 140, 144-49 (1992); *Ass'n of Flight Attendants*, 493 F.3d at 159.  None of those circumstances, however, are presented here.

seen through to completion.  But *the exhaustion rule does not contain an escape hatch for litigants who steer clear of established agency procedures altogether*. To the contrary, exhaustion is especially important where allowing the litigants to proceed in federal court would deprive the agency of any opportunity to exercise its discretion or apply its expertise.  *See McCarthy*, 503 U.S. at 145 ("exhaustion principles apply with special force when 'frequent and deliberate flouting of administrative processes' could weaken an agency's effectiveness by encouraging disregard of its procedures" (quoting *McKart*, 395 U.S. at 195)).

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Chao*, 493 F.3d 155, 158-59 (D.C. Cir. 2007) (emphasis added).

This Court has applied the exhaustion requirement contained in FDA regulations.  For example, in *Nat'l Gay Rights Advocates v. HHS*, the court dismissed the complaint as premature for failure to file a citizen petition where, as here, plaintiffs "chose[] to ignore the administrative processes available to them by making no attempt to seek relief in this manner." No. 87-1735, 1988 U.S. Dist. LEXIS 17283, at *1-7 (D.D.C. Apr. 26, 1988).  *See also Garlic v. FDA*, 783 F. Supp. 4 (D.D.C. 1992), *appeal dismissed*, 986 F.2d 546 (D.C. Cir. 1993).

Allied's failure to avail itself of available administrative remedies has prevented FDA from developing all the factual issues in the case, thus thwarting effective and efficient judicial review.  Indeed, requiring Allied to submit a citizen petition to FDA before seeking judicial review would allow FDA to consider and address Allied's concerns about the fairness and reliability of the various steps in the agency's process for determining the admissibility of Chinese aquaculture, and could potentially resolve Allied's concerns; at the very least, the citizen petition process would crystalize the issues in contention.  Because exhaustion of administrative remedies would thus promote judicial economy and aid judicial review (if any) in this case, Allied should be precluded from seeking judicial review until after it presents its claims and contentions to the agency.

34

**III.    IMPORT ALERT 16-131 IS NOT A SUBSTANTIVE RULE THAT REQUIRES
NOTICE AND COMMENT RULEMAKING UNDER THE APA**

Even if this Court had subject matter jurisdiction over this action, Count One of Allied's

complaint fails to state a claim upon which relief can be granted, and is thus subject to dismissal

on that basis as well.  Count One alleges that IA 16-131 is a substantive rule that should have

been promulgated through notice and comment rulemaking.  Compl. ¶ 74.  Allied seeks

declaratory relief that the import alert is unlawful and an injunction preventing FDA from

enforcing it.  Allied is not entitled to any such relief.

Contrary to Allied's claim, IA 16-131 is not a substantive rule such as would necessitate

notice and comment rulemaking.  Under the APA, the publication of notice and opportunity for

comment are only required for a limited subset of agency pronouncements.  Rulemaking is

required for "legislative" or "substantive" rules, but not for "interpretive rules" or "general

statements of policy."  5 U.S.C. § 553(b)(3)(A) & (d).  A rule is "legislative" only when the

"agency intends to create new law, rights, or duties."  *General Motors*, 742 F.2d at 1565.

In contrast, "interpretive rules are those that merely clarify or explain existing laws or

regulations." *Nat'l Med. Enters., Inc. v. Shalala*, 43 F.3d 691, 697 (D.C. Cir. 1995).  Similarly, a

"policy statement announces the agency's tentative intentions for the future." *Brock v. Cathedral

Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986) (quoting *Pac. Gas & Elec. v. FPC*, 506

F.2d 33, 38 (D.C. Cir. 1974)).  "By issuing a policy statement, an agency simply lets the public

know its current enforcement or adjudicatory approach.  The agency retains the discretion and the

authority to change its position – even abruptly – in any specific case." *Sycor Int'l Corp. v.

Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997).

An agency pronouncement does not become a substantive rule "merely because it

supplies crisper and more detailed lines than the authority being interpreted." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d at 1106, 1112 (D.C. Cir. 1993).  The pronouncement even may have a "substantive impact" on the parties being regulated without becoming a substantive rule.  *Cathedral Bluffs Shale Oil Co.*, 796 F.2d at 537 (quoting *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666, 668 (D.C. Cir. 1978)).  Instead, the key distinction turns on whether the decisionmaker retains some discretion in making the ultimate decision, *id.*; or "whether the agency action binds private parties or the agency itself with the force of law."  *Cement Kiln Recycling Coalition*, 493 F.3d at 215-16 (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002)).

 In drawing this distinction, the D.C. Circuit has described certain factors that may be considered.  In *Am. Mining Cong.*, the court identified four criteria that indicate a rule is legislative (none of which are present in this case):  (1) in the absence of the rule, no legislative basis would exist for an enforcement action; (2) the agency has published the rule in the Code of Federal Regulations ("C.F.R."); (3) the agency explicitly invoked its general legislative authority to pass the rule; (4) the rule effectively amends a prior legislative rule.  995 F.2d at 1112.[21]

Here, regardless of whether IA 16-131 is characterized as an interpretive rule, a policy statement, or not a "rule" at all, IA 16-131 is certainly not a *substantive* rule.  The import alert is a mechanism for FDA headquarters to communicate information and policy to FDA field personnel and the regulated industry.  Here, FDA headquarters gathered and analyzed data that showed a significant problem of drug/food additive residues in Chinese aquaculture and it shared

---

[21]  Similarly, in *Cement Kiln Recycling Coalition*, the court described the factors (albeit in the context of the Resource Conservation and Recovery Act) as "(1) the Agency's own characterization of the action; (2) whether the action was published in the Federal Register or Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency."  493 F.3d at 226-27.

such information with the field through the import alert.  The import alert also set forth

information regarding particular products that may be DWPE, the data that might be sufficient to

convince FDA that a particular line should be admitted, and the data that should be submitted

with a request for removal from DWPE.

This communication and its contents do not constitute a substantive rule.  FDA retains the

discretion to assess each situation individually and the flexibility to further develop its policies as

the circumstances evolve.  Indeed, plaintiff itself alleges that IA 16-131 is implemented

inconsistently.  *See* Compl ¶ 81.  Certainly nothing in the FDCA or APA places any limit

whatever on FDA's ability to communicate with its employees who are making admissibility

determinations under the FDCA.  Also, as the D.C. Circuit has recognized, written guidelines

that describe how the agency intends to exercise its discretion, and that are not issued pursuant to

notice and comment rulemaking, "have the not inconsiderable benefits of apprising the regulated

community of the agency's intentions as well as informing the exercise of discretion by agents

and officers in the field."  *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987).

As noted, none of the indicia of rulemaking identified in *Am. Mining Cong.*, 995 F.2d at

1112, apply to IA 16-131:  in its absence, FDA has the same authority granted by the FDCA to

detain imported goods; the import alert was not published in the C.F.R.; FDA did not invoke its

legislative authority; and the rule did not amend a prior legislative rule.  Nor does IA 16-131

have a "binding effect" on private parties or the agency.  *See Cement Kiln Recycling Coalition*,

493 F.3d at 226-27.  To the contrary, IA 16-131 relates to detention, and not to the final

admission or refusal of a product into United States commerce, it has only a "tentative effect."

*See Pacific Gas & Elec.*, 506 F.2d at 38-39; *Professionals and Patients for Customized Care v.*

*Shalala*, 56 F.3d 592, 596 (5th Cir. 1995).  If a product is detained based on the information in

IA 16-131, the importer has the opportunity to overcome any presumption of the appearance of a violation by submitting, for example, third-party laboratory results verifying that the detained lot does not contain violative residues.

Courts have found that, where a pronouncement sets forth a rebuttable presumption that may be challenged in individual proceedings, it is not a binding rule. *Panhandle Producers v. Econ. Reg. Admin.*, 847 F.2d 1168, 1174-75 (5th Cir. 1988 ); *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377-78 (11th Cir. 1983). Moreover, if FDA ultimately decides to refuse admission to a particular product, the decision can be appealed administratively within the agency. *See* 21 C.F.R. §§ 10.33, 10.75; RPM Chap. 9-9. Thus, IA 16-131 does not create binding law because it is not "finally determinative" of whether a particular importation will be admitted or released into United States commerce. *See Pacific Gas & Elec.*, 506 F.2d at 38; *see also Am. Mining Cong. v. Marshall*, 671 F.2d 1251, 1263 (10th Cir. 1982) (because affected parties will still have opportunity to challenge ultimate determination, the pronouncement "does not finally affect [their] rights and obligations").

IA 16-131 also does not impose any new obligations or requirements beyond the existing statutory requirements on foreign producers or importers, or on FDA personnel. Importers remain subject to the exact same statutory obligation – that they refrain from importing adulterated food into the United States. And FDA continues to exercise the same authority – to refuse admission to any product that "appears" to be adulterated or otherwise violative of the FDCA. 21 U.S.C. § 381(a). Nothing in the import alert "cabin[s]" the agency's discretion to determine whether to admit or refuse any aquaculture product. *See Cmty. Nutrition Inst.*, 818 F.2d at 948 ("cabining of an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule"). Although the import alert provides crisper details regarding the

38

possible treatment, at the detention stage, of Chinese aquaculture products, FDA nevertheless

relies on the same statutory standard to reach its ultimate admissibility determination.

Indeed, it is clear from even a cursory examination of the actual language of IA 16-131

that the alert is – and is meant to be – nothing more than an expression of a non-binding  policy

on import compliance activities.  The import alert provides:

> GUIDANCE:  Districts may detain without physical examination, all shipments of
> aquacultured catfish, Basa (Pangasius sp), shrimp, dace, and eel
> from the People's Republic of China (CN) . . .

The use of the words "Guidance" and "may" clearly demonstrates that the document is not

intended to be a binding directive.  *See Cathedral Bluffs Shale Oil Co.*, 796 F.2d at 537-38 (the

agency's characterization of the pronouncement, and the language of the statement itself, such as

the choice between the words "may" and "will," are significant in determining whether the

pronouncement is a substantive rule).

FDA's description of the process for obtaining removal from DWPE under IA 16-131

likewise embodies discretion.  The alert explains that FDA will remove a firm from DWPE if the

agency has confidence that a "manufacturer has the appropriate controls and processes in place to

ensure the quality of the product."  IA 16-131.  The alert then describes the information that FDA

believes would be the most useful in making that assessment.  These statements do not even

approach the type of mandatory requirements that characterize a substantive rule.  Rather, they

merely describe – for both industry and agency personnel – how the agency may exercise its

discretion with respect to requests for removal from DWPE.  Indeed, just as an agency's exercise

of discretion is not judicially reviewable, *see supra* at I.A., so are courts particularly reluctant to

require rulemaking regarding policy statements that relate to the exercise of such discretion.  *See*

*Cathedral Bluffs Shale Oil Co.*, 796 F.2d at 538; *Professionals and Patients for Customized*

*Care*, 56 F.3d at 600-01.  The same analysis applies to FDA's description of the data that should be submitted to secure the release of a detained shipment; IA 16-131 simply provides useful information concerning the manner in which FDA may exercise its discretion when applying the requirements of the FDCA to specific seafood products.

The discretionary, non-mandatory language of IA 16-131 distinguishes it from the FDA import alert at issue in *Bellarno Int'l Ltd. v. FDA*, 678 F. Supp. 410 (E.D.N.Y. 1988), which was held to be a binding legislative rule subject to notice and comment rulemaking.  The import alert in *Bellarno* used the words "automatically" and "shall," *id.* at 415, leading the court to find that it was a mandatory directive, not discretionary guidance, and was binding on both the agency and importers.  *Id*. at 414.  The court also cited a contemporaneous memorandum issued by the agency which provided that "[t]here should be no exceptions to strict enforcement."  *Id.* at 415. Here, by contrast, IA 16-131 employs discretionary, non-mandatory language, providing that "[d]istricts *may* detain . . . " and importers "*should* provide . . . ."  Indeed, as noted above, Allied itself acknowledges that IA 16-131 has not been implemented uniformly by FDA field personnel, thus confirming its non-mandatory nature.  *See* Compl ¶ 81.

The import alert in *Bellarno* also contained requirements for overcoming detention that went beyond satisfaction of the statutory standard, such as establishing a "complete chain of custody" and a "satisfactory reason for return of the goods."  *Id.* at 411-12.  When the plaintiff was unable to produce the complete chain of custody, FDA was unwilling to consider alternative evidence, such as testing to confirm the products' safety and purity.  *Id*. at 412.  The *Bellarno* court thus found that the agency had created a new obligation (*i.e.*, acquiring and maintaining a paper chain of custody) with which importers had to comply to satisfy the statutory requirements. 678 F. Supp. at 414 & n.4.  IA 16-131, by contrast, recommends, but does not require, that an

importer may seek to overcome the appearance of a violation by submitting samples that confirm the absence of certain frequently found contaminants, thereby demonstrating that the lot is not adulterated. Thus, IA 16-131 imposes no obligation beyond that which the statute already imposes on the importer – to refrain from importing adulterated foods. Therefore, the specific facts in *Bellarno* prevent any useful comparison between the two cases.

For all of the reasons set forth above, IA 16-131 is not a legislative rule that required notice and comment rulemaking under the APA. Accordingly, Count One of Allied's complaint fails to state a claim as a matter of law and should be dismissed.

## IV.    ALLIED CANNOT CHALLENGE THE IMPORT ALERT AS A VIOLATION OF DUE PROCESS

Count Four of Allied's complaint is inconsistently plead. Allied claims that certain procedures that FDA allegedly employs to determine the admissibility of food products violate the Due Process Clause of the Fifth Amendment to the United States Constitution. Compl. ¶¶ 91-92, 95-97. However, in terms of relief, Allied seeks a wholesale invalidation of IA 16-131 (Compl. Count Four Wherefore Clause) even though the alleged policies and procedures of which Allied complains (*see* Compl. ¶¶ 95-97) are not contained in IA 16-131. Thus, on the one hand, if Allied intends to challenge certain, specific methods for gathering data that are not discussed in IA 16-131, it does not follow that the appropriate relief would be invalidation of IA 16-131. On the other hand, if Allied intends to allege that DWPE as a whole is illegal, its allegations do not support that claim. Either way, however, Allied's due process claim fails as a matter of law because Allied has no property right to have its products enter United States commerce.

A plaintiff's "federal constitutional claim depends on [its] having had a property

right. . . ." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). Thus, only if Allied can identify a cognizable property or liberty interest need the Court even address the question of "what process is due." *Id*. at 541 (citation omitted). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). That claim of entitlement is not derived from the Constitution itself but stems from sources such as federal law, state law, and contracts. *Id*.

It has long been established that there is no property right to import products into the United States. Congress has "complete power" over "foreign commerce." *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904). No individual has a "vested right" that limits this power. *Id*. *See also Bd. of Trs. v. United States*, 289 U.S. 48, 57 (1933) ("No one can be said to have a vested right to carry on foreign commerce with the United States."); *Arjay Assocs., Inc. v. Bush*, 891 F.2d 894, 896 (Fed. Cir. 1989) ("It is beyond cavil that no one has a constitutional right to conduct foreign commerce in products excluded by Congress."). Consequently, "a statute which restrains the introduction of particular goods into the United States from considerations of public policy does not violate the due process clause of the Constitution." *Buttfield*, 192 U.S. at 493; *see also Gilda Indus. v. United States*, 446 F.3d 1271, 1284 (Fed. Cir. 2006) ("It has long been settled that executive actions involving foreign trade, such as the imposition of tariffs, do not constitute the taking of property without due process of law."). Furthermore, Congress may delegate its discretion to exclude imports to federal agencies. *Buttfield*, 192 U.S. at 496.

In the instant case, Allied alleges that "[t]he detention and subsequent refusal of foodstuffs constitutes the deprivation of property." Compl. ¶ 94. Even if the government refuses to admit Allied's products into United States commerce, however, the products may be re-

exported, meaning Allied would suffer no "deprivation" beyond the costs associated with this process. In any event, the law is clear that Allied has no "right" to import and cannot mount a due process challenge to restrictions on importation. *Buttfield*, 192 U.S. at 496-97; *see also Ganadera Industrial, S.A.*, 727 F.2d at 1160 ("[the foreign producer]'s due process argument must fail because [it] has no constitutionally-protected right to import into the United States. The Supreme Court has stated: No one can be said to have a vested right to carry on foreign commerce with the United States.") (citation omitted).

