# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALLIED PACIFIC FOOD (DALIAN) CO.,
LIMITED, a foreign Limited Company,
888 Yong Zheng Industrial Ares
San Li
Jinzhou District
Dalian 116100
China

       Plaintiff,

vs.

                                    Civil Action No.:07-1982 (HHK)

UNITED STATES FOOD AND DRUG
ADMINISTRATION,
5600 Fishers Lane
Rockville, MD 20857

ANDREW C. VON ESCHENBACH, M.D.,
Commissioner of the United States Food
and Drug Association,
5600 Fishers Lane
Rockville, MD 20857

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
200 Independence Ave., S.W.,
Washington, D.C. 20201

and

MICHAEL O. LEAVITT, Secretary of the
United States Department of Health and
Human Services
200 Independence Ave., S.W.
Washington, D.C. 20201,

       Defendants.
_____/

## PLAINTIFF'S FIRST AMENDED COMPLAINT FOR
## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR**
<u>**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**</u>

Plaintiff, Allied Pacific Food (Dalian) Co., Ltd. ("Allied"), hereby files this amended complaint suing Defendants, U.S. Food and Drug Administration, Andrew C. Von Eschenbach, M.D., Food and Drug Administration Commissioner ("Dr. Von Eschenbach"), United States Department of Health and Human Services ("HHS"), and Michael O. Leavitt, Secretary of Health and Human Services ("Secretary Leavitt") (collectively "FDA") for a declaratory judgment and injunctive relief and alleges the following:

**Introduction**

Allied, a Chinese limited company, is an exporter of aquaculture products into the United States and has received international recognition for its aquaculture safety and compliance practices. In Import Alert 16-131, the FDA has implemented an unconstitutional rule that was passed in contravention of the Administrative Procedures Act ("A.P.A.") rule-making procedures, unfairly damages Allied as a Chinese exporter, and deprives it of fundamental Due Process rights. Specifically, FDA requires verifiably non-compliant food testing procedures by third-party laboratories to serve as the basis for prohibiting the importation of safe food products.

Import Alert 16-131 includes a strict methodology for testing, among other things, shrimp imports from China. Pursuant to this alert, Allied's customers – International Pacific, LLC, d/b/a Pacific Supreme ("Pacific Supreme"), Seacoast Seafood Supply, Inc. ("Seacoast"), and Thunder Bay Seafood Co., Inc. ("Thunder Bay") (the "Customers") – are required to contract with third-party laboratories for the examinations which are to be conducted according to the FDA methodology. The laboratories contracted by the Customers to conduct these tests failed to take many of the steps required in the Import Alert; failed to submit to FDA any form of scientific

2

validation of their un-validated testing; failed to notify the importer of record that the laboratory utilized an un-validated methodology; and failed to present the full laboratory analysis to the importer of record. Without this information, the Customers and affected third parties such as Allied are unable to verify the accuracy or validity of the testimonial evidence presented to FDA for FDA's subsequent administrative adjudicative process. And because FDA has adopted a policy whereby the third-party laboratories are not allowed to test the shrimp a second time or to modify their initial reports in any way, Allied stands to suffer irreparable damage.

Allied's most catastrophic damage would be the result of an FDA refusal of any of Allied's shipments, followed by FDA's posting that refusal on FDA's OASIS website (http://www.fda.gov/ora/oasis/ora_oasis_ref.html). FDA's OASIS website is the official FDA website for import refusals, and the website the Chinese Inspection and Quarantine ("CIQ") department relies upon in regulating Chinese companies which export into the United States. Should FDA refuse even one of Allied's shipments, Allied will suffer a one year suspension from exporting out of China. Such a suspension would effective destroy the company.

Import Alert 16-131 also includes a procedure by which an exporter can exempt itself from compliance with the rule. Allied has conducted itself in accordance with each of the requirements for exempt status. Nevertheless, despite's Allied's strict adherence to the requirements, FDA – as the direct result of its own inconsistent procedures and policies and arbitrary and capricious enforcement of the Import Alert – has *sua sponte* added new, impossible-to-satisfy requirements and has thereby refused to exempt Allied from the Import Alert.

Additionally, FDA has failed to educate its compliance officers in a consistent manner, rendering the compliance officers incapable of rationally applying the un-validated test results of

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

the third party laboratories. FDA's administrative adjudication process thereby deprives Allied of due process. FDA's inconsistent application of un-validated testing methodologies under Import Alert 16-131 results in retroactive determination of admissibility standards without any rational basis, factual support, or scientific justification, all of which has rendered Allied incapable of continuing to ship its products into the United States.

## PARTIES, JURISDICTION AND VENUE

1.      Allied is a foreign limited company with its principal place of business in Dalian, China.

2.      HHS is a department of the United States Federal Government and oversees the Food and Drug Administration. Its principal place of business is located at 200 Independence Ave., S.W., Washington, D.C., 20201.

3.       Secretary Leavitt is the Secretary of the Department of Health and Human Services. He is sued in his official capacity. He maintains offices at 200 Independence Ave., S.W., Washington, D.C., 20201.

4.      The Food and Drug Administration is a United States regulatory agency within the HHS, with its principal place of business at 5600 Fishers Lane, Rockville, Maryland 20857.

5.      Dr. Von Eschenbach is the Food and Drug Administration Commissioner and senior official. He is sued in his official capacity. He maintains offices at 5600 Fishers Lane, Rockville, Maryland 20857.

6.      This action arises under the Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. § 301 *et. seq.*; the Administrative Procedures Act, 5 U.S.C. § 551 *et. seq.*; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et. seq.*; and the All Writs Act, 28 U.S.C. § 1651.

4

7.    This Court has personal jurisdiction over the Defendants because they are either located in, conduct substantial business in, or have regular, systematic contact with this District.

8.    This Court has subject matter jurisdiction under 5 U.S.C. § 702 and 28 U.S.C. § 1346.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 (e).

10.    There exists an actual, substantial and continuing controversy between the parties regarding FDA's Import Alert 16-131.  This Court may declare the rights and legal relations of the parties under 28 U.S.C. § 2201, *et. seq.*

## FACTS

### Allied

11.    Allied is a manufacturer of aquacultured or "farm grown" shrimp products in China. The specific product at issue in this action is Allied's breaded shrimp.  Allied enjoys an impeccable record of food safety compliance, is a certified member of the BRC Global Standard, is a certified member of the Aquaculture Certification Council, maintains third-party audits, and incorporates various antibiotic testing procedures in compliance with both FDA and Chinese Inspection and Quarantine ("CIQ") requirements.

12.    As an exporter of aquaculture products, including shrimp, to the United States, Allied is cognizant of all FDA policies and Import Alerts and acts in compliance with each of them.

13.    As a Chinese exporter, Allied is required to have a Hazard Analysis and Critical Control Point ("HACCP") plan. Allied's HACCP plan is a comprehensive program required by FDA which meticulously details the processing, production, packaging, and preparation of the

5

breaded shrimp, including any and all potential hazards and the preventive measures and corrective actions being taken to address them. *See* 21 CFR §123.

14.    As part of its HACCP plans, Allied inspects and examines its own raw and finished products for all prohibited substances, and is compliant with all Chinese export laws and United States import laws.  Allied's HACCP plans for its Breaded shrimp are attached hereto as Exhibit 1.

15.    Compliance with the CIQ and FDA is a priority for Allied, particularly because CIQ has adopted a policy whereby a single FDA refusal and subsequent posting on OASIS results in a one-year suspension of a company's license to export from China.  Such a suspension would be a death sentence for Allied.

### The Customers

16.    After passing Allied's internal HACCP tests and the CIQ's inspections, Allied exported several shipments of breaded shrimp ("Shrimp Entries") to the United States.

17.    In compliance with HACCP and CIQ exporting requirements, all of Allied's Shrimp Entries tested negative for each of the banned substances prior to leaving Allied and China.  Without a negative test, neither Allied nor the Chinese Government would have allowed the Shrimp Entries to leave China.

18.    Allied's exported products were then imported into the United States by domestic Customers. For purposes of this action, the interested Customers of record are Pacific Supreme, Seacoast, and Thunder Bay.

19.    Pacific Supreme is a California limited liability company with its principal place of business in Gardena, California.

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

20.    Seacoast is a Florida corporation with its principal place of business in Jacksonville, Florida.

21.    Thunder Bay is a Florida corporation with its principal place of business in Wesley Chapel, Florida.

22.    Samples from the Shrimp Entries were then delivered by the respective U.S. Customers to third-party laboratories for testing in accordance with Import Alert 16-131.

23.    The Customers each have their own HACCP plans and comply with all applicable FDA requirements.

24.    Each of the previously identified Customers has an Allied shipment that has been unlawfully detained and is pending refusal due to Import Alert 16-131.

## FDA

25.    In response to political pressure and without a legitimate basis for food safety, FDA, among other actions, has embraced the United States Government's 'Trade War' with China. Consequently, FDA has enacted several heavy-handed rules which unduly and unfairly burden Chinese imports into the United States, simply based on the imports' country of origin.

26.    Import Alert 16-131 is one such rule. Officially titled, "Detention Without Physical Examination of Aquacultured Catfish, Basa (*Pangasius* sp.), Shrimp, Dace and Eel Products From the People's Republic of China Due To the Presence of New Animal Drugs and/or Unsafe Food Activities," Import Alert 16-131 unfairly and unnecessarily targets only Chinese aquaculture exports; *see* Import Alert 16-131, attached hereto as Exhibit 2.  [Emphasis added]. Aquaculture exports from no other nation are named in the Import Alert.

27.    Import Alert 16-131 requires that third-party laboratories perform a specific examination of Chinese aquaculture products using acceptable FDA methods available at

7

http://www.cfsan.fda.gov/seafood1.html, the results of which, under FDA policy, are to be provided directly to FDA. The procedure for shrimp testing reads in part:

> The sample should consist of a minimum of 12 sub-samples. When an entry consists of multiple lines of similar products (e.g., multiple sizes of headless shrimp), the sample should be representative of the entire entry and should be collected across all lines, with a minimum of two sub-samples per line. The sampling should be proportional based on the quantity of product (e.g. more sub-samples should be obtained from larger lines, fewer sub-samples from smaller lines). Obtaining 12 sub-samples from a single line or a limited number of lines when multiple lines of similar products are offered for the entry will not provide a representative sample for that entry.

> If an entry contains only one line of aquacultured product, then a minimum of 12 sub-samples should be obtained from that single line. If the entry includes multiple date codes, the sample should reflect a range of date codes (e.g., all sub-samples should not be collected from a single date code).

> Each sample should consist of 12 sub-samples, minimum 225g (0.5 lb.) per sub-sample, total 2.7 kg (6.0 lb.) of product. If the product unit size is larger than 225g (0.5 lb.) and less than or equal to 3 lb., collect one product unit per sub-sample. If the unit size is less than 225g. (0.5 lb.), collect an adequate number of units so that the amount collected per sub-sample equals a minimum of 225 grams (0.5 lb.).

*Id.*

28.    More specifically as it relates to this action, the Import Alert provides as follows:

> Analysis for Nitrofuran should be conducted on *individual subsamples*. Analysis for all other residues should be conducted on a composite sample.

*Id.*; [Emphasis added].

29.    Import Alert 16-131 provides the sole testing protocol for shrimp, and does not provide for any alternative or modified testing procedure:

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

> Prepare one composite from an equal amount of each subsample for the testing of malachite green, fluoroquinolones, and gentian violet.
>
> Shrimp are to be analyzed on an individual sub basis for nitrofurans. When sampling guidance directs the collection of six subsamples, two portions from each of the six subsamples should be individually analyzed. ***

30.     Pursuant to Import Alert 16-131, laboratories must test for Malachite Green, Fluoroquinolones, Nitrofurans, and Gentian Violet.

31.     Import Alert 16-131 does not state what levels of each prohibited antibiotic render an import acceptable for admission, but the stated policy of FDA is that any amount less than one part per billion is allowable.

32.     Purportedly in order to prevent "laboratory shopping," FDA has allegedly adopted a rule whereby FDA does not allow re-testing, regardless of the circumstances.[1]

33.     Furthermore, FDA has also adopted a rule providing that only one report may be submitted for any given shipment, even if that report contains errors as admitted by the reporting laboratory, and even though the report constitutes testimony on behalf of the interested party, i.e. the importer.

## The Exemption

34.     Import Alert 16-131 includes language that exempts exporters such as Allied from complying with the requirements imposed by the Import Alert.

35.     Specifically, Import Alert 16-131 reads:

> In order to remove a firm from detention without physical examination, information should be provided to FDA to adequately

---

1.     *But see* 71 F.R. 75865, permitting retesting for medical gloves.

9

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

assess whether a manufacturer has the appropriate controls and processes in place to ensure the quality of the product, the firm or shipper should provide the following information (In English):

1)    Documentation showing that a minimum of five (5) consecutive entries have been released by FDA based on third-party laboratory analysis of a representative sample of the lot verifying that products do not contain malachite green and its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet and fluoroquinolones.    The chart provided above identifies which residues should be screened for each species.    Third-party laboratory must use methods acceptable to FDA (e.g., see http://www.cfsan.fda.gov/seafood1.html); and

2)    Documentation, from an appropriate third-party (e.g. a government inspection authority such as AQSIQ) demonstrating that an inspection of the processor was conducted and that the seafood was processed in accordance with FDA's Seafood HACCP regulations, 21 CFR part 123, including controls for aquaculture drugs.    See 21 CFR 123.12(a).

Documentation should include test results of any products sampled during the course of the inspection, demonstrating that the products do not contain malachite green or its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet or Fluoroquinolones; and

3)    Documentation that the processor is in compliance with all Chinese government requirements for exporting aquacultured seafood to the U.S.

Documentation should include copies of any registration that may be required by the Chinese government.

Documentation should include copies of any registration that may be required by the Chinese government.

10

36.    On September 10, 2007, Allied applied to FDA to secure a position as an exempt foreign manufacturer.

37.    In accordance with Import Alert 16-131's requirements, Allied submitted a large binder containing: **a)** Documentation showing that <u>a minimum of five (5) consecutive entries have been released by FDA based on third-party laboratory analysis…</u>; **b)** Documentation from an appropriate third-party demonstrating that an inspection of the processor was conducted and that the seafood was processed in accordance with FDA's Seafood HACCP regulations, 21 CFR part 123; and, **c)** Documentation that the processor is in compliance with all Chinese government requirements for exporting aquacultured seafood to the U.S.

38.    On October 31, 2007, Mr. Domenic Veneziano (the Director of FDA's Division of Import Operations and Policy (DIOP)) wrote a letter to undersigned counsel explaining that Allied had "not met the criteria for removal from DWPE…" (Mr. Veneziano's October 31, 2007 letter is attached hereto as Exhibit 3.) Undersigned counsel received Mr. Veneziano's October 31, 2007 letter on November 5, 2007.

39.    Despite the fact that several of Mr. Veneziano's justifications for refusing to exempt Allied from the Import Alert were not supported by the Import Alert itself, Allied responded point-by-point to Mr. Veneziano's October 31, 2007 letter, and submitted to FDA its (Allied's) updated HACCP plans, as well as the report of the full, on-site HACCP audit of its (Allied's) Chinese facilities that the United States Department of Commerce (USDOC) conducted in September of 2007.

11

40.    FDA's Deputy Chief Counsel for Litigation, Eric Blumberg, Esq., and undersigned counsel met on December 3, 2007 at FDA headquarters in Maryland to discuss Allied's application for exempt status.