Nor did Congress grant any procedural rights to foreign producers in the context of FDA import proceedings. Although the FDCA sets forth certain hearing procedures in connection with goods proposed to be imported, they are applicable only to the "owner or consignee" of the goods. 21 U.S.C. § 381(a); *see also* 21 C.F.R. § 1.94. Thus, a foreign producer, such as Allied, that is not the "owner or consignee" of the goods once they reach the United States, does not have any statutory procedural rights. Even if Allied did have such a right, however, the Court would not need to evaluate it in connection with the instant case because Allied's complaint does not cite any particular deprivation it has suffered with respect to its attempt to import a specific product. Instead, Count Four seeks a declaration that IA 16-131 violates the Constitution. This, however, is precisely the sort of broad challenge to the federal government's authority to restrict imports that has long been precluded under *Buttfield* and its progeny.

## V.    CONGRESS HAS BARRED PRIVATE PARTIES FROM CHALLENGING AGENCY ACTION BASED ON INCONSISTENCY WITH WTO POLICIES AND AGREEMENTS

Allied alleges in Count Five of its complaint that FDA enacted IA 16-131 in contravention of World Trade Organization ("WTO") procedure for the proper enactment of a non-tariff trade barrier. *See* Compl. p. 2, ¶¶ 100-108, Count Five Wherefore Clause. Although

43

there are several reasons why this claim is meritless, there is an initial hurdle that Allied cannot

overcome which is dispositive on this Count – namely, the claim is precluded by statute.

Although Allied's complaint does not specify the precise source of any WTO rulemaking

procedure FDA allegedly violated, Allied is presumably referring to The General Agreement on

Tariffs and Trade 1994 and/or The Agreement on the Application of Sanitary and Phytosanitary

Measures.  Both of these agreements are included in Congress' definition of "Uruguay Round

Agreements."  *See* 19 U.S.C. § 3501(7), § 3511(a)(1) & (d).  Critically, however, Congress has

explicitly barred private parties from challenging agency action based upon asserted

inconsistencies with the Uruguay Round Agreements:

> No person . . . may challenge, in any action brought under any provision of law, any
> action or inaction by any department, agency, or other instrumentality of the United States
> . . . on the ground that such action or inaction is inconsistent with [the Uruguay Round
> Agreements].

19 U.S.C. §  3512(c)(1)(B).  *See Norsk Hydro Can., Inc. v. United States*, 472 F.3d 1347, 1360

n.21 (Fed. Cir. 2006) ("Congress has precluded challenges to agency action on the grounds that

they are inconsistent with Uruguay Round Agreements"); *Gilda Indus.*, 446 F.3d at 1284; *In re*

*Rath*, 402 F.3d 1207, 1210-11 n.2 (Fed. Cir. 2005).

Here, Count Five of Allied's complaint attempts to do exactly what Congress prohibited –

challenge an action by FDA (namely, the issuance of IA 16-131) on the ground that the action

was inconsistent with the Uruguay Round Agreements.  Accordingly, Count Five is precluded by

statute and should be dismissed as a matter of law.

## CONCLUSION

For the foregoing reasons, Allied's complaint should be dismissed for lack of subject

matter jurisdiction and failure to state a claim upon which relief can be granted.


Of Counsel:                                         Respectfully submitted,

JAMES C. STANSEL                                    JEFFREY S. BUCHOLTZ
Acting General Counsel                              Acting Assistant Attorney General

GERALD F. MASOUDI                                   C. FREDERICK BECKNER III
Associate General Counsel                           Deputy Assistant Attorney General
Food and Drug Division
                                                    EUGENE M. THIROLF
ERIC M. BLUMBERG                                    Director
Deputy Chief Counsel, Litigation

KAREN E. SCHIFTER
Associate Chief Counsel, Litigation                 _____/s/_____
U.S. Dept. of Health & Human Services               ANDREW E. CLARK
Office of the General Counsel                        Senior Trial Counsel
5600 Fishers Lane                                   Office of Consumer Litigation
Rockville, MD  20857                                U.S. Department of Justice
(301) 827-1152                                      PO. Box 386
                                                    Washington, D.C.  20044
                                                    (202) 307-0067
January 2, 2008                                     andrew.clark@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of the foregoing Motion to Dismiss, Memorandum in Support of Defendants' Motion to Dismiss, and (proposed) Order to be served via the District Court's electronic filing (ECF) system upon:

Eric W. Bloom
WINSTON & STRAWN, LLP
1700 K Street, NW
Washington, D.C.  20006
*Counsel for Plaintiff Allied Pacific Food (Dalian) Co., Limited*

this 2nd day of January, 2008.


_____/s/_____
Andrew E. Clark

# EXHIBIT 1

IA #16-131, 8/3/07, IMPORT ALERT #16-131, "DETENTION WITHOUT PHYSICAL
EXAMINATION OF AQUACULTURED CATFISH, BASA (Pangasius sp), SHRIMP, DACE, AND
EEL PRODUCTS FROM THE PEOPLE'S REPUBLIC OF CHINA DUE TO THE PRESENCE OF NEW
ANIMAL DRUGS AND/OR UNSAFE FOOD ADDITIVES", ATTACHMENT 9/18/07

NOTE:       This revision includes additional sampling guidance.
            Changes are bracketed by asterisks.

TYPE OF
ALERT:      DETENTION WITHOUT PHYSICAL EXAMINATION (DWPE)

            (Note: This import alert represents the Agency's current
            guidance to FDA field personnel regarding the
            manufacturer(s) and/or products(s) at issue.  It does not
            create or confer any rights for or on any person, and does
            not operate to bind FDA or the public).

PRODUCT:    Aquacultured seafood products

PRODUCT
CODE:           Catfish (Ichtalurus sp.)
            16X[][]02
            16A[][]10, 16B[][]10, 16C[][]10, 16I[][]10, 16S[][]10
            16A[][]67, 16B[][]67, 16C[][]67, 16I[][]67, 16S[][]67

            Shrimp
            16X[][]21
            16J[][]05, 16K[][]05, 16L[][]05

            Basa (Pangasius sp.)
            16X[][]43
            16A[][]82, 16B[][]82, 16C[][]82, 16I[][]82, 16S[][]82

            Dace - 16A[][]57, 16B[][]57, 16C[][]57, 16I[][]57, 16S[][]57

            Eel - 16A[][]15, 16B[][]15, 16C[][]15, 16I[][]15, 16S[][]15

            Aquaculture Harvested Fishery/Seafood Products, N.E.C.
            16X[][]99

            (*Dace and eel may also be coded as aquaculture harvested
            product, N.E.C.; i.e. 16X[][]99)

PROBLEM:    Unapproved drug residues
            Unsafe food additives

IA16-131 000001

PAF:          ANT (Drug residues)
              FAD (Food Additive)

PAC:          04018

COUNTRY:      China, People's Republic of (CN)

MANUFACTURER
FEI#:         All

IMPORTER'S
ID#:          N/A

CHARGES:      "The article is subject to refusal of admission pursuant to
              Section 801(a)(3), in that it appears to bear or contain a
              food additive that is unsafe within the meaning of Section
              409 [Adulteration, Section 402(a)(2)(C)(i)]."
              (OASIS CHARGE CODES:  UNSAFE ADD)

                           AND/OR

              "The article is subject to refusal of admission pursuant to
              Section 801(a)(3), in that it appears to bear or contain a
              new animal drug (or conversion product thereof) that is
              unsafe within the meaning of Section 512 [Adulteration,
              Section 402(a)(2)(C)(ii)]."
              (OASIS CHARGE CODES:  VETDRUGRES)

RECOMMENDING
OFFICE:       OFS/DSS, HFS-325
              OC/DE, HFS-606

REASON FOR
ALERT:        There has been extensive commercialization and increased
              consumption of aquaculture seafood products worldwide.
              Aquacultured seafood has become the fastest growing sector
              of the world food economy, accounting for approximately half
              of all seafood production worldwide.  Approximately 80% of
              the seafood consumed in the U.S. is imported from
              approximately 62 countries. Over 40% of that seafood comes
              from aquaculture operations.  As the aquaculture industry
              continues to grow and compete with wild-caught seafood
              products, concerns regarding the use of unapproved animal
              drugs and unsafe chemicals and the misuse of animal drugs in
              aquaculture operations have increased substantially.

              China is the largest producer of aquacultured seafood in the

world, accounting for 70% of the total production and 55% of
the total value of aquacultured seafood exported around the
world.  China is currently the third largest exporter of
seafood to the U.S.  Shrimp and catfish products represent
two of the top ten most consumed seafood products in the
U.S.

The use of unapproved antibiotics or chemicals in
aquaculture raises significant public health concerns.
There is clear scientific evidence that the use of
antibiotics or chemicals, such as malachite green,
nitrofurans, fluoroquinolones, and gentian violet during the
various stages of aquaculture can result in the presence of
residues of the parent compound or its metabolites in the
edible portion of the aquacultured seafood.  The presence of
antibiotic residues may contribute to an increase of
antimicrobial resistance in human pathogens.  Moreover,
prolonged exposure to nitrofurans, malachite green, and
gentian violet has been shown to have a carcinogenic affect.

In the United States, use of malachite green, nitrofurans,
fluoroquinolones, or gentian violet as drugs in food-
producing animals would require an approved new animal drug
application under Section 512 of the Federal Food, Drug, and
Cosmetic Act (FFDCA).  FDA has not approved these
antibiotics for use as drugs in aquacultured animals.
Therefore, if they are used in aquaculture with an intent
that they treat disease in, or affect the structure or
function of, any aquacultured animal, they are considered to
be unsafe new animal drugs within the meaning of Section
512, and the presence of their residues in seafood
adulterates the seafood under 402(a)(2)(C)(ii) of the FFDCA.

Furthermore, malachite green, nitrofurans, fluoroquinolones
and gentian violet are not generally recognized as safe
under any conditions of intended use that may reasonably be
expected to result in their becoming a component of food.
Therefore, if intended for any such use, they are unsafe
food additives within the meaning of section 409 of the FDCA
and would render the food adulterated under section
402(a)(2)(C)(i).

FDA has several existing Import alerts related to unapproved
drugs in seafood dating back to November of 2001 (IA #16-124
DWPE of Seafood Products Due to Unapproved Drugs, IA #16-129
DWPE of Seafood Products Due to Nitrofurans, and IA #16-130
DWPE of Eel from China Due to the presence of Malachite

**IA16-131 000003** 12/12/2007

Green).  Based on an increased monitoring of imported
aquacultured seafood from October 1, 2006, through May 31,
2007, FDA continued to find residues of unapproved new
animal drugs and/or unsafe food additives in seafood
imported from China.  During that period, FDA tested 89
samples consisting of catfish, Basa, shrimp, dace and eel
from China.  Twenty two (22) of the 89 samples (25%) were
found to contain drug residues.  These residues include
nitrofurans detected in shrimp at levels above 1 ppb;
malachite green detected in dace, eel and catfish/Basa fish
at levels ranging from 2.1 to 122 ppb; gentian violet
detected in eel and catfish at levels ranging from 2.5 ppb
to 26.9 ppb and fluoroquinolones in catfish/Basa at level
ranging from 1.9 to 6.5 ppb.  Furthermore, Chinese
authorities have acknowledged permitting the use of
fluoroquinolones in aquaculture

Although the use of some animal drugs (nitrofurans and
malachite green) in aquaculture has been prohibited by
Chinese authorities since 2002, FDA continues to find
residues of these and other animal drugs in shipments of
aquacultured seafood products from China.

GUIDANCE:      Districts may detain without physical examination, all
shipments of aquacultured catfish, Basa (Pangasius sp),
shrimp, dace, and eel from the People's Republic of China
(CN) except for the firms identified on the attachment to
this alert.

Screening criteria has been set into OASIS.

If a firm, shipper, or importer believes that their product
should not be subject to detention under this import alert
they should forward information supporting their position to
FDA at the following address:

Food and Drug Administration
Division of Import Operations and Policy (HFC-170)
5600 Fishers Lane, Room 12-36
Rockville, MD 20587

In order to secure release of an individual shipment subject
to this Import Alert, the importer should provide the
results of a third-party laboratory analysis of a
representative sample of the lot verifying that products do
not contain malachite green and its metabolite
leucomalachite green, nitrofurans, gentian violet,

**IA16-131 000004**

leucogentian violet or fluoroquinolones.  The chart provided
below identifies which residues should be screened for each
species.

Third-party laboratories may use any methods that are found
acceptable to FDA.  (e.g., see
http://www.cfsan.fda.gov/seafood1.html

The following residues should be tested for each species.

| SPECIES | RESIDUE |
|---------|---------|
| Catfish, Basa, and Other Pangasius | Malachite Green<br>    Fluoroquinolones<br>Gentian Violet |
| Shrimp | Malachite Green<br>Fluoroquinolones<br>Nitrofurans<br>Gentian Violet |
| Dace | Malachite Green<br>Gentian Violet |
| Eel | Malachite Green<br>Gentian Violet |

*** NOTE:  The samples taken should be representative of the
shipment.  The following provides guidance on what may be
considered a representative sample.

Import sampling plan

Single product type entry

Shrimp     The sample should consist of a minimum of 12
           sub-samples.  When an entry consists of multiple
           lines of similar products (e.g., multiple sizes
           of headless shrimp), the sample should be
           representative of the entire entry and should be
           collected across all lines, with a minimum of
           two sub-samples per line.  The sampling should
           be proportional based on the quantity of product
           (e.g. more sub-samples should be obtained from
           larger lines, fewer sub-samples from smaller
           lines).  Obtaining 12 sub-samples from a single
           line or a limited number of lines when multiple

lines of similar products are offered for the
entry will not provide a representative sample
for that entry.

If an entry contains only one line of aquacultured product,
then a minimum of 12 sub-samples should be obtained from
that single line. If the entry includes multiple date
codes, the sample should reflect a range of date codes
(e.g., all sub-samples should not be collected from a single
date code).

Each sample should consist of 12 sub-samples, minimum 225g
(0.5 lb.) per sub-sample, total 2.7 kg (6.0 lb.) of product.
If the product unit size is larger than 225g (0.5 lb.) and
less than or equal to 3 lb., collect one product unit per
sub-sample. If the unit size is less than 225g. (0.5 lb.),
collect an adequate number of units so that the amount
collected per sub-sample equals a minimum of 225 grams (0.5
lb.).

For units (block frozen) larger than 3 lbs. only:    If the
units must be sampled and shipped intact, collect 6 sub-
samples (units). Alternatively, sub-samples of at least
225g (0.5 lb.) may be broken/sawed off (keep frozen) from
each of 12 units, and the twelve (12) 225 g sub-samples
shipped to the analyzing lab.

Analysis for Nitrofuran should be conducted on individual
subsamples.

Analyses for all other residues should be conducted on a
composite sample.

Catfish, Basa, Dace, Eel

The sample should consist of a minimum of 12 sub-samples and
be representative of the entry. If the entry contains
multiple lines, each line should be sampled separately. A
sample, consisting of a minimum of 12 sub-samples, should be
collected from each line. If the entry consists of multiple
date codes, the samples should be representative of a range
of date codes.  Analyses should be conducted on a composite
sample from each line.

Each sample should consist of a minimum of 12/225 gram (0.5
lb.) sub-samples, totaling 2.7 kg (6.0 lb.) of product. If
the container size is larger than 225 grams (0.5 lb.),

**IA16-131 000006**
12/12/2007

collect one container per sub-sample.  If the container is
less than 225 grams (0.5 lb.), collect an adequate number of
containers so that the amount collected per sub-sample
equals a minimum of 225 grams (0.5 lb.).

Mixed products entry

If the entry consists of mixed aquacultured seafood
products, a minimum of 12 sub-samples should be obtained
from each line.  For example, if an entry includes one line
of headless shrimp and one line of basa fillets, two samples
should be obtained  one sample, consisting of a minimum of
12 sub-samples, of shrimp; and one sample, consisting of a
minimum of 12 sub-samples, of basa.

Analyses should be conducted on a sample from each line as
described above, depending on the commodity.***

Sample Preparation

Prepare one composite from an equal amount of each subsample
for the testing of malachite green, fluoroquinolones, and
gentian violet.

Shrimp are to be analyzed on an individual sub basis for
nitrofurans.  When sampling guidance directs the collection
of six subsamples, two portions from each of the six
subsamples should be individually analyzed. ***

For questions or issues concerning science, science policy,
analysis, preparation, or analytical methodology, contact
the Division of Field Science at (301) 827-7605.

In order to remove a firm from detention without physical
examination, information should be provided to FDA to
adequately assess whether a manufacturer has the appropriate
controls and processes in place to ensure the quality of the
product, the firm or shipper should provide the following
information (In English):

1)    Documentation showing that a minimum of five (5)
      consecutive entries have been released by FDA based on
      third-party laboratory analysis of a representative
      sample of the lot verifying that products do not
      contain malachite green and its metabolite
      leucomalachite green, nitrofurans, gentian violet,
      leucogentian violet and fluoroquinolones.  The chart

provided above identifies which residues should be
screened for each species.  Third-party laboratory
must use methods acceptable to FDA (e.g., see
http://www.cfsan.fda.gov/seafood1.html);

and

2)    Documentation, from an appropriate third-party (e.g. a
      government inspection authority such as AQSIQ)
      demonstrating that an inspection of the processor was
      conducted and that the seafood was processed in
      accordance with FDA's Seafood HACCP regulations, 21
      CFR part 123, including controls for aquaculture
      drugs.  See 21 CFR 123.12(a).