41.    On December 7, 2007, Allied received, in the form of a letter authored by Mr. Veneziano, the results of FDA's re-review of Allied's HACCP plan. Mr. Veneziano's December 7, 2007 letter is attached hereto as Exhibit 4.

42.    Despite the fact that Allied actually passed the USDOC inspection of its (Allied's) Chinese facilities, Mr. Veneziano's December 7, 2007 letter describes the USDOC's audit and inspection of Allied's plants as not only incomplete, but *per se untrustworthy* as well. Mr. Veneziano, in once again rejecting Allied's application for exempt status, raised the following points in his December 7, 2007 letter:

a.    "The November 3 and 8, 2007 audit reports from USDOC provided a broad evaluation of [Allied's] overall implementation of [Allied's] HACCP system. No detailed information was provided regarding the adequacy of controls in place for unapproved veterinary drugs used in aquacultured shrimp. **If available, the USDOC should provide this information.**" Veneziano Letter, at p.2; [Emphasis added].

b.    "The Seafood HACCP regulation, 21 CFR part 123, is an innovative rule in the regulation of food safety, in that it places the burden on processors of fish nad fishery producs to identify hazards that are reasonably likely to occr and to develop suitable controls for those hazards. Making these HACCP assessments properly requires a solid scientific background, a thorough understanding of the particular food and how it is processed, and a working knowledge of HACCP principles. The transition to a HACCP control system has proven to be a significant challenge for much of the U.S. and foreign fish and fishery products industry as well as for many state, federal, and foreign regulatory officials. Indeed, FDA has found that industry representatives, investigators, and consultants who understand these concepts in theory do not always apply them properly. **For this reason *as well as other concerns*, FDA plans to apply the same standards and processes to inspections conducted by USDOC, which conducts inspections under a fee-for-service structure, as it does to**

12

**inspections conducted by other third parties**." Veneziano Letter, at p.3; [Emphasis added].

c.  "FDA does not believe it should forego inspections to verify the ability of auditors to conduct appropriate HACCP inspections simply because a company may have had several third party audits of its processes. Cumulative audits are only as reliable as the quality of the auditors who perform them. **Thus, multiple audits will not provide FDA with the assurance that HACCP principles are being properly applied unless and until FDA gains confidence with at least one of the specific auditors**."  Veneziano Letter, at pp.3-4; [Emphasis added].

43.    Mr. Veneziano's letter concludes by providing that **no firm** will be exempted under the Import Alert unless and until FDA conducts an onsite examination of that firm's facilities. The letter provides as follows:

> FDA is currently planning its next trip to China to perform a sweries of audits of several aquaculture firms and their third party inspectors. Although we seek to make that trip as soon as (sic) practicable (our current target is January or February 2008), there are factors outside of FDA's control that may limit our ability to do so. If Allied is able to address the HACCP-related issues raised in this letter above, and provided that there are no other significant adverse developments related to Allied's request in the meantime, AFDA intends to make every effort to include Allied in that next trip.

Veneziano Letter, at p.4; [Emphasis added].[2]

44.    FDA has refused to inspect Allied's Chinese facilities and has thereby - despite the fact that such an inspection is not included in the Import Alert as a prerequisite to exemption

---

[2]  At p.3 of his letter, Mr. Veneziano indicates that FDA "followed this inspect-the auditor process for **the one firm** that has been removed from [Detention Without Physical Examination] under Import Alert 16-131 to date." [Emphasis added]. FDA has previously disclosed to undersigned counsel that the one firm (Goulian) presently exempted from the Import Alert was only exempted because FDA was in China and was therefore able to "inspect" Goulian's auditor (AQSIQ) on the date that the Import Alert was enacted. The specifics of that "inspection" process have not, however, been disclosed to Allied. Allied's HACCP audit was performed by the United States Department of Commerce, while Goulian's was performed by the Chinese government. FDA has accepted Goulian's HACCP audit, but has rejected Allied's.

13

- refused to exempt Allied from the Import Alert's mandatory detention without physical examination rule.

### Certified Labs

45.    The Customers initially contracted Certified Laboratories, Inc. ("Certified") and Adpen Laboratories, Inc. ("Adpen") to conduct the examinations of the Allied Entries in accordance with the Import Alert.

46.    Certified was contracted separately by both Pacific Supreme and Thunder Bay to conduct the requisite tests on the Entries.

47.    Certified tested Pacific Supreme Entry AQZ-0250069-5 and Thunder Bay Shrimp Entries AQZ-0250569-4 and AQZ-0250573-6. These Entries were imported on or about July 2, 2007, and each had an approximate value of $100,000.00.

48.    On July 31, 2007, Certified issued its test results, among which were impermissible and impossible levels of Gentian Violet.

49.    Based on these findings, and in strict accordance with FDA rule 71 F.R. 75865 (which states that testimony cannot be reviewed by the importer), Certified published its results to FDA.

50.    Certified's publication of its results to FDA would have resulted in FDA's refusal of the Shrimp Entries, FDA's publication of the refusal on its OASIS webpage, and the one year suspension of Allied in China, however, prior to FDA refusing the Shrimp Entries, undersigned counsel was retained and on August 31, 2007 petitioned FDA for an Administrative Stay of Action under 21 CFR § 10.35, a copy of which is attached hereto as Exhibit 5.

14

51. Unbeknownst to Allied, Pacific Supreme and Thunder Bay, Certified notified FDA that it had initially submitted erroneous reports, and submitted corrected reports to replace the erroneous submissions. The corrected reports comply with Import Alert 16-131.

52. Because of the erroneous reports, Allied retained a third party testing facility – SGS Group ("SGS"), a world renowned, independent compliance testing company – to perform tests on retained samples, pursuant to Allied's HACCP plan, on the questioned lots shipped to the Customers in the United States.

53. SGS tested the samples in accordance with FDA's approved Laboratory Information Bulletin 4363 ("LIB") and determined that the questioned lots did not, in fact, contain any traces of Gentian Violet or any other prohibited substance, and were, in fact in compliance with Import Alert 16-131.

54. Additionally, notwithstanding FDA's "One Test – One Report" rule, Pacific Supreme and Thunder Bay subsequently retained Michelson Laboratories, Inc. ("Michelson") to conduct additional tests on the Shrimp.

55. Michelson concluded that **a)** Certified was not conducting a confirmation analysis in accordance with acceptable FDA methodology, and that **b)** the test results presented false positives. Like the SGS findings, Michelson's conclusions revealed that the Shrimp Entries were compliant with Import Alert 16-131.

56. FDA has received the Michelson test results, Certified's subsequent recantation of the erroneous results, and Certified's revised report. Additionally, FDA has tested its own samples from the Certified Shrimp Entries.

57. Accordingly, before Allied's product – which was never tainted in the first place –

15

could be released from FDA Detention, FDA reviewed **a)** Allied's internal examinations demonstrating a compliant product; **b)** CIQ's examinations demonstrating a compliant product; **c)** Additional third party laboratory testing confirming a compliant product; **d)** Certified's recanted report demonstrating a compliant product; **e)** Michelson's examination and subsequent report demonstrating a compliant product; and **f)** FDA's own examinations.

58.     FDA did not release the first of the three Certified entries until November 15, 2007 and the second and third until December 21, 2007. In other words, it ultimately took an average of more than five months from the date of importation until the date that FDA finally released these Shrimp Entries. Such undue delay cost Allied millions of dollars in lost revenue.

59.     Allied cannot continue to ship its product into the United States in such an environment. Because of Import Alert 16-131, Allied has been foreclosed from doing business in the United States.

### Adpen Labs

60.     Adpen was contracted by both Seacoast and Thunder Bay to conduct the requisite tests on both importers' Shrimp Entries.

61.     Adpen uses a modified methodology that varies from acceptable FDA methods.

62.     Adpen claims that its machinery is ultra-sensitive to the prohibited antibiotics. However, Adpen employs a noncompliant, rogue, and un-validated methodology whereby it samples only three sub-samples, despite Import Alert 16-131's specific requirement that a "minimum of 12 individual sub-samples" of each shrimp entry, in accordance with FDA Laboratory Information Bulletin ("LIB") "Detection of Nitrofurans in Shrimp."

16

63.     Adpen's procedures clearly violate the required methodologies approved under Import Alert 16-131.

64.     Adpen's abbreviated report reveals that Adpen's methodology is contradictory. Both a composite analysis and a full 12 individual subsample analysis are reported.  Adpen's test results yielded Nitrofuran amounts that were compliant with FDA admissibility standards.

65.     On several occasions, Adpen reported positive amounts of prohibited antibiotics, only to subsequently recant and report that those tests were negative.  On other occasions, Adpen refused to retest the positive results in conformity with the FDA mandated tests, citing FDA's "One Test – One Report" rule.

66.     Adpen's report does not indicate whether the breaded shrimp were de-breaded before the tests were conducted. Removal of the bread is a <u>required</u> procedure, a failure of which can yield false positives.

67.     Adpen has refused to produce the complete reports to Seacoast and Thunder Bay, (the importers of record), claiming a proprietary work product privilege.

68.     FDA has also refused to produce the complete reports to Seacoast and Thunder Bay.

69.     Allied and the Customers have consequently been left unable to challenge the testimony which will form the basis of the FDA administrative adjudication.

70.     FDA compliance officers cannot properly interpret the reports of the modified methodologies utilized by third party laboratories such as Adpen.  Adpen, for instance, only tests one-quarter of the required samples.  Accordingly, in an effort to interpret Adpen's noncompliant

17

test results against the Import Alert's requirement that each laboratory must test a "minimum of 12 individual sub-samples" of each shrimp entry, some but not all FDA compliance officers have actually, in some cases, been multiplying the laboratory results *by a factor of four*. Such quadruple-counting finds no support in either the Import Alert or in any related guidance materials.

71.     The maelstrom of misinformation created by Adpen's rogue methodology, FDA's lack of control over the enforcement of its unlawful rules, and FDA's failure to educate their compliance officers yields the erroneous conclusion that the prohibited antibiotics are present at *four times their actual levels*. Consequently, the compliant Shrimp Entries are deemed impermissible and Allied faces irreparable damage.

72.     Adpen has refused to disclose its methodologies to Allied, the Customers, or FDA.

73.     Adpen's official and complete test results and the reason for the Shrimp Entries' failure have not been disclosed to Seacoast, Thunder Bay, Allied or its counsel.

74.     FDA never provided either Allied or the importers of record with a complete explanation of the basis for refusal.

75.     Like Certified's false-positives, the Adpen test results were false-positives as well.

76.     The first two Adpen Shrimp entries were released on or about November 13, 2007, the second two were released on or about December 3, 2007 and the final entry was released on or about December 11, 2007. It ultimately took an average of approximately four

18

months (along with hundreds of hours of attorney time and millions of dollars in lost revenue) from the date of importation until the date that FDA finally released these Shrimp Entries.

77.    Allied cannot continue to ship its product into the United States under the environment which has been created by Import Alert 16-131.

## CLAIMS FOR RELIEF

## COUNT ONE

### Import Alert 16-131 is Violative of the Administrative Procedures Act

78.    Allied repeats and realleges paragraphs 1-77 as though fully alleged herein.

79.    Import Alert 16-131 is unlawful and contains binding requirements that have not been properly promulgated in accordance with the Administrative Procedures Act; *see* 5 U.S.C. § 553.

80.    Allied has suffered and continues to suffer irreparable harm as a result of Import Alert 16-131.

WHEREFORE, Allied respectfully prays that this Honorable Court **a)** enter a judicial decision, pursuant to 28 U.S.C § 2201 *et. seq.*, declaring Import Alert 16-131 unlawful as a matter of law; **b)** enjoin the enforcement of Import Alert 16-131 pursuant to the All Writs Act, 28 U.S.C. §1651; **c)** assess costs and attorneys' fees; and **d)** grant such other relief that the Court may deem just and proper.

## COUNT TWO

### FDA's Failure to Enforce Standards Leads to the Arbitrary and Capricious Enforcement of Import Alert 16-131 in Violation of the Administrative Procedures Act

81.    Allied repeats and realleges paragraphs 1-77 as though fully alleged herein.

19

82.     Allied and its Customers are required by Import Alert 16-131 to retain third party laboratories. Following the conclusion of the testing of Allied's product, the third party laboratories are required to provide their test results to the FDA.

83.     FDA exercises no oversight or control over the third party laboratories, and therefore cannot ensure that each laboratory is complying with the requirements set forth in the Import Alert and/or the LIB.

84.     Consequently, rogue laboratories use intrepid methods, circumvent Import Alert requirements, and yield inconsistent and unreliable results.

85.     Such inconsistent and unreliable results are then misinterpreted by FDA's compliance officers and ultimately lead to unwarranted refusals.

86.     In the same way that FDA fails to oversee or control the testing procedures of the third party laboratories, FDA fails to oversee or control FDA compliance officers. FDA's failure to promulgate standards or guidelines for the FDA compliance officers responsible for enforcing the Import Alert has yielded – and will continue to yield – unwarranted refusals. Substantially identical test results provided to different compliance officers very often lead to substantially different determinations.

87.     FDA's failure to enforce the standards contained in the Import Alert has caused, and will continue to cause, irreparable harm to Allied.

WHEREFORE, Allied respectfully prays that this Honorable Court **a)** enter a judicial decision, pursuant to 28 U.S.C § 2201 *et. seq.*, declaring that FDA's failure to promulgate standards has led to the arbitrary and capricious enforcement of Import Alert 16-131 in violation of the Administrative Procedures Act; **b)** enjoin the enforcement of Import Alert 16-131 pursuant

20

to the All Writs Act, 28 U.S.C. §1651; **c)** assess costs and attorneys' fees; and **d)** grant such other relief that the Court may deem just and proper.

<u>**COUNT THREE**</u>

<u>**Declaratory Judgment**</u>:

**The Defendants have Arbitrarily and Capriciously Enforced the Exemption Provision of Import Alert 16-131**

88.    Allied repeats and realleges paragraphs 1-77 as though fully alleged herein.

89.    Import Alert 16-131 provides that firms may apply to be exempt from Import Alert 16-131. To do so, the Import Alert provides the exporter or importer must provide FDA with the following:

a.  Documentation showing that <u>a minimum of five (5) consecutive entries</u> have been released by FDA based on third-party laboratory analysis of a representative sample of the lot verifying that products do not contain malachite green and its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet and fluoroquinolones.

b.  Documentation, from an appropriate third-party (e.g. a government inspection authority such as AQSIQ) demonstrating that an inspection of the processor was conducted and that the seafood was processed in accordance with FDA's Seafood HACCP regulations…

c.  Documentation that the processor is in compliance with all Chinese government requirements for exporting aquacultured seafood to the U.S.

90.    In this case, Allied has provided FDA with evidence of a) fifty-four (54) consecutive released entries, b) full, complete and compliant HACCP plans, and c) evidence of a

21

successful on-site inspection of Allied's Chinese facilities by the United States Department of Commerce. FDA, however, has arbitrarily and capriciously refused to exempt Allied from the mandatory provisions of the Import Alert.

91.     Over and above the a) fifty-four (54) consecutive released entries, b) full, complete and compliant HACCP plans, and c) evidence of a successful on-site inspection of Allied's Chinese facilities by the United States Department of Commerce, FDA has articulated that Allied may not become an exempt firm unless and until it (FDA) conducts its own on-site inspection of Allied's Chinese facilities and thereby audit the previous audit conducted by the United States Department of Commerce.