      Documentation should include test results of any
      products sampled during the course of the inspection,
      demonstrating that the products do not contain
      malachite green or its metabolite leucomalachite
      green, nitrofurans, gentian violet, leucogentian
      violet or fluoroquinolones.

and

3)    Documentation that the processor is in compliance with
      all Chinese government requirements for exporting
      aquacultured seafood to the U.S.

      Documentation should include copies of any
      registration that may be required by the Chinese
      government.

      All requests for removal (exemption) from DWPE will be
      forwarded by DIOP to CFSAN (HFS-606) for evaluation.

PRIORITIZATION
GUIDANCE:    I

FOI:         No purging required

KEYWORDS:    Nitrofurans, Fluoroquinolones (ciprofloxacin and
             enrofloxacin), malachite green, leucomalachite green,
             gentian violet, aquaculture,

PREPARED
BY:          Barbara Montwill, CFSAN/OFS/DSS/SAPB (HFS-325), 301-436-1426
             Giselle Jordan, CFSAN/OC/DE/PAB (HFS-606), 301-436-1576

```
                Ted Poplawski, DIOP, (301) 443-6553

REVISED
BY:          Virginia L. Meeks, DIOP, (301) 594-3845

DATE LOADED
INTO FIARS:          August 3, 2007

          ATTACHMENT TO IMPORT ALERT #16-131     9/18/07

     Firms and products exempt from DWPE recommendation

FIRM                          PRODUCT/PRODUCT CODE

Zhangjiang Guolian Aquatic Products       Shrimp
  Co., Ltd.                               16J[][]05/16K[][]05
6 Yongping S. Rd.                         16L[][]05/16X[][]21
Pingle Industry Development Region        9/18/07
Zhangjiang, Guangdong, China
FEI# 3004097215
```

IA16-131 000009 12/12/2007



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service
Food and Drug Administration

# Memorandum

Date: June 5, 2007

From: Director, Office of Compliance, Center for Food Safety and Applied
Nutrition, HFS-600

Subject: Countrywide Detention without Physical Examination for Aquacultured
Catfish, Basa, Shrimp, Tilapia, Dace, and Eel from China Due to the
Presence of Unapproved New Animal Drugs and Unsafe Food Additives -
ACTION

To: Associate Commissioner for Regulatory Affairs, HFC-1

Thru: Director, Center for Food Safety and Applied Nutrition, HFS-1

## ISSUE

The Center for Food Safety and Applied Nutrition (CFSAN) believes action must be
taken now to preclude entries of aquacultured catfish, basa, shrimp, tilapia, dace, and
eel imported from China into the United States (U.S.).

## BACKGROUND

There has been an extensive commercialization and an increased consumption of
aquacultured seafood products worldwide. Aquacultured seafood is the fastest growing
sector of the world food economy, accounting for approximately half of all seafood
production worldwide. Approximately 80% of the seafood consumed in the U.S. is
imported from approximately 62 countries. Over 40% of that seafood comes from
aquaculture operations. As the aquaculture industry continues to grow and compete
with wild-caught seafood products, concerns regarding the use of unapproved new
animal drugs and unsafe chemicals and the misuse of approved animal drugs in
aquaculture operations have increased substantially.

China is the largest producer of aquacultured seafood in the world, accounting for 70%
of the total production and 55% of the total value of aquacultured seafood exported
around the world. China is currently the third largest exporter of seafood to the U.S.
and its exports include shrimp, catfish, and tilapia. These three products represent
three of the top ten most consumed seafood products in the U.S. China, with its large
and expanding aquaculture industry, may soon bypass Canada and Thailand to
become the largest exporter of seafood into the U.S.

From October 1, 2006, through April 30, 2007, FDA repeatedly found residues of
unapproved new animal drugs or unsafe food additives in aquacultured seafood
products imported from China. The residues include nitrofurans, malachite green,

**IA16-131 000010**

gentian violet, and fluoroquinolones. These residues have been found in catfish, basa, dace, tilapia, shrimp, and eel. None of these substances is approved for use in aquacultured products in the U.S.

In 2006, FDA put into place a countrywide DWPE for eel from China due to the presence of malachite green. FDA continues to find unapproved new animal drugs and unsafe food additives in eel offered for import into the U.S.

Although the use of some unapproved new animal drugs (nitrofurans and malachite green) has been prohibited by Chinese competent authorities since 2002, FDA and other governments continue to find these and other unapproved new animal drugs and unsafe food additives in shipments of aquacultured products from China.

## HUMAN HEALTH CONCERNS

The use of unapproved or misused new animal drugs and unsafe food additives in aquacultured seafood products raises significant public health concerns. There is clear scientific evidence that the use of these substances during the various stages of aquaculture can result in the presence of residues of the parent compound or their metabolites in the edible portion of the aquacultured products. This may have an impact on the safety of these products for consumers.

One concern is the immediate and long-range human health implications associated with the misuse of antibiotics, for example, fluoroquinolones, and their subsequent residual presence in aquacultured products. This practice may contribute to an increase of antimicrobial resistance in human pathogens.

Another concern is the risk of exposing consumers to suspected carcinogens such as nitrofurans, malachite green, or gentian violet. Nitrofurans are considered to be carcinogenic and genotoxic. Nitrofurans are rapidly metabolized in fish and human bodies and bind to fish and human tissue.

Malachite green and its metabolite, leuchomalachite green, have been shown to be multi-organ toxins in animal research studies. The potential carcinogenic toxicity of the compounds increases with exposure.

Fluoroquinolones and nitrofurans have been specifically prohibited from extra label use by veterinarians in food producing animals in the U.S [21 CFR 530.41]. This further demonstrates our safety concerns for the use of these compounds.

All substances used as aquaculture drugs in food producing animals in the U.S. are required to be the subject of an approved new animal drug application (NADA) under Section 512 of the Federal Food, Drug and Cosmetic Act (FFDCA). The presence of unapproved new animal drug residues in edible tissue (in this case seafood) causes the food to be adulterated within the meaning of Section 402(a)(2)(C)(ii) of the FFDCA. Because these drugs are not the subject of an approved new animal drug application for any aquacultured seafood, no tolerance has been established for these compounds

in aquacultured seafood; therefore, any detectable amount found in the aquacultured seafood would be a violation.

Fluoroquinolones, nitrofurans, malachite green, and gentian violet also are not generally recognized as safe when used in a manner that could reasonably be expected to result in their becoming a component of an aquacultured seafood product, nor are they approved for such use. Therefore, when used in this manner, these compounds are unsafe food additives within the meaning of Section 409 of the FFDCA.

## COMMERCIAL IMPORTATION AND ENTRY VIOLATIONS

From October 1, 2006, through April 30, 2007, FDA repeatedly found residues of unapproved new animal drugs and unsafe food additives in aquacultured products imported from China. During that period, FDA tested 145 samples of catfish, basa, tilapia, shrimp, dace, and eel from approximately 3,473 entries of seafood from China. Twenty of the samples were found to contain an unapproved new animal drug residue or unsafe food additive (14%). The substances found include: nitrofurans in shrimp at levels above 1 ppb; malachite green in dace, tilapia, eel, and catfish at levels ranging from 2.1 ppb to 19.1 ppb; and gentian violet in eel at levels ranging from 17.0 ppb to 26.9 ppb. None of the substances is approved for use in aquacultured products in the U.S. (**See TAB A**).

From October 1, 2006, to April 30, 2007, roughly 365 catfish, basa, shrimp, tilapia, dace, and eel processing firms in China offered products for import into the U.S. These processors are located in 13 provinces along the eastern shore in mainland China. The 20 violative samples discussed above were shipped by 18 firms. These firms are located in the following nine provinces: Fujian (1 firm), Guangdong (7), Guangxi (1), Hainan (2), Jiangsu (2), Jiangxi (2), Lianoning (1), Zhejiang (1), and Shanghai (1) (autonomous city). **(See TAB B & C)**.

Currently, there are 32 seafood processors from China listed on three FDA active Import Alerts (IA) due to the presence of unapproved new animal drugs or unsafe food additives in species covered by this memorandum. The three IAs are as follows:

- IA#16-124 for unapproved animal drugs in seafood products[1]
- IA#16-129 for nitrofurans in shrimp[1]
- IA#16-130 for malachite green in eel[2]

Unapproved new animal drug residues and unsafe food additives have also been found in testing performed by other government agencies. On April 25, 2007, the Alabama Department of Agriculture and Industry issued a "stop-sale order" on imported Chinese catfish due to contamination with fluoroquinolones, specifically enrofloxacin. Twenty samples of catfish were collected for analysis by the Alabama Department of Agriculture and Industry's Food and Drug Laboratories, between February 13 and March 29, 2007. Fourteen of the 20 samples (70%) were contaminated with

1 Chinese firms currently listed on 16-124 and 16-129 will be transferred to this Import Alert
2 Upon issuance of this Import Alert, IA#16-130 will be cancelled

fluoroquinolones at levels ranging from 1.14 to 20.6 ppb. **(See TAB G)**. 43% of the results meet or exceed 5 ppb, which is FDA's limit of detection. We note that FDA has not reviewed the worksheets for these samples.

During a recent 12 month period (April 1, 2006 to March 31, 2007), the Canadian Food Inspection Agency (CFIA) found aquacultured seafood products from China to be contaminated with nitrofuran or malachite green residues. Fifty-eight shipments were rejected due to nitrofurans and 15 shipments were rejected due to malachite green, out of a total of 678 shipments examined (11%). These rejections included one shipment of catfish, two shipments of tilapia, and five shipments of dace due to malachite green; and 47 shipments of shrimp and three shipments of eel due to nitrofurans. FDA has not reviewed the worksheets for these samples. Currently, 22 processors are listed on the CFIA Import Alert list of Chinese processors/shippers with violative product. Of these processors, three are listed on FDA's active import alerts and five have shipped product into the U.S. over the last six months. **(See TAB E & F)**.

## CHARGES

CFSAN has determined that the appropriate charges to be used in the country-wide Import Alert **(see TAB H)** are as follows:

"The article is subject to refusal of admission pursuant to Section 801(a)(3), in that it appears to bear or contain a food additive that is unsafe within the meaning of Section 409 [Adulteration, Section 402(a)(2)(C)(i)]."

### AND/OR

"The article is subject to refusal of admission pursuant to Section 801(a)(3), in that it appears to bear or contain a new animal drug (or conversion product thereof) that is unsafe within the meaning of Section 512 [Adulteration, Section 402(a)(2)(C)(ii)]."

## CHINA'S CONTROLS

FDA has information from two sources to suggest that China does not have an adequate system in place to ensure that aquacultured seafood intended for the U.S. market is free from unapproved new animal drugs and unsafe food additives.

In September 2006, a team of experts from the then-Office of Seafood visited China to evaluate China's overall control of drug usage in aquacultured products. The FDA team concluded that China's current residue control program for products exported to the U.S. is not effective. Observations noted during the visit include the following: organized groups forging Sanitary or Export Certificates; shipments originating from untraceable lots; identified adulterated lots diverted into domestic market distribution, with no further controls to prevent export; and uncertified servicing laboratories performing sampling and analysis of drug residues. The expert team also found that there is no preventative system in place whereby the aquaculture industry (e.g.,

IA16-131 000013

farmers, processors, and exporters) are trained on food safety issues as it relates to aquaculture operations. **(See TAB D)**.

On May 22, 2007 representatives of CFSAN and CVM met with representatives of the General Administration of Quality Supervision, Inspection and Quarantine of the People's Republic of China (AQSIQ), lead by Li Yuanping, Director General of the Import and Export Food Safety Bureau. During the meeting, Mr. Li asserted that aquacultured products legally exported from China are tested for malachite green and nitrofurans, and, consequently, any positive findings by FDA for these substances in aquacultured product would have had to been in product illegally shipped from China. Mr. Li acknowledged that that statement suggests that a very considerable proportion of aquacultured product leaving China is moving through illegal channels. He indicated that enterprising individuals in China had apparently founds ways to illegally exploit the differences between Chinese and U.S. control systems (e.g., AQSIQ reliance on testing and certificates for export control and U.S. disregard for certificates, differences in drugs that are approved for use and therefore available to the grower). He suggested that if FDA demanded AQSIQ certificates as a condition of entry for all Chinese aquacultured products, the problem with unapproved aquaculture drugs in these products would be solved.

The FDA representatives explained that review of certificates is logistically problematic for FDA because of: 1) the large number line items received from China and the need to compare certificates to entry documents to ensure that all line items are covered; 2) the fact that much entry decision making is done electronically, making paper certificates incompatible with the process; 3) the possibility of certificate falsification. The FDA representatives further pointed out that certificate falsification was acknowledged as a problem during the September 2006 audit. The AQSIQ representatives reconfirmed the problem. The FDA representatives also explained that FDA could not make demands at time of entry for certificates or other evidence that the product was not adulterated until a determination had been made by the agency that there was an appearance of adulteration for all such products, which would ordinarily result in a country-wide Import Alert instructing detention without physical examination. It was further explained that FDA was exploring with other countries the establishment of a system whereby the Competent Authority (CA) would provide, and periodically update, a list of firms in regulatory good standing with the CA. U.S. importers with submit an attestation code on entry documents indicating that the product that they were offering for entry was from a firm on the CA's list. FDA would then take that information into account when making its entry decision.

The FDA representatives explained that, while no decision had yet been reached by the agency with respect to Detention without Physical Examination for Chinese aquacultured products, should a decision be reached to proceed with such an action, it might be possible to accept listing of an exporter on an AQSIQ list of firms in regulatory good standing as a substitute for U.S. importer testing for unapproved drugs that may be present. This could have the effect of driving the illegal commerce into the AQSIQ-controlled system.

Page 6 - Associate Commissioner for Regulatory Affairs, HFC-1

## SUMMARY

### Countrywide DWPE:

Based on the evidence stated above, the following criteria warrant imposing a countrywide DWPE on aquacultured seafood products, catfish, basa, shrimp, tilapia, dace, and eel, imported from China:

1. China is the largest aquaculture producer in the world, accounting for 70% of the total production, and is the third largest exporter of seafood to the U.S.

2. Despite China's ban on the use of specific unapproved new animal drugs (nitrofurans and malachite green) in seafood farm operations, FDA continues to find unapproved new animal drugs and unsafe food additives in shipments of aquacultured seafood products from China.

3. From October 1, 2006, to April 30, 2007, FDA tested 173 samples of aquacultured seafood products from China for nitrofurans, fluoroquinolones, malachite green, and gentian violet. Twenty of the samples (14%) contained unapproved new animal drug residues or unsafe food additives. The violative products were from 18 different firms.

4. The Alabama Department of Agriculture and Industries detected residues of fluoroquinolones in 14 of 20 catfish samples (70%) from different Chinese processors in April 2007.

5. The Canadian Food and Inspection Agency refused 73 of 678 inspected shipments of aquacultured seafood (11%) because they contained residues of nitrofurans or malachite green between April 1, 2006, and March 31, 2007.

6. The FDA assessment of China's current residue control program for products exported to the U.S found the program to be ineffective.

CFSAN acknowledges that, based on FDA sampling alone, we do not meet the criteria set out in Chapter 9 of the Regulatory Procedures Manual for countrywide detention without physical examination (DWPE), in that the shipments found violative do not represent at least 25% of the total shipments of the products examined. CFSAN believes that DWPE is, nonetheless, justified in this case, given the totality of the evidence. There is clearly a continued pattern of importation of articles that violate the FFDCA, as demonstrated by analytical results reported by FDA and other government agencies. In addition, China's own quality organization has admitted that the controls in that country are inadequate to ensure that aquacultured seafood products offered for entry into the U.S. meet U.S. requirements.

## RECOMMENDATION

CFSAN recommends imposing countrywide detention without physical examination on catfish, basa, shrimp, tilapia, dace, and eel from China based on the evidence presented. Future shipments of these products offered for entry from China will appear to be adulterated pursuant to Section 801(a)(3) and 402(a)(2)(C)(i) or 402(a)(2)(C)(ii) of the FFDCA.