92.     FDA, however, refuses to conduct such an on-site inspection and has thereby foreclosed Allied from becoming an exempt firm.

91.     Allied has suffered and continues to suffer irreparable harm as a result of FDA's arbitrary and capricious enforcement of Import Alert 16-131.

WHEREFORE, Allied respectfully prays that this Honorable Court **a)** enter a judicial decision, pursuant to 28 U.S.C § 2201 *et. seq.*, declaring that the defendants have arbitrarily and capriciously enforced the exemption provision of Import Alert 16-131; **b)** enjoin the enforcement of Import Alert 16-131 pursuant to the All Writs Act, 28 U.S.C. §1651; **c)** assess costs and attorneys' fees; and **d)** grant such other relief that the Court may deem just and proper.

## <u>COUNT FOUR</u>

### FDA's "One Test – One Report" Policy is Violative of the Fifth Amendment Due Process Clause

92.     Allied repeats and realleges paragraphs 1-77 as though fully alleged herein.

Fuerst, Humphrey, Ittleman, PL
1001 Brickell Bay Drive, Ste. 2002, Miami, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • www.fuerstlaw.com

93.     Import Alert 16-131 requires Allied and its Customers to provide third party laboratory results to the FDA.

94.     The lab results constitute the testimony of the third party witness and the sole evidence that the FDA is willing to accept.

95.     FDA bases its decisions, or "informal adjudications," as to whether to refuse or permit an entry entirely upon these third party test results.

96.     The detention and subsequent refusal of foodstuffs constitutes a deprivation of property.

97.     Under this policy, FDA only allows the third party laboratory to perform one test per entry. Additionally, under this policy, FDA accepts only one report for each test performed.

98.     FDA applies this "One Test – One Report" rule even if the third party test result was incorrect. In other words, even if FDA learns that the test result with which it was presented was erroneous or based upon erroneous methodologies, FDA will not accept additional test results.

99.     Also pursuant to this policy, the manufacturer of the tested products is not permitted to either review or challenge the tests of the independent third party laboratories when such tests are submitted to the FDA.

100.     FDA's informal adjudications are performed without affording any interested parties due process of law.  Allied faces irreparable harm as a result.

WHEREFORE, Allied respectfully prays that this Honorable Court **a)** enter a judicial decision, pursuant to 28 U.S.C § 2201 *et. seq.*, declaring that Import Alert 16-131 violates the Fifth Amendment to the United States Constitution; **b)** enjoin the enforcement of Import Alert

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

16-131 pursuant to the All Writs Act, 28 U.S.C. §1651; **c)** assess costs and attorneys' fees; and

**d)** grant such other relief that the Court may deem just and proper.

Dated: February 25, 2008

                                    Respectfully submitted,

                                    */s/ Andrew S. Ittleman*
                                    Andrew S. Ittleman, Esq.
                                    Florida Bar No. 802441
                                    Fuerst Humphrey Ittleman, PL
                                    1001 Brickell Bay Drive,
                                    Suite 2002
                                    Miami, FL  33131
                                    305-350-5690 (o)
                                    305-371-8989 (f)

                                    */s/  Eric Bloom*
                                    Eric Bloom, Esq.
                                    DC Bar No. 417819
                                    Winston & Strawn
                                    1700 K Street, N.W.
                                    Washington, D.C.  20006-3817
                                    T: (202) 282-5000
                                    F: (202) 282-5100
                                    ebloom@winston.com

## <u>CERTIFICATE OF SERVICE</u>

    I HEREBY CERTIFY that I caused a copy of the foregoing Amended Complaint (and

accompanying exhibits) to be served via the District Court's electronic filing system upon:

                        Andrew E. Clark
                        Senior Trial Counsel
                    Office of Consumer Litigation
                    U.S. Department of Justice
                            PO Box 386
                        Washington, DC 20044
                        andrew.clark@usdoj.gov

this 25th day of February, 2008.

                                    *Eric Bloom, Esq.*

Fuerst, Humphrey, Ittleman, PL
1001 Brickell Bay Drive, Ste. 2002, Miami, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • www.fuerstlaw.com

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

# EXHIBIT 1

## ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199     Method of Storage and Distribution : Frozen
Products : Breaded Shrimp             Intended Use and Consumer : For General Public, Serve after Fully Cooked.

# HAZARD ANALYSIS
# & CRITICAL CONTROL POINT

# BREADED SHRIMP

### THE SIXTH PRESS

## PROPERTIES OF
## ALLIED PACIFIC FOOD（DALIAN）CO., LTD
## AND STRICTLY CONFIDENTIAL

### IN LINE OF CONTRO

**CONFIRMED BY:**           **YES    NO**         [ ·· ]     [   ]

**CONFIRMED DATE:**         **Nov. 9th, 07**

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                Intended Use and Consumer : For General Public, Serve after Fully Cooked.

# *Hazard Analysis for Breaded Shrimp*

1. **Main content and area of application.**
2. **Organization chart.**
3. **HACCP team.**
4. **Terms and definitions.**
5. **Product introduction**
6. **The processing flow**
7. **Hazard analysis worksheet.**
8. **HACCP plan form.**
9. **Verification and Corrective Action Procedure**
10. **Recall procedure and Customer complaint**
11. **HACCP inspection forms.**

## 1. Main content and area of application.

This plan analyzes the hazards probably existing in the process of export breaded vannamei white shrimps, defines as Critical Control Point CCP , and draws up corresponding controlling measures to improve the safety of export breaded vannamei white shrimps. This plan is suitable for processing of export breaded vannamei white shrimp, using block frozen HLSO vannamei white shrimps as raw material. It is also can be taken as the guarantee measurement of product quality for the plant.

## 2. Organization chart.

**See attached chart.**

## 3. HACCP team.

**See attached table.**

This table describes all the personnel responsible in every department.

## 4. Terms and definitions.

**A. Hazard:** A biological, chemical or physical hazard that may cause a food to be unsafe for consumption.

**B. Critical Control Point:** A point, step or procedure at which control can applied and a food

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                Intended Use and Consumer : For General Public, Serve after Fully Cooked.

safety hazard can be prevented, eliminated or reduced to acceptable levels. If CCP is out of control, then it brings the hazard of unsafe to product.

**C. Critical Limit:** Means the maximum or minium value to which a physical, biological, or chemical parameter must be controlled at a critical control point to prevent, eliminate, or reduce to an acceptable level the occurrence of the identified food safety hazard.

**D. Monitoring procedure :** the occurrence of the identified food safety hazard. measurements to assess whether a CCP is under control and to produce an accurate record for future use in verification.

**E. Deviation:** Failure to meet a critical limit.

**F. Corrective action**: Procedure to be followed when a deviation from a critical limit occurs at a CCP.

**G. Food safety hazard:** Means any biological, chemical, or physical property that may cause a food to be unsafe for human consumption.

**H. Preventive measure:** Means physical, chemical, or other factors that can be used to control an identified food safety hazard.

**I. Processing:** Means with respect to fish or fishery products; Handling, Storing, Preparing, De-heading, Eviscerating, Shucking, Freezing, Changing into different market forms, manufacturing, preserving, packing, labeling, dockside unloading, or holding.

**J. Processor:** Means any person engaged in commercial, custom, or institutional processing of fish or fishery products. A processor includes any person engated in the production of foods that are to be used in market or consumer test.

**K. Shall:** Shall is used to state mandatory requirements.

## 5. Product introduction.

Breaded vannamei white shrimps are using imported block frozen vannamei white shrimps as raw material. It is processed through raw material receiving, thawing, grading, peeling, cutting, deveinding, pre - dusting, battering, breading, (pre - frying), freezing, weighting, packing and metal detecting. All the products export to U.S.A., Japan and E.U. The final

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                Intended Use and Consumer : For General Public, Serve after Fully Cooked.

products are sold to the general public .

## 6. The processing flow

See attached chart.

## 7. Hazard analysis worksheet.

This worksheet is to organize and document the consideration in identifying food-safety
hazards. It consists of processing steps, potential hazards signification, justification,
preventative measures, and identification of CCP(see attached worksheet.) Based on the
influence of safety factors on seafood, we hereby analyze the hazards as below:

**1. Biological hazards:**

These hazards come from raw materials or processing steps used to make the final product.
Shrimp itself contains abundant nutritious substances, is an ideal and optimum reproduction
place for microorgannism. It is attached by microorganism and may be polluted or
contaminated during transporting and processing. Thus, if handling the products not
adequate, it will bring hazards for consumption.

**2. Chemical hazards:**

Chemical contamination can happen at any stage in shrimp production and processing.
Chemical can be harmful and are purposefully used with some foods, such as sodium
metabysulfite on shrimps as food additive. Chemicals are not hazardous if properly used or
controlled. Potential risks to consumers increase when chemical are not controlled or the
recommended treatment rates are exceeded. The presence of a chemicals may not always
represent a hazard. The amount of the chemical may determine whether it is a hazard or not.
Shrimp contains substance of enzyme called PPO, which may cause the shrimp to be
deteriorated by pollution or chemical contamination. This hazard will cause harmful for
consumption.

**3. Physical hazards:**

Physical hazards include any potential harmful extraneous matter or foreign object not
normally found in food. During the processing, foreign object may mix together with product.
For example, flake of metal, glass and other filth. When a consumer mistakenly eats the
foreign object, it is likely to cause choking, injury or other adverse health effects.

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                 Intended Use and Consumer : For General Public, Serve after Fully Cooked.

## 8. HACCP plan form.

**See attached table.**

## 9. Verification AND CORRECTIVE ACTION PROCEDURE

Plant manager appoints quality assurance section head to in-charge the implementing and coordinating tasks of HACCP plan. As for the line, quality control group leader is appointed to be the person in charge. Person in-charge of line quality control is responsible for overseeing the monitoring record of CCP. When CCP is getting deviation , he or she should be responsible for the implementation of corrective actions and keeping good records. Q,A section head random checks the monitoring situation everyday, reports extraordinary problem to plant manager timely. Plant manager ,Q.A. and Q.C staff organize HACCP plan and continuously review and verify for keeping HACCP plan in the best position.

### *The verification of HACCP system:*

**Overall verification**: HACCP plan should be assessed at least once a year, it is included the facilities, processing flow and other modifications. The calibration of processing equipment and fixed schedule of finished product and incomplete finished product inspection must be met. All the following reports have to be done according to the requirements: CCP monitoring records, Corrective Action and Calibration records. Any feedback information of quality problem from customer, the Q.C & Q.A personnel have to verify. In addition,during weekly production and quality meeting should bring up the problem for verification and record.

**Ordinary verification**: Q.A. manager reviews all the reports daily, and ensures the reports are complete filled up according to the requirements,whether it is true has to inspect by himself at the processing area, and every inspection procedure is within the critical limits.

**Corrective action procedure:**

1. Record the date, time, shift , product name and amount of deviation products when deviation occurs.

2. Record the deviation CCP.

3. What deviation happened.

4.What is the CCP monitoring frequency.

5. The engineer corrects the deviation to the equipment for CCP monitoring.

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                 Intended Use and Consumer : For General Public, Serve after Fully Cooked.

6. Monitoring again for the whole products during the period that deviation occurs.

7. Strictly inspections should be done for all the re-work products, and keep on file.

## 10. Recall Procedure and Customer Complaint

### See attachment : GMP-Recall Plan

## 11. HACCP inspection form.

These forms include of CCP1-raw material receiving report, CCP2-ingredients certificate, CCP3-shrimp battering record, CCP4- metal detecting record.

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199      Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                    Intended Use and Consumer : For General Public, Serve after Fully Cooked.

## ORGANIZATION CHART



7/16          BREADED SHRIMP – HACCP PLAN

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                 Intended Use and Consumer : For General Public, Serve after Fully Cooked.

## HACCP TEAM

| NAME | SEX | PROFESSIONAL | POSITION | IN-CHARGE | TRAINING |
|------|-----|--------------|----------|-----------|----------|
| YUAN JINGANG | MALE | PUBLIC RELATIONSHIP | GENERAL MANAGER | PUBLIC RELATIONSHIP | NECCA HACCP CERTIFICATE TRAINING |
| ALEX LI | MALE | BUSINESS MANAGEMENT | VICE-GENERAL MANAGER | BUSINESS / RESEARCH & DEVELOPMENT | NECCA HACCP CERTIFICATE TRAINING |
| GENG SHUJING | FEMALE | FOOD SCIENCE & PROJECT | PRODUCTION MANAGER | PRODUCTION DEPARTMENT | NECCA HACCP CERTIFICATE TRAINING |
| WU JING | FEMALE | FOOD SCIENCE & PROJECT | Q.A. MANAGER | QUALITY ASSURANCE | NECCA HACCP CERTIFICATE TRAINING |
| LI JING | FEMALE | FOOD SCIENCE & PROJECT | Q.A. STUFF | Q.A. SYSTEM FILE | NECCA HACCP CERTIFICATE TRAINING |
| ZHAO JIAN | MALE | FOOD INSPECTION | LABOURATORY SUPERVISOR | QUALITY ASSURANCE | NECCA HACCP CERTIFICATE TRAINING |
| DONG GUOZHEN | MALE | ENGINEER & MACHINE | EQUIPMENT MANAGER | EQUIPMENT | NECCA HACCP CERTIFICATE TRAINING |
| GAO FUCHUN | MALE | FOOD SCIENCE & PROJECT | VICE-GENERAL MANAGER | MARKETING | NECCA HACCP CERTIFICATE TRAINING |
| ZHANG QINGLIN | MALE | INTERNATIONAL TRADE | IN / EX PORT MANAGER | IMP / EXP | NECCA HACCP CERTIFICATE TRAINING |

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                    Intended Use and Consumer : For General Public, Serve after Fully Cooked.

## BREADED SHRIMP

### PROCESSING FLOW



# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188       Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                Intended Use and Consumer : For General Public, Serve after Fully Cooked.