Joseph R. Baca

## Attachments:

TAB A - PROC Seafood Violative Samples as of April 30, 2007

TAB B - Map of China - Location of Violative Aquacultured Seafood Product Processors

TAB C - CN Aquacultured Seafood Product Manufacturers & Shipments (Oct. 1, 2006 to April 30, 2007)

TAB D - U.S. FDA China Chemotherapeutic Residues Trip Report September 12-28, 2006

TAB E - CFIA Results for Unapproved Drug Residues in Imports from China, April 01, 2006-March 31, 2007

TAB F - CFIA Import Alert list of Chinese processors/shippers with violative product (Oct 2006-April 2007)

TAB G - Alabama Department of Agriculture and Industries

TAB H - Draft "IMPORT ALERT #16-XX, "DETENTION WITHOUT PHYSICAL EXAMINATION OF AQUACULTURED CATFISH, BASA, SHRIMP, TILAPIA, DACE, AND EEL PRODUCTS FROM CHINA DUE TO THE PRESENCE OF UNAPPROVED NEW ANIMAL DRUG RESIDUES OR UNSAFE FOOD ADDITIVES"


## DECISION:

**Countrywide DWPE for Aquacultured Catfish, Basa, Shrimp, Tilapia, Dace, and Eel from China Due to the Presence of Unapproved New Animal Drugs or Unsafe Food Additives**

Approved _____Disapproved _____Date_____

Page 8 - Associate Commissioner for Regulatory Affairs, HFC-1

cc:

HFA-224 (Records)
HFC-100 (Ralston)
HFC-150 (Morrison)
HFC-170 (Siddiqui)
HFS-1 (Brackett)
HFS-1 (Landa)
HFS-3 (Oliver)
HFS-300 (Kramer)
HFS-325 (Jones, Creeden, Montwill)
HFS-600 (Baca)
HFS-605 (Thomas)
HFS-606 (Pace, Jordan)

---

R/D: HFS-606: G.Jordan: 5/21/07
Edits: HFS-606: M.Stuckey: 5/22/07
Rev: HFS-606: R.Pace: 5/23/07
Edits: HFS-606: G.Jordan: 5/24/07
Rev: HFS-605: JAThomas: 5/29/2007
Edits: HFS-606: R.Pace: 5/29/07
Rev & comment: HFS-325: D.Kraemer: 5/29/07
Edits: HFS-605: JAThomas: 5/30/2007
Rev & comment: HFV-1: M.Smith & F.Pell: 5/31/07
Edits: HFS-606: G.Jordan: 5/31/07
Rev & comment: HFS-1: MLanda: 6/4/2007
Edits: HFS-605: JAThomas: 6/4/2007

---

Electronic file: p:\Division of Enforcement\IMPORTS\JORDAN\Import Alerts &
Bulletins\China aqua drugs\Action Memo-Aquaculture drugs in CN seafood

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service
Food and Drug Administration

# Memorandum

Date:    November 26, 2007

From:    Compliance Officer, Product Adulteration Branch, Division of Enforcement, Office
of Compliance, Center for Food Safety and Applied Nutrition, HFS-606

Subject:  Countrywide Detention without Physical Examination for Aquacultured Seafood
Products from China Due to the Presence of Unapproved New Animal Drugs and
Unsafe Food Additives – –Explanation of Product Coverage and Entry Violation
Revisions

To:      File

In a memorandum dated June 5, 2007, the Center for Food Safety and Applied Nutrition
(CFSAN) recommended that FDA issue an Import Alert for unapproved drug residues
(nitrofurans, fluoroquinolones, malachite green, and gentian violet) in aquacultured seafood
products originating from China. The recommendation included six varieties of aquacultured
seafood – catfish, basa, shrimp, dace, eel, and tilapia. The recommendation reported analytical
results obtained from October 1, 2006 through April 30, 2007. As stated in the recommendation
memorandum from Joseph Baca, the violation rate for these six seafood products was 10.5%.

After submission of the initial recommendation, FDA engaged in additional internal discussion.
During this discussion, we decided to omit tilapia from the Import Alert because the violation rate
for tilapia (145 of 1,935 shipments or 7.5%) was lower than for other species of seafood.

Subsequent to the submission of the recommendation, CFSAN obtained additional analytical
data, through May 31, 2007. The data presented in the Import Alert reflects both the removal of
tilapia and the updated analytical results; however, the recommendation memorandum was not
updated. The violation rate for the five remaining seafood products was 25%. Import Alert (IA)
16-131, was issued on June 28, 2007.

With the updated numbers, the June 5, 2007 memo would have read, in part:

> *From October 1, 2006, through May 31, 2007, FDA repeatedly found residues of
> unapproved drugs in aquacultured products imported from China. During that period,
> FDA tested 89 samples of catfish, basa, shrimp, dace, and eel from China. Twenty-two
> of the samples were found to contain an unapproved drug (25%). The unapproved drugs
> include: nitrofurans in shrimp at levels above 1 ppb; malachite green in dace, eel, and
> catfish at levels ranging from 2.1 ppb to 122 ppb; gentian violet in catfish and eel at
> levels ranging from 2.5 ppb to 26.9 ppb and fluoroquinolones in catfish/basa at level
> ranging from 1.9 to 6.5 ppb.*

In all other respects, the June 5, 2007 memo accurately describes the reasoning behind IA 16-
131.

Giselle Jordan

**Attachments:**

Revised PROC Seafood Violative Samples as of May 31, 2007

Updated CN Aquacultured Seafood Product Manufacturers & Shipments (Oct. 1, 2006 to May 31, 2007)

**Attachment A**

**PROC Seafood Violative Samples as of May 31, 2007**

Total number of samples collected and tested: 211 (89 samples of catfish, basa, dace, eel, and shrimp)
Number of samples tested positive for drug residues: 22 of 211 (10.5%);
22 of 89 (25%)

| I.p. | Sample # | District | Product | Date Collected | Residue Level | Mfr FEI # | Mfr Name | Mfr Address | Mfr City | CIQ certificate |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 332215 | LOS | Shrimp | 10/3/2006 | NF (AOZ&SC) | | | | Shantou, Guangdong | N/A |
| 2 | 394287 | LOS | Shrimp | 10/13/2006 | NF (SC) | | | | Shantou, Guangdong | N/A |
| 3 | 385569 | LOS | Eel | 10/24/2006 | 26.9 ppb GV | | | | Jiangxi | YES |
| 4 | 396412 | NYK | Shrimp | 10/31/2006 | NF (AOZ) | | | | Haikou City, Hainan | N/A |
| 5 | 396532 | LOS | Eel | 10/31/2006 | 17.0 ppb GV | | | | Shanghai | YES |
| 6 | 399482 | LOS | Catfish | 11/27/2006 | 3.5 ppb MG | | | | Chang City, Fuzhou, Fujian | N/A |
| 7 | 400561 | LOS | Eel | 12/5/2006 | 2.3 ppb MG | | | | Qingyuan | N/A |
| 8 | 402052 | SAN | Dace | 12/14/2006 | 3.6 ppb MG | | | | Zhongshan City, Guangdong | N/A |
| 9 | 403995 / 403255 | SWID / SWID | Catfish / Channel Catfish | 1/9/2007 / 2/14/2007 | 2.85 ppb MG | | | | Daleng City | N/A |
| 10 | 409295 | SWID | Channel Catfish | 2/14/2007 | 2.9 ppb MG | | | | Jiangsu Province | N/A |
| 11 | 409297 | SWID | Catfish | 2/14/2007 | 2.9 ppb MG | | | | Jiangsu Province | N/A |
| 12 | 388100 | LOS | Dace | 8/21/2006 | 19.1 ppb MG | | | | Guangdong | YES |
| 13 | 407966 | LOS | Shrimp | 2/6/2007 | NF (AOZ) | | | | Shantou, Guangdong | N/A |
| 14 | 406653 | LOS | Shrimp | 1/30/2007 | NF (AOZ) | | | | Shantou, Guangdong | N/A |
| 15 | 410566 | FLA | Catfish | | 4.6 ppb MG | | | | Nanning, Guangxi | YES |
| 16 | 415079 | FLA DET | Catfish Catfish | 3/23/2007 | 1.6 ppb MG | | | | Jiangsu | YES |
| 17 | 413482 | LOS | Catfish | 3/15/2007 | 3.0ppb MG | | | | Jiangxi | N/A |
| 18 | 411165 | LOS | Shrimp | 2/27/2007 | NF | | | | Guangdong | N/A |
| 19 | 421442 | NWE | Catfish | 5/02/2007 | 2.0 ppb MG | | | | Daleng City | N/A |

IA16-131 000020

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Jiangsu Province, | |
| 20 | 421202 | SWI | Catfish | 5/01/2007 | 2.5 ppb GV | | Tongi Road | Xinhua City | N/A |
| 21 | 421990 | SWI | Catfish | 5/07/2007 | 122 ppb MG | | Meixin, Meihua Town | Changle City | N/A |
| 22 | 415772 | LCS | Shrimp | 3/27/2007 | NF | | Longtian Industrial Estate | Fuqing, Fujian Province | N/A |

**TAB B: Map of China - Location of Violative Aquacultured Seafood Product Processors**



| Province or City(*) | Product | Violative Firms |
|---|---|---|
| Fujian | Catfish | 1 |
| Guangdong | Shrimp, Dace, Tilapia | 7 |
| Guangxi | Catfish | 1 |
| Hainan | Shrimp, Tilapia | 2 |
| Hebei | Eel | -- |
| Hongkong (*) | Eel | -- |
| Hubei | Eel | -- |
| Hunan | Eel | -- |
| Jiangsu | Catfish | 2 |
| Jiangxi | Eel, Catfish | 2 |
| Liaoning | Eel | 1 |
| Shandong | Eel | -- |
| Shanghai (*) | Eel | 1 |
| Zhejiang | Catfish | 1 |
| **Total** | | **18** |



Aquacultured eel processing farms

Aquacultured catfish/Basa, shrimp, dace, tilapia, and/or eel processing farms

**IA16-131 000022**

## Updated Aquacultured Seafood from CN
## 10/1/06 to 5/31/07
(Compared with previous TAB C up to 4/30/07 without Tilapia)

| Seafood | As Of Date | Manufacturers | Shipments |
|---------|------------|---------------|-----------|
| Basa | 4/30/2007 | 6 | 11 |
|  | 5/31/2007 | 6 | 11 |
| Catfish | 4/30/2007 | 66 | 391 |
|  | 5/31/2007 | 70 | 417 |
| Dace | 4/30/2007 | 17 | 50 |
|  | 5/31/2007 | 18 | 51 |
| Eel | 4/30/2007 | 79 | 263 |
|  | 5/31/2007 | 83 | 292 |
| Shrimp | 4/30/2007 | 52 | 823 |
|  | 5/31/2007 | 57 | 915 |
| **Totals** | **4/30/2007** | **220** | **1,538** |
|  | **5/31/2007** | **234** | **1,686** |
| **Increment** |  | **14** | **148** |
| % Violation | **4/30/2007** | **10.5** |  |
|  | **5/31/2007** | **25** |  |

IA16-131 000023

**Updated CN Basa Entries**
**10-01-06 to 05-31-07**

| Submission Date | Product Code Description | Product Code | Entries Count |
|---|---|---|---|
| 11/03/2006 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XFD43 | 1 |
| 11/30/2006 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 01/25/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 02/21/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 02/25/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 02/26/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGD43 | 1 |
| 03/01/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 03/08/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGD43 | 1 |
| 03/08/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 03/13/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 04/24/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGD43 | 1 |

11

IA16-131 000024

**Total manuf**          **6**
**Total shipments**      **11**

IA16-131 000025

**Updated CN Catfish Entries**
**10-01-06 to 05-31-07**

| Submission Date | Product Code Description | Product Code | Entries Count |
|---|---|---|---|
| 10/02/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 10/02/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/03/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 10/04/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 10/04/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/06/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/06/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/06/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/09/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 10/10/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 10/10/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 10/10/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/10/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/11/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 10/11/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| 10/12/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
|---|---|---|---|
| 10/13/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/13/2006 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 2 |
| 10/17/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 10/17/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/18/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 10/19/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/19/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/19/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/19/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/24/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 10/25/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 10/25/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 10/25/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/26/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/26/2006 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 10/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

IA16-131 000027

| | | | |
|---|---|---|---|
| 10/28/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 10/30/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 10/30/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 3 |
| 10/31/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/31/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/31/2006 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 11/01/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 11/01/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/02/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/03/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/06/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 11/06/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 5 |
| 11/07/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/08/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/08/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/09/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/09/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

IA16-131 000028

| 11/10/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 11/13/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 11/13/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/14/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/14/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 11/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/17/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/17/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/18/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 11/20/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 11/20/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/20/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/20/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/21/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/22/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/23/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

IA16-131 000029

| | | | |
|---|---|---|---|
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 6 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/28/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 11/28/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/28/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/01/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/01/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/01/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 3 |
| 12/01/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/03/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/04/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |

| 12/04/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
|---|---|---|---|
| 12/04/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/05/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 12/05/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/05/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/06/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 12/06/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/06/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/06/2006 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 12/07/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/07/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/08/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 12/08/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 12/08/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/09/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 12/11/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/11/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |

IA16-131 000031

| 12/11/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
|---|---|---|---|
| 12/12/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 12/12/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/12/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/12/2006 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 12/13/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/13/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/13/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/14/2006 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 12/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/18/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/18/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 12/18/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

IA16-131 000032

| | | | |
|---|---|---|---|
| 12/18/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/18/2006 | Catfish, Aquaculture, Fresh Water | 16XVD02 | 1 |
| 12/19/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 3 |
| 12/19/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/20/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/20/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/20/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/22/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 12/22/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 12/22/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/22/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/24/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/24/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 12/26/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 12/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/28/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 12/28/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

IA16-131 000033

| | | | |
|---|---|---|---|
| 12/29/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/29/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/29/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/29/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/29/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/30/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 4 |
| 12/31/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 12/31/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/31/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/02/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 01/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/03/2007 | Catfish, Aquaculture, Fresh Water | 16XGC02 | 1 |
| 01/03/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 01/03/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 01/04/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/04/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| 01/05/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 3 |
|---|---|---|---|
| 01/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/05/2007 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 01/07/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/08/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 3 |
| 01/09/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 01/09/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/09/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 01/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

IA16-131 000035

| 01/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/15/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 01/15/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/16/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/16/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/16/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/17/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 01/17/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/17/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/18/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/18/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/19/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/20/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/22/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/22/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |

IA16-131 000036

| | | | |
|---|---|---|---|
| 01/22/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/22/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/22/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 3 |
| 01/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 4 |
| 01/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/23/2007 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 01/24/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 01/24/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/25/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 3 |
| 01/26/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/26/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/29/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/30/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/30/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/30/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

IA16-131 000037

| | | | |
|---|---|---|---|
| 01/30/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/30/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 2 |
| 01/30/2007 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 01/31/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/01/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 3 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 02/03/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 02/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/06/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |

| 02/06/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/06/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/06/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/07/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/08/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/08/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 02/09/2007 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 02/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/12/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 02/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/13/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/14/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/15/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/15/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |

IA16-131 000039

| | | | |
|---|---|---|---|
| 02/16/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/17/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 02/17/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 02/18/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/18/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 02/20/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/20/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/21/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/22/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 02/23/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 02/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/24/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 02/26/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 3 |
| 02/26/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 02/27/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/27/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

IA16-131 000040

| 02/28/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/28/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/02/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 3 |
| 03/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/02/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/03/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/03/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/04/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/04/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 03/07/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 03/07/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 03/07/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/09/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 03/09/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 03/09/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 2 |

IA16-131 000041

| | | | |
|---|---|---|---|
| 03/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/13/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/13/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/15/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 2 |
| 03/17/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/19/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/19/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 03/19/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/21/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/26/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 03/27/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/04/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/06/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 04/07/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/10/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/13/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |

| 04/16/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
|---|---|---|---|
| 04/16/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/18/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 04/18/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 6 |
| 04/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 04/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 04/24/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 04/24/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 04/24/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 04/24/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/25/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/26/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 04/26/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 04/28/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 05/01/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 05/03/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 05/04/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |

IA16-131 000043

| 05/04/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
|---|---|---|---|
| 05/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 05/08/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 05/10/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 05/10/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 05/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 05/14/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/15/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 6 |
| 05/15/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/15/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/17/2007 | Catfish, Aquaculture, Fresh Water | 16XVD02 | 1 |
| 05/21/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 05/22/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/31/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/31/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