## IQF , BREADED SHRIMP HACCP PLAN ,HAZARD ANALYSIS WORKSHEET - 1

| Processing Steps | Potential hazards | This Hazard Significant | Reason | Preventive Measures | Corrective Actions | Is this CCP |
|---|---|---|---|---|---|---|
| Raw material receiving | BIOLOGICAL: Microorganism growth | Yes | Raw shrimp can be natural reservoirs for microorganism. Once pathogens grow it's difficult to eliminate. It will cause the shrimp to be decomposed, and is harmful for consumption. | Check the temperature of the shrimp (not excess 8℃) , room and container. Imported material we need: Certificate of origin. Certificate of health. | If found no certificate, the lot will be segregated and making claims. | NO |
| | Odor of raw material | Yes | This hazard will cause contaminated & rejected. | Q.C inspect the raw material | If found odor or decomposed, segregate and reject. | NO |
| | CHEMICAL: Furazolidone (AOZ) Furaltadone (AMOZ) Furacilinum (SEM) Nitrofurantoin (AHD) | Yes | Any use of such chemical and Aquaculture drugs will cause the raw shrimp to be contaminated | Lab test with ELISA for imported material. Certificate is required for domestic material. | If found the AOZ / AMOZ / SEM / AHD residual, segregate and reject the lot. The tolerance level is Zero. Detection limit is 0.5ppb. If found no certificate, segregated and make complain. If found no certificate, segregated and make complain. | |
| | Sulfite | Yes | Excessive use of potential for allergic-type reaction | Repaid sulfite test for imported material. Certificate is required for domestic material. Residual conrol limit is <10ppm. | If found the sulfite residual over 10ppm, segregate and reject the lot. If found no certificate, segregated and make complain. | |
| | Chloramphenicol | Yes | Any use of such chemical and Aquaculture drugs will cause the raw shrimp to be contaminated. | Lab test with Charm II analyzer for imported material. Cerificate is required for domestic material | If found the Chloramphenicol residual, segregate and reject the lot. The tolerance level is Zero. Detection limit is 0.3ppb. If found no certificate, segregated and make complain. | |
| | Tetracycline Oxytetracycline Chlortetracycline | Yes | Any use of such chemical and Aquaculture drugs will cause the raw shrimp to be contaminated. | Lab test with Charm II analyzer for imported material. Certificate is required for domestic material | If found the tetracycline / oxytetracycline / chlortetracycline residual,segregate and reject the lot. The tolerance level is Zero. Detection limit is 20ppb. If found no certificate, segregated and make complain. | |
| | Flumequine | Yes | Any use of such chemical and Aquaculture drugs will cause the raw shrimp to be contaminated. | Lab test with Charm II analyzer for imported material. Certificate is required for domestic material | If found the flumequine residual, segregate and reject the lot. The tolerance level is Zero. Detection limit is 0.25ppb. If found no certificate, segregated and make complain. | YES |
| | Ciprofloxacine Enrofloxacine Danofloxacine | Yes | Any use of such chemical and Aquaculture drugs will cause the raw shrimp to be contaminated. | Lab test with Charm II analyzer for imported material. Certificate is required for domestic material | If found the ciprofloxacine / enrofloxacine / danofloxacine residual, segregate and reject the lot. The tolerance level is Zero. Detection limit is 1ppb. If found no certificate, segregated and make complain. | |
| | Malachite Green / Leucomalachite green | Yes | Any use of such chemical and Aquaculture drugs will cause the raw shrimp to be contaminated. | Lab test with ELISA for imported material. Certificate is required for domestic material | If found the malachite green / Leucomalachite green residual, segregate and reject the lot. The tolerance level is Zero. Detection limit is 0.5ppb. If found no certificate, segregated and make complain. | |
| | Crystal violet / Gentian violet / Leucocrystal violet | Yes | Any use of such chemical and Aquaculture drugs will cause the raw shrimp to be contaminated. | Lab test with ELISA for imported material. Certificate is required for domestic material | If found the crystal violet / gentian violet / leucocrystal violet residual, segregate and reject the lot. Non The tolerance level is Zero. Detection limit is 1.5ppb. If found no certificate, segregated and make complain. | |

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                    Intended Use and Consumer : For General Public, Serve after Fully Cooked.

| | | | | | | |
|---|---|---|---|---|---|---|
| | PHYSICAL: Dehydration Improper size short weight | No | These hazards will cause economically lose only. Not related with safety | Q.C inspect the raw material | If found dehydration, improper size and short weight, segregate and make claim. | |
| Thawing | BIOLOGICAL: Discolor or black tail | No | Not related with safety | QC inspect the temperature and time of thawing period. Water temperature should be <15℃, shrimp temperature should be <8℃, thawing time should be <30minutes. | Controlled by SSOP、GMP | NO |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: | No | | | | |
| Grading | BIOLOGICAL: | No | | | | |
| | CHEMICAL: | No | | | | NO |
| | PHYSICAL: Size and uniformity do not meet the requirements | No | Not related with safety | Train the workers | Reprocess | |
| Peeling & Cutting | BIOLOGICAL: | No | | | | |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: Shell, legs left on shrimps, filth , contaminated with bacterial pathogen | No | Not related with safety | Line leaders inspect and control the wokers processing methods. | If found any product deviates return and reprocess | NO |
| | *Broken knife pieces | Yes | Controlled by metal detector such matter is not allowed. | Check the knives used by the workers | Extra attention to these products | |
| Pre - dusting | BIOLOGICAL: Pathogen growth | No | Risk is low due to short pre - dust time potable water is used (SSOP) | Controlled by SSOP、GMP The shrimp temperature should be <8 ℃ | Controlled by SSOP、GMP | |
| | CHEMICAL: | No | | | | NO |
| | PHYSICAL: Foreign materials | Yes | Foreign materials are harmful for consumption. | Sieved with sifter, the state sieve size Min. : 2mm | If found foreign materials, segregated and make complain. | |
| | Allergen contamination | Yes | Allergen material will cause people reaction | Please refer allergen plan | Please refer allergen plan | |
| Battering | BIOLOGICAL: Pathogen growth | Yes | Pathogen growth if batter held too long at elevated temperature. | Keep tempurature below 8 ℃ | If batter temperature is over 8 ℃ but no more than 10℃, add ice at once; if excess 10 ℃, dump batter and change new, separate products of this time and the last time, waite evaluation and treating. | YES |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: Foreign materials | Yes | Foreign materials are harmful for consumption. | Sieved with sifter, the state sieve size Min. : 2mm | If found foreign materials, segregated and make complain. | NO |
| | Allergen contamination | Yes | Allergen material will cause people reaction | Please refer allergen plan | Please refer allergen plan | |
| Breading | BIOLOGICAL: *Pathogen Survial | No | Risk is low due to short breading time. | Controlled by SSOP、GMP The shrimp temperature should be <8 ℃ | Controlled by SSOP、GMP | |
| | CHEMICAL: | No | | | | NO |
| | PHYSICAL: Foreign materials | Yes | Foreign materials are harmful for consumption. | Check by sense | If found foreign materials, segregated and make complain. | |
| | Allergen contamination | Yes | Allergen material will cause people reaction | Please refer allergen plan | Please refer allergen plan | |

BREADED SHRIMP – HACCP PLAN

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188          Fax : 86-411-87821199     Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                                Intended Use and Consumer : For General Public, Serve after Fully Cooked.

| | | | | | | |
|---|---|---|---|---|---|---|
| (Pre – Frying) | BIOLOGICAL: *Pathogen Survial | No | Risk is low due to short frying time. Frying oil temperature Min. 180℃, frying time: 40 seconds. | Controlled by SSOP、GMP | Controlled by SSOP、GMP | NO |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: | No | | | | |
| Freezing | BIOLOGICAL: | No | | | | NO |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: Improper temp. and freezing time will affect the quality of the final product | No | Not related with safety | Ensure the final products core temperature is equal to or below -18℃ | Re-freeze | |
| Weighting | BIOLOGICAL: | No | | | | NO |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: Under weight | No | Not related with safety | Correct the scale and operatemethod of weighting | Re-weight | |
| Inner packing | BIOLOGICAL: shrimp was contaminated by worker's hands | Yes | Controlled by SSOP、GMP | Ensure worker's hands be sterilized by alcohol regularly | Controlled by SSOP、GMP | NO |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: Foreign materials | Yes | Foreign materials are harmful for | Check by sense for inner bag, tray pack one by one. | If found foreign materials, segregated and make complain. | |
| Metal detecting | BIOLOGICAL: | No | | | | YES |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: Metal fragments | Yes | Metal fragments from many machines or other sources | All products must be passed through the metal detector. | If found metal fragments, separate the product, check after thawing, identify source of it, test the metal detector before work again, and destroy the product. | |
| | | | | Inspect metal detector's sensitivity once every 30 minutes and check the first one and the last one, mark when no production. | If found the metal detector was not work, fix it and re - inspect all products from last time. | |
| Master packing | BIOLOGICAL: | No | | | | NO |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: Foreign materials | Yes | Foreign materials are harmful for consumption. | Check by sense | If found foreign materials, segregated and make complain. | |
| Cold storage | BIOLOGICAL: | No | | | | NO |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: Microorganism and dehydration | No | High variation of the temperature will cause the final products quality dropped. Long period of storage will cause final products to be destroied. | Automatic temperature recording machine constantly inspect and control the temperature below -18 ℃ | If the temperature does not meet the requirement, inform power room to lower the temperature | |

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188      Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp           Intended Use and Consumer : For General Public, Serve after Fully Cooked.

## IQF , BREADED SHRIMP HACCP PLAN ,HAZARD ANALYSIS WORKSHEET -2

| Processing Steps | Potential hazards | This Hazard Significant | Reason | Preventive Measures | Corrective Actions | Is this CCP |
|---|---|---|---|---|---|---|
| Ingredients Receiving | BIOLOGICAL: pathogen contamination | Yes | Pathogen contamination | Certificate is required, lab test every lot | If found no certificate or not accord with test standard, segregated and make complain. | NO |
| | CHEMICAL: Melamine | Yes | Excessive use of melamine will cause the material to be contaminated. | Supplier provide guarantee letter and certificate. | If found no certificate, segregated and stop ingredients using until practices have changed. | YES |
| | PHYSICAL: Foreign materials | Yes | Foreign materials are harmful for consumption. | Check before use | If found foreign materials, segregated and make complain. | NO |
| Ingredients Storage | BIOLOGICAL: pathogen contamination | No | Controlled by SSOP、GMP | Controlled by SSOP、GMP | Controlled by SSOP、GMP | NO |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: Allergen contamination | Yes | Allergen material will cause people reaction | Please refer allergen plan | Please refer allergen plan | |
| Packaging Receiving | BIOLOGICAL: Pathogen contamination | No | Pathogen contamination | Inspect the official test certification before receive | If found no certificate, segregated and make complain. | NO |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: Foreign materials | Yes | Foreign materials are harmful for consumption. | Check by sense for inner bag, tray pack. | If found foreign materials, segregated and make complain. | |
| Packaging Storage | BIOLOGICAL: Pathogen contamination | No | Controlled by SSOP、GMP | Controlled by SSOP、GMP | Controlled by SSOP、GMP | NO |
| | CHEMICAL: | No | | | | |
| | PHYSICAL: | No | | | | |

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp            Intended Use and Consumer : For General Public, Serve after Fully Cooked.

## BREADED SHRIMP HACCP PLAN FORM

| CCP | Processing Step | Significant Hazards | Critical for each Preventive | Monitoring | | | | Corrective Action | Records | Verification |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | | what | how | frequency | who | | | |
| CCP1 | Raw material receiving | Sulfite | No sulfite should be used. | Sulfite residual | Rapid sulfite test for imported material Certificate is required for demestic material | Every lot | Lab staff | If found the sulfite residual over 10ppm, segregate and reject the lot. If found no certificate, segregated and make complain. | LAB report | Two samples send to third party lab for verification test every month |
| | | Furazolidone (AOZ) Furaltadone (AMOZ) Furacillinum (SEM) Nitrofurantoin (AHD) | No AOZ / AMOZ/ SEM/ AHD should be used. | AOZ/ AMOZ/ SEM/ AHD residual | Lab test with ELISA for imported, Certificate is required for demestic material | Every lot | Lab staff | If found the AOZ / AMOZ / SEM/ AHD residual, segregate and reject the lot. The tolerance level is Zero. Detection limit is 0.5ppb. If found no certificate, segregated and make complain. | LAB report | |
| | | Chloramphenicol | No chloramphenicol should be used. | Chloramphenicol residual | Lab test with Charm II for imported, Certificate is required for demestic material | Every lot | Lab staff | If found the Chloramphenicol residual, segregate and reject the lot. The tolerance level is Zero. Detection limit is 0.3ppb. If found no certificate, segregated and make complain. | LAB test report | |
| | | Tetracycline Oxytetracycline Chlortetracycline | No tetracycline / oxytetracycline / chlortetracycline should be used. | Tetracycline / oxytetracycline / chlortetracycline residual | Lab test with Charm II for imported, Certificate is required for demestic material | Every lot | Lab staff | If found the tetracycline / oxytetracycline / chlortetracycline residual,segregate and reject the lot. The tolerance level is Zero. Detection limit is 20ppb. If found no certificate, segregated and make complain. | LAB test report | |
| | | Flumequine | No flumequine should be used. | Flumequine residual | Lab test with ELISA for imported, Certificate is required for demestic material | Every lot | Lab staff | If found the flumequine residual, segregate and reject the lot. The tolerance level is Zero. Detection limit is 0.25ppb. If found no certificate, segregated and make complain. | LAB test report | |
| | | Ciprofloxacine Enrofloxacine Danofloxacine | No ciprofloxacine should be used. | Ciprofloxacine residual | Lab test with ELISA for imported, Certificate is required for demestic material | Every lot | Lab staff | If found the ciprofloxacine / enrofloxacine / danofloxacine residual, segregate and reject the lot. The tolerance level is Zero. Detection limit is 1ppb. If found no certificate, segregated and make complain. | LAB test report | |
| | | Malachite Green / Leucomalachite green | No malachite green / leucomalachite green should be used. | Malachite green / leucomalachite green residual | Lab test with ELISA for imported, Certificate is required for demestic material | Every lot | Lab staff | If found the malachite green / Leucomalachite green residual, segregate and reject the lot. The tolerance level is Zero. Detection limit is 0.5ppb. If found no certificate, segregated and make complain. | LAB test report | |

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                        Intended Use and Consumer : For General Public, Serve after Fully Cooked.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Crystal violet / Gentian violet / Leucocrystal violet | No crystal violet / gentian violet / leucocrystal violet should be used. | Crystal violet / Gentian violet / Leucocryst al violet residual | Lab test with ELISA for imported, Certificate is required for demestic material | Every lot | Lab staff | If found the crystal violet / gentian violet / leucocrystal violet residual, segregate and reject the lot. Non The tolerance level is Zero. Detection limit is 1.5ppb. If found no certificate, segregated and make complain. | LAB test report |
| CCP2 | Ingredients receiving | Melamine | No melamine should be used. | Melamine residual | Supplier provide guarantee letter and certificate. | Every year for certific ate | Q.C insp ector | If found no certificate, segregated and stop ingredients using until practices have changed. | Supplier certificat e | One sample for each ingredient send to third party lab for verification test half a year. |
| CCP3 | Battering | Pathogen growth if batter hold too long at elevated temperature. | Batter temperature not to exceed 8°C | Check the temperatur e. | Thermometer | Each 15 minute s. | Q.C insp ector | If batter temperature is over 8°C but no more than 10°C, add ice at once; if excess 10°C, dump batter and change new, separate products of this time and the last time, waite evaluation and treating. | Batter temperat ure control report | QA review operator logs |
| CCP4 | Metal detecting | Metal fragments | Diameter: 1.5mm for ferrous, 2mm for non - ferrous and 2.5mm stainless steel Metal detector 's sensitivity. | Metal fragments | All production | Contin uous | Q.C insp ector | If found metal fragments, separate the product, check after thawing, identify source of it, test the metal detector before work again, and destroy the product. | Metal detector monitorin g record | QA review operator logs |
| | | | | Use the sample test pad to check. | must pass the metal detector. Every 30 munites. Check the first one and the last one, mark when no production. | | | If found the metal detector was not work, fix it and re - inspect all products from last time. | | |

# ALLIED PACIFIC FOOD (DALIAN) CO., LTD

Company Name : Allied Pacific Food (DALIAN) Co., Ltd.
Company Address: 888 Yong Zheng Industrial Area , San Li, Jinzhou District, Dalian116100, China .
Company Telephone: 86-411-87821188        Fax : 86-411-87821199    Method of Storage and Distribution : Frozen
Products : Breaded Shrimp                Intended Use and Consumer : For General Public, Serve after Fully Cooked.

## DECISION TREE TABLE FOR SHRIMP PROCESSING

*Q1* : DO PREVENTIVE MEASURES EXIST AT THIS STEP OR SUBSEQUENT STEP FOR IDENTIFIED HAZARD?