417

IA16-131 000044

**Total manuf**          70
**Total shipments**      417

IA16-131 000045

**Updated CN Dace Entries**
**10-01-06 to 05-31-07**

| Submission Date | Product Code Description | Product Code | Entries |
|---|---|---|---|
| 10/06/2006 | Dace | 16AGT57 | 1 |
| 10/16/2006 | Dace | 16AEE57 | 1 |
| 11/06/2006 | Dace | 16AEE57 | 1 |
| 11/09/2006 | Dace | 16AGT57 | 1 |
| 11/14/2006 | Dace | 16AGT57 | 1 |
| 11/16/2006 | Dace | 16AFT57 | 1 |
| 11/28/2006 | Dace | 16AGD57 | 1 |
| 12/05/2006 | Dace | 16AEE57 | 1 |
| 12/05/2006 | Dace | 16AFD57 | 1 |
| 12/07/2006 | Dace | 16AGD57 | 1 |
| 12/13/2006 | Dace | 16AEN57 | 1 |
| 12/14/2006 | Dace | 16AFD57 | 1 |
| 12/14/2006 | Dace | 16AGD57 | 1 |
| 12/14/2006 | Dace | 16AGT57 | 1 |
| 12/15/2006 | Dace | 16AGD57 | 1 |
| 12/19/2006 | Dace | 16AGT57 | 1 |
| 12/21/2006 | Dace | 16AGD57 | 1 |
| 12/28/2006 | Dace | 16AGD57 | 1 |
| 12/28/2006 | Dace | 16AGT57 | 1 |
| 01/02/2007 | Dace | 16AGD57 | 1 |
| 01/02/2007 | Dace | 16AGT57 | 1 |
| 01/03/2007 | Dace | 16AGD57 | 1 |
| 01/04/2007 | Dace | 16AGD57 | 1 |
| 01/05/2007 | Dace | 16AHN57 | 1 |
| 01/10/2007 | Dace | 16AGD57 | 1 |
| 01/10/2007 | Dace | 16AGD57 | 1 |
| 01/11/2007 | Dace | 16AGT57 | 1 |
| 01/16/2007 | Dace | 16AGT57 | 2 |
| 01/17/2007 | Dace | 16AGD57 | 1 |
| 01/17/2007 | Dace | 16AGD57 | 1 |
| 01/18/2007 | Dace | 16AGD57 | 1 |
| 01/18/2007 | Dace | 16AGT57 | 1 |
| 01/25/2007 | Dace | 16AGD57 | 1 |
| 01/25/2007 | Dace | 16AGT57 | 1 |
| 01/26/2007 | Dace | 16AEE57 | 1 |
| 01/26/2007 | Dace | 16AGT57 | 1 |
| 02/01/2007 | Dace | 16AGD57 | 1 |
| 02/02/2007 | Dace | 16AGD57 | 1 |
| 02/05/2007 | Dace | 16AEN57 | 1 |
| 02/08/2007 | Dace | 16AGD57 | 1 |
| 02/24/2007 | Dace | 16AGD57 | 1 |
| 02/26/2007 | Dace | 16AGD57 | 1 |
| 03/12/2007 | Dace | 16AGN57 | 1 |
| 03/26/2007 | Dace | 16AET57 | 4 |
| 03/27/2007 | Dace | 16AGD57 | 1 |
| 04/23/2007 | Dace | 16AET57 | 1 |

| 05/03/2007 | Dace | 16AGT57 | 1 |
|---|---|---|---|

51

**Total manuf**          **18**
**Total shipments**    **51**

IA16-131 000047

**Updated CN Eel Entries**
**10-01-06 to 05-31-07**

| Submission Date | Product Code Description | Product Code | Entries Count |
|---|---|---|---|
| 10/02/2006 | Eel | 16AGC15 | 1 |
| 10/02/2006 | Eel | 16AGT15 | 1 |
| 10/02/2006 | Eel | 16AGT15 | 1 |
| 10/04/2006 | Eel | 16AGT15 | 1 |
| 10/05/2006 | Eel | 16AGN15 | 1 |
| 10/06/2006 | Eel | 16AGN15 | 1 |
| 10/06/2006 | Eel | 16AGT15 | 1 |
| 10/06/2006 | Eel | 16AGT15 | 1 |
| 10/06/2006 | Eel | 16AGT15 | 1 |
| 10/10/2006 | Eel | 16AGN15 | 1 |
| 10/10/2006 | Eel | 16AGN15 | 1 |
| 10/10/2006 | Eel | 16AGT15 | 1 |
| 10/10/2006 | Eel | 16AVH15 | 1 |
| 10/11/2006 | Eel | 16AGN15 | 1 |
| 10/11/2006 | Eel | 16AGT15 | 1 |
| 10/12/2006 | Eel | 16AVT15 | 1 |
| 10/13/2006 | Eel | 16AGT15 | 1 |
| 10/13/2006 | Eel | 16AGT15 | 1 |
| 10/13/2006 | Eel | 16AVY15 | 1 |
| 10/16/2006 | Eel | 16AGC15 | 1 |
| 10/16/2006 | Eel | 16AGD15 | 1 |
| 10/18/2006 | Eel | 16AGC15 | 1 |
| 10/18/2006 | Eel | 16AVT15 | 1 |
| 10/20/2006 | Eel | 16AGC15 | 1 |
| 10/20/2006 | Eel | 16AYY15 | 1 |
| 10/23/2006 | Eel | 16AGN15 | 1 |
| 10/23/2006 | Eel | 16AGN15 | 1 |
| 10/23/2006 | Eel | 16AHF15 | 1 |
| 10/23/2006 | Eel | 16AVT15 | 1 |
| 10/25/2006 | Eel | 16AVN15 | 1 |
| 10/26/2006 | Eel | 16AGT15 | 1 |
| 10/26/2006 | Eel | 16AGT15 | 1 |
| 10/27/2006 | Eel | 16AGN15 | 1 |
| 10/29/2006 | Eel | 16AGT15 | 1 |
| 10/30/2006 | Eel | 16AGD15 | 1 |
| 10/30/2006 | Eel | 16AGN15 | 1 |
| 10/30/2006 | Eel | 16AGT15 | 1 |
| 10/31/2006 | Eel | 16AVY15 | 1 |
| 11/01/2006 | Eel | 16AFN15 | 1 |
| 11/01/2006 | Eel | 16AGT15 | 1 |
| 11/02/2006 | Eel | 16AGC15 | 1 |
| 11/04/2006 | Eel | 16AVT15 | 1 |
| 11/06/2006 | Eel | 16AFN15 | 1 |
| 11/07/2006 | Eel | 16AFN15 | 1 |
| 11/07/2006 | Eel | 16AGT15 | 1 |
| 11/07/2006 | Eel | 16AGT15 | 1 |

IA16-131 000048

| 11/09/2006 | Eel | 16AGT15 | 1 |
|---|---|---|---|
| 11/09/2006 | Eel | 16AVT15 | 1 |
| 11/13/2006 | Eel | 16AGN15 | 1 |
| 11/13/2006 | Eel | 16AGT15 | 1 |
| 11/13/2006 | Eel | 16AGT15 | 1 |
| 11/14/2006 | Eel | 16AGT15 | 1 |
| 11/14/2006 | Eel | 16AVN15 | 1 |
| 11/14/2006 | Eel | 16AVT15 | 1 |
| 11/15/2006 | Eel | 16AFN15 | 1 |
| 11/16/2006 | Eel | 16AGC15 | 1 |
| 11/16/2006 | Eel | 16AVN15 | 1 |
| 11/16/2006 | Eel | 16AYT15 | 1 |
| 11/16/2006 | Eel | 16AYY15 | 1 |
| 11/17/2006 | Eel | 16AFN15 | 1 |
| 11/17/2006 | Eel | 16AGD15 | 1 |
| 11/17/2006 | Eel | 16AGN15 | 1 |
| 11/17/2006 | Eel | 16AGT15 | 1 |
| 11/17/2006 | Eel | 16AGT15 | 1 |
| 11/17/2006 | Eel | 16AVT15 | 1 |
| 11/20/2006 | Eel | 16AEE15 | 1 |
| 11/20/2006 | Eel | 16AGC15 | 1 |
| 11/20/2006 | Eel | 16AGT15 | 1 |
| 11/20/2006 | Eel | 16AVT15 | 1 |
| 11/21/2006 | Eel | 16AGC15 | 1 |
| 11/21/2006 | Eel | 16AGN15 | 1 |
| 11/24/2006 | Eel | 16AGC15 | 1 |
| 11/24/2006 | Eel | 16AGT15 | 1 |
| 11/25/2006 | Eel | 16AGT15 | 1 |
| 11/27/2006 | Eel | 16AGN15 | 1 |
| 11/29/2006 | Eel | 16AGT15 | 1 |
| 11/29/2006 | Eel | 16AVT15 | 1 |
| 11/30/2006 | Eel | 16AGD15 | 1 |
| 11/30/2006 | Eel | 16AGT15 | 1 |
| 12/01/2006 | Eel | 16AFN15 | 1 |
| 12/01/2006 | Eel | 16AGC15 | 1 |
| 12/01/2006 | Eel | 16AVN15 | 1 |
| 12/01/2006 | Eel | 16AVT15 | 1 |
| 12/01/2006 | Eel | 16AYY15 | 1 |
| 12/04/2006 | Eel | 16AGT15 | 1 |
| 12/04/2006 | Eel | 16AGT15 | 1 |
| 12/05/2006 | Eel | 16AFN15 | 1 |
| 12/05/2006 | Eel | 16AGD15 | 1 |
| 12/05/2006 | Eel | 16AGT15 | 1 |
| 12/05/2006 | Eel | 16AGT15 | 1 |
| 12/06/2006 | Eel | 16AGT15 | 1 |
| 12/07/2006 | Eel | 16AFN15 | 1 |
| 12/07/2006 | Eel | 16AGT15 | 1 |
| 12/08/2006 | Eel | 16AGD15 | 1 |
| 12/08/2006 | Eel | 16AGN15 | 1 |
| 12/08/2006 | Eel | 16AGT15 | 1 |
| 12/11/2006 | Eel | 16AGN15 | 1 |
| 12/11/2006 | Eel | 16AGT15 | 1 |

| 12/11/2006 | Eel | 16AVT15 | 1 |
|---|---|---|---|
| 12/12/2006 | Eel | 16AVT15 | 1 |
| 12/13/2006 | Eel | 16AGT15 | 1 |
| 12/15/2006 | Eel | 16AGD15 | 1 |
| 12/15/2006 | Eel | 16AGT15 | 1 |
| 12/15/2006 | Eel | 16AGT15 | 1 |
| 12/18/2006 | Eel | 16AVT15 | 1 |
| 12/18/2006 | Eel | 16AYD15 | 1 |
| 12/19/2006 | Eel | 16AGD15 | 1 |
| 12/19/2006 | Eel | 16AGN15 | 1 |
| 12/19/2006 | Eel | 16AGT15 | 1 |
| 12/19/2006 | Eel | 16AVT15 | 1 |
| 12/21/2006 | Eel | 16AFN15 | 1 |
| 12/21/2006 | Eel | 16AGD15 | 1 |
| 12/21/2006 | Eel | 16AGT15 | 1 |
| 12/21/2006 | Eel | 16AVN15 | 1 |
| 12/22/2006 | Eel | 16AGT15 | 1 |
| 12/22/2006 | Eel | 16AVN15 | 1 |
| 12/23/2006 | Eel | 16AGT15 | 1 |
| 12/25/2006 | Eel | 16AGT15 | 1 |
| 12/26/2006 | Eel | 16AGD15 | 1 |
| 12/26/2006 | Eel | 16AGD15 | 1 |
| 12/26/2006 | Eel | 16AVT15 | 2 |
| 12/26/2006 | Eel | 16AVT15 | 1 |
| 12/26/2006 | Eel | 16AVY15 | 1 |
| 12/27/2006 | Eel | 16AGD15 | 1 |
| 12/27/2006 | Eel | 16AVT15 | 1 |
| 12/28/2006 | Eel | 16AFN15 | 2 |
| 12/28/2006 | Eel | 16AGH15 | 1 |
| 12/28/2006 | Eel | 16AGT15 | 1 |
| 12/28/2006 | Eel | 16AYT15 | 1 |
| 01/02/2007 | Eel | 16AGN15 | 1 |
| 01/02/2007 | Eel | 16AGT15 | 1 |
| 01/03/2007 | Eel | 16AGD15 | 1 |
| 01/03/2007 | Eel | 16AGD15 | 1 |
| 01/03/2007 | Eel | 16AVN15 | 1 |
| 01/04/2007 | Eel | 16AGT15 | 1 |
| 01/04/2007 | Eel | 16AGT15 | 1 |
| 01/05/2007 | Eel | 16AFN15 | 1 |
| 01/05/2007 | Eel | 16AGT15 | 1 |
| 01/08/2007 | Eel | 16AGC15 | 1 |
| 01/08/2007 | Eel | 16AGN15 | 1 |
| 01/08/2007 | Eel | 16AGT15 | 1 |
| 01/09/2007 | Eel | 16ABT15 | 1 |
| 01/09/2007 | Eel | 16AGD15 | 1 |
| 01/10/2007 | Eel | 16AGT15 | 1 |
| 01/11/2007 | Eel | 16AGD15 | 1 |
| 01/12/2007 | Eel | 16AGN15 | 1 |
| 01/15/2007 | Eel | 16AGN15 | 1 |
| 01/15/2007 | Eel | 16AGT15 | 1 |
| 01/16/2007 | Eel | 16AGD15 | 1 |
| 01/16/2007 | Eel | 16AVT15 | 1 |

| | | | |
|---|---|---|---|
| 01/17/2007 | Eel | 16AGD15 | 1 |
| 01/18/2007 | Eel | 16AGN15 | 1 |
| 01/19/2007 | Eel | 16AGD15 | 1 |
| 01/19/2007 | Eel | 16AGD15 | 1 |
| 01/19/2007 | Eel | 16AGT15 | 1 |
| 01/19/2007 | Eel | 16AVT15 | 1 |
| 01/22/2007 | Eel | 16AGC15 | 1 |
| 01/22/2007 | Eel | 16AGT15 | 1 |
| 01/22/2007 | Eel | 16AGT15 | 1 |
| 01/22/2007 | Eel | 16AVN15 | 1 |
| 01/25/2007 | Eel | 16AGT15 | 1 |
| 01/25/2007 | Eel | 16AVN15 | 1 |
| 01/29/2007 | Eel | 16AVN15 | 1 |
| 01/30/2007 | Eel | 16AGN15 | 1 |
| 01/30/2007 | Eel | 16AGT15 | 1 |
| 02/01/2007 | Eel | 16AGD15 | 1 |
| 02/01/2007 | Eel | 16AGE15 | 1 |
| 02/02/2007 | Eel | 16AFN15 | 1 |
| 02/02/2007 | Eel | 16AGT15 | 1 |
| 02/02/2007 | Eel | 16AGT15 | 1 |
| 02/05/2007 | Eel | 16AVN15 | 1 |
| 02/07/2007 | Eel | 16AGD15 | 1 |
| 02/12/2007 | Eel | 16AGT15 | 1 |
| 02/13/2007 | Eel | 16AGN15 | 1 |
| 02/13/2007 | Eel | 16AGT15 | 1 |
| 02/13/2007 | Eel | 16AYT15 | 1 |
| 02/14/2007 | Eel | 16AGD15 | 1 |
| 02/14/2007 | Eel | 16AGN15 | 1 |
| 02/14/2007 | Eel | 16AGT15 | 1 |
| 02/15/2007 | Eel | 16AFN15 | 1 |
| 02/15/2007 | Eel | 16AGT15 | 1 |
| 02/15/2007 | Eel | 16AVN15 | 2 |
| 02/16/2007 | Eel | 16AGN15 | 1 |
| 02/16/2007 | Eel | 16AGT15 | 1 |
| 02/19/2007 | Eel | 16AVN15 | 2 |
| 02/20/2007 | Eel | 16AGN15 | 1 |
| 02/20/2007 | Eel | 16AGT15 | 1 |
| 02/22/2007 | Eel | 16AGT15 | 1 |
| 02/22/2007 | Eel | 16AVN15 | 1 |
| 02/26/2007 | Eel | 16AGN15 | 1 |
| 02/26/2007 | Eel | 16AGN15 | 1 |
| 02/27/2007 | Eel | 16AFY15 | 1 |
| 02/27/2007 | Eel | 16AGN15 | 1 |
| 03/01/2007 | Eel | 16AGT15 | 1 |
| 03/01/2007 | Eel | 16AGT15 | 1 |
| 03/01/2007 | Eel | 16AVN15 | 1 |
| 03/02/2007 | Eel | 16AGT15 | 1 |
| 03/02/2007 | Eel | 16AGT15 | 1 |
| 03/05/2007 | Eel | 16AVN15 | 1 |
| 03/06/2007 | Eel | 16AVN15 | 1 |
| 03/07/2007 | Eel | 16AGT15 | 1 |
| 03/07/2007 | Eel | 16AGT15 | 1 |