*Q2:* DOES THIS STEP ELIMINATE OR REDUCE THE LIKELY OCCURRENCE OF A HAZARD TO AN ACCEPTABLE LEVEL?

*Q3:* COULD CONTAMINATION WITH IDENTIFIED HAZARDS OCCUR IN EXCESS OF ACCEPTABLE LEVELS OR COULDTHESES

INCREASE TO UNACCEPTABLE LEVELS?

*Q4* : WILL A SUBSEQUENT STEP ELIMINATE IDENTIFIED HAZARDS OR REDUCE THE LIKELY OCCURRENCE TO AN ACCEPTABLE

LEVELS?

| PROCESS STEP | HAZARD | Q1 | Q2 | Q3 | Q4 | CCP |
|---|---|---|---|---|---|---|
| SHRIMP RECEIVING | ANTIBIOTIC RESIDUAL | YES | YES | - | - | YES |
| THAWING | BACTERIAL PATHOGENS | YES | NO | YES | YES | NO |
| WASHING | BACTERIAL PATHOGENS | YES | NO | YES | YES | NO |
| GRADING | SIZE CONTROL | YES | NO | - | - | NO |
| PEELING & CUTTING | METAL PIECES SURVIVAL | YES | NO | YES | YES | NO |
| PRE-DUSTING | FOREIGN MATERIAL | YES | NO | YES | YES | NO |
| BATTERING | BACTERIAL PATHOGENS | YES | YES | YES | YES | YES |
| BREADING | FOREIGN MATERIAL | YES | YES | YES | YES | NO |
| (PRE - FRYING) | BACTERIAL PATHOGENS | YES | YES | YES | YES | NO |
| FROZEN | BACTERIAL PATHOGENS | YES | NO | YES | YES | NO |
| WEIGHTING | WEIGHT CONTROL | NO | NO | - | - | NO |
| INNER PACKING | BACTERIAL PATHOGENS | YES | NO | YES | YES | NO |
| METAL DETECTING | METAL PIECES SURVIVAL | YES | YES | - | - | YES |
| MASTER PACKING | FOREIGN MATERIAL | YES | NO | YES | YES | NO |
| COLD STORAGE | BACTERIAL PATHOGENS | YES | NO | YES | YES | NO |
| PROCESS STEP | HAZARD | Q1 | Q2 | Q3 | Q4 | CCP |
| INGREDIENTS RECEIVING | ANTIBIOTIC RESIDUAL | YES | YES | - | - | YES |
| INGREDIENTS STORAGE | BACTERIAL PATHOGENS | YES | NO | YES | YES | NO |
| PACKAGING RECEIVING | BACTERIAL PATHOGENS | YES | NO | YES | YES | NO |
| PACKAGING STORAGE | BACTERIAL PATHOGENS | YES | NO | YES | YES | NO |

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

# EXHIBIT 2

IA #16-131, 8/3/07, IMPORT ALERT #16-131, "DETENTION WITHOUT PHYSICAL
EXAMINATION OF AQUACULTURED CATFISH, BASA (Pangasius sp), SHRIMP, DACE, AND
EEL PRODUCTS FROM THE PEOPLE'S REPUBLIC OF CHINA DUE TO THE PRESENCE OF NEW
ANIMAL DRUGS AND/OR UNSAFE FOOD ADDITIVES", ATTACHMENT 9/18/07

NOTE:        This revision includes additional sampling guidance.
             Changes are bracketed by asterisks.

TYPE OF
ALERT:       DETENTION WITHOUT PHYSICAL EXAMINATION (DWPE)

             (Note: This import alert represents the Agency's current
             guidance to FDA field personnel regarding the
             manufacturer(s) and/or products(s) at issue.  It does not
             create or confer any rights for or on any person, and does
             not operate to bind FDA or the public).

PRODUCT:     Aquacultured seafood products

PRODUCT
CODE:            Catfish (Ichtalurus sp.)
             16X[][]02
             16A[][]10, 16B[][]10, 16C[][]10, 16I[][]10, 16S[][]10
             16A[][]67, 16B[][]67, 16C[][]67, 16I[][]67, 16S[][]67

             Shrimp
             16X[][]21
             16J[][]05, 16K[][]05, 16L[][]05

             Basa (Pangasius sp.)
             16X[][]43
             16A[][]82, 16B[][]82, 16C[][]82, 16I[][]82, 16S[][]82

             Dace - 16A[][]57, 16B[][]57, 16C[][]57, 16I[][]57, 16S[][]57

             Eel - 16A[][]15, 16B[][]15, 16C[][]15, 16I[][]15, 16S[][]15

             Aquaculture Harvested Fishery/Seafood Products, N.E.C.
             16X[][]99

             (*Dace and eel may also be coded as aquaculture harvested
             product, N.E.C.; i.e. 16X[][]99)

PROBLEM:     Unapproved drug residues

Unsafe food additives

PAF:            ANT (Drug residues)
                FAD (Food Additive)

PAC:            04018

COUNTRY:        China, People's Republic of (CN)

MANUFACTURER
FEI#:           All

IMPORTER'S
ID#:            N/A

CHARGES:        "The article is subject to refusal of admission pursuant to
                Section 801(a)(3), in that it appears to bear or contain a
                food additive that is unsafe within the meaning of Section
                409 [Adulteration, Section 402(a)(2)(C)(i)]."
                (OASIS CHARGE CODES:  UNSAFE ADD)

                                    AND/OR

                "The article is subject to refusal of admission pursuant to
                Section 801(a)(3), in that it appears to bear or contain a
                new animal drug (or conversion product thereof) that is
                unsafe within the meaning of Section 512 [Adulteration,
                Section 402(a)(2)(C)(ii)]."
                (OASIS CHARGE CODES:  VETDRUGRES)

RECOMMENDING
OFFICE:         OFS/DSS, HFS-325
                OC/DE, HFS-606

REASON FOR
ALERT:          There has been extensive commercialization and increased
                consumption of aquaculture seafood products worldwide.
                Aquaculture seafood has become the fastest growing sector
                of the world food economy, accounting for approximately half
                of all seafood production worldwide.  Approximately 80% of
                the seafood consumed in the U.S. is imported from
                approximately 62 countries. Over 40% of that seafood comes
                from aquaculture operations.  As the aquaculture industry
                continues to grow and compete with wild-caught seafood
                products, concerns regarding the use of unapproved animal

drugs and unsafe chemicals and the misuse of animal drugs in aquaculture operations have increased substantially.

China is the largest producer of aquacultured seafood in the world, accounting for 70% of the total production and 55% of the total value of aquacultured seafood exported around the world.  China is currently the third largest exporter of seafood to the U.S.  Shrimp and catfish products represent two of the top ten most consumed seafood products in the U.S.

The use of unapproved antibiotics or chemicals in aquaculture raises significant public health concerns. There is clear scientific evidence that the use of antibiotics or chemicals, such as malachite green, nitrofurans, fluoroquinolones, and gentian violet during the various stages of aquaculture can result in the presence of residues of the parent compound or its metabolites in the edible portion of the aquacultured seafood.  The presence of antibiotic residues may contribute to an increase of antimicrobial resistance in human pathogens.  Moreover, prolonged exposure to nitrofurans, malachite green, and gentian violet has been shown to have a carcinogenic affect.

In the United States, use of malachite green, nitrofurans, fluoroquinolones, or gentian violet as drugs in food-producing animals would require an approved new animal drug application under Section 512 of the Federal Food, Drug, and Cosmetic Act (FFDCA).  FDA has not approved these antibiotics for use as drugs in aquacultured animals. Therefore, if they are used in aquaculture with an intent that they treat disease in, or affect the structure or function of, any aquacultured animal, they are considered to be unsafe new animal drugs within the meaning of Section 512, and the presence of their residues in seafood adulterates the seafood under 402(a)(2)(C)(ii) of the FFDCA.

Furthermore, malachite green, nitrofurans, fluoroquinolones and gentian violet are not generally recognized as safe under any conditions of intended use that may reasonably be expected to result in their becoming a component of food. Therefore, if intended for any such use, they are unsafe food additives within the meaning of section 409 of the FDCA and would render the food adulterated under section 402(a)(2)(C)(i).

FDA has several existing Import alerts related to unapproved
drugs in seafood dating back to November of 2001 (IA #16-124
DWPE of Seafood Products Due to Unapproved Drugs, IA #16-129
DWPE of Seafood Products Due to Nitrofurans, and IA #16-130
DWPE of Eel from China Due to the presence of Malachite
Green).  Based on an increased monitoring of imported
aquacultured seafood from October 1, 2006, through May 31,
2007, FDA continued to find residues of unapproved new
animal drugs and/or unsafe food additives in seafood
imported from China.  During that period, FDA tested 89
samples consisting of catfish, Basa, shrimp, dace and eel
from China.  Twenty two (22) of the 89 samples (25%) were
found to contain drug residues.  These residues include
nitrofurans detected in shrimp at levels above 1 ppb;
malachite green detected in dace, eel and catfish/Basa fish
at levels ranging from 2.1 to 122 ppb; gentian violet
detected in eel and catfish at levels ranging from 2.5 ppb
to 26.9 ppb and fluoroquinolones in catfish/Basa at level
ranging from 1.9 to 6.5 ppb.  Furthermore, Chinese
authorities have acknowledged permitting the use of
fluoroquinolones in aquaculture

Although the use of some animal drugs (nitrofurans and
malachite green) in aquaculture has been prohibited by
Chinese authorities since 2002, FDA continues to find
residues of these and other animal drugs in shipments of
aquacultured seafood products from China.

GUIDANCE:    Districts may detain without physical examination, all
             shipments of aquacultured catfish, Basa (Pangasius sp),
             shrimp, dace, and eel from the People's Republic of China
             (CN) except for the firms identified on the attachment to
             this alert.

             Screening criteria has been set into OASIS.

             If a firm, shipper, or importer believes that their product
             should not be subject to detention under this import alert
             they should forward information supporting their position to
             FDA at the following address:

                 Food and Drug Administration
                 Division of Import Operations and Policy (HFC-170)
                 5600 Fishers Lane, Room 12-36

Rockville, MD 20587

In order to secure release of an individual shipment subject to this Import Alert, the importer should provide the results of a third-party laboratory analysis of a representative sample of the lot verifying that products do not contain malachite green and its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet or fluoroquinolones.  The chart provided below identifies which residues should be screened for each species.

Third-party laboratories may use any methods that are found acceptable to FDA.  (e.g., see http://www.cfsan.fda.gov/seafood1.html

The following residues should be tested for each species.

| SPECIES | RESIDUE |
| --- | --- |
| Catfish, Basa, and Other Pangasius | Malachite Green<br>    Fluoroquinolones<br>Gentian Violet |
| Shrimp | Malachite Green<br>Fluoroquinolones<br>Nitrofurans<br>Gentian Violet |
| Dace | Malachite Green<br>Gentian Violet |
| Eel | Malachite Green<br>Gentian Violet |

*** NOTE:  The samples taken should be representative of the shipment.  The following provides guidance on what may be considered a representative sample.

Import sampling plan

Single product type entry

Shrimp     The sample should consist of a minimum of 12 sub-samples.  When an entry consists of multiple

lines of similar products (e.g., multiple sizes
of headless shrimp), the sample should be
representative of the entire entry and should be
collected across all lines, with a minimum of
two sub-samples per line.  The sampling should
be proportional based on the quantity of product
(e.g. more sub-samples should be obtained from
larger lines, fewer sub-samples from smaller
lines).  Obtaining 12 sub-samples from a single
line or a limited number of lines when multiple
lines of similar products are offered for the
entry will not provide a representative sample
for that entry.

If an entry contains only one line of aquacultured product,
then a minimum of 12 sub-samples should be obtained from
that single line.  If the entry includes multiple date
codes, the sample should reflect a range of date codes
(e.g., all sub-samples should not be collected from a single
date code).

Each sample should consist of 12 sub-samples, minimum 225g
(0.5 lb.) per sub-sample, total 2.7 kg (6.0 lb.) of product.
If the product unit size is larger than 225g (0.5 lb.) and
less than or equal to 3 lb., collect one product unit per
sub-sample.  If the unit size is less than 225g. (0.5 lb.),
collect an adequate number of units so that the amount
collected per sub-sample equals a minimum of 225 grams (0.5
lb.).

For units (block frozen) larger than 3 lbs. only:  If the
units must be sampled and shipped intact, collect 6 sub-
samples (units).  Alternatively, sub-samples of at least
225g (0.5 lb.) may be broken/sawed off (keep frozen) from
each of 12 units, and the twelve (12) 225 g sub-samples
shipped to the analyzing lab.

Analysis for Nitrofuran should be conducted on individual
subsamples.

Analyses for all other residues should be conducted on a
composite sample.

Catfish, Basa, Dace, Eel

The sample should consist of a minimum of 12 sub-samples and be representative of the entry. If the entry contains multiple lines, each line should be sampled separately. A sample, consisting of a minimum of 12 sub-samples, should be collected from each line. If the entry consists of multiple date codes, the samples should be representative of a range of date codes. Analyses should be conducted on a composite sample from each line.

Each sample should consist of a minimum of 12/225 gram (0.5 lb.) sub-samples, totaling 2.7 kg (6.0 lb.) of product. If the container size is larger than 225 grams (0.5 lb.), collect one container per sub-sample. If the container is less than 225 grams (0.5 lb.), collect an adequate number of containers so that the amount collected per sub-sample equals a minimum of 225 grams (0.5 lb.).

Mixed products entry

If the entry consists of mixed aquacultured seafood products, a minimum of 12 sub-samples should be obtained from each line. For example, if an entry includes one line of headless shrimp and one line of basa fillets, two samples should be obtained  one sample, consisting of a minimum of 12 sub-samples, of shrimp; and one sample, consisting of a minimum of 12 sub-samples, of basa.

Analyses should be conducted on a sample from each line as described above, depending on the commodity.***

Sample Preparation

Prepare one composite from an equal amount of each subsample for the testing of malachite green, fluoroquinolones, and gentian violet.

Shrimp are to be analyzed on an individual sub basis for nitrofurans. When sampling guidance directs the collection of six subsamples, two portions from each of the six subsamples should be individually analyzed. ***

For questions or issues concerning science, science policy, analysis, preparation, or analytical methodology, contact the Division of Field Science at (301) 827-7605.

In order to remove a firm from detention without physical examination, information should be provided to FDA to adequately assess whether a manufacturer has the appropriate controls and processes in place to ensure the quality of the product, the firm or shipper should provide the following information (In English):

1)  Documentation showing that a minimum of five (5) consecutive entries have been released by FDA based on third-party laboratory analysis of a representative sample of the lot verifying that products do not contain malachite green and its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet and fluoroquinolones.  The chart provided above identifies which residues should be screened for each species.  Third-party laboratory must use methods acceptable to FDA (e.g., see http://www.cfsan.fda.gov/seafood1.html);

                        and

2)  Documentation, from an appropriate third-party (e.g. a government inspection authority such as AQSIQ) demonstrating that an inspection of the processor was conducted and that the seafood was processed in accordance with FDA's Seafood HACCP regulations, 21 CFR part 123, including controls for aquaculture drugs.  See 21 CFR 123.12(a).

    Documentation should include test results of any products sampled during the course of the inspection, demonstrating that the products do not contain malachite green or its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet or fluoroquinolones.

                        and

3)  Documentation that the processor is in compliance with all Chinese government requirements for exporting aquacultured seafood to the U.S.

    Documentation should include copies of any registration that may be required by the Chinese government.