IA16-131 000051

| 03/08/2007 | Eel | 16AGT15 | 1 |
|------------|-----|---------|---|
| 03/08/2007 | Eel | 16AGT15 | 1 |
| 03/12/2007 | Eel | 16AGN15 | 1 |
| 03/15/2007 | Eel | 16AGT15 | 1 |
| 03/16/2007 | Eel | 16AGD15 | 1 |
| 03/19/2007 | Eel | 16AGT15 | 1 |
| 03/20/2007 | Eel | 16AGC15 | 1 |
| 03/21/2007 | Eel | 16AGT15 | 1 |
| 03/22/2007 | Eel | 16AFN15 | 1 |
| 03/22/2007 | Eel | 16AGT15 | 1 |
| 03/22/2007 | Eel | 16AVN15 | 4 |
| 03/23/2007 | Eel | 16AGN15 | 1 |
| 03/25/2007 | Eel | 16AGC15 | 1 |
| 03/27/2007 | Eel | 16AGN15 | 1 |
| 03/28/2007 | Eel | 16AHT15 | 1 |
| 03/28/2007 | Eel | 16AVN15 | 4 |
| 03/30/2007 | Eel | 16AGN15 | 1 |
| 03/30/2007 | Eel | 16AVN15 | 1 |
| 04/02/2007 | Eel | 16AVT15 | 1 |
| 04/02/2007 | Eel | 16AVT15 | 1 |
| 04/03/2007 | Eel | 16AGN15 | 1 |
| 04/03/2007 | Eel | 16AVN15 | 1 |
| 04/06/2007 | Eel | 16AGN15 | 1 |
| 04/09/2007 | Eel | 16AGD15 | 1 |
| 04/09/2007 | Eel | 16AGH15 | 1 |
| 04/10/2007 | Eel | 16AGN15 | 1 |
| 04/10/2007 | Eel | 16AGN15 | 1 |
| 04/10/2007 | Eel | 16AGT15 | 1 |
| 04/11/2007 | Eel | 16AGD15 | 1 |
| 04/11/2007 | Eel | 16AGD15 | 1 |
| 04/11/2007 | Eel | 16AGN15 | 1 |
| 04/11/2007 | Eel | 16AGT15 | 1 |
| 04/12/2007 | Eel | 16AVT15 | 1 |
| 04/13/2007 | Eel | 16AFN15 | 1 |
| 04/13/2007 | Eel | 16AVN15 | 1 |
| 04/14/2007 | Eel | 16AGT15 | 1 |
| 04/16/2007 | Eel | 16AGT15 | 1 |
| 04/16/2007 | Eel | 16AYT15 | 1 |
| 04/17/2007 | Eel | 16AGD15 | 1 |
| 04/17/2007 | Eel | 16AGE15 | 1 |
| 04/17/2007 | Eel | 16AVD15 | 1 |
| 04/18/2007 | Eel | 16AGN15 | 1 |
| 04/18/2007 | Eel | 16AGT15 | 1 |
| 04/19/2007 | Eel | 16AGC15 | 1 |
| 04/20/2007 | Eel | 16AGH15 | 1 |
| 04/24/2007 | Eel | 16AGT15 | 1 |
| 04/27/2007 | Eel | 16AVN15 | 1 |
| 04/29/2007 | Eel | 16AGT15 | 1 |
| 04/30/2007 | Eel | 16AGN15 | 1 |
| 04/30/2007 | Eel | 16AGN15 | 1 |
| 04/30/2007 | Eel | 16AVT15 | 1 |
| 05/02/2007 | Eel | 16AVT15 | 1 |

IA16-131 000052

| 05/02/2007 | Eel | 16AVT15 | 1 |
| 05/04/2007 | Eel | 16AGN15 | 1 |
| 05/07/2007 | Eel | 16AGC15 | 1 |
| 05/07/2007 | Eel | 16AGT15 | 1 |
| 05/08/2007 | Eel | 16AGT15 | 1 |
| 05/08/2007 | Eel | 16AGT15 | 1 |
| 05/08/2007 | Eel | 16AGT15 | 1 |
| 05/08/2007 | Eel | 16AVT15 | 1 |
| 05/09/2007 | Eel | 16AGN15 | 1 |
| 05/09/2007 | Eel | 16AGT15 | 1 |
| 05/10/2007 | Eel | 16AGN15 | 1 |
| 05/11/2007 | Eel | 16AVT15 | 1 |
| 05/14/2007 | Eel | 16AGT15 | 1 |
| 05/15/2007 | Eel | 16AGD15 | 1 |
| 05/15/2007 | Eel | 16AGN15 | 1 |
| 05/16/2007 | Eel | 16AVT15 | 1 |
| 05/16/2007 | Eel | 16AVT15 | 1 |
| 05/17/2007 | Eel | 16AGD15 | 1 |
| 05/22/2007 | Eel | 16AVT15 | 1 |
| 05/23/2007 | Eel | 16AYD15 | 1 |
| 05/24/2007 | Eel | 16AGN15 | 1 |
| 05/25/2007 | Eel | 16AGN15 | 1 |
| 05/25/2007 | Eel | 16AVT15 | 1 |
| 05/28/2007 | Eel | 16AGN15 | 1 |
| 05/28/2007 | Eel | 16AVN15 | 1 |
| 05/29/2007 | Eel | 16AVN15 | 1 |
| 05/30/2007 | Eel | 16AGN15 | 1 |
| 05/30/2007 | Eel | 16AGT15 | 1 |

292

**Total manuf**          **83**
**Total shipments**      **292**

IA16-131 000053

**Updated CN Shrimp Entries**
**10-01-06 to 05-31-07**

| Submission Date | Product Code Description | Product Code | Entries Count |
|---|---|---|---|
| 10/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 10/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 3 |
| 10/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 10/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |

| | | | |
|---|---|---|---|
| 10/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 10/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 10/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 10/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |

IA16-131 000055

| 10/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/07/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGP21 | 1 |
| 10/07/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/07/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 3 |
| 10/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |
| 10/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000056

| 10/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
|---|---|---|---|
| 10/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 10/10/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 10/10/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 10/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 10/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

| | | | |
|---|---|---|---|
| 10/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 10/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 10/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 2 |
| 10/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 10/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |

| | | | |
|---|---|---|---|
| 10/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 6 |
| 10/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 10/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 10/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000059

| | | | |
|---|---|---|---|
| 10/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGY21 | 1 |
| 10/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 10/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 10/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 10/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 10/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 10/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000060

| | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | | |
|---|---|---|---|
| 10/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 10/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 10/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 10 |
| 10/22/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/23/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 10/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 3 |

| | | | |
|---|---|---|---|
| 10/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/25/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/25/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 9 |
| 10/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 10/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 11 |

| 10/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
|---|---|---|---|
| 10/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 10/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 10/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |

IA16-131 000063

| 10/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
|---|---|---|---|
| 10/30/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 10/30/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/30/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/31/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 3 |
| 10/31/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 10/31/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 10/31/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000064

| | | | |
|---|---|---|---|
| 11/01/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 5 |
| 11/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 11/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 11/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 11/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 7 |

| 11/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
|---|---|---|---|
| 11/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 12 |
| 11/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 11/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 11/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 7 |
| 11/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000066

| 11/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
|---|---|---|---|
| 11/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/10/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/10/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000067

| 11/10/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
|---|---|---|---|
| 11/10/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 9 |
| 11/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 10 |
| 11/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |
| 11/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |

IA16-131 000068

| 11/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
|---|---|---|---|
| 11/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 11/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000069

| | | | |
|---|---|---|---|
| 11/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 11/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 11/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000070

| 11/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 4 |
|---|---|---|---|
| 11/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XDD21 | 1 |
| 11/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 2 |
| 11/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 5 |
| 11/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |

| | | | |
|---|---|---|---|
| 11/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 2 |
| 11/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 11/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 6 |
| 11/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 8 |
| 11/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/22/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/22/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 11/22/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/23/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 11/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 5 |
| 11/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 11/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 7 |
| 11/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 11/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 11/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 4 |

IA16-131 000073

| | | | |
|---|---|---|---|
| 11/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 11/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 10 |
| 11/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 11/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

IA16-131 000074

| | | | |
|---|---|---|---|
| 11/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 11/30/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 12/01/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 12/01/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 12/01/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 6 |
| 12/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 12/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 5 |

| | | | |
|---|---|---|---|
| 12/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 2 |
| 12/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 12/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 4 |
| 12/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 12/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |

| 12/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |
| 12/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 6 |
| 12/07/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 3 |
| 12/07/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 12/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 12/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 8 |

IA16-131 000077

| | | | |
|---|---|---|---|
| 12/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 12/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 2 |
| 12/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 12/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |
| 12/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 2 |
| 12/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 6 |
| 12/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |

| | | | |
|---|---|---|---|
| 12/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 12/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 12/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 12/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 12/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 12/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

IA16-131 000079

| 12/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
|---|---|---|---|
| 12/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 12/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 4 |
| 12/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |

| | | | |
|---|---|---|---|
| 12/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 12/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 12/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 12/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000081

| 12/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
|---|---|---|---|
| 12/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 12/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 12/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGY21 | 1 |
| 12/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 9 |
| 12/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 10 |

IA16-131 000082

| 12/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/22/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/22/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 12/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000083

| | | | |
|---|---|---|---|
| 12/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 12/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 12/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 12/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 4 |
| 12/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |

IA16-131 000084

| | | | |
|---|---|---|---|
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 5 |
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/31/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/31/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 01/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |

IA16-131 000085

| 01/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
|---|---|---|---|
| 01/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 2 |
| 01/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 01/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 4 |
| 01/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |

IA16-131 000086

| | | | |
|---|---|---|---|
| 01/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 01/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 01/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 01/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/06/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000087

| | | | |
|---|---|---|---|
| 01/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 01/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 01/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 5 |
| 01/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |
| 01/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 01/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 3 |
| 01/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 01/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000088

| | | | |
|---|---|---|---|
| 01/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 01/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 01/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |
| 01/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 01/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 01/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 4 |
| 01/13/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |

| | | | |
|---|---|---|---|
| 01/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 01/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 01/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 01/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 01/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000090

| | | | |
|---|---|---|---|
| 01/21/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 01/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 01/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 01/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000091

| 01/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XHD21 | 1 |
| 01/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 01/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 01/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 01/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/30/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 3 |
| 01/31/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/31/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |

IA16-131 000092

| | | | |
|---|---|---|---|
| 02/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 02/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 02/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 5 |
| 02/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/06/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 02/06/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 02/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |

| 02/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 5 |
|---|---|---|---|
| 02/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 02/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 02/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 02/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 4 |
| 02/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 4 |
| 02/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 4 |

| | | | |
|---|---|---|---|
| 02/14/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGP21 | 1 |
| 02/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 02/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 02/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 02/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 02/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 02/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |

| 02/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/20/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 02/20/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

IA16-131 000096

| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
|---|---|---|---|
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/23/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 02/23/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

IA16-131 000097

| | | | |
|---|---|---|---|
| 02/23/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 02/23/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/23/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 02/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 02/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 02/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 02/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 02/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 02/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 02/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 02/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |

IA16-131 000099

| 03/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 03/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 03/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 03/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/06/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 03/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| 03/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
|---|---|---|---|
| 03/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/13/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/15/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |

| | | | |
|---|---|---|---|
| 03/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |
| 03/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 03/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 03/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |
| 03/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 03/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

IA16-131 000102

| | | | |
|---|---|---|---|
| 03/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 03/30/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 04/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 3 |
| 04/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 04/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 04/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/06/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000103

| | | | |
|---|---|---|---|
| 04/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 04/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 04/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 04/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000104

| | | | |
|---|---|---|---|
| 04/13/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 2 |
| 04/13/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/15/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 04/15/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 04/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGP21 | 1 |
| 04/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

| 04/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
|---|---|---|---|
| 04/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 04/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 04/20/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 04/20/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/20/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000106

| | | | |
|---|---|---|---|
| 04/21/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 04/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 04/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 04/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 04/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 04/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 4 |
| 04/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 04/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 04/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 04/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/30/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |

| 04/30/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
|---|---|---|---|
| 04/30/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |
| 05/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 05/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 05/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |
| 05/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 4 |

IA16-131 000109

| 05/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
|---|---|---|---|
| 05/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 6 |
| 05/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000110

| | | | |
|---|---|---|---|
| 05/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 05/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 05/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |
| 05/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

IA16-131 000111

| 05/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
|---|---|---|---|
| 05/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 05/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/13/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 05/13/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/14/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/15/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| 05/15/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 05/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 05/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 05/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 05/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |

| 05/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/20/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/21/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 05/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 05/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 05/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

IA16-131 000114

| 05/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
|---|---|---|---|
| 05/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 05/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 05/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |

IA16-131 000115

| | | | |
|---|---|---|---|
| 05/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/30/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

915

**Total manuf**         **57**
**Total shipments**      **915**

IA16-131 000116

## U.S. FDA China Chemotherapeutic Residues Trip Report
### September 12-28, 2006

# Final Report - Summary

**1.    Introduction**

This mission took place in the People's Republic of China from September 12-28, 2006.   The mission team consisted of Brett Koonse and Barbara Montwill from the U.S. Food and Drug Administration (FDA).

**2.    Objectives and Scope of Mission**

The objective of the mission was to evaluate China's overall control of chemotherapeutic residues in aquacultured products exported to the US.

In terms of scope, the mission looked at the legal, administrative, and regulatory measures the competent authorities have implemented to control the use and availability of antibiotics;   the controls farms and processing facilities have implemented to control drug residues; the availability of antibiotics at retail stores that sell veterinary medicinal products (VMP); and the operation and performance of the laboratories that analyze for the presence of drug residues in catfish, shrimp, eel, and crab meat.

In pursuit of this objective, the following sites were visited and meetings held:

| COMPETENT AUTHORITY VISITS | | # meetings |
|---|---|---|
| Competent Authority Provincial Competent Authorities<br><br>Local CIQ and    MOA officials | Central | 2 |
| | Regional Provincial | 3 |
| | Local | 6 |
| | | |
| **LABORATORYY VISITS** | | 3 |
| Central/reference | | |
| | | |
| **LIVE ANIMAL CONTROL SITES** | | 9 |
| Farms | | |

1

IA16-131 000117

| | |
|---|---|
| **ESTABLISHMENTS** | 7 |
| Processing facilities | |
| **OTHERS** | 5 |
| VMP retailer | 3 |
| Farm association meetings | 2 |

### 3.    China Aquaculture Production and Exports to the US

The United States imports 70% of the seafood it consumes and over 40% percent of this seafood is from aquaculture operations.   Three of the most popular seafood items are also three of the top aquaculture imports: shrimp, salmon, and tilapia. Together, they represented over two billion pounds of seafood imported into the U.S. in 2004.

It is estimated that 90 percent of shrimp, the number one seafood consumed in the US, is imported, and almost all of the tilapia is imported as well. China is the largest aquaculture producing country in the world, accounting for 70% of the total quantity and 55% of the total value of aquacultured seafood bought and sold around the world. China is currently the third largest exporter of seafood to the US and includes, shrimp, catfish, and tilapia.   China's market share in the U.S has steady increased from 5 percent in 1995 to 11 percent in 2004. With its rapidly growing aquaculture industries, China may soon surpass Canada and Thailand as the leading supplier of seafood products to the U.S.

### 4.    Overall Comments on Competent Authorities

The control of animal residues in China is rather complicated.   There does appear to be overlapping responsibilities of several government agencies.

In General:
- China General Administration of Quality Supervision, Inspection and Quarantine, AQSIQ, has the overall responsibility for aquacultured products exported from China;
- Ministry of Agriculture, MOA, has the overall responsibility for aquaculture operations and for the products used on aquaculture farms (e.g., VMPs);
- Certification and Accreditation Administration, CNCA, has overall responsibility for HACCP compliance of seafood processing facilities;
- Entry-Exit Inspection and Quarantine Bureau, CIQ, has local responsibility for inspecting and sampling aquaculture farms and seafood processors that export.
- Local or municipal branches of CIQ conduct many of the inspecting and sampling functions on aquaculture farms intended for export
- Local or municipal Ocean and Fishery Bureaus are responsible for implementation the national NRCP and the local residue control programs.

### 5. Conclusions:

2

IA16-131 000118

Overall, the FDA team concluded that China's current unapproved residue control program for products exported to the U.S. is neither satisfactory nor effective. China is a very large country with the world's largest aquaculture industry producing 70% of the world's aquaculture products. There is no preventative system in place whereby the aquaculture industry (e.g., farmers), processors, and exporters are trained about food safety as it relates to aquaculture operations and the rely too heavily on an inadequate product testing scheme.

A significant concern is that MG and its metabolite Leucomalachite Green residues appear to be currently in the eel in China, both those eel still in ponds or that is frozen after processing, because of past practices. The reasons are its historical use in China, CIQ's relatively recent testing methods and product testing schemes, eel's relative long grow-out period, and MGs long residual time in fish tissue.

There are also concerns with using other drugs in aquaculture products that are not approved in the US e.g. nitrofurans, fluoroquinolones.

Other Concerns:

1.  In China, processors collect and analyze their own pre-harvest samples in their own laboratories.

2.  Chinese government officials stated that there have been reports of an organized group developing and providing forged Sanitary or Export Certificates which are the guarantee that the product had been manufactured under sanitary conditions and is in compliance with the US regulations.

3.  Numerous lots (product from one pond, from one farm, on any given day) make up "shipments" but only a relatively few sub-samples are taken to assure aquaculture products are free for unapproved residues.