> All requests for removal (exemption) from DWPE will be
> forwarded by DIOP to CFSAN (HFS-606) for evaluation.

PRIORITIZATION
GUIDANCE:      I

FOI:           No purging required

KEYWORDS:      Nitrofurans, Fluoroquinolones (ciprofloxacin and
               enrofloxacin), malachite green, leucomalachite green,
               gentian violet, aquaculture,

PREPARED
BY:            Barbara Montwill, CFSAN/OFS/DSS/SAPB (HFS-325), 301-436-1426
               Giselle Jordan, CFSAN/OC/DE/PAB (HFS-606), 301-436-1576
               Ted Poplawski, DIOP, (301) 443-6553

REVISED
BY:            Virginia L. Meeks, DIOP, (301) 594-3845

DATE LOADED
INTO FIARS:        August 3, 2007

              ATTACHMENT TO IMPORT ALERT #16-131      9/18/07

          Firms and products exempt from DWPE recommendation

FIRM                                 PRODUCT/PRODUCT CODE

Zhangjiang Guolian Aquatic Products       Shrimp
  Co., Ltd.                               16J[][]05/16K[][]05
6 Yongping S. Rd.                         16L[][]05/16X[][]21
Pingle Industry Development Region        9/18/07
Zhangjiang, Guangdong, China
FEI# 3004097215

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

# EXHIBIT 3



OCT 3 1 2007

Food and Drug Administration
Rockville MD 20857

Ms. Christine Humphrey
Fuerst Humphrey Ittleman PL
1001 Brickell Bay Drive, Ste. 2002
Miami, FL 33131

Dear Ms. Humphrey:

This is in reply to your request dated September 10, 2007, concerning the removal shrimp processed by Allied Pacific Foods Co., Ltd., Dalian, China, from detention without physical examination (DWPE) under Import Alert# 16-131, ""Detention Without Physical Examination Of Aquacultured Catfish, Basa (Pangasius Sp), Shrimp, Dace, And Eel Products From The People's Republic Of China Due To The Presence Of New Animal Drugs And/Or Unsafe Food Additives."

A review of the information submitted with your request and Food and Drug Administration (FDA) records indicates that shrimp processed by Allied Pacific Foods Co., Ltd., 888 Yong Zheng Industrial Area, Dalain, China, has not met the criteria for removal from DWPE at this time.

The private laboratory analysis submitted with your request for entry AQZ-2510860-6 indicated that nitrofurans (specifically, 1-aminohydantoin hydrochloride (AH)) were present at 1.98 ppb and 7.75 ppb, which are above the limit of detection (LOD). Further, the FDA district's review of the private lab analysis for line entries AQZ-0251860-6/1/1 and AQZ-0251619-6/1/1 found the samples to have levels of nitrofurans above the LOD.

The submission includes HACCP plans for breaded shrimp, breaded skewered shrimp, and pre-fried tempura shrimp. Antibiotic residues are identified as a hazard and controlled at the Receiving raw materials critical control point. Residues listed include nitrofurans (NF) (furazolidone, furaltadone, furacilinum, nitrofurantoin), fluroquinolones (FQ) (flumequine, ciprofloxacin, enrofloxacin, dinofloxacin), malachite green, leuchomalachite green, gentian violet (GV), and leuchogentian violet (LGV). The critical limit "No (residue) should be used" is adequately set for all residues. All residue limits of detection (LOD) are adequate except for GV and LGV which is set at 1.5 ppb above the FDA acceptable limit of detection of 1.0 ppb.

Imported raw materials are sampled for antibiotics. Residue-free certificates are required for domestic raw materials according to the firm's HACCP plan. Tabs 1-16, sub-tab 'c' include a "Raw Material Antibiotic Test Report" for domestic raw materials received by the firm. All reports show "Not Detected" for all residues tested; however, GV and LGV are tested at a LOD of 1.5 ppb. The firm verifies by sending two samples to a third-party lab every month. Third party lab analyses for all residues have LODs equal to FDA except for GV and LGV. The levels for GV and LGV are set at 1.5 ppb, which is inadequate.

RECEI

NOV 03

Third-parties Cook & Thurber and Surefish Seafood Quality Specialists (Lynnwood, WA) conducted audits on June 22, 2007 and May 15 & 16, 2007, respectively, prior to the issuance of the import alert on June 28, 2007. Although these audits were conducted prior to the issuance of the import alert, the results were acceptable as they represent the firm's current HACCP system implementation. However, the package fails to include a adequate description of Cook & Thurber and Surefish Seafood Quality Specialists functions, knowledge, and experience; and the CV, qualifications and experience for both auditors, Mark D. Neely and Roger Helgerson.

The firm provided testing reports issued by the PROC Provincial Entry-Exit Inspection and Quarantine Bureau, Food Testing Center (CIQ), for five entries under Tab 2, A – E. The translated reports are incomplete as they do not specify the analytical methods used.

If you have any questions concerning this request, feel free to contact Ted Poplawski at (301) 443-6553.

Sincerely yours,

Domenic Veneziano
Director
Division of Import Operations
&  Policy

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

# EXHIBIT 4

U.S. FOOD AND DRUG ADMINISTRATION
DIVISION OF IMPORT OPERATIONS & POLICY

PHONE NUMBER: 301-443-6553
FAX NUMBER: 301-594-0413

## FACSIMILE TRANSMITTAL SHEET

TO: Mitchell Fuerst / Christina Humphrey

FROM: Ted Poplawski

COMPANY: FHI PL

DATE: 12/6/2007

FAX NUMBER: 305 371-8989

TOTAL NO. OF PAGES INCLUDING COVER: 5

PHONE NUMBER: 305 350-5690

SENDER'S PHONE NUMBER: 301 694-3849

RE: Allied Pacific Food Co. response

☐ URGENT ☐ FOR REVIEW ☐ PLEASE COMMENT ☐ PLEASE REPLY ☐ PLEASE RECYCLE

NOTES/COMMENTS:

5600 FISHERS LANE, 12TH FLOOR, SUITE 36 – ROCKVILLE, MARYLAND 20857



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**                     Public Health Service

Food and Drug Administration
Rockville MD 20857

DEC 0 7 2007

Mr. Mitchell Fuerst
Ms. Christine Humphrey
Fuerst, Humphrey, Ittleman, PL
1001 Brickell Bay Drive
Suite 2002
Miami, Florida 33131

Dear Mr. Fuerst and Ms. Humphrey:

This is in response to documents provided to the Food and Drug Administration (FDA) in further support of your request on behalf of Allied Pacific Food Company for removal of the firm from Detention Without Physical Examination (DWPE) under Import Alert 16-131, "Detention Without Physical Examination of Aquacultured Catfish, Basa (Pangasius Sp), Shrimp, Dace, and Eel Products From The People's Republic Of China Due to the Presence of New Animal Drugs and/or Unsafe Food Additives." This letter addresses only the documentation provided regarding the firm's Hazard Analysis Critical Control Point (HACCP) system; it does not address any remaining issues related to private laboratory analytical documentation, which will be responded to separately.

On November 13, 2007, you provided FDA with the firm's revised HACCP plans dated November 12, 2007, for breaded shrimp, breaded skewered shrimp, and pan-fried tempura shrimp. The package also included two letters dated November 12, 2007, from the U.S. Department of Commerce (USDoC) Seafood Inspection Program, attesting to the completion of audit inspections conducted at the firm on November 3 and 8, 2007. On November 15, 2007, you provided the qualifications for Robert Helgerson and Mark Neely, auditors representing Cook and Thurber and Surefish, respectively. On November 21, USDoC provided their inspection reports to FDA. The audits covered an examination of the firm's HACCP plan, the operation of the plan, including the standard sanitation operating procedures, for compliance with FDA's Seafood HACCP regulation at 21 CFR part 123.

FDA has reviewed the additional documentation you provided and has the following comments:

Revised HACCP Plans

The three HACCP plans identify aquaculture drugs as a potential hazard at the receiving step. The processor receives raw material from two sources: imported aquacultured shrimp and domestically farm-raised shrimp. According to the three HACCP plans, each lot of imported shrimp is tested by a third-party laboratory using rapid screening kits, ELISA and CHARM II, and each lot of domestic farm-raised shrimp is accompanied by a certificate indicating proper drug usage.

The verification step in the HACCP plans for imported shrimp requires evaluation of third-party laboratory testing results on a monthly basis. The HACCP plans do not, however, provide information describing how the firm evaluates the third-party laboratory testing results or what methodology is used. For domestic shrimp, the verification step in the HACCP plans requires a weekly review of monitoring records, corrective actions, and in-house laboratory results for the domestic shrimp. It is unclear what is meant by the "in-house" laboratory and what methodology is used by the "in-house" laboratory. FDA cannot fully review the verification steps for imported and domestic shrimp without this information.

Because the imported shrimp is routinely tested only by rapid screening method, for the verification step for imported shrimp, FDA recommends, including monthly or quarterly verification testing using methods recommended by FDA or AOAC.

<u>Auditor Paper Credentials</u>

The documentation provided for Mr. Helgerson indicates experience in auditing and in HACCP generally; however, there is no information in the documentation provided to demonstrate that Mr. Helgerson has any training or experience in seafood HACCP. If Mr. Helgerson does have this training or experience, please provide documentation of this. FDA has no additional comments or questions regarding Mr. Neely's documentation.

<u>USDoC Seafood Inspection Program Audits</u>

The November 3 and 8, 2007 audit reports from USDoC provided a broad evaluation of the firm's overall implementation of the firm's HACCP system. No detailed information was provided regarding the adequacy of controls in place for unapproved veterinary drugs used in aquacultured shrimp. If available, the USDoC should provide this information.

The November 3 audit evaluated the September 1, 2007, HACCP plan. In the November 8 audit, the auditor does not indicate what HACCP plan was evaluated, that is, whether it was the same or a revision of the September 1, 2007, HACCP plan audited on November 3. This should be clarified.

<u>Audit Inspection</u>

As you are aware, IA 16-131 states that if a firm wishes to request removal from DWPE for Chinese aquaculture, the firm should provide information to FDA that demonstrates that the "manufacturer has the appropriate controls and processes in place to ensure the quality of the product" it produces. IA 16-131 further describes the information that may satisfy that standard to include documentation from "an appropriate third-party ... demonstrating that an inspection of the processor was conducted and that the seafood was processed in accordance with ... 21 CFR part 123...." As FDA has begun to process requests to be removed from DWPE under IA 16-131, FDA has given additional consideration to what it means for the third party auditor to be "appropriate" in this context.

As we discussed during our November 13 meeting, FDA has been contemplating whether to conduct on-site inspections of third party auditors in order to evaluate the adequacy of their submissions, i.e., whether the third party is an "appropriate" auditor. The Seafood HACCP regulation, 21 CFR part 123, is an innovative rule in the regulation of food safety, in that it places the burden on processors of fish and fishery products to identify hazards that are reasonably likely to occur and to develop suitable controls for those hazards. Making these HACCP assessments properly requires a solid scientific background, a thorough understanding of the particular food and how it is processed, and a working knowledge of HACCP principles. The transition to a HACCP control system has proven to be a significant challenge for much of the U.S. and foreign fish and fishery products industry as well as for many state, federal, and foreign regulatory officials. Indeed, FDA has found that industry representatives, investigators, and consultants who understand these concepts in theory do not always apply them properly in the processing plant environment. For this reason as well as other concerns, FDA plans to apply the same standards and processes to inspections conducted by USDoC, which conducts inspections under a fee-for-service structure, as it does to inspections conducted by other third parties.

The evidence summarized in the Import Alert suggests that a significant portion of the Chinese aquaculture processing industry had not properly implemented HACCP controls as required. For example, during the period October 1, 2006 through May 31, 2007, 25% of the aquacultured catfish, Basa (Pangasius sp), shrimp, dace, and eel from China that FDA tested contained drug/food additive residues. If appropriate and effective controls were in place, they would have prevented this routine, documented occurrence of unapproved new animal drugs or unsafe food additives in the finished products from China. Because many Chinese aquaculture processors may have sufficient HACCP plans on paper but may not appropriately implement them, as has been the case elsewhere, and because FDA does not have the resources to itself inspect every foreign producer on an ongoing basis, FDA believes that third party audits of the foreign processors will play an important role in FDA's assessment whether a manufacturer has the appropriate controls and processes in place.

However, given the learning curve experienced by regulators around the world in shifting to HACCP-based inspections, FDA's current view is that, before it can be confident in the quality of a given auditor, it should verify that the auditor understands the science, the product, the processing technology, and the principles of HACCP and can apply them in different processing plant settings. Thus, in addition to reviewing a processing plant's HACCP paperwork and a third-party's credentials, FDA believes it would be prudent, at this early stage of this program, to conduct its own on-site audits of the auditors' work until it gains confidence that the specific auditor or auditors are properly applying HACCP principles. This process would enable FDA to verify that the third party will apply standards consistent with the Agency's standards on the suitability of controls in place at a processing facility to ensure that residues of drugs/food additives will be appropriately controlled. FDA has followed this inspect-the-auditor process for the one firm that has been removed from DWPE under Import Alert 16-131 to date.

FDA does not believe it should forego inspections to verify the ability of auditors to conduct appropriate HACCP inspections simply because a company may have had several third party audits of its processes. Cumulative audits are only as reliable as the quality of the auditors who

perform them. Thus, multiple audits will not provide FDA with the assurance that HACCP principles are being properly applied unless and until FDA gains confidence with at least one of the specific auditors.

FDA is currently planning its next trip to China to perform a series of audits of several aquaculture firms and their third party inspectors. Although we seek to make that trip as soon a practicable (our current target is January or February 2008), there are factors outside of FDA's control that may limit our ability to do so. If Allied is able to address the HACCP-related issues raised in this letter above, and provided that there are no other significant adverse developments related to Allied's request in the meantime, FDA intends to make every effort to include Allied in that next trip.

If you have any questions concerning this letter, please contact Mr. Ted Poplawski at 301-594-3849 or ted.poplawski@fda.hhs.gov.

Sincerely,

Domenic J. Veneziano, CDR/USPHS
Director, Division of Import Operations & Policy

- 4 -

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

# EXHIBIT 5



FUERST
HUMPHREY
ITTLEMAN PL
Attorneys and Counselors at Law

Christine M. Humphrey, Esq.
(786) 245-0439
chumphrey@fuerstlaw.com

Division of Dockets Management
Food and Drug Administration
Department of Health and Human Services
5630 Fishers Lane
Room 1061
Rockville, MD 20852.

Re:  **Petition for Stay of Action under 21 CFR § 10.35**

August 31, 2007

Dear Sir or Madam:

The undersigned submits this petition requesting that the Commissioner of Food and Drugs stay the effective date of the following matter.

## A. Decision involved

### Background

On August 30, 2007, our office submitted an FD-766 for Entry AQZ-0250069-5 on behalf of International Pacific, LLC d.b.a. Pacific Supreme. *See* EXHIBIT A.  The Los Angeles Import Office is pending a decision concerning the request for retesting submitted under the FD-766.  *See* 21 CFR § 10.35, *Barnes v. Shalala*, 865 F. Supp. 550, 556 (D. Wis. 1994) (stating that the [FDA] commissioner has the authority to "stay or extend the effective date of an <u>action pending or following a decision on any matter</u>".) (*emphasis added*).  If the FDA refuses to allow the retesting of the affected product, a refusal will be issued.

## B. Action requested

We are requesting that the Commissioner of Food and Drugs stay the effective date of any possible refusal of Entry AQZ-0250069-5 as a consequence of the denial by Los Angeles District of the FD-766.