4.  Feed, fingerlings, or product found to contain unapproved drug residues may not be destroyed or tracked to assure the product does not get into the export country market. It may be sold into the domestic market or as animal feed and may make its way back into the export market.

5.  Most of the aquaculture products are being analyzed at local CIQ laboratories. We received limited information as to the capacity for these laboratories to test inspectional samples. However, it appeared to us that there are too few routine or local laboratories capable of testing for drugs that are prohibited for use in aquaculture. This includes the lack of routine or local laboratories that are capable of analyzing for NF and MG.

6.  All four drugs (furazolidone, furaltadone, nitrofurazone and nitrofurantoin) belonging to the group of nitrofuran antibacterial agents have been widely used as veterinary drugs

3

IA16-131 000119

in China. However, some local government laboratories and processor laboratories use and rely on results from commercially available laboratory screening methods for NF that can only detect metabolites of furazolidone (AOZ) and furaltadone (AMOZ). A confirmatory test is not employed. Furthermore, some laboratories listed in the National Residue Control Program tested only for the metabolite furazolidone (AOZ). This limitation may result in a failure to detect residues of NF in the product and cast doubt on China's ability to control the use of this drug in aquaculture production.

7. In China, the approved analytical method for detection of MG and its metabolite of Leucomalachite Green is still not widely used in all laboratories. In addition, the method that was developed in September 2005 and implemented in January 2006 has a sensitivity of $2\mu g/kg$ (as indicated in the NRCP) which does not meet the U.S. expectation for a detection level for the presence of this illegal drug residue.

8. The standard methods used in China are only recommended methods and AQSIQ laboratories can select any method that meets their needs and capability as long as the selection is validated according to the Quality Control Guideline for Analysis of Residues. This may result in inconsistent results.

9. In some instances various methods for specific drug residue testing might be available. Laboratories might modify the standard method according to their capability (e.g. instrumentation, personnel and workload) and will develop their own SOPs. This may make it difficult for inter-laboratory comparison and may affect the reliability and quality of the analytical data generated.

10. There appeared to be limited communication between AQSIQ and MOA laboratories involved in seafood product safety control.

**IA16-131 000120**

**Attachment E**

**CFIA Results for Unapproved Drug Residues in Imports from China, April 01, 2006-March 31, 2007**

Source: CFIA Report: Number of Lots Inspected and Number of Lots Rejected for Drug Residues between 2006/04/01 and 2007/03/31 (Sorted by Country of Origin, Foreign Processor and Species)

| Species | Analyte | # Firms Inspected | # Shipments Inspected | # Unacceptable Shipments | Rejection Rate |
|---------|---------|-------------------|------------------------|---------------------------|----------------|
| Shrimp | Malachite green | 11 | 15 | 0 | 0% |
| Bream | | 3 | 6 | 0 | 0 |
| Catfish | | 3 | 3 | 1 | 33.3% |
| Croaker | | 21 | 63 | 3 | 4.8% |
| Dace/Carp | | 8 | 34 | 5 | 14.7% |
| Eel | | 17 | 71 | 3 | 4.2% |
| Mullet | | 2 | 4 | 0 | 0% |
| Salmon | | 3 | 5 | 0 | 0% |
| Tilapia | | 20 | 42 | 2 | 4.8% |
| Pompano | | 3 | 5 | 1 | 20% |
| Other fish | | 14 | 18 | 0 | 0% |
| **Total** | | | **266** | **15** | **5.6%** |
| | Nitrofurans | | | | |
| Shrimp | | 42 | 345 | 47 | 13.6% |
| Eel | | 8 | 10 | 3 | 30.0% |
| Tilapia | | 9 | 11 | 0 | 0% |
| Croaker | | 8 | 8 | 1 | 12.5% |
| Dace/Carp | | 5 | 5 | 0 | 0% |
| Catfish | | 3 | 3 | 0 | 0% |
| Salmon | | 3 | 4 | 0 | 0% |
| Bass Sea | | 1 | 1 | 0 | 0% |
| Squid | | 1 | 2 | 0 | 0% |
| Crawfish | | 1 | 1 | 0 | 0% |
| Other fish | | 9 | 22 | 7 | 31.8% |
| **Total** | | | **412** | **58** | **14.1%** |

**Attachment F**

**CFIA Import Alert list of Chinese processors/shippers with violative product (Oct 2006-April 2007)**

Source: CFIA website http://active.inspection.gc.ca/scripts/fispoi/ial/IALFront.asp?lang=e

| Country | Processor | Product | Analyte Residue | Date Listed |
|---------|-----------|---------|-----------------|-------------|
| China | ████████████████████ | All products | Malachite green | 1/23/2007 |
| China | ██████████████████ | All products | Malachite green | 1/26/2007 |
| China | ███████████████████████ | All products | Nitrofuran | 2/5/2007 |
| China | █████████████████ | All products | Nitrofuran | 2/8/2007 |
| China | █████████████████ | All products | Nitrofuran | 2/19/2007 |
| China | ████████████████████████ | All products | Nitrofuran | 2/26/2007 |
| China | ██████████████ | All products | Nitrofuran | 2/26/2007 |
| China | ████████████████████ | All products | Nitrofuran | 2/27/2007 |
| China | ███████████████████ | All products | Nitrofuran | 3/1/2007 |
| China | ████████████████████ | All products | Nitrofuran | 3/13/2007 |
| China | █████████████████████ | All products | Nitrofuran | 3/13/2007 |
| China | ███████████████ | All products | Nitrofuran | 3/14/2007 |
| China | ████████████████ | All products | Nitrofuran | 3/20/2007 |
| China | ██████████████ | All products | Florfenicol | 3/29/2007 |
| China | █████████████████████ | All products | Nitrofuran | 4/10/2007 |
| China | ████████████████ | All products | Nitrofuran | 4/10/2007 |
| China | ██████████████ | All products | Nitrofuran | 4/11/2007 |
| China | ███████████████████████████ | All products | Malachite green | 5/8/2007 |
| China | ██████████████████ | All products | Nitrofuran | 11/2/2006 |
| China | ████████████████████ | All products | Malachite green | 11/29/2006 |
| China | ████████████████████ | All products | Nitrofuran | 11/30/2006 |
| China | █████████████████████ | All products | Nitrofuran & Malachite green | 12/22/2006 |

Marked in red: processors with product that tested positive under FDA program

Marked in green: processors that shipped product to US in the last 6 months

IA16-131 000122

## Attachment G

On April 25, 2007 <u>Alabama Department of Agriculture and Industry</u> issued an automatic "Stop Sale" order for all catfish from China. The decision was made after the results of tests conducted on samples of imported fish from China revealed the presence of Enrofloxicin, a drug that belongs to the class of Flouoroqinolones, antibiotics not approved for use in aquatic food producing animals in the United States. Twenty samples of catfish collected for analysis were obtained from nine different food storage warehouses between February 13, 2007 and March 29, 2007. Information on the manufacturer/shipper in China was not available.

Tests were conducted in the Alabama Department of Agriculture and Industry's Food and Drug Laboratory. Of the twenty samples, fourteen were positive. Levels of Enrofloxacin residue in fish tissue ranged from 1.2 to 20.6 ppb. The presence of this drug residue in catfish was detected by LC/MS/MS with a method sensitivity of 1.0 ppb.  Ciprofloxacin and Sarafloxacin were not detected in any sample.

Detailed lab results are provided below.

| Date sampled | Level (ppb) | |
|---|---|---|
| | Detected | Confirmed |
| 3/29/07 | 1.57 | 1.68 |
| 3/29/07 | 1.59 | 1.78 |
| 2/27/07 | 1.20 | 1.21 |
| 3/09/07 | 1.14 | 1.28 |
| 3/09/07 | 2.90 | 2.99 |
| 3/09/07 | 3.34 | 2.85 |
| 3/09/07 | 3.19 | 2.85 |
| 3/01/07 | 7.61 | 7.26 |
| 3/09/07 | 13.4 | 12.6 |
| 3/09/07 | 15.0 | 15.1 |
| 3/09/07 | 5.20 | 5.10 |
| 3/06/07 | 24.4 | 20.6 |
| 3/06/07 | 8.28 | 8.43 |

# EXHIBIT 2



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
Rockville MD 20857

DEC 0 7 2007

Mr. Mitchell Fuerst
Ms. Christine Humphrey
Fuerst, Humphrey, Ittleman, PL
1001 Brickell Bay Drive
Suite 2002
Miami, Florida 33131

Dear Mr. Fuerst and Ms. Humphrey:

This is in response to documents provided to the Food and Drug Administration (FDA) in further support of your request on behalf of Allied Pacific Food Company for removal of the firm from Detention Without Physical Examination (DWPE) under Import Alert 16-131, "Detention Without Physical Examination of Aquacultured Catfish, Basa (Pangasius Sp), Shrimp, Dace, and Eel Products From The People's Republic Of China Due to the Presence of New Animal Drugs and/or Unsafe Food Additives." This letter addresses only the documentation provided regarding the firm's Hazard Analysis Critical Control Point (HACCP) system; it does not address any remaining issues related to private laboratory analytical documentation, which will be responded to separately.

On November 13, 2007, you provided FDA with the firm's revised HACCP plans dated November 12, 2007, for breaded shrimp, breaded skewered shrimp, and pan-fried tempura shrimp. The package also included two letters dated November 12, 2007, from the ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ attesting to the completion of audit inspections conducted at the firm on November 3 and 8, 2007. On November 15, 2007, you provided the qualifications for ▮▮▮▮▮▮ and ▮▮▮▮▮ auditors representing ▮▮▮ and ▮▮▮ respectively. On November 21, ▮▮▮ provided their inspection reports to FDA. The audits covered an examination of the firm's HACCP plan, the operation of the plan, including the standard sanitation operating procedures, for compliance with FDA's Seafood HACCP regulation at 21 CFR part 123.

FDA has reviewed the additional documentation you provided and has the following comments:

Revised HACCP Plans

The three HACCP plans identify aquaculture drugs as a potential hazard at the receiving step. The processor receives raw material from two sources: imported aquacultured shrimp and domestically farm-raised shrimp. According to the three HACCP plans, each lot of imported shrimp is tested by a third-party laboratory using rapid screening kits, ELISA and CHARM II, and each lot of domestic farm-raised shrimp is accompanied by a certificate indicating proper drug usage.

The verification step in the HACCP plans for imported shrimp requires evaluation of third-party laboratory testing results on a monthly basis. The HACCP plans do not, however, provide information describing how the firm evaluates the third-party laboratory testing results or what methodology is used. For domestic shrimp, the verification step in the HACCP plans requires a ███████████████████████████████████████████████████████████████████████for the domestic shrimp. It is unclear what is meant by the ████████████████ and what methodology is used by the ████████████████ FDA cannot fully review the verification steps for imported and domestic shrimp without this information.

Because the imported shrimp is routinely tested only by rapid screening method, for the verification step for imported shrimp, FDA recommends including monthly or quarterly verification testing using methods recommended by FDA or AOAC.

Auditor Paper Credentials

The documentation provided for ████████████ indicates experience in auditing and in HACCP generally; however, there is no information in the documentation provided to demonstrate that ████████████ has any training or experience in seafood HACCP. If ████████████ does have this training or experience, please provide documentation of this. FDA has no additional comments or questions regarding ████████████ documentation.

████████████████████████████████ Audits

The November 3 and 8, 2007 audit reports from ████████ provided a broad evaluation of the firm's overall implementation of the firm's HACCP system. No detailed information was provided regarding the adequacy of controls in place for unapproved veterinary drugs used in aquacultured shrimp. If available, the ████████ should provide this information.

The November 3 audit evaluated the September 1, 2007, HACCP plan. In the November 8 audit, the auditor does not indicate what HACCP plan was evaluated, that is, whether it was the same or a revision of the September 1, 2007, HACCP plan audited on November 3. This should be clarified.

Audit Inspection

As you are aware, IA 16-131 states that if a firm wishes to request removal from DWPE for Chinese aquaculture, the firm should provide information to FDA that demonstrates that the "manufacturer has the appropriate controls and processes in place to ensure the quality of the product" it produces. IA 16-131 further describes the information that may satisfy that standard to include documentation from "an appropriate third-party ... demonstrating that an inspection of the processor was conducted and that the seafood was processed in accordance with ... 21 CFR part 123...." As FDA has begun to process requests to be removed from DWPE under IA 16-131, FDA has given additional consideration to what it means for the third party auditor to be "appropriate" in this context.

As we discussed during our November 13 meeting, FDA has been contemplating whether to conduct on-site inspections of third party auditors in order to evaluate the adequacy of their submissions, i.e., whether the third party is an "appropriate" auditor. The Seafood HACCP regulation, 21 CFR part 123, is an innovative rule in the regulation of food safety, in that it places the burden on processors of fish and fishery products to identify hazards that are reasonably likely to occur and to develop suitable controls for those hazards. Making these HACCP assessments properly requires a solid scientific background, a thorough understanding of the particular food and how it is processed, and a working knowledge of HACCP principles. The transition to a HACCP control system has proven to be a significant challenge for much of the U.S. and foreign fish and fishery products industry as well as for many state, federal, and foreign regulatory officials. Indeed, FDA has found that industry representatives, investigators, and consultants who understand these concepts in theory do not always apply them properly in the processing plant environment. For this reason as well as other concerns, FDA plans to apply the same standards and processes to inspections conducted by ▮▮▮▮▮ which conducts inspections under a fee-for-service structure, as it does to inspections conducted by other third parties.

The evidence summarized in the Import Alert suggests that a significant portion of the Chinese aquaculture processing industry had not properly implemented HACCP controls as required. For example, during the period October 1, 2006 through May 31, 2007, 25% of the aquacultured catfish, Basa (Pangasius sp), shrimp, dace, and eel from China that FDA tested contained drug/food additive residues. If appropriate and effective controls were in place, they would have prevented this routine, documented occurrence of unapproved new animal drugs or unsafe food additives in the finished products from China. Because many Chinese aquaculture processors may have sufficient HACCP plans on paper but may not appropriately implement them, as has been the case elsewhere, and because FDA does not have the resources to itself inspect every foreign producer on an ongoing basis, FDA believes that third party audits of the foreign processors will play an important role in FDA's assessment whether a manufacturer has the appropriate controls and processes in place.

However, given the learning curve experienced by regulators around the world in shifting to HACCP-based inspections, FDA's current view is that, before it can be confident in the quality of a given auditor, it should verify that the auditor understands the science, the product, the processing technology, and the principles of HACCP and can apply them in different processing plant settings. Thus, in addition to reviewing a processing plant's HACCP paperwork and a third-party's credentials, FDA believes it would be prudent, at this early stage of this program, to conduct its own on-site audits of the auditors' work until it gains confidence that the specific auditor or auditors are properly applying HACCP principles. This process would enable FDA to verify that the third party will apply standards consistent with the Agency's standards on the suitability of controls in place at a processing facility to ensure that residues of drugs/food additives will be appropriately controlled. FDA has followed this inspect-the-auditor process for the one firm that has been removed from DWPE under Import Alert 16-131 to date.

FDA does not believe it should forego inspections to verify the ability of auditors to conduct appropriate HACCP inspections simply because a company may have had several third party audits of its processes. Cumulative audits are only as reliable as the quality of the auditors who

perform them. Thus, multiple audits will not provide FDA with the assurance that HACCP principles are being properly applied unless and until FDA gains confidence with at least one of the specific auditors.

FDA is currently planning its next trip to China to perform a series of audits of several aquaculture firms and their third party inspectors. Although we seek to make that trip as soon a practicable (our current target is January or February 2008), there are factors outside of FDA's control that may limit our ability to do so. If Allied is able to address the HACCP-related issues raised in this letter above, and provided that there are no other significant adverse developments related to Allied's request in the meantime, FDA intends to make every effort to include Allied in that next trip.

If you have any questions concerning this letter, please contact Mr. Ted Poplawski at 301-594-3849 or ted.poplawski@fda.hhs.gov.

Sincerely,

Domenic J. Veneziano, CDR/USPHS
Director, Division of Import Operations & Policy

# EXHIBIT 3

section 9, the section under consideration, are to be accepted as official and constitute the basis of criminal prosecution in the courts, or is the question of fact open for consideration in the courts?

Mr. MANN. Why, it is certainly open for consideration in the courts, but this is the basis for the criminal prosecution. It is absolutely necessary that there should be some standard fixed before anybody can determine on the part of the Government whether prosecution shall be inaugurated or not, but, of course, it finally rests with the court to determine whether, as a matter of fact, the article is adulterated or is unwholesome, under the provisions of the act.

Mr. CRUMPACKER. Then, an indictment or information would not be good under this bill, if it charged simply that a person failed to comply with the food or drug standard, as fixed by the law?

Mr. MANN. It would not.