Division of Dockets Management
Food and Drug Administration
August 31, 2007
Page – 2 –

## C. Statement of grounds

### Factual Background

Entry AQZ-0250069-5 (Allied lot # A7043) was entered on June 28, 2007. *See* Attachment B. On July, 7, 2007, FDA detained the entry under U.S. Food and Drug Administration (FDA) Import Alert 16-131, "Detention without Physical Examination of Aquacultured Catfish, Basa (Pangasius sp), Shrimp, Dace, and Eel Products from the People's Republic from China Due to the Presence of New Animal Drugs and/or Unsafe Food Additives". *See* Attachment C; *see also* FDA Import Alert 16-131 *available at* http://www.fda.gov/ora/fiars/ora_import_ia16131.html.

1: Analytical Testing Pre-Export from China to U.S.

Allied Pacific Food Co., LTD. is the manufacturer of aquacultured shrimp products in China. The company enjoys an impeccable record of food safety compliance and is a certified member of the BRC Global Standard (*See* Attachment D), is a certified member of the Aquaculture Certification Council (*See* Attachment E), maintains third party audits (*See* Attachment F) and incorporates various antibiotic testing in the HACCP plans employed by the company. *See* Attachment G.

To date, Pacific Supreme has made five (5) entries of frozen raw breaded aquacultured shrimp manufactured by Allied Pacific Food Co., LTD. All of the entries, AQZ-0240703-2, AQZ-0250069-5, AQZ-0251531-3, AQZ-0251828-3 and AQZ-0251829-1, have been tested for gentian violet as a part of the Allied Pacific Food Co., LTD. HACCP program. *See* Attachment H (demonstrating negative raw product and final product test results for gentian violet). In addition, Allied Pacific Food Co., LTD has imported 19 additional entries of frozen raw breaded aquacultured shrimp all of which have tested negative for gentian violet. *See* Attachment I.

2. Certified Laboratory Failed to Follow Laboratory Information Bulletin #4363

On or about August 17, 2007, Certified Laboratories, Inc. conducted an analysis of the referenced entry (line 001/002). *See* Attachment J. Upon receipt of the Certified Laboratory report, counsel learned that Certified Laboratories, Inc. utilized the following methodology for the testing of the referenced entry: "Liquid Chromatographic Determination of Malchite Green and Leucomalachite Green (LMG) Residues in Salmon with in-situ LMG Oxidation", Wendy C. Anderson, Jose E. Roybal, and Sherri B. Turnispeed, JAOAC Vol 88 #5, p 1292-1298 (2005). This test methodology is identified as FDA Laboratory Information Bulletin (LIB) #4334, November 2004.

Division of Dockets Management
Food and Drug Administration
August 31, 2007
Page – 3 –

Undersigned counsel contacted the Division of Import Operations and Policy (DIOP) to receive guidance on the acceptable LIB that should be used in accordance with gentian violet testing required under Import Alert 16-131. Counsel was instructed that the following testing methodology is to be used: "Quantitative and Confirmatory Analyses of Crystal Violet (Gentian Violet) and Brilliant Green in Fish", Wendy C. Andersen, Sherri B. Turnipseed, Christine M. Karbiwnyk, Rebecca H Lee, Susan B. Clark, W. Douglas Rowe, Mark R. Madson, Keith E. Miller, LIB #4363, U.S. Food and Drug Administration (2005).

**Certified Laboratories, Inc. failed to conduct the gentian violet testing in accordance with LIB #4363**

    3.    <u>Gentian Violet (Crystal Violet) False Positives</u>

The FDA LIB #4363 specifically states that "the previously published malachite green method [LIB #4334] was expanded [in the current LIB #4363] to include crystal violet (CV) and brilliant green. *See* LIB #4363 *available at* http://www.cfsan.fda.gov/~frf/lib4395.html. During the development of this method, negative control and method blank samples were analyzed and consistently found to have low levels of crystal violet contamination in the range of 0.4 to 0.8 ppb. An effort was undertaken to meticulously clean all glassware and laboratory equipment between analyses; however, the background level of CV was persistent. **Only when the laboratory work areas were scrupulously cleaned was it realized that the electrostatic nature of CV is such that simply opening the bottle and weighing the compound to prepare standards is enough to scatter CV across the lab where it easily adheres to the scale, lab bench, lab coats, gloves, pens, glassware, etc.** FDA's own methodology states that "[g]reat caution must be taken to thoroughly decontaminate the work space before preparing samples. Even with such precautions, 2 of the 12 negative controls were found to be positive for CV by LC-MSn..." *See id.*

Certified Laboratories utilized LIB #4334 and in doing so, tested for an additional compound, CV (gentian violet), without adhering to the precautions specifically reiterated in the correct methodology LIB #4363. For example, Certified Laboratories, Inc. utilized HPLC methodology under LIB #4334. LIB #4363 specifically requires confirmation testing. Compliance with LIB #4363 implements analysis of CV (gentian violet) by LC/MS/MS, a mass spectrometry combined with the separation power of liquid chromatography which provides additional structural information. This provides a characteristic molecular fingerprint of the component as well as retention time identification. **With Plain HPLC, as performed by Certified Laboratories, Inc., you only rely on retention time/retention index (RI) value and wavelength spectrum.**

Review of Certified Laboratories, Inc. analysis demonstrates that there is no indication of the confirmation of CV (gentian violet) by LC/MS/MS. *See* Attachment J. The

Division of Dockets Management
Food and Drug Administration
August 31, 2007
Page – 4 –

possibility of one lab finding a positive and another finding a negative is possible since running a sample using an LC/MS/MS provides the capability of confirming a positive or negative result. Further, the LIB #4363 requires confirmation testing and none was conducted by Certified Laboratories, Inc.

4.    SGS Third Party Analysis Following LIB #4363 Revealed Negative Results for CV (gentian violet)

Allied Pacific Food Co., LTD. conducted laboratory analysis of entry AQZ-0250069-5 (Allied lot # A7043) on August 16, 2007 upon verbal preliminary test results received from Certified Laboratories, Inc. The results from SGS demonstrate that the product did not contain CV (gentian violet) and the tolerance was set at <0.5 ppb utilizing FDA methodology in LIB #4363. See Attachment K.

5.    Michelson Laboratories, Inc. Analysis Following LIB #4363 Revealed Negative Results for CV (gentian violet)

Allied Pacific Food Co., LTD. conducted laboratory analysis of entry AQZ-0250069-5 (Allied lot # A7043) on August 29, 2007 in support of this FD-766 and to ensure that a U.S. laboratory conducted the testing as a recognized U.S. FDA third party laboratory, although FDA has no authority or certification requirements for third party laboratories.[1] The results from Michelson Laboratories Inc., demonstrate that the product did not contain CV (gentian violet) and the tolerance was set at <1.00 ppb utilizing FDA methodology in LIB #4363. Counsel is awaiting the final documentation from Michelson Laboratories, Inc. and will supplement the referenced FD-766 accordingly.

**Legal Analysis and Comment**

1. Import Alert 16-131 is Unlawful

The current Import Alert 16-131 is unlawful and contains binding requirements that have not been properly promulgated in accordance with APA requirements. Agency accountability is one of the fundamental goals of the notice-and-comment procedure of

---

[1]    See    ORA    Laboratory    Manual,    Section    7,    *available    at* http://www.fda.gov/ora/science_ref/lm/vol3/section/07.pdf; *see also* 69 Fed. Reg. 23460, Requirements Pertaining to Sampling Services and Private Laboratories Used in Connection With Imported Food (citing FDA's proposed rule to regulate third party laboratories tasked with sampling and analyzing FDA regulated food imports).

Division of Dockets Management
Food and Drug Administration
August 31, 2007
Page – 5 –

section 553 of the APA.[2] Because FDA exercises broad powers to create regulations, the APA requires that FDA-made rules undergo both notice and comment and the opportunity for judicial review. Courts have consistently upheld APA challenges against FDA's use of a *specific* Alert.[3]  In other cases, courts have required the FDA to follow APA notice provisions to rules that FDA chose to label as guidance, policy statements, or interpretative rules.[4]

Import Alert 16-131 is no different than the Import Alert that was held unlawful in 1988. In *Bellarno*, the result of the challenge rested, in part, upon the words "automatic detention" contained within Alert # 66-14.[5] The Alert "dictated" that agency personnel should automatically detain and refuse all U.S. Goods Returned drug products when the importer could not supply a complete chain of custody.[6]  **The court disagreed with FDA's contention that FDA enjoys "plenary authority" to automatically detain a product.**[7]

    2.    A One Test Rule is Arbitrary and Capricous

Notwithstanding the current imposition of the unlawful Import Alert 16-131, FDA has stated that is unlawful to test imported product and then subsequently retest the product. *See* Exhibit B.

---

[2] SENATE COMM. ON THE JUDICIARY, 79TH CONG., 2D SESS., S. DOC. NO. 248 (Comm. Print 1945), *reprinted in* LEGISLATIVE HISTORY OF THE ADMINISTRATIVE PROCEDURE ACT 18-20 (1946).

[3] *See Bellarno Int'l, Ltd. v. Food & Drug Admin.,* 678 F. Supp. 410 (E.D.N.Y. 1988); *see also, e.g., Community Nutrition Inst. v. Young,* 818 F.2d 943, 947-48 (D.C. Cir. 1987); *Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 93-94 (D.C. Cir. 1997).

[4] *Id.* Courts characterizing them as rules that violate the notice-and-comment provision have struck down FDA Alerts and other "guidance" documents. Notwithstanding, FDA seems to have a preference for labeling rules as "guidance."

[5] *Bellarno Int'l, Ltd. v. Food and Drug Admin.,* 678 F. Supp. 410 at 415 (E.D.N.Y. 1988).

[6] *See* FDA REGULATORY PROCEDURES MANUAL, *supra* note 19, ch. 9, subch. *Import Information Directives.* Like current Alerts, # 66-14 was labeled as "guidance."

[7] *See Bellarno,* 678 F. Supp. at 411-13.

Division of Dockets Management
Food and Drug Administration
August 31, 2007
Page – 6 –

Import Alert 16-131 requires importers to test product in accordance with FDA approved laboratory procedures.[8]  However, FDA exercises no control whatsoever over the third party testing facilities that importers are required to hire to conduct third party testing.[9]

Pacific Supreme contracted a third party laboratory to analyze their product and the laboratory failed to follow FDA approved procedures. Pacific Supreme is a party to an informal adjudication under the Administrative Procedures Act (APA). 5 USC § 554(a). The evidence that Pacific Supreme supplied to the FDA was premised on the understanding that Certified Laboratories would follow FDA approved procedures.  This did not occur.  This is an example of why the agency (FDA) needs to promulgate lawful rules concerning the third party testing of imported product to ensure consistent controls are in place and that importer's such as Pacific Supreme are not adversely affected by unlawful requirements imposed by Import Alerts and subsequent non-compliance by unregulated third party laboratories.  **Any "one-test" requirement is arbitrary and capricious and a violation of Pacific Supreme's due process rights**.[10]

Pacific Supreme is the owner of any and all information that is a product of the analytical services provided by a third party laboratory as to Pacific Supreme product. The relative rights of Pacific Supreme and a third party laboratory are governed by the relationships among those companies, and FDA has no jurisdiction or authority to alter those rights. [11]

The APA specifically restricts *ex parte* communications in adjudicatory processes and does not allow third parties, such as a third party laboratory, to participate in the adjudication process. 5 USC § 557(d)(1).  In the case at hand, the laboratory results were sent directly to FDA without Pacific Supreme's review.  The results were misappropriated.

---

[8]FDA        Import        Alert        16-131        *available*        *at*
http://www.fda.gov/ora/fiars/ora_import_ia16131.html.

[9]  *See*        ORA        Laboratory        Manual,        Section        7,        *available*        *at*
http://www.fda.gov/ora/science_ref/lm/vol3/section/07.pdf; *see also* 69 Fed. Reg. 23460, Requirements Pertaining to Sampling Services and Private Laboratories Used in Connection With Imported Food (citing FDA's proposed rule to regulate third party laboratories tasked with sampling and analyzing FDA regulated food imports).

[10] See, e.g., Kolender v. Lawson, 461 U.S. 352, 357 (1983).

[11] *A.L. Laboratories, Inc. v. Philips Roxane, Inc.*, 803 F.2d 378, 382 (8th Cir. 1986).

Division of Dockets Management
Food and Drug Administration
August 31, 2007
Page – 7 –


## Conclusion

Undersigned counsel respectfully requests that the Commissioner of Food and Drugs
stay the effective date of any potential refusal of Entry AQZ-0250069-5 because:

(1) Substantial evidence has been presented to demonstrate the absence of
contaminants in the referenced product;
(2) Pacific Supreme is requesting to provide additional testing under FDA approved
procedures in addition to the existing 3 negative tests supplied to FDA;
(3) Import Alert 16-131 is unlawful; and
(4) A "one-test" rule is arbitrary and capricious and unlawful

Finally, we believe the Commissioner of Food and Drugs is compelled to grant a stay in
this proceeding pursuant to 21 CFR § 10.35(e) because the following factors apply:

(1) Pacific Supreme will otherwise suffer irreparable injury because the Chinese
government has imposed a rule that all "FDA refusals" as reported on FDA's OASIS
Refusal page will result in a one year ban of exports.   Allied Pacific Food Co., LTD is
the main supplier of products to Pacific Supreme and any arbitrary refusal will result in
immediate and irreparable harm to Pacific Supreme;
(2) Pacific Supreme's request and presentation of factual and legal issues are not
frivolous and are being pursued in good faith;
(3) Pacific Supreme has demonstrated sound public policy grounds supporting the stay
in that Import Alert 16-131 is unlawful because it violates the APA and procedural
fairness and due process; and
(4) The delay resulting from the stay is not outweighed by public health or other public
interests.  In fact, public health interest requires the FDA to allow for retesting and to
ensure that all third party laboratories are utilizing FDA approved methodologies
because a false negative resulting from unapproved FDA methodologies is a serious
health and safety issue as is a false positive result affecting our company's
constitutional and statutory rights and economic well being.

Very truly yours,


Christine M. Humphrey, Esq.
1001 Brickell Bay Drive
Suite 2002
Miami, FL 33131
(305)350-5690
chumphrey@fuerstlaw.com

Division of Dockets Management
Food and Drug Administration
August 31, 2007
Page – 8 –



**FUERST**
**HUMPHREY**
**ITTLEMAN** PL

Attorneys and Counselors at Law

Christine M. Humphrey, Esq.
(786) 245-0439
chumphrey@fuerstlaw.com

Division of Dockets Management
Food and Drug Administration
Department of Health and Human Services
5630 Fishers Lane
Room 1061
Rockville, MD 20852.

**Re: Petition for Stay of Action under 21 CFR § 10.35**

September 4, 2007

Dear Sir or Madam:

The undersigned submits this petition requesting that the Commissioner of Food and Drugs stay the effective date of the following matter.

**A. Decision involved**

<u>**Background**</u>

On August 30, 2007, our office submitted an FD-766 for AQZ-0250569-4 and AQZ-0250573-6 on behalf of Thunder Bay Seafood Co., Inc. *See* EXHIBIT A. The Los Angeles Import Office is pending a decision concerning the request for retesting submitted under the FD-766. *See* 21 CFR § 10.35, *Barnes v. Shalala*, 865 F. Supp. 550, 556 (D. Wis. 1994) (stating that the [FDA] commissioner has the authority to "stay or extend the effective date of an <u>action pending or following a decision on any matter</u>".) (*emphasis added*). If the FDA refuses to allow the retesting of the affected product, a refusal will be issued.