Mr. CRUMPACKER. What does the phrase mean, in line 22, "and for the information of the courts?" If the standard is to be fixed officially and it is not to constitute a basis of an indictment or a penal prosecution, why do you say "for the information of the courts?"

Mr. MANN. That it may be introduced in evidence in the courts.

Mr. CRUMPACKER. It is to be admissible in evidence, is it?

Mr. MANN. That is what it amounts to.

Mr. CRUMPACKER. I do not believe this section makes it admissible. It does not provide it shall be admissible in evidence.

Mr. MANN. I think "for information of the courts" will admit it in evidence when presented in proper form. I have no doubt of that.

Mr. CLARK of Missouri. I would like to ask the gentleman, Does the gentleman undertake to make a certificate of the Secretary of Agriculture evidence against a defendant in a criminal case?

Mr. MANN. Evidence that that is the standard which has been fixed by the Secretary of Agriculture; not evidence that the person is guilty of a misdemeanor.

Mr. PAYNE. That is not involved in this amendment, is it?

Mr. MANN. It is not particularly involved in it.

Mr. PAYNE. Now, the gentleman from Indiana is talking about that which seems to be harmless. See if we can not get time to amend the other part of it.

Mr. CRUMPACKER. That is not harmless; it has a good deal of significance when read in connection with other provisions.

Mr. PAYNE. It does not make much difference whether we get at this or not if we leave the other in——

Mr. CLARK of Missouri. Mr. Chairman, if the gentleman will permit me, when we get to that part of the bill I will move to strike it out, because it is contrary to the Constitution of the United States and the constitution of every State in the Union.

Mr. CRUMPACKER. And of every individual in the country.

Mr. GROSVENOR. If the gentleman will allow me a word, I think I can say to my friend——

The CHAIRMAN. The time of the gentleman has expired.

Mr. CRUMPACKER. I ask unanimous consent for five minutes more.

The CHAIRMAN. Is there objection? [After a pause.] The Chair hears none.

Mr. GROSVENOR. The text as it stands; I would like to have the gentleman from Missouri take a copy of the bill and look at page 23; "It shall be the duty of the Secretary of Agriculture, for the purpose of aiding him in determining as to the wholesomeness or unwholesomeness of food." Now, that is all here is of it. It need not have been put there at all. He might have used their advice for any purpose. But in order to limit the Secretary of Agriculture so that he should not permit he board to become a finality the limitation is put and——

Mr. CRUMPACKER. It seems, by implication at least, to provide that the Secretary of Agriculture is to fix a standard which shall be a basis for criminal prosecutions——

Mr. GROSVENOR. That is true.

Mr. CRUMPACKER. The text as it stands will not bear that instruction, in my judgment—will not bear that interpretation, certainly do not believe we ought to confer upon the Secretary of Agriculture the power to fix a standard and then convict a man of crime, fine him, and send him to prison because he does not comply with the standard. That would be department-made law.

Mr. ADAMS. Will the gentleman permit me?

Mr. CRUMPACKER. I believe the law ought to provide that whoever sells forbidden kinds of foods or drugs or medicines may be amenable to the penal provisions in the bill.

Mr. ADAMS. Will the gentleman allow me to offer a suggestion?

Mr. CRUMPACKER. I will.

Mr. ADAMS. The object of this bill is to frame a law which will enable the Secretary of Agriculture to get all possible information, so that when he desires to prosecute he will have all of the information he can get. It does not confer any additional authority of law upon him.

Mr. CRUMPACKER. It authorizes the Secretary of Agriculture to collect this information and fix standards for foods and drugs, among other things, for the information of the courts. What is the business of the courts in this connection? To try criminals, men who are put on trial for violating its provisions.

Mr. ADAMS. Will the gentleman permit me to answer the question? It does not make any difference whether the phrase "for the information of the court" goes in or not. This commission is established for the purpose of endeavoring to arrive at a series of correct standards as nearly as possible by scientific judgment for the information of the Secretary and for the purposes of prosecution. Now, when the Secretary of Agriculture goes into court and undertakes to try a case, the opinion of that commission comes in there simply as a part of the evidence, just as the gentleman from Illinois says. It is not conclusive. You can not make it conclusive.

Mr. CRUMPACKER. If the gentleman from Wisconsin is correct in his interpretation of the law, I have no criticism to make of it, but if this section of the bill will authorize the Secretary of Agriculture to fix a standard, the violation of which shall subject citizens to fine and imprisonment, then I object to it.

Mr. ADAMS. It does not.

Mr. PAYNE. Why does not my friend from Indiana [Mr. CRUMPACKER] let the amendment pass? It has no effect upon his proposition. After the committee amendments are agree to he can then make a motion.

Mr. CRUMPACKER. I will let it pass. I do not think I can help it in any way.

The CHAIRMAN. The question is on agreeing to the amendment.

The question was taken; and the amendment was agreed to.

Mr. MANN. Mr. Chairman, I desire to offer an amendment.

The CHAIRMAN. The gentleman from Illinois offers an amendment, which the Clerk will report.

The Clerk read as follows:

On page 23, at the end of line 22, insert the following:
"Foods complying with the standards fixed by the Secretary of Agriculture, as provided in this section, may bear upon the label the inscription 'United States Standard,' but such inscription, or words of similar import, shall not be used as descriptive of any article of food which does not comply with the standard so fixed, under penalty of being deemed misbranded under the provisions of this act."

The CHAIRMAN. The question is on agreeing to the amendment.

The question was taken, and the amendment was agreed to.

Mr. MANN. Mr. Chairman, I desire to offer an amendment.

The CHAIRMAN. The gentleman from Illinois [Mr. MANN] offers an amendment, which the Clerk will report.

The Clerk read as follows:

On page 26 strike out section 14 and insert as section 14 the following:

"The Secretary of the Treasury shall deliver to the Secretary of Agriculture, upon his request from time to time, samples of foods and drugs which are being imported into the United States or offered for import, giving notice thereof to the owner or consignee, who may appear before the Secretary of Agriculture and have the right to introduce testimony, and if it appear from the examination of such samples that any article of food or drug offered to be imported into the United States is adulterated or misbranded within the meaning of this act, or is otherwise dangerous to the health of the people of the United States, or is of a kind forbidden entry into, or forbidden to be sold or restricted in sale in the country in which it is made or from which it is exported, or is otherwise falsely labeled in any respect, the said article shall be refused admission, and the Secretary of the Treasury shall refuse delivery to the consignee and shall cause the destruction of any goods refused delivery which shall not be exported by the consignee within three months from the date of notice of such refusal under such regulations as the Secretary of the Treasury may prescribe: Provided, That the Secretary of the Treasury may deliver to the consignee such goods pending examination and decision in the matter on execution of a penal bond for the amount of the full invoice value of such goods, together with the duty thereon, and on refusal to return such goods for any cause to the custody of the Secretary of the Treasury, when demanded, for the purpose of excluding them from the country, or for any other purpose, said consignee shall forfeit the full amount of the bond: And provided further, That all charges for storage, cartage, and labor on goods which are refused admission or delivery shall be paid by the owner or consignee, and in default of such payment shall constitute a lien against any future importation made by such owner or consignee."

Mr. MANN. Mr. Chairman, the amendment is substantially an amendment that is already in the bill, but redrafted in conformity with the opinion of the Treasury Department in connection with various provisions.

BEST COPY AVAILABLE

Mr. CRUMPACKER
Secretary of Agriculture of goods imported from branded, that his deci destroyed or exported tigation or power of r

Mr. MANN. The g ing of the matter that [Cries of "Vote!"]

Mr. COOPER of Wi

Mr. MANN. The l who makes the entry which determines the

Mr. COOPER of W invoice value with the them, provided he wil

Mr. MANN. He m

Mr. COOPER of ' branded and fraudule

Mr. MANN. It is Agriculture to advise

Mr. COOPER of \ that that bond, in vie apparently indulged to be very much larg him to take false, i them at that invoice

Mr. MANN. I do more than the value The amount was sta charge of the validit of the proposition we which deals with the

Mr. PAYNE. If "appraised value" w

Mr. MANN. The Treasury Department

Mr. PAYNE. Wh would be better.

Mr. MANN. I am

Mr. FITZGERALD made, does he know under the provisions the product sold, and improperly imported

Mr. MANN. The the delivery of the requested that provi sold in many cases storage instead of d

Mr. HINSHAW. tion, because I do yet. If these goods may give a bond, Now what may be d

Mr. MANN. He

Mr. HINSHAW.

Mr. MANN. The Secretary of the T not required to suggested that it has charge of that and the Treasury tion to stop the g views the goods he i to the consignee, l the goods finally, held not to be sub the goods or pay t sufficiently guards which are adultera

Mr. HINSHAW. may have been sol

Mr. MANN. Th

Mr. HINSHAW.

Mr. MANN. Th

Mr. HINSHAW. not protect the ma

Mr. MANN. Th The question wa

Mr. MANN. I The Clerk read

On page 28 strik lowing:
"Sec. 18. That th its passage: Provid

Mr. CRUMPACKER. I understand under this provision the Secretary of Agriculture has power to decide whether a cargo of goods imported from a foreign country is adulterated or misbranded, that his decision is final, and that the goods must be destroyed or exported and returned without any further investigation or power of review. That is true, is it not?

Mr. MANN. The gentleman has about the same understanding of the matter that I have. That is the existing law.

[Cries of "Vote!"]

Mr. COOPER of Wisconsin. Who fixes the invoice value?

Mr. MANN. The invoice value is first fixed by the person who makes the entry and, second, by the board of appraisers, which determines the invoice value if it is requested.

Mr. COOPER of Wisconsin. Then, if he gives a bond for the invoice value with the duty added, he takes the goods and sells them, provided he will pay the bond?

Mr. MANN. He may.

Mr. COOPER of Wisconsin. Although the goods are misbranded and fraudulent in every way, as well as poisonous?

Mr. MANN. It is within the discretion of the Secretary of Agriculture to advise that that be done.

Mr. COOPER of Wisconsin. Does not the gentleman think that that bond, in view of the fact that the undervaluation was apparently indulged in by the importer's false invoicing, ought to be very much larger than the face value, when it will permit him to take false, fraudulent, and poisonous goods and sell them at that invoice value?

Mr. MANN. I do not think that if it were made ten times more than the value we could recover any more than the value. The amount was stated by the Agricultural officials who have charge of the existing law which covers the case, and the form of the proposition was suggested by the Treasury Department, which deals with the matter.

Mr. PAYNE. If the gentleman will allow me to suggest, "appraised value" would be better than "invoice value."

Mr. MANN. The "invoice value" is the suggestion of the Treasury Department.

Mr. PAYNE. With all due deference, "appraised value" would be better.

Mr. MANN. I am not familiar with that.

Mr. FITZGERALD. In the investigations the gentleman made, does he know of any instance in which food was delivered under the provisions of this existing law, the bond given, and the product sold, and the goods were afterwards adjudged to be improperly imported?

Mr. MANN. The law as it now exists does not provide for the delivery of the goods; but the Agricultural Department requested that provision be inserted in the law, because they said in many cases it was a great hardship to hold goods in storage instead of delivering them to the parties.

Mr. HINSHAW. I would like to ask the gentleman a question, because I do not know that I understand this provision yet. If these goods are refused admission, then the entryman may give a bond, and the bond stands in lieu of the goods. Now what may he do with the goods?

Mr. MANN. He may do whatever he pleases with them.

Mr. HINSHAW. He can not bring them into this country.

Mr. MANN. They are already in the country, provided the Secretary of the Treasury delivers them to him, which he is not required to do, and probably will not do, unless it is suggested that it should be done by the Department which has charge of that matter; and the Agricultural Department and the Treasury Department have authority under this section to stop the goods. If the Agricultural Department advises the goods be turned over by the Secretary of the Treasury to the consignee, it will be done upon giving a bond; and if the goods finally, for any reason—usually misbranding—are held not to be subject to import, the man must either return the goods or pay to the Government the full value. I think it sufficiently guards against bringing goods into the country which are adulterated.

Mr. HINSHAW. In the meantime the adulterated goods may have been sold.

Mr. MANN. That is true.

Mr. HINSHAW. As pure goods.

Mr. MANN. That is true. We take that chance.

Mr. HINSHAW. This is simply a penalty, but that does not protect the man that bought them.

Mr. MANN. That is true.

The question was taken and the amendment was agreed to.

Mr. MANN. I offer the following amendment.

The Clerk read as follows:

On page 28 strike out section 16 and insert as section 16 the following:

"SEC. 16. That this act shall be in force and effect from and after its passage: Provided, however, That no penalties herein named for misbranding shall be imposed until after the expiration of eighteen months from the passage of the act, except the penalties provided in section 14."

Mr. GAINES of Tennessee. I would like to ask the gentleman a question about a provision here. The section, in effect, says that when the goods have been properly examined and passed with the regular label on the package, and the package gets into the State and comes in the regular, original, unbroken package, would it interfere with the power of the State to take charge of it if it had spoiled? Suppose that in transmission it becomes deleterious; suppose it has undergone some change by reason of the atmosphere or otherwise; suppose it is in a condition of fermentation, or from any condition that you may discover by looking at it or otherwise examine it it had become deleterious. Is there anything in this bill that prevents the State from absolutely taking charge and destroying it?

Mr. MANN. I would suggest to my friend from Tennessee that if it becomes fermented or deleterious to health it at once becomes subject to the provisions of the act, and is covered by that provision of the section.

Mr. GAINES of Tennessee. What provision?

Mr. MANN. It is deleterious goods.

Mr. GAINES of Tennessee. Suppose it becomes deleterious of its own act while in transmission?

Mr. MANN. Then it does not fully comply with the provisions of the act.

Mr. GAINES of Tennessee. In that condition, does the State take charge of it, or the Federal Government?

Mr. MANN. Either one.

Mr. GAINES of Tennessee. I am afraid your section does not say that.

Mr. MANN. We do not need to say that to the State authorities. They have control, although the section does expressly provide against interfering with the police powers of the State. The United States authorities would have control of it if they obtain possession of it first. It would be a violation of both the Federal and State law, if there be a State law on the subject. It is a violation of this law, in any event.

Mr. GAINES of Tennessee. With that explanation I feel more satisfied than I was. I want to help the gentleman.

The CHAIRMAN. The question is on agreeing to the amendment.

The question was taken; and the amendment was agreed to.

Mr. MANN. Mr. Chairman, I move that the committee do now rise.

The motion was agreed to.

The committee accordingly rose; and the Speaker having resumed the chair, Mr. CURRIER, chairman of the Committee of the Whole House on the state of the Union, reported that that committee had had under consideration the bill S. 88, and had come to no resolution thereon.

## ENROLLED BILLS SIGNED.

Mr. WACHTER, from the Committee on Enrolled Bills, reported that they had examined and found truly enrolled bills of the following titles; when the Speaker signed the same:

H. R. 16290. An act to modify the requirements of the act entitled "An act to promote the education of the blind," approved March 3, 1871;

H. R. 15513. An act to declare and enforce the forfeiture provided by section 4 of the act of Congress approved March 3, 1875, entitled "An act granting to railroads the right of way through the public lands of the United States;"

H. R. 20210. An act to authorize the city of St. Louis, a corporation organized under the laws of the State of Missouri, to construct a bridge across the Mississippi River;

H. R. 118. An act to amend sections 713 and 714 of "An act to establish a code of law for the District of Columbia," approved January 31 and June 30, 1902, and for other purposes;

H. R. 20119. An act to authorize the village of Osh, Marshall County, Minn., to construct a bridge across the Red River of the North;

H. R. 19181. An act to grant a certain parcel of land, part of the Fort Robinson Military Reservation, Nebr., to the village of Crawford, Nebr., for park purposes; and

H. R. 16785. An act giving preference right to actual settlers on pasture reserve No. 3 to purchase land leased to them for agricultural purposes in Comanche County, Okla.

The SPEAKER announced his signature to enrolled bills of the following titles:

S. 4109. An act to increase the efficiency of the Bureau of Insular Affairs of the War Department; and

S. 6146. An act to authorize the Back River Bridge Company to construct a bridge across the west or smaller division

COPY AVAILABLE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
ALLIED PACIFIC FOOD (DALIAN)      )
COMPANY, LIMITED,                 )
                                  )
            Plaintiff,            )
                                  )
      v.                          )      Civil Action No. 07-1982 (HHK)
                                  )
UNITED STATES FOOD AND DRUG       )
ADMINISTRATION, *et. al.*,        )
                                  )
            Defendants.           )
_____)

### **ORDER**

Upon consideration of the Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P.

12(b)(1) and 12(b)(6), and all memoranda in support thereof and in opposition thereto, it is

hereby ORDERED that the defendants' motion is GRANTED.

The above-captioned case is hereby DISMISSED with prejudice.


SO ORDERED this _____ day of _____, 2008.




_____
UNITED STATES DISTRICT JUDGE