**B. Action requested**

We are requesting that the Commissioner of Food and Drugs stay the effective date of any possible refusal of AQZ-0250569-4 and AQZ-0250573-6 as a consequence of the denial by Los Angeles District of the FD-766.

Division of Dockets Management
Food and Drug Administration
September 4, 2007
Page – 2 –

## C. Statement of grounds

### Factual Background

Entry AQZ-AQZ-0250569-4 and AQZ-0250573-6 were entered on June 28 and 29, 2007, respectively. *See* Attachment B. On July, 7, 2007, FDA detained the entry under U.S. Food and Drug Administration (FDA) Import Alert 16-131, "Detention without Physical Examination of Aquacultured Catfish, Basa (Pangasius sp), Shrimp, Dace, and Eel Products from the People's Republic of China Due to the Presence of New Animal Drugs and/or Unsafe Food Additives". *See* Attachment C; *see also* FDA Import Alert 16-131 *available at* http://www.fda.gov/ora/fiars/ora_import_ia16131.html.

    1.    Analytical Testing Pre-Export from China to U.S.

Allied Pacific Food Co., LTD. is the manufacturer of aquacultured shrimp products in China. The company enjoys an impeccable record of food safety compliance and is a certified member of the BRC Global Standard (*See* Attachment D), is a certified member of the Aquaculture Certification Council (*See* Attachment E), maintains third party audits (*See* Attachment F) and incorporates various antibiotic testing in the HACCP plans employed by the company. *See* Attachment G.

To date, Thunder Bay Seafood Co., Inc. has made five (13) entries of frozen raw breaded aquacultured shrimp manufactured by Allied Pacific Food Co., LTD. <u>All of the entries, AQZ-0250568-6, AQZ-0250569-4, AQZ-0250573-6, AQZ-0251196-5, AQZ-0251197-3, AQZ-0251198-1, AQZ-0251199-9, AQZ-0251212-0, AQZ-0251619-6, AQZ-0251620-4, AQZ-0251621-2, AQZ-0251860-6 and AQZ-0251861-4, AQZ-025057-6 have been tested for gentian violet as a part of the Allied Pacific Food Co., LTD. HACCP program.</u> *See* Attachment H (demonstrating <u>negative</u> raw product and final product test results for gentian violet). In addition, Allied Pacific Food Co., LTD has imported 10 additional entries of frozen raw breaded aquacultured shrimp all of which have tested negative for gentian violet. *See* Attachment I.

    2.    Certified Laboratory Failed to Follow Laboratory Information Bulletin #4363

On or about July 17, 2007, Certified Laboratories, Inc. conducted an analysis of the referenced entries. *See* Attachment J. Upon receipt of the Certified Laboratory report, counsel learned that Certified Laboratories, Inc. utilized the following methodology for the testing of the referenced entry: "Liquid Chromatographic Determination of Malchite Green and Leucomalachite Green (LMG) Residues in Salmon with In-situ LMG Oxidation", Wendy C. Anderson, Jose E. Roybal, and Sherri B. Turnispeed, JAOAC Vol 88 #5, p 1292-1298 (2005). This test methodology is identified as FDA Laboratory Information Bulletin (LIB) #4334, November 2004.

Division of Dockets Management
Food and Drug Administration
September 4, 2007
Page – 3 –

Undersigned counsel contacted the Division of Import Operations and Policy (DIOP) to receive guidance on the acceptable LIB that should be used in accordance with gentian violet testing required under Import Alert 16-131. Counsel was instructed that the following testing methodology is to be used: "Quantitative and Confirmatory Analyses of Crystal Violet (Gentian Violet) and Brilliant Green in Fish", Wendy C. Andersen, Sherri B. Turnipseed, Christine M. Karbiwnyk, Rebecca H Lee, Susan B. Clark, W. Douglas Rowe, Mark R. Madson, Keith E. Miller, LIB #4363, U.S. Food and Drug Administration (2005).

**Certified Laboratories, Inc. failed to conduct the gentian violet testing in accordance with LIB #4363**

> ### 3.    Gentian Violet (Crystal Violet) False Positives

The FDA LIB #4363 specifically states that "the previously published malachite green method [LIB #4334] was expanded [in the current LIB #4363] to include crystal violet (CV) and brilliant green. *See* LIB #4363 *available at* http://www.cfsan.fda.gov/~frf/lib4395.html. During the development of this method, negative control and method blank samples were analyzed and consistently found to have low levels of crystal violet contamination in the range of 0.4 to 0.8 ppb. An effort was undertaken to meticulously clean all glassware and laboratory equipment between analyses; however, the background level of CV was persistent. **Only when the laboratory work areas were scrupulously cleaned was it realized that the electrostatic nature of CV is such that simply opening the bottle and weighing the compound to prepare standards is enough to scatter CV across the lab where it easily adheres to the scale, lab bench, lab coats, gloves, pens, glassware, etc.** FDA's own methodology states that "[g]reat caution must be taken to thoroughly decontaminate the work space before preparing samples. Even with such precautions, 2 of the 12 negative controls were found to be positive for CV by LC-MSn..." *See id.*

Certified Laboratories utilized LIB #4334 and in doing so, tested for an additional compound, CV (gentian violet), without adhering to the precautions specifically reiterated in the correct methodology LIB #4363. For example, Certified Laboratories, Inc. utilized HPLC methodology under LIB #4334. LIB #4363 specifically requires confirmation testing. Compliance with LIB #4363 implements analysis of CV (gentian violet) by LC/MS/MS, a mass spectrometry combined with the separation power of liquid chromatography which provides additional structural information. This provides a characteristic molecular fingerprint of the component as well as retention time identification. **With Plain HPLC, as performed by Certified Laboratories, Inc., you only rely on retention time/retention index (RI) value and wavelength spectrum**.

Review of Certified Laboratories, Inc. analysis demonstrates that there is no indication of the confirmation of CV (gentian violet) by LC/MS/MS. *See* Attachment J. The

Division of Dockets Management
Food and Drug Administration
September 4, 2007
Page – 4 –

possibility of one lab finding a positive and another finding a negative is possible since running a sample using an LC/MS/MS provides the capability of confirming a positive or negative result. Further, the LIB #4363 requires confirmation testing and none was conducted by Certified Laboratories, Inc.

Finally, the levels of (CV) gentian violet range from 3.8 -290 ppb, an incredible conclusion that warrants retesting.

    4.    <u>SGS Third Party Analysis Following LIB #4363 Revealed Negative Results for CV (gentian violet)</u>

Allied Pacific Food Co., LTD. conducted laboratory analysis of AQZ-0250569-4 and AQZ-0250573-6 on August 16, 2007 upon verbal preliminary test results received from Certified Laboratories, Inc. The results from SGS demonstrate that the product did not contain CV (gentian violet) and the tolerance was set at <0.5 ppb utilizing FDA methodology in LIB #4363. *See* Attachment K.

    5.    <u>Michelson Laboratories, Inc. Analysis Following LIB #4363 Revealed Negative Results for CV (gentian violet)</u>

Allied Pacific Food Co., LTD. conducted laboratory analysis of entry AQZ-0250569-4 and AQZ-0250573-6 on August 30, 2007 in support of this FD-766 and to ensure that a U.S. laboratory conducted the testing as a recognized U.S. FDA third party laboratory, although FDA has no authority or certification requirements for third party laboratories.[1] The results from Michelson Laboratories Inc., demonstrate that the product did not contain CV (gentian violet) and the tolerance was set at <1.00 ppb utilizing FDA methodology in LIB #4363. Counsel is awaiting the final documentation from Michelson Laboratories, Inc. and will supplement this FD-766 accordingly.

**Legal Analysis and Comment**

    1. Import Alert 16–131 is Unlawful

The current Import Alert 16-131 is unlawful and contains binding requirements that have not been properly promulgated in accordance with APA requirements. Agency accountability is one of the fundamental goals of the notice-and-comment procedure of

---

[1]    *See* ORA Laboratory Manual, Section 7, *available at* http://www.fda.gov/ora/science_ref/lm/vol3/section/07.pdf; *see also* 69 Fed. Reg. 23460, Requirements Pertaining to Sampling Services and Private Laboratories Used in Connection With Imported Food (citing FDA's proposed rule to regulate third party laboratories tasked with sampling and analyzing FDA regulated food imports).

Division of Dockets Management
Food and Drug Administration
September 4, 2007
Page -- 5 --

section 553 of the APA.[2] Because FDA exercises broad powers to create regulations, the APA requires that FDA-made rules undergo both notice and comment and the opportunity for judicial review. Courts have consistently upheld APA challenges against FDA's use of a *specific* Alert.[3] In other cases, courts have required the FDA to follow APA notice provisions to rules that FDA chose to label as guidance, policy statements, or interpretative rules.[4]

Import Alert 16-131 is no different than the Import Alert that was held unlawful in 1988. In *Bellarno*, the result of the challenge rested, in part, upon the words "automatic detention" contained within Alert # 66-14.[5] The Alert "dictated" that agency personnel should automatically detain and refuse all U.S. Goods Returned drug products when the importer could not supply a complete chain of custody.[6] __The court disagreed with FDA's contention that FDA enjoys "plenary authority" to automatically detain a product.__[7]

    2.    A One Test Rule is Arbitrary and Capricous

Notwithstanding the current imposition of the unlawful Import Alert 16-131, FDA has stated that is unlawful to test imported product and then subsequently retest the product. *See* Exhibit B.

---

[2] SENATE COMM. ON THE JUDICIARY, 79TH CONG., 2D SESS., S. DOC. NO. 248 (Comm. Print 1945), *reprinted in* LEGISLATIVE HISTORY OF THE ADMINISTRATIVE PROCEDURE ACT 18-20 (1946).

[3] *See Bellarno Int'l, Ltd. v. Food & Drug Admin.*, 678 F. Supp. 410 (E.D.N.Y. 1988); *see also, e.g., Community Nutrition Inst. v. Young*, 818 F.2d 943, 947-48 (D.C. Cir. 1987); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93-94 (D.C. Cir. 1997).

[4] *Id.* Courts characterizing them as rules that violate the notice-and-comment provision have struck down FDA Alerts and other "guidance" documents. Notwithstanding, FDA seems to have a preference for labeling rules as "guidance."

[5] *Bellarno Int'l, Ltd. v. Food and Drug Admin.*, 678 F. Supp. 410 at 415 (E.D.N.Y. 1988).

[6] *See* FDA REGULATORY PROCEDURES MANUAL, *supra* note 19, ch. 9, subch. *Import Information Directives.* Like current Alerts, # 66-14 was labeled as "guidance."

[7] *See Bellarno*, 678 F. Supp. at 411-13.

Division of Dockets Management
Food and Drug Administration
September 4, 2007
Page – 6 –

Import Alert 16-131 requires importers to test product in accordance with FDA approved laboratory procedures.[8]  However, FDA exercises no control whatsoever over the third party testing facilities that importers are required to hire to conduct third party testing.[9]

Thunder Bay Seafood Co., Inc. contracted a third party laboratory to analyze their product and the laboratory failed to follow FDA approved procedures. Thunder Bay Seafood Co., Inc. is a party to an informal adjudication under the Administrative Procedures Act (APA). 5 USC § 554(a).  The evidence that Thunder Bay Seafood Co., Inc. supplied to the FDA was premised on the understanding that Certified Laboratories would follow FDA approved procedures.  This did not occur.  This is an example of why the agency (FDA) needs to promulgate lawful rules concerning the third party testing of imported product to ensure consistent controls are in place and that importer's such as Thunder Bay Seafood Co., Inc. are not adversely affected by unlawful requirements imposed by Import Alerts and subsequent non-compliance by unregulated third party laboratories.   **Any "one-test" requirement is arbitrary and capricious and a violation of Thunder Bay Seafood Co., Inc.'s due process rights.**[10]

Thunder Bay Seafood Co., Inc. is the owner of any and all information that is a product of the analytical services provided by a third party laboratory as to Thunder Bay Seafood Co., Inc. product. The relative rights of Thunder Bay Seafood Co., Inc. and a third party laboratory are governed by the relationships among those companies, and FDA has no jurisdiction or authority to alter those rights. [11]

The APA specifically restricts *ex parte* communications in adjudicatory processes and does not allow third parties, such as a third party laboratory, to participate in the adjudication process. 5 USC § 557(d)(1).  In the case at hand, the laboratory results were sent directly to FDA without Thunder Bay Seafood Co., Inc.'s review.  The results were misappropriated.

---

[8] FDA          Import          Alert          16-131          *available*          *at* http://www.fda.gov/ora/fiars/ora_import_ia16131.html.

[9]   *See*     ORA     Laboratory     Manual,     Section     7,     *available*     *at* http://www.fda.gov/ora/science_ref/lm/vol3/section/07.pdf; *see also* 69 Fed. Reg. 23460, Requirements Pertaining to Sampling Services and Private Laboratories Used in Connection With Imported Food (citing FDA's proposed rule to regulate third party laboratories tasked with sampling and analyzing FDA regulated food imports).

[10] See, e.g., Kolender v. Lawson, 461 U.S. 352, 357 (1983).

[11] *A.L. Laboratories, Inc. v. Philips Roxane, Inc.*, 803 F.2d 378, 382 (8th Cir. 1986).

Division of Dockets Management
Food and Drug Administration
September 4, 2007
Page – 7 –


## Conclusion

Undersigned counsel respectfully requests that the Commissioner of Food and Drugs stay the effective date of any potential refusal of Entry AQZ-0250069-5 because:

(1) Substantial evidence has been presented to demonstrate the absence of contaminants in the referenced product;
(2) Thunder Bay Seafood Co., Inc. is requesting to provide additional testing under FDA approved procedures in addition to the existing 3 negative tests supplied to FDA;
(3) Import Alert 16-131 is unlawful; and
(4) A "one-test" rule is arbitrary and capricious and unlawful

Finally, we believe the Commissioner of Food and Drugs is compelled to grant a stay in this proceeding pursuant to 21 CFR § 10.35(e) because the following factors apply:

(1) Thunder Bay Seafood Co., Inc. will otherwise suffer irreparable injury because the Chinese government has imposed a rule that all "FDA refusals" as reported on FDA's OASIS Refusal page will result in a one year ban of exports.   Allied Pacific Food Co., LTD is the main supplier of products to Thunder Bay Seafood Co., Inc. and any arbitrary refusal will result in immediate and irreparable harm to Thunder Bay Seafood Co., Inc.;
(2) Thunder Bay Seafood Co., Inc.'s request and presentation of factual and legal issues are not frivolous and are being pursued in good faith;
(3) Thunder Bay Seafood Co., Inc. has demonstrated sound public policy grounds supporting the stay in that Import Alert 16-131 is unlawful because it violates the APA and procedural fairness and due process; and
(4) The delay resulting from the stay is not outweighed by public health or other public interests.  In fact, public health interest requires the FDA to allow for retesting and to ensure that all third party laboratories are utilizing FDA approved methodologies because a false negative resulting from unapproved FDA methodologies is a serious health and safety issue as is a false positive result affecting our company's constitutional and statutory rights and economic well being.

Very truly yours,

Christine M. Humphrey, Esq.
1001 Brickell Bay Drive
Suite 2002
Miami, FL 33131
(305)350-5690
chumphrey@fuerstlaw.com