**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALLIED PACIFIC FOOD (DALIAN) COMPANY, LIMITED,

Plaintiff,

v.

UNITED STATES FOOD AND DRUG ADMINISTRATION, *et. al.*,

Defendants.

Civil Action No. 07-1982 (HHK)

**DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

Defendants, the United States Food and Drug Administration ("FDA"), Andrew C. von Eschenbach, Commissioner of Food and Drugs, the United States Department of Health and Human Services ("HHS"), and Michael O. Leavitt, Secretary of HHS, respectfully move for the dismissal of this case pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure.

The grounds for this motion are fully set forth in the accompanying Memorandum in Support of Defendants' Motion to Dismiss Amended Complaint filed herewith.

Of Counsel:

JAMES C. STANSEL
Acting General Counsel

GERALD F. MASOUDI
Associate General Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

EUGENE M. THIROLF
Director

KAREN E. SCHIFTER
Associate Chief Counsel, Litigation
U.S. Dept. of Health & Human Services
Office of the General Counsel
5600 Fishers Lane
Rockville, MD 20857
(301) 827-1152

March 12, 2008

/s/
ANDREW E. CLARK
Senior Trial Counsel
Office of Consumer Litigation
U.S. Department of Justice
PO. Box 386
Washington, D.C. 20044
(202) 307-0067
andrew.clark@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ALLIED PACIFIC FOOD (DALIAN) COMPANY, LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOOD AND DRUG ADMINISTRATION, *et. al*.,<br><br>Defendants. | ) | Civil Action No. 07-1982 (HHK) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

Of Counsel:

JAMES C. STANSEL
Acting General Counsel

GERALD F. MASOUDI
Associate General Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

KAREN E. SCHIFTER
Associate Chief Counsel, Litigation
U.S. Dept. of Health & Human Services
Office of the General Counsel
5600 Fishers Lane
Rockville, MD 20857
(301) 827-1152

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

EUGENE M. THIROLF
Director
Office of Consumer Litigation

ANDREW E. CLARK
Senior Trial Counsel
Office of Consumer Litigation
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
(202) 307-0067
andrew.clark@usdoj.gov

March 12, 2008

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

REGULATORY BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. FDA's Import Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. Import Alert Overview.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C. Import Alert 16-131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

PROCEDURAL POSTURE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I. FDA'S ADMISSIBILITY AND DETENTION DECISIONS ARE COMMITTED TO AGENCY DISCRETION AND NOT SUBJECT TO JUDICIAL REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A. FDA's Detention and Admissibility Decisions, the Issuance of the Import Alert, and the Determination of Whether the Criteria for Removal from DWPE Have Been Satisfied Are Committed to Agency Discretion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1. The Statutory Language and Legislative History Demonstrate that Congress Intended to Delegate Unreviewable Discretion for Import Refusals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

2. Courts Have Confirmed FDA's Discretion to Refuse Imports . . . 21

3. The Discretionary Standard Serves Important Policy Purposes.. . 22

B. This Court Lacks Jurisdiction to Enjoin FDA Detention and Import Refusal Decisions.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

II. ALLIED'S COMPLAINT IS NOT JUSTICIABLE UNDER DOCTRINES OF RIPENESS, FINALITY AND EXHAUSTION.. . . . . . . . . . . . . . . . . . . . . . 27

A. Allied's Challenge is Not Ripe for Adjudication, and There has Been No Final Agency Action on Allied's Request for Removal from DWPE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1. Allied's Challenge is Not Fit for Judicial Review Because It Does Not Raise Purely Legal Questions and There is No Final Agency Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2. Withholding Judicial Review Will Not Cause Hardship to Allied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

B. Allied Has Failed to Exhaust Administrative Remedies. . . . . . . . . . . . . . . 34

III. IMPORT ALERT 16-131 IS NOT A SUBSTANTIVE RULE THAT REQUIRES NOTICE AND COMMENT RULEMAKING UNDER THE APA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IV. ALLIED CANNOT CHALLENGE THE IMPORT ALERT AS A VIOLATION OF DUE PROCESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## TABLE OF AUTHORITIES

## CASES

**Page(s)**

* *Abbott Laboratories v. Gardner*,
387 U.S. 136 (1967). ... 25, 29, 31

*American Mining Congress v. Marshall*,
671 F.2d 1251 (10th Cir. 1982). ... 39

* *American Mining Congress v. Mine Safety & Health Administration*
995 F.2d 1106 (D.C. Cir. 1993) . ... 37, 38, 39

*Arjay Associates, Inc. v. Bush*,
891 F.2d 894 (Fed. Cir. 1989) ... 43

*Association of American Physicians & Surgeons, Inc. v. FDA,*
No. 07-0668, 2008 WL 564942 (D.D.C. March 4, 2008) ... 35

*Association of Flight Attendants-CWA, AFL-CIO v. Chao*,
493 F.3d 155 (D.C. Cir. 2007). ... 27, 35

*Association of Irritated Residents v. EPA*,
494 F.3d 1027 (D.C. Cir. 2007). ... 24

*Ayuda, Inc. v. Thornburgh*,
948 F.2d 742 (D.C. Cir. 1991), 509 U.S. 916 (1993). ... 27

*Balmaceda v. United States*,
815 F. Supp. 823 (E.D. Pa. 1992). ... 3, 20

*Baltimore Gas and Electric Co. v. FERC*,
252 F.3d 456 (D.C. Cir. 2001). ... 16

*Bellarno International Ltd. v. FDA*,
678 F. Supp. 410 (E.D.N.Y. 1988). ... 41, 42

*Bennett v. Spear*,
520 U.S. 154 (1997). ... 30

*Authorities upon which we chiefly rely are marked with asterisks*

*Board of Regents v. Roth*,
408 U.S. 564 (1972). ..................................................... 43

*Board of Trustees v. United States*,
289 U.S. 48 (1933). ..................................................... 43

*Bonterra America, Inc. v. Bestmann*,
907 F. Supp. 4 (D.D.C. 1995). ..................................................... 6

*Brock v. Cathedral Bluffs Shale Oil Co.*,
796 F.2d 533 (D.C. Cir. 1986). ..................................................... 37, 40, 41

*Brotherhood of Locomotive Firemen & Enginemen v. Bangor & Aroostook R. Co.*,
380 F.2d 570 (D.C. Cir. 1967) ..................................................... 18

*Burt Lake Band of Ottawa & Chippewa Indians v. Norton*,
217 F. Supp. 2d 76 (D.D.C. 2002). ..................................................... 34

* *Buttfield v. Stranahan*,
192 U.S. 470 (1904). ..................................................... 23, 43, 44, 45

* *Cement Kiln Recycling Coalition v. EPA*,
493 F.3d 207 (D.C. Cir. 2007). ..................................................... 31, 32, 37, 38, 39

*Cleveland Board of Education v. Loudermill*,
470 U.S. 532 (1985). ..................................................... 43

*Coalition for Underground Expansion v. Mineta*,
333 F.3d 193 (D.C. Cir. 2003). ..................................................... 6

*Coker v. Sullivan*,
902 F.2d 84 (D.C. Cir. 1990). ..................................................... 16, 17

*Community Nutrition Institute v. Young*,
818 F.2d 943 (D.C. Cir. 1987). ..................................................... 38, 40

*Continental Seafoods, Inc. v. Schweiker*,
674 F.2d 38 (D.C. Cir. 1982). ..................................................... 21, 22

*Dalton v. Specter*,
511 U.S. 462 (1994) ..................................................... 19

* *Devia v. NRC,*
492 F.3d 421 (D.C. Cir. 2007) ..................................................... 28, 29, 31, 32, 33

*Dina v. Attorney General*,
793 F.2d 473 (2d Cir. 1986)........................................................................................ 16

*Drake v. FAA*,
291 F.3d 59 (D.C. Cir. 2002)........................................................................................ 16

*Estee Lauder, Inc. v. FDA*,
727 F. Supp. 1 (D.D.C. 1989) ........................................................................................ 35

*Ethyl Corp. v. EPA*,
541 F.2d 1 (D.C. Cir. 1976)........................................................................................ 14

* *Ewing v. Mytinger & Casselberry, Inc.*,
339 U.S. 594 (1950)........................................................................................ 15, 25, 26, 27

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)........................................................................................ 30

*Ganadera Industrial, S.A. v. Block*
727 F.2d 1156 (D.C. Cir. 1984)........................................................................................ 22, 44

*Garlic v. FDA*,
783 F. Supp. 4 (D.D.C. 1992)........................................................................................ 35

*Genendo Pharm. v. Thompson*,
308 F. Supp. 2d 881 (N.D. Ill. 2003)........................................................................................ 26

*General Electric Co. v. EPA*,
290 F.3d 377, 382 (D.C. Cir. 2002)........................................................................................ 32

*General Motors Corp. v. Ruckleshaus*,
742 F.2d 1561 (D.C. Cir. 1984)........................................................................................ 37

*Gilda Industrial v. United States*,
446 F.3d 1271 (Fed. Cir. 2006)........................................................................................ 44

*Goodwin v. United States*,
371 F. Supp. 433, 436 (S.D. Cal. 1972) ........................................................................................ 20

*Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corp.*,
589 F.2d 658 (D.C. Cir. 1978) ........................................................................................ 37

* *Heckler v. Chaney*,
470 U.S. 821 (1985)........................................................................................ 12, 16, 17, 22, 23

*Herbert v. National Academy of Sciences*,
974 F.2d 192 (D.C. Cir. 1992). .......................................................................... 6

*Hudson v. FAA*,
192 F.3d 1031 (D.C. Cir. 1999). .................................................................. 31, 32

*ICC v. Brotherhood of Locomotive Engineers*,
482 U.S. 270 (1987)................................................................................... 16

*K & K Merchandise Group v. Shalala*,
Civ. No. 95-10082, 1996 WL 183023 (S.D.N.Y. Apr. 15, 1996)................................. 22

*Land v. Dollar*,
330 U.S. 731 (1947)..................................................................................... 6

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .................................................................................. 16

*Lorillard v. Pons*,
434 U.S. 575 (1978) ................................................................................... 18

*McCarthy v. Madigan*,
503 U.S. 140 (1992)................................................................................... 35

* *McKart v. United States*,
395 U.S. 185 (1969).............................................................................. 34, 35

*Meserey v. United States*,
447 F. Supp. 548 (D. Nev. 1977). ................................................................. 22

*Motor Vehicle Manufacturers Association of the United States, Inc., v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)............................................................ 15

*Myers v. Bethlehem Shipbuilding Corp.*,
303 U.S. 41 (1938)...................................................................................... 34

*Mytinger & Casselberry, Inc. v. Ewing*,
87 F. Supp. 650 (D.D.C. 1949). ................................................................... 25

*National Federation of Federal Employees v. United States*,
905 F.2d 400 (D.C. Cir. 1990). .............................................................. 16, 17

*National Gay Rights Advocates v. HHS,*
No. 87-1735, 1988 U.S. Dist. LEXIS 17283 (D.D.C. Apr. 26, 1988). ........................... 35

*National Medical Enterprises, Inc. v. Shalala*,
43 F.3d 691 (D.C. Cir. 1995). .......... 37

*National Park Hospitality Association v. Department of Interior*,
538 U.S. 803 (2003). .......... 28

*National Treasury Employees Union v. United States*,
101 F.3d at 1423 (D.C. Cir. 1996). .......... 29

*Nebraska HHS v. HHS*,
435 F.3d 326 (D.C. Cir. 2006). .......... 30

*Nevada v. DOE*,
457 F.3d 78 (D.C. Cir. 2006). .......... 29, 33

*Nuclear Energy Institute v. EPA*,
373 F.3d 1251 (D.C. Cir. 2004). .......... 33

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
523 U.S. 726, 733 (1998) .......... 29

*Pacific Gas & Electric v. FPC*,
506 F.2d 33 (D.C. Cir. 1974). .......... 37, 39

*Panhandle Producers v. ERA*,
847 F.2d 1168 (5th Cir. 1988 ). .......... 39

*Pfizer v. Shalala*,
182 F.3d 975 (D.C. Cir. 1999). .......... 28

*Premo Pharm. Laboratories, Inc. v. United States*,
629 F.2d 795 (2d Cir. 1980). .......... 26

*Professionals and Patients for Customized Care v. Shalala*,
56 F.3d 592 (5th Cir. 1995). .......... 39, 41

*Public Citizen, Inc. v. Nuclear Regulatory Commission*,
940 F.2d 679 (D.C. Cir. 1991). .......... 31

*Reno v. Catholic Social Services, Inc.*,
509 U.S. 43 (1993). .......... 33

*Ryder Truck Lines, Inc. v. United States*,
716 F.2d 1369 (11th Cir. 1983). .......... 39

*Safe Extensions v. FAA*,
509 F.3d 593 (D.C. Cir. 2007) .......... 16

*Schering Corp. v. Heckler*,
779 F.2d 683 (D.C. Cir. 1985). .......... 17

* *Seabrook International Foods, Inc. v. Harris*,
501 F. Supp. 1086, (D.D.C. 1980). .......... 21, 22

*Southeastern Minerals, Inc. v. Harris*
622 F.2d 758 (5th Cir. 1980). .......... 26

* *Sugarman v. Forbragd*,
267 F. Supp. 817 (N.D. Cal. 1967). .......... 4, 22, 23

*Sycor International Corp. v. Shalala*,
127 F.3d 90 (D.C. Cir. 1997). .......... 37

*Texas v. United States*,
523 U.S. 296 (1998). .......... 28

* *The James J. Hill*,
65 F. Supp. 265, 270 (D. Md. 1946) .......... 21

*Toilet Goods Association v. Gardner*,
387 U.S. 158 (1967). .......... 29

*United States v. Alcon Laboratories*,
636 F.2d 876 (1st Cir. 1981). .......... 26

*United States v. Food, 2,998 Cases*,
64 F.3d 984 (5th Cir. 1995). .......... 5

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978). .......... 14

*Webster v. Doe*,
486 U.S. 592 (1988). .......... 16

## STATUTES

5 U.S.C. § 553(b)(3)(A). .......... 36

5 U.S.C. § 553(d). .......... 36

5 U.S.C. § 701(a)(1). .......... 16

* 5 U.S.C. § 701(a)(2). .......... 13, 15, 16, 24

5 U.S.C. § 704 .......... 28

5 U.S.C. § 706(2)(A) .......... 16

21 U.S.C. § 334 .......... 20, 22, 25, 26

21 U.S.C. § 334 (a). .......... 21

21 U.S.C. § 342(a)(2)(C)(i). .......... 6, 7, 8

21 U.S.C. § 342(a)(2)(C)(ii). .......... 6

21 U.S.C. § 348. .......... 6

21 U.S.C. § 360b. .......... 6

* 21 U.S.C. § 381. .......... 9, 20

* 21 U.S.C. § 381(a). .......... 1, 3, 4, 12, 15, 17, 22, 23, 24, 40, 44

21 U.S.C. § 381(b). .......... 3

## REGULATIONS

19 C.F.R. § 113.62(d)(l). .......... 3

21 C.F.R. § 1.94. .......... 3, 4, 31, 44

21 C.F.R. § 10.25. .......... 34

21 C.F.R. § 10.33. .......... 4, 39

* 21 C.F.R. § 10.45(b). .......... 14, 28, 34

21 C.F.R. § 10.75 .......... 4, 39

21 C.F.R. § part 123 .......... 8

**RULES**

Fed. R. Civ. P. 12(b)(1).......... 2, 6, 12, 14

Fed. R. Civ. P. 12(b)(6) .......... 2, 12, 14

**OTHER**

26 Stat. 415, Chap. 839, Sec. 2-4 (1890) .......... 18

32 Stat. 1157-58 (1903) .......... 19

* 40 Cong. Rec. 9002-9003 (daily ed. June 12, 1906) .......... 20, 23

H.R. Rep. No. 75-2139, at 13 (1938) .......... 18

Pub. L. No. 384, Chap. 3915, Sec.10-11 (1907) .......... 19

* U.S. Constitution Article III. .......... 28, 29, 32, 33

**MISCELLANEOUS**

Oscar E. Anderson, Jr. *The Health of a Nation* 145 (1958) .......... 19

In this action, plaintiff Allied Pacific Food (Dalian) Company, Limited ("Allied"), a Chinese producer of aquacultered (*i.e.*, farmed) shrimp, challenges the discretion of the U.S. Food and Drug Administration ("FDA") to determine the admissibility of foreign seafood into United States commerce. Allied asks this Court to enjoin "enforcement" of an FDA "import alert," IA 16-131, under which FDA has advised field offices that they may "detain" without physical examination ("DWPE") certain aquacultured seafood products originating in China.

FDA "detains" a product when it makes an initial determination that an article may not meet the standards for admission into domestic commerce and notifies the owner or consignee of an opportunity to show that the article meets the admissibility criteria. Under the import alert at issue here, certain aquacultured seafood from China may be detained until the importer provides information to FDA to demonstrate that the product is free of specific antibiotic and chemical residues. FDA issued this alert as a result of recent information showing that aquaculture from China have frequently tested positive for contaminants such as malachite green, nitrofurans, fluoroquinolones, and gentian violet, which raise significant public health concerns in humans, including antibiotic resistance and increased risk of cancer. The import alert process enables FDA to leverage its resources to prevent the entry into domestic commerce of foods that may be dangerous to human health until the owner of the goods can demonstrate that they are safe.

The practices that Allied challenges, therefore, relate to the potential refusal to admit an article into United States commerce – not to any seizure of the imported goods – a distinction with significant legal ramifications. First, foreign producers have no Constitutional right to have their products enter United States commerce. Second, Congress has granted FDA broad discretionary authority to deny admission to imported goods without judicial process or review. *See* 21 U.S.C. § 381(a). Third, in carrying out that responsibility, FDA has wide latitude to

determine the type and amount of information it will consider and the administrative process it will use. Thus, consistent with constitutional, statutory and administrative law, FDA's issuance of the import alert and related actions (including the detention of shrimp products produced by Allied), are reasonable exercises of the agency's discretion and are not subject to judicial review.

Because the FDA actions Allied seeks to challenge are committed to agency discretion, Allied's complaint must be dismissed for lack of subject matter jurisdiction. Furthermore, Allied has requested that FDA remove it from DWPE (so as to be relieved of the obligation to provide evidence of compliance on an entry-by-entry basis in the future) and Allied's request for such relief is still pending before the agency. As such, Allied's lawsuit is premature and subject to dismissal on the additional grounds of ripeness and finality, as well as failure to exhaust administrative remedies. Further, contrary to Allied's contention that FDA was required to engage in notice and comment rulemaking before issuing IA 16-131, the import alert at issue is not a substantive rule, but is a mechanism for the agency to communicate information to its field personnel, to suggest priorities for the allocation of resources, and to provide notice to the affected industry regarding the agency's current views on regulatory priorities related to these products. For these reasons, as more fully set forth below, the complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## REGULATORY BACKGROUND

### A.     FDA's Import Program

Several federal agencies have overlapping and concurrent jurisdiction over imported products. Imported foods (including seafood products) that fall under FDA's jurisdiction are required to meet the safety and sanitary standards of the Federal Food, Drug, and Cosmetic Act ("FDCA"). *See* Import Program System Information (avail. at www.cfsan.fda.gov/~lrd/imp-

info.html.) ("Imp. Program Sys. Info."). An article of food subject to the FDCA shall be refused admission if it "appears" that (1) the article has been manufactured, processed, or packed under insanitary conditions; (2) the article is forbidden or restricted in sale in the country in which it was produced or from which it was exported; or (3) the article is adulterated or misbranded. *See* 21 U.S.C. § 381(a). Under the statute, the appearance of a violation may be based on "the examination of such samples or otherwise." *Id*. Accordingly, FDA can refuse admission to an article of food based upon its own examination of the food, or on evidence other than sampling and analytical results. *See id.*; *Balmaceda v. United States*, 815 F. Supp. 823, 827 (E.D. Pa. 1992), *aff'd*, 46 F.3d 279 (3d Cir. 1995).

FDA coordinates with U.S. Customs and Border Protection ("Customs") to ensure that FDA is notified of FDA-regulated products imported or offered for import into the United States. As a first step, the importer, or his/her representative, files an entry notice and an entry bond with Customs. *See* 21 U.S.C. § 381(b). After Customs notifies FDA of the entry, FDA determines initially whether to admit the product into United States commerce, detain the product based on information it already has, or conduct a physical examination or otherwise obtain additional information. *See* Imp. Program Sys. Info.

When FDA believes that "it appears that an article may be subject to refusal of admission," FDA may "detain" the product by issuing a notice of detention to notify the owner or consignee of the opportunity for a hearing. 21 C.F.R. § 1.94.[1] In some instances, FDA may detain a product as soon as it is offered for entry into the United States without first examining it and taking a sample. *See* Imp. Program Sys. Info.; *see also* FDA's Regulatory Procedure Manual

[1] Although referred to as "detention," generally neither FDA nor Customs has physical custody or control of the articles. However, if Customs demands redelivery and the importer is unable to redeliver, Customs may assess liquidated damages pursuant to the entry bond for failure to hold the product intact. *See* 19 C.F.R. § 113.62(d) & (l).

("RPM") Chap. 9-6 (avail. at http://www.fda.gov/ora/compliance_ref/rpm/ chapter9/ch.9-6.html). A detention without physical examination (or "DWPE" as it is commonly known) may be based on past history of that company or product or geographic region, or other information indicating the product appears to be violative. *Id.*; *see also* 21 U.S.C. § 381(a).

A hearing on a detention can take many forms, including telephone conversations and letters. *See* RPM Chap. 9-8. The owner or consignee may introduce testimony either orally or in writing to demonstrate the admissibility of the food. 21 C.F.R. § 1.94; *see also* 21 U.S.C. § 381(a); *Sugarman v. Forbragd*, 267 F. Supp. 817, 824 (N.D. Cal. 1967), *aff'd*, 405 F.2d 1189 (9th Cir. 1968), *cert. denied*, 395 U.S. 960 (1969).[2] A decision as to the admissibility of detained goods is made only after the importer has an opportunity to present testimony and that testimony is considered. If FDA concludes that the product is in compliance, the shipment may be released into United States commerce. *See* Imp. Program Sys. Info. If FDA concludes that a violation appears to exist, the product will be refused admission. *See* 21 U.S.C. § 381(a). An owner/consignee may seek reconsideration of the decision of an FDA field office to refuse admission of a particular shipment. *See* 21 C.F.R. §§ 10.33, 10.75; RPM Chap. 9-9. If the product is ultimately refused, however, the importer is required to either re-export or destroy the article under Customs or other approved supervision. *See* 21 U.S.C. § 381(a).

**B. Import Alert Overview**

FDA's Division of Import Operations and Policy ("DIOP") may issue "import alerts" to the FDA employees located in FDA district offices who review import entries. RPM Chap. 9-13.

---

[2] Typically, and in the case of Allied, by the time entry is made with Customs, the foreign producer or other foreign shipper has sold or consigned the products to another entity. Under the FDCA, the opportunity to participate in admissibility proceedings is offered solely to the owner/consignee of the product offered for import, and not the foreign producer. *See* 21 U.S.C. § 381(a). Thus, Allied, as the foreign producer, has no statutory right to participate in any admissibility determination relating to its products.

This process allows DIOP to efficiently and effectively disseminate information throughout the field and coordinate FDA's screening efforts. *See id.* (The purpose of import alerts is to "identify and disseminate important information (problems, violative trends, etc.)" to help ensure an "effective import coverage program."); *United States v. Food, 2,998 Cases*, 64 F.3d 984, 986 n.2 (5th Cir. 1995) ("An import alert advises FDA field offices of ongoing problems with a specific product offered for import and suggests appropriate action, such as detention for inspection and sampling."). This mechanism is particularly important given the large disparity between the volume of imported products within FDA's jurisdiction and FDA's resources.[3]

Import alerts communicate information and policy to FDA staff. *See* Imp. Program Sys. Info. Usually, they inform FDA field personnel that FDA has sufficient evidence or other information to refuse admission of future shipments of an imported article (*i.e.*, that future shipments appear to be violative). *See id.* FDA field staff use the information contained in import alerts, along with other information, to help determine whether they will initiate refusal of admission in any given case. *See id.* Occasionally, when the violative conditions appear to be geographically widespread, FDA may identify particular products from an entire country or geographic region for DWPE. *See id.* In such event, the agency will issue an import alert to provide information to field personnel regarding the products from that country or region. *See id.*

### C. Import Alert 16-131

The presence of antibiotics and other chemicals in aquacultured seafood products is currently a matter of significant concern to FDA. The use of such chemicals in the aquatic environment can lead to the presence of drug or chemical residues in the edible portions of the

---

[3] In recent years, FDA has tested less than 2% of imported seafood products. *See* GAO Report: Food Safety – FDA's Imported Seafood Safety Program Shows Some Progress, But Further Improvements Are Needed (January 2004) at 4 (avail. at http://www.gao.gov/new.items/d04246.pdf).

seafood. These residues raise significant human health concerns: overuse and unnecessary consumption of antibiotics and antibiotic residues can contribute to antibiotic resistance, which has become a growing problem in medical treatment; and certain of these chemicals have been shown, after prolonged exposure, to have a carcinogenic effect. *See* Import Alert # 16-131 "Detention without Physical Examination of Aquacultured Catfish, Basa (Pangasius sp), Shrimp, Dace and Eel from the People's Republic of China Due to the Presence of New Animal Drugs and/or Unsafe Food Additives" (avail. at http://www.fda.gov/ora/fiars/ora_import_ia16131.html ("IA 16-131"); Memorandum from Director, Office of Compliance, Center for Food Safety and Applied Nutrition to Associate Commissioner for Regulatory Affairs (June 5, 2007); Memorandum from Compliance Officer, Product Adulteration Branch, Division of Enforcement, Office of Compliance, Center for Food Safety and Applied Nutrition File (November 26, 2007) (attached hereto as Exhibit 1, at 1-9, 10-17, 18-19, respectively).[4]

The presence of malachite green, nitrofurans, fluoroquinolones, or gentian violet in seafood products violates the FDCA in that the residues are (1) unsafe new animal drugs under 21 U.S.C. § 360b that render the seafood adulterated under 21 U.S.C. § 342(a)(2)(C)(ii); and/or (2) unsafe food additives under 21 U.S.C. § 348 that render the seafood adulterated under 21 U.S.C. § 342(a)(2)(C)(i). Accordingly, producers of seafood aquaculture who wish to export their products to the United States must not introduce these chemicals into their aquatic environments and must take affirmative steps to prevent contamination by these chemicals.

Approximately 80% of the seafood consumed in the United States is imported. Ex. 1, at

[4] When subject matter jurisdiction is challenged under Fed. R. Civ. P. 12(b)(1), the Court may consider evidentiary material outside of the pleadings without treating the motion as one for summary judgment. *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947); *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003); *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197-98 (D.C. Cir. 1992); *Bonterra America, Inc. v. Bestmann*, 907 F. Supp. 4, 5 n.1 (D.D.C. 1995).

10. China is the largest producer of aquaculture in the world, and the third largest exporter of seafood to the United States. *Id*. For several months before it issued IA 16-131, FDA, in monitoring imported aquaculture seafood from China, repeatedly found illegal residues, including nitorfurans, malachite green, genitian violate, and fluoroquinolones. *Id*. at 10-11, 18. Overall, during the period October 1, 2006 through May 31, 2007, FDA found that, of the 89 samples of catfish, basa, shrimp, dace, and eel from China that were tested, twenty-two of the samples (25%) were found to contain an unapproved drug. *Id*. at 18. Testing conducted by Canadian authorities and the Alabama Department of Agriculture also revealed high percentages of Chinese aquacultured seafood containing drug residues. *Id*. at 13.

In September 2006, FDA sent a team of experts to China to evaluate the Chinese government's control over the use of drugs in aquacultured seafood products. *Id*. at 13. The FDA team concluded that China's then current program was not sufficiently effective. *Id*. Indeed, a representative of the Chinese government explained that, although the Chinese authorities test for certain drug residues in legally exported seafood products, a considerable volume was apparently moving through illegal channels. *Id*. at 14.

As a result of the above data and information, FDA issued IA 16-131 on June 28, 2007. *Id*. at 18. IA 16-131 advises FDA district offices responsible for reviewing import entries that they may detain without physical examination aquacultured catfish, basa, shrimp, dace, and eel from China. *Id*. at 4. Once a shipment has been detained, the importer may provide to FDA the results of a third-party laboratory analysis of a representative sample of the lot, conducted under appropriate methods, showing that the lot has been properly tested for the designated drug residues. *Id*. at 4-7. If the results show that the shipment does not contain antibiotic or chemical residues, the shipment may be released into United States commerce. If the results show that the

shipment does contain violative residues, the shipment will be refused, subject to administrative appeal as described above. *Id*. at 4-7.

Import Alert 16-131 explains how specific manufacturers can request to be removed from DWPE under IA 16-131. FDA may remove a firm from DWPE if the agency determines that the manufacturer has the appropriate controls and processes in place to ensure that aquaculture produced by that manufacturer no longer appear to be violative due to the presence of illegal drug residues and/or food additives. *Id*. at 7-8. IA 16-131 further describes the information that may satisfy that standard: documentation showing five consecutive untainted seafood entries (based on third-party laboratory analysis using acceptable methodologies); documentation that verifies the processors' compliance with FDA's Seafood Hazard Analysis Critical Control Point ("HACCP") regulations, 21 C.F.R. part 123, from an "appropriate" third-party that conducted an inspection of the processor; and documentation that the processor is in compliance with all Chinese government requirements for exporting aquaculture seafood to the United States. *Id*. Requests for removal are evaluated by FDA's Center for Food Safety and Applied Nutrition ("CFSAN") at FDA headquarters in accordance with CFSAN's standards and procedures, as well as by DIOP. *See id*. at 8.[5]

**FACTUAL BACKGROUND**

Allied, a foreign limited company with its principal place of business in Dalian, China, produces aquacultured shrimp products. Am. Compl. ¶¶ 1, 11. It exports these products, in particular breaded shrimp, to the United States. Am. Compl. ¶¶ 11-12.

On September 10, 2007, Allied applied to FDA to be removed from DWPE under IA 16-

[5] Even if FDA decides to remove a company from DWPE under IA 16-131, FDA retains its authority to examine any of that company's aquacultured products before they are admitted into domestic commerce and to refuse admission to any product that appears violative.

131. Am. Compl. ¶ 36. Since that time, there have been frequent communications between Allied's representatives and FDA regarding the status of its request and potential obstacles to approval. *See, e.g.*, Am. Compl. ¶¶ 38, 40, 41. Specifically, importers of Allied's products sought to stay any refusal decision on pending imports of such products. *See* Am. Compl. Ex. 5. For several of Allied's entry lines, the third party laboratory that tested the products for the presence of drug/food additive residues reported positive findings. *See* Am. Compl. ¶¶ 48, 65.[6] The importers requested further consideration and submitted additional information to FDA, including new testing of the same products from other laboratories. FDA engaged in extensive evaluation of all the submitted data and obtained its own data. By late 2007, FDA determined to admit into United States commerce all Allied entries that were under consideration at the time the original complaint was filed, *see* Am. Compl. ¶¶ 58, 76, and no entries from Allied since then have been refused.

As noted above, HACCP compliance is also a factor that FDA considers relevant in determining whether a foreign producer should be removed from DWPE under IA 16-131. Ex. 1, at 8. Since its September 2007 request for removal from DWPE, Allied has submitted additional information to FDA regarding the status of its efforts to demonstrate compliance with HACCP. *See* Letter from Dominic J. Veneziano, Director, Division of Import Operations & Policy to Mitchell Fuerst (Dec. 7, 2007) (Am. Compl. Ex. 4). On November 13, 2007, Allied provided FDA with the firm's revised HACCP plans, dated November 12, 2007, for breaded shrimp, breaded skewered shrimp, and pan-fried tempura shrimp. *See id*. at 1. The package also

---

[6] The terms "line" and "entry line" refer to each portion of an import shipment that is listed as a separate item on an entry document. A line may consist of several items of the same product, such as a quantity of frozen breaded shrimp. FDA considers a line to be an "article" under 21 U.S.C. § 381, and it may make admissibility decisions on a line-by-line basis.

included two letters dated November 12, 2007, from a third-party auditor, attesting to the completion of audit inspections it conducted at the firm on November 3 and 8, 2007. *See id*. On November 21, that auditor provided its inspection reports to FDA. *See id*. In addition, on November 15, 2007, Allied provided additional information to FDA regarding other third-party auditors who had conducted HACCP audits and whose audit reports were part of the September package. *See id*.

On December 7, 2007, FDA sent a letter to Allied's counsel, providing FDA's evaluation of the HACCP compliance information submitted as of that date. *Id*. The letter identified specific deficiencies in both the HACCP plans themselves and the most recent inspection reports. *Id*. at 1-2. FDA explained that the HACCP plans lacked sufficient information regarding the mechanisms for ensuring that the aquaculture did not contain drug/food additive residues, and the auditor's report lacked detailed information regarding the adequacy of controls in place for unapproved veterinary drugs used in aquacultured shrimp. *Id*. FDA further explained that:

> Because many Chinese aquaculture processors may have sufficient HACCP plans on paper but may not appropriately implement them, as has been the case elsewhere, and because FDA does not have the resources to itself inspect every foreign producer on an ongoing basis, FDA believes that third party audits of the foreign processors will play an important role in FDA's assessment whether a manufacturer has the appropriate controls and processes in place. . . . FDA's current view is that, before it can be confident in the quality of a given auditor, it should verify that the auditor understands the science, the product, the processing technology, and the principles of HACCP and can apply them in different processing plant settings. Thus, in addition to reviewing a processing plant's HACCP paperwork and a third-party's credentials, *FDA believes it would be prudent*, at this early stage of this program, *to conduct its own on-site audits* of the auditors' work until it gains confidence that the specific auditor or auditors are properly applying HACCP principles.

*Id*. at 3 (emphasis added).

Because FDA determined that it needs more information about Allied's HACCP plans and state of compliance, including an on-site evaluation, FDA has not yet made a final decision

on Allied's request for removal from DWPE under IA 16-131. In its December 7 letter, FDA further explained that, "[i]f Allied is able to address the HACCP-related issues raised in this letter above, and provided that there are no other significant adverse developments related to Allied's request in the meantime, FDA intends to make every effort to include Allied in [its] next trip [to China]," which the agency hoped to make in January or February 2008, but noted that timing was affected by factors outside the agency's control. *Id*. at 4. As of the date of this brief, Allied has not yet provided the information requested in the December 2007 letter, and FDA has not yet been able to schedule its next trip to China, but expects to do so in the coming months.

**PROCEDURAL POSTURE**

Allied filed its complaint on November 2, 2007, less than two months after it initially requested removal from DWPE under IA 16-131, and in the midst of ongoing communications with FDA regarding the status of various import lines. After the government moved to dismiss the complaint, and Allied obtained extensions of time to respond, Allied filed an amended complaint on February 25, 2007. The amended complaint drops two of the six counts from Allied's original complaint and provides updated information on the administrative proceedings involving Allied and its products. The amended complaint alleges: in *Count One*, that IA 16-131 is a substantive rule that should have been promulgated through notice and comment rulemaking; in *Count Two*, that FDA fails to oversee third party laboratories and its own compliance officers, leading to inconsistent enforcement of IA 16-131; in *Count Three*, that FDA arbitrarily and capriciously refused to remove Allied from DWPE under IA 16-131; and in *Count Four*, that FDA impermissibly limits the evidence that may be presented as to the admissibility of an import in violation of due process. Allied seeks a declaration that IA 16-131 is unlawful and unconstitutional, and that FDA's enforcement of IA 16-131 is arbitrary and capricious. Allied

also seeks an injunction against FDA's enforcement of IA 16-131.

FDA now moves to dismiss Allied's amended complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

**ARGUMENT**

As discussed more fully below, Allied's claims are meritless and subject to dismissal based on several overlapping and alternative grounds. First and foremost, this lawsuit seeks judicial review of a matter that is committed to the discretion of the agency. When "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," the matter is not subject to judicial review. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Here, the statute confers on FDA the authority to refuse admission to products that "appear" to violate the FDCA based on an examination of the samples "or otherwise." *See* 21 U.S.C. § 381(a). This standard is unreviewable because the "appearance" standard by its very language embodies undefined discretion; the use of the term "otherwise" likewise indicates Congress' intent to delegate discretion to the agency. The history and structure of the FDCA confirm Congress' intent to make import refusals (as opposed to product seizures) unreviewable.

Where, as here, the statute affords no judicial review of FDA's ultimate determination to refuse admission of an entry offered for import, Allied has no basis for challenging the agency's preliminary steps and determinations, such as the manner in which FDA goes about making admissibility decisions and gathering sufficient information to determine whether or not to admit particular entries. FDA's decisions regarding how to allocate its resources, what entries to examine or not examine, and what evidence or information to consider in determining whether to admit or deny any particular entry are unquestionably "committed to agency discretion by law,"

and thus judicially unreviewable.  5 U.S.C. § 701(a)(2).

Similarly, Allied's request that FDA be enjoined from enforcing IA 16-131 is tantamount to a preemptive injunction against FDA's enforcement of the FDCA, which relief this Court cannot enter.  Indeed, it is well established that courts have no jurisdiction to enjoin enforcement proceedings brought pursuant to the FDCA.  Although import admissibility determinations are not enforcement proceedings *per se*, the line of cases barring pre-enforcement review in the FDCA context applies equally to import proceedings.

Second, even if FDA's actions were otherwise reviewable, this lawsuit is untimely.  At the time this lawsuit was filed, FDA was still considering the admissibility of the specific entries referenced in Allied's complaint.  All of the pending entries have now been admitted, however, rendering those aspects of Allied's complaint moot.[7]  Allied's request to be removed from DWPE under IA 16-131, on the other hand, remains under active consideration by FDA.  By letter dated December 7, 2007, FDA requested additional information from the firm and its auditors related to Allied's removal request.  FDA also informed Allied at that time that it would need to travel to China before it could issue a decision on Allied's request, and FDA has not yet been able to schedule that trip.  Absent final agency action on Allied's request for removal from DWPE, Allied's claims as to that issue are not ripe for review.  Because there are thus no adverse final decisions for this Court to review, there is no jurisdiction over Allied's claims.

Third, Allied has failed to exhaust administrative remedies by filing a citizen petition as required by FDA regulations.  Allied complains that FDA's detention program for Chinese aquaculture is unjustified and unfairly administered.  Specifically, Allied alleges that FDA should

---

[7]  Despite this outcome, Allied continues to complain about these entries in its amended complaint.  See Am. Compl. ¶¶ 50-58, 60-76.

have engaged in rulemaking to issue IA 16-131, inadequately monitors third party laboratories and its own personnel, has failed to clearly identify in the import alert the information that it is requesting from foreign companies, and has unfairly limited the information it will consider as to the admissibility of an import line. *See* Am. Compl. Counts One - Four. These are all matters that should have been brought to the attention of the Commissioner in the first instance for the agency to consider. Indeed, FDA regulations require that a party first use the citizen petition process to "request that the Commissioner take or refrain from taking any form of administrative action," and that request must "be the subject of a final administrative decision based on [the citizen petition] . . . before any legal action is filed in a court." 21 C.F.R. § 10.45(b).

For all of these reasons, Allied's complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. Even if this Court had subject matter jurisdiction, however, Allied's complaint fails to state a claim upon which relief can be granted. Allied is not entitled to relief on Count One as a matter of law because IA 16-131 is not a substantive rule that created new, binding law, and therefore notice and comment rulemaking was not required. Allied has similarly failed to state a claim in Count Four, because a private party has no vested right to import into the United States on which to base a due process challenge to the government's authority to restrict imports. Each of these claims should therefore be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).[8]

---

[8] With respect to Counts Two and Three, it is unclear how this Court would begin to evaluate FDA's processes for evaluating whether an import line is admissible, including its consideration of third-party laboratory analysis, the communications among its employees, and the types of information it requests from foreign manufacturers and importers. To the extent these processes are reviewable at all (and the government firmly believes that they are not), courts give broad discretion to agencies to develop procedures and methods of inquiry that are suited for particular matters, and to conduct evaluations of scientific information within its area of technical expertise. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978) ("administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties") (internal citations omitted); *Ethyl Corp. v. EPA*, 541 F.2d 1, 34, 36 (D.C. Cir.) (1976) (*en banc*) (Courts review scientific judgments of federal agencies "not as the chemist, biologist, or

## I. FDA'S ADMISSIBILITY AND DETENTION DECISIONS ARE COMMITTED TO AGENCY DISCRETION AND NOT SUBJECT TO JUDICIAL REVIEW

Allied's complaint should be dismissed in its entirety because it challenges FDA determinations that are "committed to agency discretion by law," and therefore not subject to judicial review. 5 U.S.C. § 701(a)(2). In directing FDA to refuse the admission of imported products that "appear" to be adulterated or misbranded based on an examination of samples "or otherwise," 21 U.S.C. § 381(a), Congress committed such decisions to the agency's complete discretion and designated those decisions as unreviewable. Nor may Allied challenge the manner in which FDA goes about making admissibility decisions. As discussed below, FDA has broad discretion to allocate its resources as it deems appropriate. Allied's request for an injunction against FDA's "enforcement" of IA 16-131 (*i.e.*, detaining Chinese aquaculture without physical examination) fares no better. Indeed, the law is well-settled that the district courts lack jurisdiction to enjoin enforcement proceedings brought pursuant to the FDCA. *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950).

### A. FDA's Detention and Admissibility Decisions, the Issuance of the Import Alert, and the Determination of Whether the Criteria for Removal from DWPE Have Been Satisfied Are Committed to Agency Discretion

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701(a)(2), precludes judicial review when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ('law') can be

statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality."). Thus, were this case to proceed beyond the instant motion, the government would establish that the agency has acted rationally, based upon relevant factors, and within its authority, and the Court should accordingly defer to the agency's process and determinations. *Motor Vehicle Mfrs. Ass'n of the United States, Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-42 (1983).

taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Chaney*, 470 U.S. at 830. The Supreme Court has directed that, when review is precluded under section 701(a)(2), there is no review at all, even for an abuse of discretion: "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for abuse of discretion." *Chaney,* 470 U.S. at 830.[9] The non-reviewability of such decisions is not simply a question of deference – it is jurisdictional. *Baltimore Gas and Elec. Co. v. FERC*, 252 F.3d 456, 458 (D.C. Cir. 2001).

The Supreme Court has applied section 701(a)(2) "to preclude judicial review of certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (citations and quotation marks omitted).[10] Section 701(a)(2) applies where there is clear and convincing evidence that Congress intended such a delegation. *See Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 601 (D.C. Cir. 2007). Nevertheless, the Supreme Court has made clear that Congress' intent to preclude review need not be express; indeed, such a requirement would render section 701(a)(2) superfluous in light of the language of section 701(a)(1). *See Chaney*, 470 U.S. at 830.[11]

---

[9] *See also Webster v. Doe*, 486 U.S. 592, 600 (1988) ("complete discretion" of the agency where statute provides "no substantive standards on which a court could base its review"); *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002) ("§ 701(a)(2) encodes the principle that an agency cannot abuse its discretion, and thus violate § 706(2)(A), where its governing statute confers such broad discretion as to essentially rule out the possibility of abuse.").

[10] Courts have applied section 701(a)(2) to a variety of agency decisions. *See, e.g.*, *Lincoln*, 508 U.S. at 191-93 (decision to discontinue allotment of program funds); *Webster v. Doe*, 486 U.S. at 599-601 (decisions regarding employee termination); *ICC v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 280 (1987) (agency refusal to reconsider its decision); *Baltimore Gas and Elec. Co.*, 252 F.3d at 458 (decision to settle enforcement action); *Nat'l Fed'n of Fed. Employees*, 905 F.2d 400, 405-06 (D.C. Cir. 1990) (decision to close military bases); *Coker v. Sullivan*, 902 F.2d 84, 88-89 (D.C. Cir. 1990) (monitoring and taking enforcement action against state programs); *Dina v. Attorney Gen.*, 793 F.2d 473, 475 (2d Cir. 1986) (decision regarding waiver of residency requirement related to immigration status).

[11] 5 U.S.C. § 701(a) provides that the judicial review provisions of the APA do not apply where: "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."

Where the statute does not provide firm substantive standards, the agency instead makes policy decisions relying on its specialized knowledge and expertise and by balancing numerous considerations. Congress commits determinations to agency discretion where such determinations "involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise . . . . The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Chaney*, 470 U.S. at 831-32. *See also Nat'l Fed'n of Fed. Employees*, 905 F.2d at 405-06 (issues related to capacity and military policy should be left to experts in the agency); *Coker*, 902 F.2d at 88-89 (agency decision required balancing of resources and priorities); *Schering Corp. v. Heckler*, 779 F.2d 683, 687 (D.C. Cir. 1985) (the "balancing of agency priorities and objectives, informed by judgments based on agency expertise, . . . absent some law to apply, should not be second-guessed by a court").

The FDCA's import refusal provision embodies such a discretionary standard. Congress directed the agency to refuse the admission of an article of imported food if it "appears," *inter alia*, adulterated or misbranded, based on an examination of the samples "or otherwise." *See* 21 U.S.C. § 381(a).[12] In using the terms "appear" and "otherwise," which are undefined, Congress delegated discretionary authority to the agency without creating a judicially manageable standard. This language, together with the history of the provision, and of a parallel provision providing for the forfeiture of goods, confirms Congress' intention to delegate to FDA unreviewable discretionary authority with respect to import refusals.

[12] As noted above, the statute vests this authority in the Secretary of HHS, 21 U.S.C. § 381(a), and the Secretary has delegated that authority to the Commissioner of Food and Drugs. FDA Staff Manual Guide 1410.10. That authority has been redelegated to the Regional Food and Drug Directors and District Directors. FDA Staff Manual Guide 1410.801, para. A.2.

**1. The Statutory Language and Legislative History Demonstrate that Congress Intended to Delegate Unreviewable Discretion for Import Refusals**

More than one hundred years ago, Congress established a dual-track system to protect domestic commerce from potentially adulterated imported foods: (1) forfeiture of the goods through judicial process; and (2) summary administrative refusal to prevent the goods from entering domestic commerce. When Congress enacted the FDCA in 1938, it essentially reenacted the then-existing statutory provisions governing imports,[13] and largely the same provisions continue in effect today. Because these provisions have remained substantially the same through subsequent reenactments, Congress' original legislative intent remains relevant. *See, e.g., Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *Brotherhood of Locomotive Firemen & Enginemen v. Bangor & Aroostook R. Co.*, 380 F.2d 570, 579 (D.C. Cir. 1967).

This history demonstrates that Congress intended to provide judicial review only with respect to the forfeiture track, and not for import refusals. Indeed, the first Act to deal comprehensively with imported food, the Import Food and Drugs Law of 1890, *see* F.K. Killingsworth, Import Control, Food Drug Cosmetic Law Quarterly 498, 504 (Dec. 1947), provided, in back-to-back provisions, for (1) the forfeiture and destruction, through judicial action, of adulterated food imported into the United States; and (2) suspension of importation by Presidential proclamation whenever the "President *is satisfied* that there is *good reason to believe*" that an adulterated food may be imported. 26 Stat. 415, Chap. 839, Sec. 2-4 (1890) (emphasis added). Congress demonstrated its intent to commit the import suspension decisions to the unreviewable discretion of the President by explicitly providing for judicial process only in

[13] *See* H.R. Rep. No. 75-2139, at 13 (1938) ("Section 801 relates to imports and contains no substantial change from the provisions of the present law.").

the forfeiture section, and by establishing a discretionary standard – the President's "satisf[action]" and "belie[f]" – for import refusals. *See, e.g., Dalton v. Specter*, 511 U.S. 462, 474-76 (1994) ("[L]ongstanding authority holds that [judicial] review is not available when the statute in question commits the decision to the discretion of the President. . . . How the President chooses to exercise the discretion Congress has granted him is not a matter for our review. . . . [N]o question of law is raised when the exercise of the President's discretion is challenged.") (citations and quotation marks omitted).

Over the following years, Congress kept the summary refusal provision, but modified it to reassign the task to an executive agency,[14] and to provide, in connection with the import refusal process, "notice to the owner or consignee," who shall "have the right to introduce testimony" to the agency. 32 Stat. 1157-58 (1903). These changes had no impact on the reviewability of import refusals, which remained committed to agency discretion. In 1906, Congress enacted the Pure Food and Drug Act of 1906, the predecessor statute to the current Federal Food, Drug, and Cosmetic Act, and left intact, again in back-to-back provisions, the dual-track system: (1) for seizure through judicial process; and (2) for summary refusal of imports, subject only to the administrative process. Pub. L. No. 384, Chap. 3915, Sec.10-11 (1907). In that Act, Congress modified the import refusal provision by replacing the "reason to believe" with an "appear[ance]" standard. *Id*. Sec. 11. Both terms provide wide discretion and no judicially manageable standards for how such discretion is to be exercised. At the time this language was introduced, Congress made its intent regarding judicial review clear: "[U]nder this provision, the Secretary . . . has power to decide whether a cargo of goods imported from a foreign country is

---

[14] *See* Oscar E. Anderson, Jr. *The Health of a Nation* 145 (1958) ("[I]n 1899 provision had been made for the Secretary of the Treasure to refuse delivery of imported articles found by the Secretary of Agriculture to be dangerous to health.").

adulterated or misbranded, . . . *his decision is final*, and the goods must be destroyed or exported and returned *without* further investigation or power of *review*." *See* 40 Cong. Rec. 9002-9003 (daily ed. June 12, 1906) (statement of Rep. Crumpacker) (emphasis added) (attached hereto as Exhibit 2).

When the FDCA was enacted in 1938, Congress retained substantially the same operative language for both forfeiture and import refusal. Indeed, the only relevant change to the import provision was the addition of the words "or otherwise," which only enhanced the agency's discretion. FDA understands this language to mean that FDA's import refusal decisions may be based on information other than the results of examination of samples, *see* RPM 9-6, and courts have confirmed this interpretation. *See Balmaceda*, 815 F. Supp. at 827 ("the language of the statute clearly affords the FDA with the discretion to act without requesting or relying on the results of the testing of samples"); *Goodwin v. United States*, 371 F. Supp. 433, 436 (S.D. Cal. 1972) ("[FDA] is not required to find that each shellfish is actually contaminated prior to barring its importation from a foreign country; rather, it is sufficient that the shellfish appear to have been grown or processed under insanitary conditions, which conclusion may be derived from an examination of the shellfish or otherwise.").

Still today, after reenactments, recodifications, and modifications, the operative language for forfeiture and import refusals has remained remarkably constant. Currently, under the seizure provision, the government may institute condemnation proceedings against an adulterated or misbranded article in federal district court. 21 U.S.C. § 334. Under the summary refusal provision, the government may refuse admission to an article that appears adulterated or misbranded subject only to notice and the opportunity for an administrative hearing. 21 U.S.C. § 381. Thus, Congress' historical intent that summary refusal of imports be committed to the

agency's discretion continues to control the appropriate understanding of section 381 today.

### 2. Courts Have Confirmed FDA's Discretion to Refuse Imports

Court have recognized that, under the plain language of the statute, Congress committed import refusal decisions to the agency's discretion. Some courts have found such intent in Congress' creation of the dual-track system and their contrasting procedural provisions. As one court explained:

> [T]he statute does not provide for judicial review [for import refusals]. In this respect the procedure under section 381 is quite different from that taken under other sections of the Food, Drug, and Cosmetic Act of 1938 relating to domestic commerce, where proceedings for condemnation require judicial procedure. . . . [I]t is clear that in the present case the statute makes no provision for judicial review and creates no personal federal rights as the basis for judicial review, so long as the Secretary acted within the scope of his authority under the Act.

*The James J. Hill*, 65 F. Supp. 265, 270 (D. Md. 1946). *See also Seabrook Int'l Foods, Inc. v. Harris*, 501 F. Supp. 1086, 1090-1091 (D.D.C. 1980) ("[Section 381] authorizes refusal upon the mere appearance of adulteration. It does not, in contrast to § 334(a), pertaining to domestic articles, mandate any condemnation procedure in a federal district court prior to seizure."), *aff'd sub nom., Cont'l Seafoods, Inc. v. Schweiker*, 674 F.2d 38 (D.C. Cir. 1982).

Other courts have focused on Congress' use of discretionary language:

> [T]he mere *appearance of adulteration* is enough to compel refusal to admit. There is no requirement that the food actually be adulterated or that the Secretary find, as a fact, that the food is adulterated. Nor is the Secretary directed to rely upon testimony offered at the hearing. On the contrary, his conclusion that the food "appears" to be adulterated may derive "*from the examination of such samples or otherwise*." There is no provision for judicial review. Clearly, this is an instance where "agency action is committed to agency discretion by law."
>
> * * *
>
> Congress intended that the Secretary, or the employees to whom his authority is delegated, should make the final determination whether a food offered for import *appears* to be adulterated - without judicial review.

*Sugarman v. Forbragd*, 267 F. Supp. at 824-26 (emphasis in original).[15] *See also Cont'l Seafoods, Inc.*, 674 F.2d at 42-43 (noting "FDA's broad authority to prohibit import of any food that 'appears' to be adulterated"); *Seabrook Int'l Foods, Inc.*, 501 F. Supp. at 1090-91 ("The use of the term "appears" in the statute is a striking and clear indication of Congress' intent to forego formal procedural requirements."); *K & K Merch. Group v. Shalala*, Civ. No. 95-10082, 1996 WL 183023 at *8 (S.D.N.Y. Apr. 15, 1996) (noting "the wide discretionary power FDA enjoys to determine the factors regarding its decision to grant or refuse admission of imported goods"); *Meserey v. United States*, 447 F. Supp. 548, 555 (D. Nev. 1977) (an FDA order excluding material from import under the appearance standard is committed to FDA's discretion).[16]

**3. The Discretionary Standard Serves Important Policy Purposes**

The establishment of a dual-track system serves, on the one hand, to protect legitimate property interests, and on the other hand, to provide the government with the flexibility to best protect the public health. Through the forfeiture provision, Congress affords greater process and protection to the owner of goods in domestic commerce when the government seeks to confiscate and destroy the goods. However, given the critical importance of protecting the nation's food supply, the often limited information available to FDA concerning foreign producers and

---

[15] The Ninth Circuit, in affirming the district court in *Sugarman*, held that import refusal decisions under section 381(a) are committed to agency discretion and therefore are not subject to the APA. 405 F.2d at 1190. It further held that the agency's decision was not arbitrary and capricious, *see id*., and that language has been repeated in other cases, particularly in the Ninth Circuit. However, the Supreme Court subsequently held in *Heckler v. Chaney* that decisions that are committed to agency discretion and not subject to the APA are also not subject to arbitrary and capricious review. Thus, the latter part of the Ninth Circuit's *Sugarman* analysis should be disregarded as inconsistent with *Chaney*.

[16] By contrast, the D.C. Circuit has rejected the argument that decisions of the Department of Agriculture to restrict imports of beef are committed to agency discretion and therefore unreviewable. *See Ganadera Indus., S.A. v. Block*, 727 F.2d 1156, 1159 (D.C. Cir. 1984). Significantly, however, the statute in question has a judicially reviewable standard: imports of meat are not permitted where the meat is adulterated or misbranded. *Id*. There is no "appearance" or "otherwise" language or standard in the applicable provisions. Indeed, the statutory standard governing meat imports is equivalent to the FDA standard for domestic seizures, which, as noted above, is subject to judicial review. *See* 21 U.S.C. § 334.

products, and the differing food safety laws among different countries, Congress vested the agency with broad discretion to refuse to admit certain products into domestic commerce, free from judicial challenge.[17]

In so doing, Congress enabled FDA to act on less than perfect information and conserve its resources. Given the vast disparity between FDA's relatively modest resources and the huge volume of imported products within its jurisdiction, FDA could not effectively monitor and control the influx of foreign foods into domestic commerce if the agency were required to prove an actual violation of the FDCA, subject to judicial review, every time it sought to refuse admission to an article offered for import. By granting the agency authority to refuse admission to any product that "appears" adulterated based on actual inspection or "otherwise," Congress empowered the agency to exercise its discretion in a broad and flexible manner, thereby promoting the most efficient and effective use of the agency's limited resources and information.

At the same time, Congress shielded FDA's admissibility determinations, and the steps leading up thereto, from judicial review. *See* 21 U.S.C. § 381(a); 40 Cong. Rec. at 9003; *Sugarman*, 405 F.2d at 1190. Indeed, Congress' use of such a broad standard for admissibility – whether an item appears in any way to be noncompliant – provides no meaningful standard by which a court *could* review FDA's actions. *See Chaney*, 470 U.S. at 830; *Sugarman*, 405 F.2d at 1190. Where, as here, the statute affords no judicial review of FDA's ultimate determination to *refuse* admission of an entry offered for import, it goes without saying that Allied cannot challenge FDA's initiation of the refusal process by identifying certain products for DWPE pending a determination of their admissibility. FDA's interim decisions regarding the allocation

[17] This dichotomy is consistent with the long-established principle, discussed further below, that there is no property right to import products into the United States. *See Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904).

of its resources – including what entries to examine or detain, what evidence to require, and what information to consider in determining whether to admit or deny any entry offered for import – are, like the admissibility decision itself, "committed to agency discretion by law," and thus judicially unreviewable. 5 U.S.C. § 701(a)(2).

Accordingly, both the issuance of the import alert itself and the agency's detention of Allied's products pursuant thereto exclusively involve the exercise of agency discretion and are beyond the scope of judicial review. The entire complaint is thus barred by section 701(a)(2) of the APA and must be dismissed.

**B. This Court Lacks Jurisdiction to Enjoin FDA Detention and Import Refusal Decisions**

Allied's request to enjoin FDA from enforcing IA 16-131 is also unavailing because it is tantamount to an attempt to preemptively enjoin FDA's enforcement of the FDCA – specifically, its exercise of enforcement discretion in detaining products proposed for import. IA 16-131 does not alter the legal regime in any way; whether or not any particular import alert is in effect, a foreign producer may not legally import adulterated food into the United States, and any product that "appears" to be adulterated or otherwise violative of the FDCA is subject to refusal of admission. 21 U.S.C. § 381(a). Any FDA district office could detain on an individual basis any entry that Allied might offer for import, or, indeed, all aquacultured seafood entries originating in China – irrespective of the existence of IA 16-131 or any other import alert.[18] Thus, Allied's underlying objection is that, as a result of the enforcement priorities embodied in IA 16-131, its

[18] Given FDA's unquestioned the authority to detain imported products on an individual basis, the agency likewise has discretion to implement its enforcement authority with greater efficiency through the use of DWPE. *See Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1031-32 (D.C. Cir. 2007) ("EPA could have pursued enforcement actions against each individual [company], but determined that a broader strategy would lead to quicker industry-wide compliance. These judgments -- arising from considerations of resource allocation, agency priorities, and costs of alternatives -- are well within the agency's expertise and discretion.") (citations omitted).

products are more likely to be detained pending proof of FDCA compliance.

It has long been established, however, that courts lack jurisdiction to enjoin FDA from initiating enforcement proceedings under the FDCA. *See Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950). *Ewing* involved FDA's execution of eleven seizures of a "food supplement" on grounds that it was misbranded under the FDCA because its labeling was misleading with respect to potential injuries from the product. *Id.* at 596-97. Alleging that the multiple seizure provision of the FDCA violated the Due Process Clause of the Fifth Amendment, the claimant sought and obtained an injunction from the district court enjoining FDA "from instituting or maintaining any action or proceeding raising issues of fact or law that Nutrilite Food Supplement is misbranded under the [FDCA] . . . ." *Mytinger & Casselberry, Inc. v. Ewing*, 87 F. Supp. 650, 661 (D.D.C. 1949). On direct appeal, the Supreme Court held that district courts do not have jurisdiction to review an FDA determination that there is probable cause to believe that a product violates the FDCA because Congress, in enacting the FDCA, did not intend to permit pre-enforcement judicial review:

> Judicial review of this preliminary phase of the administrative procedure does not fit the statutory scheme nor serve the policy of the [FDCA]. Congress made numerous administrative determinations under the Act reviewable by the courts. But it did not place the finding of probable cause under [21 U.S.C. § 334] in that category. This highly selective manner in which Congress has provided for judicial review reinforces the inference that the only review of the issue of probable cause which Congress granted was the one provided in the libel [seizure and condemnation] suit.

*Ewing*, 339 U.S. at 600-01 (footnote omitted). Furthermore, the speedy protection afforded the public by civil seizure actions would be impaired if district courts could intercede and enjoin FDA officials from initiating enforcement proceedings. *Id.* at 601.

The Supreme Court reaffirmed the *Ewing* principle in *Abbott Labs. v. Gardner*, 387 U.S.

136 (1967), calling the *Ewing* decision "quite clearly correct." *Id*. at 147. As the Court observed, "[t]he drug manufacturer in *Ewing* was quite obviously seeking an unheard-of form of relief which, if allowed, would have permitted interference in the early stages of an administrative determination as to specific facts, and would have prevented the regular operation of the seizure procedures established by the [FDCA]." *Id.* at 148.

The rule of *Ewing* has also been "consistently and strictly observed" by the lower courts, which have interpreted the decision to "preclude[] judicial interference with the FDA's decision to institute enforcement actions, *whatever the precise context*." *United States v. Alcon Laboratories*, 636 F.2d 876, 881-82 (1st Cir. 1981) (emphasis added). In *Southeastern Minerals, Inc. v. Harris*, for instance, the Fifth Circuit held that the jurisdictional prohibition of *Ewing* "expresses a total and complete proscription on the district court's power both to undertake a pre-enforcement review of the FDA's determination of probable cause and to enjoin federal officials from acting upon that determination *by seizing products or initiating enforcement proceedings* under the Act." 622 F.2d 758, 764 n.10 (5th Cir. 1980) (emphasis added); *see also Premo Pharm. Laboratories., Inc. v. United States*, 629 F.2d 795, 801 (2d Cir. 1980) (stating that it is "well settled" that federal courts "lack jurisdiction to enjoin seizure actions instituted by the FDA"); *Genendo Pharm. v. Thompson*, 308 F. Supp. 2d 881, 882-83 (N.D. Ill. 2003) (dismissing for lack of jurisdiction a case seeking to enjoin FDA from continuing to seize drugs).

Although *Ewing* arose in the context of domestic seizure actions under 21 U.S.C. § 334, it applies with equal force to FDA's detention of imports because Congress likewise did not provide for judicial review of FDA's initial decision to initiate refusal of admission

proceedings.[19]  Indeed, a decision to detain a product offered for import is even more preliminary than a seizure, in that detention simply indicates FDA's tentative view that the detained article may be refused admission and allows an opportunity for an administrative hearing.  In accord with *Ewing* and its progeny, this Court has no jurisdiction to make a determination that, as a matter of law, FDA cannot issue a detention notice and thereby initiate refusal proceedings under the FDCA against imported Chinese aquaculture.  Accordingly, for this reason as well, Allied's complaint must be dismissed.

## II.    ALLIED'S COMPLAINT IS NOT JUSTICIABLE UNDER DOCTRINES OF RIPENESS, FINALITY AND EXHAUSTION

Allied's complaint is also subject to dismissal because it is premature under the doctrines of ripeness, finality, and exhaustion of administrative remedies.  The three doctrines overlap and are all designed to limit challenges to agency action in federal court before the agency has fully decided issues of administrative law and policy.  *Ass'n of Flight Attendants-CWA, AFL-CIO v. Chao*, 493 F.3d 155, 160 (D.C. Cir. 2007); *Ayuda, Inc. v. Thornburgh*, 948 F.2d 742, 754 (D.C. Cir. 1991), *vacated on other grounds*, 509 U.S. 916 (1993).  As noted above, the import alert at issue in this case relates to the initial detention of an imported product and not its ultimate admissibility into United States commerce; thus, it has only a tentative and interlocutory effect and is in no sense "final agency action" with respect to the admissibility of any particular product or type of product offered for import.[20]  Moreover, the agency is still in the process of evaluating

---

[19]  The *Ewing* Court noted that a claimant would eventually have the opportunity to litigate any constitutional, statutory, or factual claims in the of the seizure action itself, thereby satisfying procedural due process.  *See Ewing*, 339 U.S. at 598-99.  In the import detention and refusal context, however, the government does not actually seize the goods but merely denies them access to United States commerce.  As discussed below, a foreign producer does not have any property right to have its goods enter domestic commerce.  *See infra*, at IV.

[20]  Indeed, to the extent the original complaint concerned the admissibility of any specific products offered for import, all of the entries under consideration at the time Allied's complaint was filed have been resolved in Allied's favor, rendering those aspects of this lawsuit moot.

the information submitted in support of Allied's request to be removed from DWPE under IA 16-131. Accordingly, the doctrines of ripeness and finality preclude judicial review of Allied's claims at this time. Allied's claims are also premature under the exhaustion of administrative remedies doctrine because FDA regulations require the filing of a citizen petition before bringing a challenge to federal court. 21 C.F.R. § 10.45(b). This lawsuit is therefore premature under all three of these doctrines and must be dismissed for lack of subject matter jurisdiction.

### A. Allied's Challenge is Not Ripe for Adjudication, and There has Been No Final Agency Action on Allied's Request for Removal from DWPE

Both Article III of the U.S. Constitution and the APA, 5 U.S.C. § 704, require that the agency complete its decision-making process before a plaintiff seeks judicial review.[21] The doctrine of ripeness is designed "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott*, 387 U.S. at 148-149).

The ripeness doctrine precludes premature adjudication of issues that might not require judicial review: "[a] claim is not ripe for adjudication if its rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Pfizer v. Shalala*, 182 F.3d 975, 978 (D.C. Cir. 1999) (citing *Texas v. United States*, 523 U.S. 296, 300 (1998)). As the D.C.

---

[21] The ripeness doctrine is based on Article III of the Constitution. *See Devia v. NRC,* 492 F.3d 421, 424 (D.C. Cir. 2007) ("The Supreme Court has noted that '[r]ipeness is a justiciability doctrine' that is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'") (quoting *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807-08). The APA likewise authorizes judicial review only with respect to "final agency action." 5 U.S.C. § 704. The requirement of final agency action is both part of the Article III ripeness inquiry, as discussed below, as well as an independent basis for dismissal under the APA.

Circuit candidly elaborated:

> [T]he "usually unspoken element of the rationale" is this: "If we do not decide [the claim] now, we may never need to. Not only does this rationale protect the expenditure of judicial resources, but it comports with our theoretical role as the governmental branch of last resort. Article III courts should not make decisions unless they have to." *Nat'l Treasury Emples. Union*, 101 F.3d at 1431 (citation omitted) . . . Federal courts cannot – and should not – spend their scarce resources on what amounts to shadow boxing. Thus, if a plaintiff's claim, though predominantly legal in character, depends on future events that may never come to pass, or that may not occur in the form forecasted, then the claim is unripe.

*Devia,* 492 F.3d at 424-25. The D.C. Circuit's cautionary explanation is particularly apt in this case, where Allied's request for removal from DWPE was first made only in September 2007 and remains pending before FDA, and the specific product admissibility determinations pending at the time Allied filed its complaint have since been resolved in Allied's favor. Should Allied's request for removal from DWPE be granted, it would no longer have a motivational, much less a jurisdictional, basis for pursuing this lawsuit. Thus, the rationale underlying the ripeness doctrine provides a particularly compelling argument for dismissal in this case.

Ripeness turns upon two primary considerations: (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Abbott Laboratories*, 387 U.S. at 149; *accord Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 162 (1967); *see also Nevada v. DOE*, 457 F.3d 78, 84 (D.C. Cir. 2006) (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

**1. Allied's Challenge is Not Fit for Judicial Review Because It Does Not Raise Purely Legal Questions and There is No Final Agency Action**

Whether Allied's claims are fit for judicial resolution turns upon (a) whether the claims raise purely legal questions, and (b) whether the decisions Allied wishes to challenge constitute final agency action. *Toilet Goods Ass'n*, 387 U.S. at 163-64; *Abbott Laboratories*, 387 U.S. at

149. In this case, Allied's complaint purports to challenge both the facial validity of IA 16-131 and its specific application to Allied's products. As discussed below, however, neither Allied's "facial" attack nor its "as applied" claims are currently ripe for judicial review.

First, Allied's "as applied" claims do not raise purely legal questions, but are essentially challenges to FDA's manner of implementing of IA 16-131. For example, in Count Two, Allied alleges that FDA fails to adequately oversee third party laboratories and its own compliance officers. Am. Compl. ¶¶ 82-87. In Count Four, Allied alleges that FDA has implemented a "One Test-One Report" policy, under which FDA allegedly accepts only one laboratory report per import entry. Am. Compl. ¶¶ 93-98. By their very nature, these claims cannot be evaluated as questions of law without factual context. Furthermore, whether, when, and how FDA determines it should remove Allied from DWPE (Count Three), and whether the existing data provide the agency with adequate assurance of the safety of Allied's processes and procedures, are not purely legal issues that can be resolved by the Court at this stage of proceedings, but instead are fact-intensive inquiries that must be resolved by the agency in the first instance. *See, e.g., Neb. HHS v. HHS*, 435 F.3d 326, 331 (D.C. Cir. 2006) (holding that where an agency decision requires the exercise of expertise and discretion, the court reviews the agency's final determinations as an appellate court based on the record before the agency at the time the final decision is made).

Second, there has been no adverse final agency action. Final agency action "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). FDA's detention

decisions are tentative and interlocutory. *See* 21 C.F.R. § 1.94. After a product has been detained, the owner/consignee has the opportunity to overcome FDA's initial views regarding the appearance of a violation by submitting, for example, third-party laboratory results verifying that the lot at issue does not contain violative residues. It is only after these proceedings conclude that the agency issues a final decision either admitting or refusing to admit a product into United States commerce. FDA did not refuse *any* of the lines discussed in Allied's complaint. Nor has FDA yet reached a decision on Allied's DWPE removal request. Thus, there is no adverse final agency action related to any of Allied's "as applied" challenges.

Allied's facial challenge to IA 16-131 – that the import alert is a substantive rule (Count One) – is likewise unfit for judicial resolution at this juncture and thus unripe. In similar circumstances, the D.C. Circuit has held facial attacks unripe under the fitness for resolution prong due to the lack of factual context necessary to evaluate such challenges. As the court recently explained:

> "[W]here we believed the agency's practical application of a statement would be important, we have found the issue not" fit for judicial determination. *Public Citizen, Inc. v. Nuclear Regulatory Comm'n*, 291 U.S. App. D.C. 248, 940 F.2d 679, 683 (D.C. Cir. 1991). . . . *See* . . . *Hudson v. FAA*, 338 U.S. App. D.C. 194, 192 F.3d 1031, 1034-35 (D.C. Cir. 1999) ("[W]e have often held that an early procedural challenge to a purported policy statement [on the ground that it is actually a legislative rule] is not ripe because it is not yet demonstrable that the agency intends to treat it as having the characteristics of a rule.").

*Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207, 216 & n.5 (D.C. Cir. 2007). *See also Devia*, 492 F.3d at 424 ("when an agency decision may never have 'its effects felt in a concrete way by the challenging parties,' *Abbott Labs.*, 387 U.S. at 148-49, the prospect of entangling ourselves in a challenge to such a decision is an element of the fitness determination as well").

Here too, FDA's "practical application" of IA 16-131 would inform the Court's analysis

and provide critical context to an evaluation of the import alert's legal status. Indeed, given the clearly non-mandatory, discretionary language of IA 16-131, Allied would be hard pressed to prove its claim that the alert is actually a legislative rule without producing evidence demonstrating that the agency has, in practice, treated the alert's terms as binding and mandatory. *See Hudson v. FAA*, 192 F.3d 1031, 1034 (D.C. Cir. 1999) (policy statement typically "will only reveal itself as something more than a policy statement when the agency subsequently relies on it as if it were binding *law*") (emphasis in original). As discussed below (*see infra* at III), one of the key distinctions between a substantive rule and a policy statement is whether the decisionmaker retains some discretion in making the ultimate decision, or whether the agency pronouncement "binds private parties or the agency itself with the force of law." *Cement Kiln*, 493 F.3d at 215-16 (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002)). Absent evidence of FDA's actual implementation of IA 16-131, including, at a minimum, the completion of FDA's decision-making process with respect to Allied's DWPE, evaluation of Allied's claim that the alert is a substantive rule that required notice and comment rulemaking is premature.[22]

Because FDA's communications with Allied to date regarding its DWPE removal request do not represent the consummation of the agency's process (which is still ongoing), did not finally determine any legal rights or obligations, and did not affect relevant actors' legal rights, those activities and communications do not constitute final agency action that is ripe for review.

**2. Withholding Judicial Review Will Not Cause Hardship to Allied**

Allied also has not established that it will be substantially harmed by allowing the agency's administrative process to continue – the second element of the ripeness test. "In order

[22] Further, given the concerns of judicial economy and efficiency that underlie the ripeness and finality doctrines, *see Devia*, 492 F.3d at 424-25, it would make little sense to consider Allied's "facial" challenge (Count One (APA)) while other aspects of this case remain under administrative review.

to outweigh institutional interests in the deferral of review, the hardship to those affected by the agency's action must be immediate and significant." *Devia,* 492 F.3d at 427-28 (citation omitted).

Any hardship to Allied from withholding judicial review in this case would arise solely from the wait necessitated by FDA's further review of information supporting Allied's DWPE request. But this precise situation is presented by FDA review of *any* request for removal from DWPE under an import alert (as well as many other applications and requests that require FDA consideration). There will always be a time delay while FDA reviews necessary data and information, particularly when it needs to rely on third party evaluations about a foreign company. That time-lag is an unavoidable part of the administrative review process and does not, by itself, constitute substantial hardship. *See Nevada*, 457 F.3d at 86 ("[R]equiring a party to participate in further administrative or judicial proceedings is not a hardship sufficient to outweigh a determination that an issue is unfit for review.") (quoting *Nuclear Energy Inst*., 373 F.3d at 1313). Furthermore, given that foreign producers have no property right to obtain access to domestic commerce, the challenged policy here, at the very most, "limit[s] access to a benefit created by the [statute] but not automatically bestowed" upon foreign producers. *See Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 (1993).[23]

For these reasons, Allied's claims are unripe and therefore not justiciable under Article III of the Constitution. Its amended complaint, accordingly, must be dismissed.

---

[23] As noted above, only the owner/consignee, not a foreign producer such as Allied, can receive the benefit created by statute.

**B.    Allied Has Failed to Exhaust Administrative Remedies**

Allied's complaint is also subject to dismissal for failure to exhaust administrative remedies.  Indeed, Allied has made no attempt to avail itself of, much less exhaust, the administrative remedy available to it under FDA regulations:  filing a citizen petition with FDA pursuant to 21 C.F.R. § 10.25.  Under FDA regulations, a party must first use the citizen petition process to "request that the Commissioner take or refrain from taking any form of administrative action," and that request must "be the subject of a final administrative decision based on [the citizen petition] . . . before any legal action is filed in a court."  21 C.F.R. § 10.45(b).

"The [exhaustion of administrative remedies] doctrine provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'"  *McKart v. United States*, 395 U.S. 185, 193 (1969) (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938)).  The purpose of the exhaustion requirement is to "avoid[] [the] premature interruption of the administrative process . . . to let the agency develop the necessary factual background upon which decisions should be based, [a]nd since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise."  *McKart*, 395 U.S. at 193-94; *Burt Lake Band of Ottawa & Chippewa Indians v. Norton*, 217 F. Supp. 2d 76, 78 (D.D.C. 2002) ("In cases where Congress has allocated decision-making responsibility to the Executive branch, petitioning parties are required to exhaust all available administrative remedies before seeking judicial relief.") (citation omitted), *appeal dismissed*, No. 02-5341, 2002 WL 31778064 (D.C. Cir. Dec. 4, 2002).  The exhaustion requirement also promotes judicial efficiency because the agency may decide the matter in favor of the plaintiff

and obviate the need for judicial review. *McKart*, 395 U.S. at 195.[24]

Here, where Allied has not even attempted to comply with the agency's citizen petition requirement, the exhaustion doctrine applies with particular force. As the D.C. Circuit recently explained:

> [E]xhaustion ensures that imminent or ongoing administrative proceedings are seen through to completion. But *the exhaustion rule does not contain an escape hatch for litigants who steer clear of established agency procedures altogether*. To the contrary, exhaustion is especially important where allowing the litigants to proceed in federal court would deprive the agency of any opportunity to exercise its discretion or apply its expertise. *See McCarthy*, 503 U.S. at 145 ("exhaustion principles apply with special force when 'frequent and deliberate flouting of administrative processes' could weaken an agency's effectiveness by encouraging disregard of its procedures" (quoting *McKart*, 395 U.S. at 195)).

*Ass'n of Flight Attendants*, 493 F.3d at 158-59 (emphasis added).

This Court has applied the exhaustion requirement contained in FDA regulations. For example, in *Ass'n of Am Physicians & Surgeons, Inc. v. FDA,* No. 07-0668, 2008 WL 564942 (D.D.C. Mar. 4, 2008), Judge Bates held that, where the plaintiffs had failed to establish compelling circumstances that might excuse filing a citizen petition, "the Court should not attempt to resolve these arguments before the FDA has the opportunity to apply its expertise and a record is developed." 2008 WL 564942 at *14. *See also Garlic v. FDA*, 783 F. Supp. 4 (D.D.C. 1992), *appeal dismissed*, 986 F.2d 546 (D.C. Cir. 1993); *Estee Lauder, Inc. v. FDA*, 727 F. Supp. 1, 6-7 (D.D.C. 1989); *Nat'l Gay Rights Advocates v. HHS*, No. 87-1735, 1988 U.S. Dist. LEXIS 17283, at *1-7 (D.D.C. Apr. 26, 1988) (dismissing complaint as premature for failure to file a citizen petition where plaintiffs "chose[] to ignore the administrative processes available to them by making no attempt to seek relief in this manner").

---

[24] The regulatory exhaustion requirement is not jurisdictional, and courts decline to apply it in certain circumstances. *See McCarthy v. Madigan*, 503 U.S. 140, 144-49 (1992); *Ass'n of Flight Attendants*, 493 F.3d at 159. None of those circumstances, however, are presented here.

Allied's failure to avail itself of available administrative remedies has prevented FDA from developing all the factual issues in the case, thus thwarting effective and efficient judicial review. Indeed, requiring Allied to submit a citizen petition to FDA before seeking judicial review would allow FDA to consider and address Allied's concerns about the fairness and reliability of the various steps in the agency's process for determining the admissibility of Chinese aquaculture, and could potentially resolve Allied's concerns; at the very least, the citizen petition process would crystalize the issues in contention. Because exhaustion of administrative remedies would thus promote judicial economy and aid judicial review (if any) in this case, Allied should be precluded from seeking judicial review until after it presents its claims and contentions to the agency.

## III.  IMPORT ALERT 16-131 IS NOT A SUBSTANTIVE RULE THAT REQUIRES NOTICE AND COMMENT RULEMAKING UNDER THE APA

Even if this Court had subject matter jurisdiction over this action, Count One of Allied's complaint fails to state a claim upon which relief can be granted, and is thus subject to dismissal on that basis as well. Count One alleges that IA 16-131 is a substantive rule that should have been promulgated through notice and comment rulemaking. Compl. ¶ 74. Allied seeks declaratory relief that the import alert is unlawful and an injunction preventing FDA from enforcing it. Allied is not entitled to any such relief.

Contrary to Allied's claim, IA 16-131 is not a substantive rule such as would necessitate notice and comment rulemaking. Under the APA, the publication of notice and opportunity for comment are only required for a limited subset of agency pronouncements. Rulemaking is required for "legislative" or "substantive" rules, but not for "interpretive rules" or "general statements of policy." 5 U.S.C. § 553(b)(3)(A) & (d). A rule is "legislative" only when the

"agency intends to create new law, rights, or duties." *General Motors*, 742 F.2d at 1565.

In contrast, "interpretive rules are those that merely clarify or explain existing laws or regulations." *Nat'l Med. Enters., Inc. v. Shalala*, 43 F.3d 691, 697 (D.C. Cir. 1995). Similarly, a "policy statement announces the agency's tentative intentions for the future." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986) (quoting *Pac. Gas & Elec. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974)). "By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach. The agency retains the discretion and the authority to change its position – even abruptly – in any specific case." *Sycor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997).

An agency pronouncement does not become a substantive rule "merely because it supplies crisper and more detailed lines than the authority being interpreted." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d at 1106, 1112 (D.C. Cir. 1993). The pronouncement even may have a "substantive impact" on the parties being regulated without becoming a substantive rule. *Cathedral Bluffs Shale Oil Co.*, 796 F.2d at 537 (quoting *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666, 668 (D.C. Cir. 1978)). Instead, the key distinction turns on whether the decisionmaker retains some discretion in making the ultimate decision, *id.*; or "whether the agency action binds private parties or the agency itself with the force of law." *Cement Kiln,* 493 F.3d at 215-16 (quoting *Gen. Elec.,* 290 F.3d at 382).

In drawing this distinction, the D.C. Circuit has described certain factors that may be considered. In *Am. Mining Cong.*, the court identified four criteria that indicate a rule is legislative (none of which are present in this case): (1) in the absence of the rule, no legislative basis would exist for an enforcement action; (2) the agency has published the rule in the Code of Federal Regulations ("CFR"); (3) the agency explicitly invoked its general legislative authority to

pass the rule; (4) the rule effectively amends a prior legislative rule.  995 F.2d at 1112.[25]

Here, regardless of whether IA 16-131 is characterized as an interpretive rule, a policy statement, or not a "rule" at all, IA 16-131 is certainly not a *substantive* rule.  The import alert is a mechanism for FDA headquarters to communicate information and policy to FDA field personnel and the regulated industry.  In this case, FDA headquarters gathered and analyzed data that showed a significant problem of drug/food additive residues in Chinese aquaculture and it shared such information with the field through the import alert.  The import alert also set forth information regarding particular products that may be DWPE, the data that might be sufficient to convince FDA that a particular line should be admitted, and the data that should be submitted with a request for removal from DWPE.

This communication and its contents do not constitute a substantive rule.  FDA retains the discretion to assess each situation individually and the flexibility to further develop its policies as the circumstances evolve.  Indeed, Allied itself alleges that IA 16-131 is implemented inconsistently.  *See* Am. Compl. ¶ 86.  Certainly nothing in the FDCA or APA places any limit whatever on FDA's ability to communicate with its employees who are making admissibility determinations under the FDCA.  Also, as the D.C. Circuit has recognized, written guidelines that describe how the agency intends to exercise its discretion, and that are not issued pursuant to notice and comment rulemaking, "have the not inconsiderable benefits of apprising the regulated community of the agency's intentions as well as informing the exercise of discretion by agents and officers in the field."  *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987).

---

[25]  Similarly, in *Cement Kiln,* the court described the factors (albeit in the context of the Resource Conservation and Recovery Act) as "(1) the Agency's own characterization of the action; (2) whether the action was published in the Federal Register or Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency."  493 F.3d at 226-27.

As noted, none of the indicia of rulemaking identified in *Am. Mining Cong.*, 995 F.2d at 1112, apply to IA 16-131: in its absence, FDA has the same authority granted by the FDCA to detain imported goods; the import alert was not published in the CFR; FDA did not invoke its legislative authority; and the rule did not amend a prior legislative rule. Nor does IA 16-131 have a "binding effect" on private parties or the agency. *See Cement Kiln,* 493 F.3d at 226-27. To the contrary, because IA 16-131 relates to detention, and not to the final admission or refusal of a product into United States commerce, it has only a "tentative effect." *See Pacific Gas & Elec.*, 506 F.2d at 38-39; *Professionals and Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995). If a product is detained based on the information in IA 16-131, the importer has the opportunity to overcome any presumption of the appearance of a violation by submitting, for example, third-party laboratory results verifying that the detained lot does not contain violative residues.

Courts have found that, where a pronouncement sets forth a rebuttable presumption that may be challenged in individual proceedings, it is not a binding rule. *Panhandle Producers v. Econ. Reg. Admin.*, 847 F.2d 1168, 1174-75 (5th Cir. 1988 ); *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377-78 (11th Cir. 1983). Moreover, if FDA ultimately decides to refuse admission to a particular product, the decision can be appealed administratively within the agency. *See* 21 C.F.R. §§ 10.33, 10.75; RPM Chap. 9-9. Thus, IA 16-131 does not create binding law because it is not "finally determinative" of whether a particular importation will be admitted or released into United States commerce. *See Pacific Gas & Elec.*, 506 F.2d at 38; *see also Am. Mining Cong. v. Marshall*, 671 F.2d 1251, 1263 (10th Cir. 1982) (because affected parties will still have opportunity to challenge ultimate determination, the pronouncement "does not finally affect [their] rights and obligations").

IA 16-131 also does not impose any new obligations or requirements beyond the existing statutory requirements on foreign producers or importers, or on FDA personnel. Importers remain subject to the exact same statutory obligation – that they refrain from importing adulterated food into the United States. And FDA continues to exercise the same authority – to refuse admission to any product that "appears" to be adulterated or otherwise violative of the FDCA. 21 U.S.C. § 381(a). Nothing in the import alert "cabin[s]" the agency's discretion to determine whether to admit or refuse any aquaculture product. *See Cmty. Nutrition Inst.*, 818 F.2d at 948 ("cabining of an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule"). Although the import alert provides crisper details regarding the possible treatment, at the detention stage, of Chinese aquaculture products, FDA nevertheless relies on the same statutory standard to reach its ultimate admissibility determination.

Indeed, it is clear from even a cursory examination of the actual language of IA 16-131 that the alert is – and is meant to be – nothing more than an expression of a non-binding policy on import compliance activities. The import alert provides:

> GUIDANCE:  Districts may detain without physical examination, all shipments of aquacultured catfish, Basa (Pangasius sp), shrimp, dace, and eel from the People's Republic of China (CN) . . . .

Ex. 1 at 4. The use of the words "Guidance" and "may" clearly demonstrates that the document is not intended to be a binding directive. *See Cathedral Bluffs Shale Oil Co.*, 796 F.2d at 537-38 (the agency's characterization of the pronouncement, and the language of the statement itself, such as the choice between the words "may" and "will," are significant in determining whether the pronouncement is a substantive rule).

FDA's description of the process for obtaining removal from DWPE under IA 16-131 likewise embodies discretion. The alert explains that FDA will remove a firm from DWPE if the

agency has confidence that a "manufacturer has the appropriate controls and processes in place to ensure the quality of the product." IA 16-131. The alert then describes the information that FDA believes would be the most useful in making that assessment. These statements do not even approach the type of mandatory requirements that characterize a substantive rule. Rather, they merely describe – for both industry and agency personnel – how the agency may exercise its discretion with respect to requests for removal from DWPE. Indeed, just as an agency's exercise of discretion is not judicially reviewable, *see supra* at I.A., so are courts particularly reluctant to require rulemaking regarding policy statements that relate to the exercise of such discretion. *See Cathedral Bluffs Shale Oil Co.*, 796 F.2d at 538; *Professionals and Patients for Customized Care*, 56 F.3d at 600-01. The same analysis applies to FDA's description of the data that should be submitted to secure the release of a detained shipment; IA 16-131 simply provides useful information concerning the manner in which FDA may exercise its discretion when applying the requirements of the FDCA to specific seafood products.

The discretionary, non-mandatory language of IA 16-131 distinguishes it from the FDA import alert at issue in *Bellarno Int'l Ltd. v. FDA*, 678 F. Supp. 410 (E.D.N.Y. 1988), which was held to be a binding legislative rule subject to notice and comment rulemaking. The import alert in *Bellarno* used the words "automatically" and "shall," *id.* at 415, leading the court to find that it was a mandatory directive, not discretionary guidance, and was binding on both the agency and importers. *Id*. at 414. The court also cited a contemporaneous memorandum issued by the agency which provided that "[t]here should be no exceptions to strict enforcement." *Id.* at 415. Here, by contrast, IA 16-131 employs discretionary, non-mandatory language, providing that "[d]istricts *may* detain . . ." and importers "*should* provide . . . ." Indeed, as noted above, Allied itself acknowledges that IA 16-131 has not been implemented uniformly by FDA field personnel,

thus confirming its non-mandatory nature.  *See* Am. Compl. ¶ 86.

The import alert in *Bellarno* also contained requirements for overcoming detention that went beyond satisfaction of the statutory standard, such as establishing a "complete chain of custody" and a "satisfactory reason for return of the goods."  *Id.* at 411-12.  When the plaintiff was unable to produce the complete chain of custody, FDA was unwilling to consider alternative evidence, such as testing to confirm the products' safety and purity.  *Id*. at 412.  The *Bellarno* court thus found that the agency had created a new obligation (*i.e.*, acquiring and maintaining a paper chain of custody) with which importers had to comply to satisfy the statutory requirements.  678 F. Supp. at 414 & n.4.  IA 16-131, by contrast, recommends, but does not require, that an importer may seek to overcome the appearance of a violation by submitting samples that confirm the absence of certain frequently found contaminants, thereby demonstrating that the lot is not adulterated.  Thus, IA 16-131 imposes no obligation beyond that which the statute already imposes on the importer – to refrain from importing adulterated foods.  Therefore, the specific facts in *Bellarno* prevent any useful comparison between the two cases.

For all of the reasons set forth above, IA 16-131 is not a legislative rule that required notice and comment rulemaking under the APA.  Accordingly, Count One of Allied's complaint fails to state a claim as a matter of law and should be dismissed.

## IV.    ALLIED CANNOT CHALLENGE THE IMPORT ALERT AS A VIOLATION OF DUE PROCESS

Count Four of Allied's complaint is inconsistently plead.  Allied claims that certain procedures that FDA allegedly employs to determine the admissibility of food products violate the Due Process Clause of the Fifth Amendment.  Am. Compl. ¶¶ 93-94, 97-99.  However, in terms of relief, Allied seeks a wholesale invalidation of IA 16-131 (Compl. Count Four

Wherefore Clause) even though the alleged policies and procedures of which Allied complains (*see* Am. Compl. ¶¶ 97-99) are not contained in IA 16-131. Thus, on the one hand, if Allied intends to challenge certain, specific methods for gathering data that are not discussed in IA 16-131, it does not follow that the appropriate relief would be invalidation of IA 16-131. On the other hand, if Allied intends to allege that DWPE as a whole is illegal, its allegations do not support that claim. Either way, however, Allied's due process claim fails as a matter of law because Allied has no property right to have its products enter United States commerce.

A plaintiff's "federal constitutional claim depends on [its] having had a property right . . . ." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985). Thus, only if Allied can identify a cognizable property or liberty interest need the Court even address the question of "what process is due." *Id*. at 541 (citation omitted). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). That claim of entitlement is not derived from the Constitution itself but stems from sources such as federal law, state law, and contracts. *Id*.

It has long been established that there is no property right to import products into the United States. Congress has "complete power" over "foreign commerce." *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904). No individual has a "vested right" that limits this power. *Id. See also Bd. of Trs. v. United States*, 289 U.S. 48, 57 (1933) ("No one can be said to have a vested right to carry on foreign commerce with the United States."); *Arjay Assocs., Inc. v. Bush*, 891 F.2d 894, 896 (Fed. Cir. 1989) ("It is beyond cavil that no one has a constitutional right to conduct foreign commerce in products excluded by Congress."). Consequently, "a statute which restrains the introduction of particular goods into the United States from considerations of public

policy does not violate the due process clause of the Constitution." *Buttfield*, 192 U.S. at 493; *see also Gilda Indus. v. United States*, 446 F.3d 1271, 1284 (Fed. Cir. 2006) ("It has long been settled that executive actions involving foreign trade, such as the imposition of tariffs, do not constitute the taking of property without due process of law."). Furthermore, Congress may delegate its discretion to exclude imports to federal agencies. *Buttfield*, 192 U.S. at 496.

In the instant case, Allied alleges that "[t]he detention and subsequent refusal of foodstuffs constitutes the deprivation of property." Am. Compl. ¶ 96. Even if the government refuses to admit Allied's products into United States commerce, however, the products may be re-exported, meaning Allied would suffer no "deprivation" beyond the costs associated with this process. In any event, the law is clear that Allied has no "right" to import and cannot mount a due process challenge to restrictions on importation. *Buttfield*, 192 U.S. at 496-97; *see also Ganadera Industrial, S.A.*, 727 F.2d at 1160 ("[the foreign producer]'s due process argument must fail because [it] has no constitutionally-protected right to import into the United States. The Supreme Court has stated: No one can be said to have a vested right to carry on foreign commerce with the United States.") (citation omitted).

Nor did Congress grant any procedural rights to foreign producers in the context of FDA import proceedings. Although the FDCA sets forth certain hearing procedures in connection with goods proposed to be imported, they are applicable only to the "owner or consignee" of the goods. 21 U.S.C. § 381(a); *see also* 21 C.F.R. § 1.94. Thus, a foreign producer, such as Allied, that is not the "owner or consignee" of the goods once they reach the United States, does not have any statutory procedural rights. Even if Allied did have such a right, however, the Court would not need to evaluate it in connection with the instant case because Allied's complaint does not cite any particular deprivation it has suffered with respect to its attempt to import a specific

product. Instead, Count Four seeks a declaration that IA 16-131 violates the Constitution. This, however, is precisely the sort of broad challenge to the federal government's authority to restrict imports that has long been precluded under *Buttfield* and its progeny.

## CONCLUSION

For the foregoing reasons, Allied's complaint should be dismissed for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

Of Counsel:

JAMES C. STANSEL
Acting General Counsel

GERALD F. MASOUDI
Associate General Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

KAREN E. SCHIFTER
Associate Chief Counsel, Litigation
U.S. Dept. of Health & Human Services
Office of the General Counsel
5600 Fishers Lane
Rockville, MD 20857
(301) 827-1152

March 12, 2008

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

C. FREDERICK BECKNER III
Deputy Assistant Attorney General

EUGENE M. THIROLF
Director

/s/
ANDREW E. CLARK
Senior Trial Counsel
Office of Consumer Litigation
U.S. Department of Justice
PO. Box 386
Washington, D.C. 20044
(202) 307-0067
andrew.clark@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a copy of the foregoing Motion to Dismiss Amended Complaint, Memorandum in Support of Defendants' Motion to Dismiss Amended Complaint, and (proposed) Order to be served via the District Court's electronic filing (ECF) system upon:

Eric W. Bloom
WINSTON & STRAWN, LLP
1700 K Street, NW
Washington, D.C. 20006
*Counsel for Plaintiff Allied Pacific Food (Dalian) Co., Limited*

this 12th day of March, 2008.

/s/
Andrew E. Clark

# EXHIBIT 1

IA #16-131, 8/3/07, IMPORT ALERT #16-131, "DETENTION WITHOUT PHYSICAL EXAMINATION OF AQUACULTURED CATFISH, BASA (Pangasius sp), SHRIMP, DACE, AND EEL PRODUCTS FROM THE PEOPLE'S REPUBLIC OF CHINA DUE TO THE PRESENCE OF NEW ANIMAL DRUGS AND/OR UNSAFE FOOD ADDITIVES", ATTACHMENT 9/18/07

NOTE: This revision includes additional sampling guidance. Changes are bracketed by asterisks.

TYPE OF ALERT: DETENTION WITHOUT PHYSICAL EXAMINATION (DWPE)

(Note: This import alert represents the Agency's current guidance to FDA field personnel regarding the manufacturer(s) and/or products(s) at issue. It does not create or confer any rights for or on any person, and does not operate to bind FDA or the public).

PRODUCT: Aquacultured seafood products

PRODUCT CODE:

Catfish (Ichtalurus sp.)
16X[][]02
16A[][]10, 16B[][]10, 16C[][]10, 16I[][]10, 16S[][]10
16A[][]67, 16B[][]67, 16C[][]67, 16I[][]67, 16S[][]67

Shrimp
16X[][]21
16J[][]05, 16K[][]05, 16L[][]05

Basa (Pangasius sp.)
16X[][]43
16A[][]82, 16B[][]82, 16C[][]82, 16I[][]82, 16S[][]82

Dace - 16A[][]57, 16B[][]57, 16C[][]57, 16I[][]57, 16S[][]57

Eel - 16A[][]15, 16B[][]15, 16C[][]15, 16I[][]15, 16S[][]15

Aquaculture Harvested Fishery/Seafood Products, N.E.C.
16X[][]99

(*Dace and eel may also be coded as aquaculture harvested product, N.E.C.; i.e. 16X[][]99)

PROBLEM: Unapproved drug residues
Unsafe food additives

PAF:            ANT (Drug residues)
                FAD (Food Additive)

PAC:            04018

COUNTRY:        China, People's Republic of (CN)

MANUFACTURER
FEI#:           All

IMPORTER'S
ID#:            N/A

CHARGES:        "The article is subject to refusal of admission pursuant to
                Section 801(a)(3), in that it appears to bear or contain a
                food additive that is unsafe within the meaning of Section
                409 [Adulteration, Section 402(a)(2)(C)(i)]."
                (OASIS CHARGE CODES:  UNSAFE ADD)

                          AND/OR

                "The article is subject to refusal of admission pursuant to
                Section 801(a)(3), in that it appears to bear or contain a
                new animal drug (or conversion product thereof) that is
                unsafe within the meaning of Section 512 [Adulteration,
                Section 402(a)(2)(C)(ii)]."
                (OASIS CHARGE CODES:  VETDRUGRES)

RECOMMENDING
OFFICE:         OFS/DSS, HFS-325
                OC/DE, HFS-606

REASON FOR
ALERT:          There has been extensive commercialization and increased
                consumption of aquaculture seafood products worldwide.
                Aquacultured seafood has become the fastest growing sector
                of the world food economy, accounting for approximately half
                of all seafood production worldwide.  Approximately 80% of
                the seafood consumed in the U.S. is imported from
                approximately 62 countries. Over 40% of that seafood comes
                from aquaculture operations.  As the aquaculture industry
                continues to grow and compete with wild-caught seafood
                products, concerns regarding the use of unapproved animal
                drugs and unsafe chemicals and the misuse of animal drugs in
                aquaculture operations have increased substantially.

                China is the largest producer of aquacultured seafood in the

world, accounting for 70% of the total production and 55% of the total value of aquacultured seafood exported around the world. China is currently the third largest exporter of seafood to the U.S. Shrimp and catfish products represent two of the top ten most consumed seafood products in the U.S.

The use of unapproved antibiotics or chemicals in aquaculture raises significant public health concerns. There is clear scientific evidence that the use of antibiotics or chemicals, such as malachite green, nitrofurans, fluoroquinolones, and gentian violet during the various stages of aquaculture can result in the presence of residues of the parent compound or its metabolites in the edible portion of the aquacultured seafood. The presence of antibiotic residues may contribute to an increase of antimicrobial resistance in human pathogens. Moreover, prolonged exposure to nitrofurans, malachite green, and gentian violet has been shown to have a carcinogenic affect.

In the United States, use of malachite green, nitrofurans, fluoroquinolones, or gentian violet as drugs in food-producing animals would require an approved new animal drug application under Section 512 of the Federal Food, Drug, and Cosmetic Act (FFDCA). FDA has not approved these antibiotics for use as drugs in aquacultured animals. Therefore, if they are used in aquaculture with an intent that they treat disease in, or affect the structure or function of, any aquacultured animal, they are considered to be unsafe new animal drugs within the meaning of Section 512, and the presence of their residues in seafood adulterates the seafood under 402(a)(2)(C)(ii) of the FFDCA.

Furthermore, malachite green, nitrofurans, fluoroquinolones and gentian violet are not generally recognized as safe under any conditions of intended use that may reasonably be expected to result in their becoming a component of food. Therefore, if intended for any such use, they are unsafe food additives within the meaning of section 409 of the FDCA and would render the food adulterated under section 402(a)(2)(C)(i).

FDA has several existing Import alerts related to unapproved drugs in seafood dating back to November of 2001 (IA #16-124 DWPE of Seafood Products Due to Unapproved Drugs, IA #16-129 DWPE of Seafood Products Due to Nitrofurans, and IA #16-130 DWPE of Eel from China Due to the presence of Malachite

Green). Based on an increased monitoring of imported aquacultured seafood from October 1, 2006, through May 31, 2007, FDA continued to find residues of unapproved new animal drugs and/or unsafe food additives in seafood imported from China. During that period, FDA tested 89 samples consisting of catfish, Basa, shrimp, dace and eel from China. Twenty two (22) of the 89 samples (25%) were found to contain drug residues. These residues include nitrofurans detected in shrimp at levels above 1 ppb; malachite green detected in dace, eel and catfish/Basa fish at levels ranging from 2.1 to 122 ppb; gentian violet detected in eel and catfish at levels ranging from 2.5 ppb to 26.9 ppb and fluoroquinolones in catfish/Basa at level ranging from 1.9 to 6.5 ppb. Furthermore, Chinese authorities have acknowledged permitting the use of fluoroquinolones in aquaculture

Although the use of some animal drugs (nitrofurans and malachite green) in aquaculture has been prohibited by Chinese authorities since 2002, FDA continues to find residues of these and other animal drugs in shipments of aquacultured seafood products from China.

GUIDANCE: Districts may detain without physical examination, all shipments of aquacultured catfish, Basa (Pangasius sp), shrimp, dace, and eel from the People's Republic of China (CN) except for the firms identified on the attachment to this alert.

Screening criteria has been set into OASIS.

If a firm, shipper, or importer believes that their product should not be subject to detention under this import alert they should forward information supporting their position to FDA at the following address:

Food and Drug Administration
Division of Import Operations and Policy (HFC-170)
5600 Fishers Lane, Room 12-36
Rockville, MD 20587

In order to secure release of an individual shipment subject to this Import Alert, the importer should provide the results of a third-party laboratory analysis of a representative sample of the lot verifying that products do not contain malachite green and its metabolite leucomalachite green, nitrofurans, gentian violet,

leucogentian violet or fluoroquinolones. The chart provided below identifies which residues should be screened for each species.

Third-party laboratories may use any methods that are found acceptable to FDA. (e.g., see http://www.cfsan.fda.gov/seafood1.html

The following residues should be tested for each species.

| SPECIES | RESIDUE |
|---|---|
| Catfish, Basa, and Other Pangasius | Malachite Green<br>Fluoroquinolones<br>Gentian Violet |
| Shrimp | Malachite Green<br>Fluoroquinolones<br>Nitrofurans<br>Gentian Violet |
| Dace | Malachite Green<br>Gentian Violet |
| Eel | Malachite Green<br>Gentian Violet |

*** NOTE: The samples taken should be representative of the shipment. The following provides guidance on what may be considered a representative sample.

Import sampling plan

Single product type entry

Shrimp The sample should consist of a minimum of 12 sub-samples. When an entry consists of multiple lines of similar products (e.g., multiple sizes of headless shrimp), the sample should be representative of the entire entry and should be collected across all lines, with a minimum of two sub-samples per line. The sampling should be proportional based on the quantity of product (e.g. more sub-samples should be obtained from larger lines, fewer sub-samples from smaller lines). Obtaining 12 sub-samples from a single line or a limited number of lines when multiple

lines of similar products are offered for the entry will not provide a representative sample for that entry.

If an entry contains only one line of aquacultured product, then a minimum of 12 sub-samples should be obtained from that single line. If the entry includes multiple date codes, the sample should reflect a range of date codes (e.g., all sub-samples should not be collected from a single date code).

Each sample should consist of 12 sub-samples, minimum 225g (0.5 lb.) per sub-sample, total 2.7 kg (6.0 lb.) of product. If the product unit size is larger than 225g (0.5 lb.) and less than or equal to 3 lb., collect one product unit per sub-sample. If the unit size is less than 225g. (0.5 lb.), collect an adequate number of units so that the amount collected per sub-sample equals a minimum of 225 grams (0.5 lb.).

For units (block frozen) larger than 3 lbs. only: If the units must be sampled and shipped intact, collect 6 sub-samples (units). Alternatively, sub-samples of at least 225g (0.5 lb.) may be broken/sawed off (keep frozen) from each of 12 units, and the twelve (12) 225 g sub-samples shipped to the analyzing lab.

Analysis for Nitrofuran should be conducted on individual subsamples.

Analyses for all other residues should be conducted on a composite sample.

Catfish, Basa, Dace, Eel

The sample should consist of a minimum of 12 sub-samples and be representative of the entry. If the entry contains multiple lines, each line should be sampled separately. A sample, consisting of a minimum of 12 sub-samples, should be collected from each line. If the entry consists of multiple date codes, the samples should be representative of a range of date codes. Analyses should be conducted on a composite sample from each line.

Each sample should consist of a minimum of 12/225 gram (0.5 lb.) sub-samples, totaling 2.7 kg (6.0 lb.) of product. If the container size is larger than 225 grams (0.5 lb.),

collect one container per sub-sample.  If the container is
less than 225 grams (0.5 lb.), collect an adequate number of
containers so that the amount collected per sub-sample
equals a minimum of 225 grams (0.5 lb.).

Mixed products entry

If the entry consists of mixed aquacultured seafood
products, a minimum of 12 sub-samples should be obtained
from each line.  For example, if an entry includes one line
of headless shrimp and one line of basa fillets, two samples
should be obtained   one sample, consisting of a minimum of
12 sub-samples, of shrimp; and one sample, consisting of a
minimum of 12 sub-samples, of basa.

Analyses should be conducted on a sample from each line as
described above, depending on the commodity.***

Sample Preparation

Prepare one composite from an equal amount of each subsample
for the testing of malachite green, fluoroquinolones, and
gentian violet.

Shrimp are to be analyzed on an individual sub basis for
nitrofurans.  When sampling guidance directs the collection
of six subsamples, two portions from each of the six
subsamples should be individually analyzed. ***

For questions or issues concerning science, science policy,
analysis, preparation, or analytical methodology, contact
the Division of Field Science at (301) 827-7605.

In order to remove a firm from detention without physical
examination, information should be provided to FDA to
adequately assess whether a manufacturer has the appropriate
controls and processes in place to ensure the quality of the
product, the firm or shipper should provide the following
information (In English):

1)    Documentation showing that a minimum of five (5)
      consecutive entries have been released by FDA based on
      third-party laboratory analysis of a representative
      sample of the lot verifying that products do not
      contain malachite green and its metabolite
      leucomalachite green, nitrofurans, gentian violet,
      leucogentian violet and fluoroquinolones.  The chart

provided above identifies which residues should be screened for each species. Third-party laboratory must use methods acceptable to FDA (e.g., see http://www.cfsan.fda.gov/seafood1.html);

and

2) Documentation, from an appropriate third-party (e.g. a government inspection authority such as AQSIQ) demonstrating that an inspection of the processor was conducted and that the seafood was processed in accordance with FDA's Seafood HACCP regulations, 21 CFR part 123, including controls for aquaculture drugs. See 21 CFR 123.12(a).

Documentation should include test results of any products sampled during the course of the inspection, demonstrating that the products do not contain malachite green or its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet or fluoroquinolones.

and

3) Documentation that the processor is in compliance with all Chinese government requirements for exporting aquacultured seafood to the U.S.

Documentation should include copies of any registration that may be required by the Chinese government.

All requests for removal (exemption) from DWPE will be forwarded by DIOP to CFSAN (HFS-606) for evaluation.

PRIORITIZATION GUIDANCE: I

FOI: No purging required

KEYWORDS: Nitrofurans, Fluoroquinolones (ciprofloxacin and enrofloxacin), malachite green, leucomalachite green, gentian violet, aquaculture,

PREPARED BY: Barbara Montwill, CFSAN/OFS/DSS/SAPB (HFS-325), 301-436-1426
Giselle Jordan, CFSAN/OC/DE/PAB (HFS-606), 301-436-1576

Ted Poplawski, DIOP, (301) 443-6553

REVISED BY: Virginia L. Meeks, DIOP, (301) 594-3845

DATE LOADED INTO FIARS: August 3, 2007

ATTACHMENT TO IMPORT ALERT #16-131 9/18/07

Firms and products exempt from DWPE recommendation

| FIRM | PRODUCT/PRODUCT CODE |
|---|---|
| Zhangjiang Guolian Aquatic Products Co., Ltd.<br>6 Yongping S. Rd.<br>Pingle Industry Development Region<br>Zhangjiang, Guangdong, China<br>FEI# 3004097215 | Shrimp<br>16J[][]05/16K[][]05<br>16L[][]05/16X[][]21<br>9/18/07 |



DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service
Food and Drug Administration

# Memorandum

Date: June 5, 2007

From: Director, Office of Compliance, Center for Food Safety and Applied Nutrition, HFS-600

Subject: Countrywide Detention without Physical Examination for Aquacultured Catfish, Basa, Shrimp, Tilapia, Dace, and Eel from China Due to the Presence of Unapproved New Animal Drugs and Unsafe Food Additives - ACTION

To: Associate Commissioner for Regulatory Affairs, HFC-1

Thru: Director, Center for Food Safety and Applied Nutrition, HFS-1

## ISSUE

The Center for Food Safety and Applied Nutrition (CFSAN) believes action must be taken now to preclude entries of aquacultured catfish, basa, shrimp, tilapia, dace, and eel imported from China into the United States (U.S.).

## BACKGROUND

There has been an extensive commercialization and an increased consumption of aquacultured seafood products worldwide. Aquacultured seafood is the fastest growing sector of the world food economy, accounting for approximately half of all seafood production worldwide. Approximately 80% of the seafood consumed in the U.S. is imported from approximately 62 countries. Over 40% of that seafood comes from aquaculture operations. As the aquaculture industry continues to grow and compete with wild-caught seafood products, concerns regarding the use of unapproved new animal drugs and unsafe chemicals and the misuse of approved animal drugs in aquaculture operations have increased substantially.

China is the largest producer of aquacultured seafood in the world, accounting for 70% of the total production and 55% of the total value of aquacultured seafood exported around the world. China is currently the third largest exporter of seafood to the U.S. and its exports include shrimp, catfish, and tilapia. These three products represent three of the top ten most consumed seafood products in the U.S. China, with its large and expanding aquaculture industry, may soon bypass Canada and Thailand to become the largest exporter of seafood into the U.S.

From October 1, 2006, through April 30, 2007, FDA repeatedly found residues of unapproved new animal drugs or unsafe food additives in aquacultured seafood products imported from China. The residues include nitrofurans, malachite green,

gentian violet, and fluoroquinolones. These residues have been found in catfish, basa, dace, tilapia, shrimp, and eel. None of these substances is approved for use in aquacultured products in the U.S.

In 2006, FDA put into place a countrywide DWPE for eel from China due to the presence of malachite green. FDA continues to find unapproved new animal drugs and unsafe food additives in eel offered for import into the U.S.

Although the use of some unapproved new animal drugs (nitrofurans and malachite green) has been prohibited by Chinese competent authorities since 2002, FDA and other governments continue to find these and other unapproved new animal drugs and unsafe food additives in shipments of aquacultured products from China.

## HUMAN HEALTH CONCERNS

The use of unapproved or misused new animal drugs and unsafe food additives in aquacultured seafood products raises significant public health concerns. There is clear scientific evidence that the use of these substances during the various stages of aquaculture can result in the presence of residues of the parent compound or their metabolites in the edible portion of the aquacultured products. This may have an impact on the safety of these products for consumers.

One concern is the immediate and long-range human health implications associated with the misuse of antibiotics, for example, fluoroquinolones, and their subsequent residual presence in aquacultured products. This practice may contribute to an increase of antimicrobial resistance in human pathogens.

Another concern is the risk of exposing consumers to suspected carcinogens such as nitrofurans, malachite green, or gentian violet. Nitrofurans are considered to be carcinogenic and genotoxic. Nitrofurans are rapidly metabolized in fish and human bodies and bind to fish and human tissue.

Malachite green and its metabolite, leuchomalachite green, have been shown to be multi-organ toxins in animal research studies. The potential carcinogenic toxicity of the compounds increases with exposure.

Fluoroquinolones and nitrofurans have been specifically prohibited from extra label use by veterinarians in food producing animals in the U.S [21 CFR 530.41]. This further demonstrates our safety concerns for the use of these compounds.

All substances used as aquaculture drugs in food producing animals in the U.S. are required to be the subject of an approved new animal drug application (NADA) under Section 512 of the Federal Food, Drug and Cosmetic Act (FFDCA). The presence of unapproved new animal drug residues in edible tissue (in this case seafood) causes the food to be adulterated within the meaning of Section 402(a)(2)(C)(ii) of the FFDCA. Because these drugs are not the subject of an approved new animal drug application for any aquacultured seafood, no tolerance has been established for these compounds

in aquacultured seafood; therefore, any detectable amount found in the aquacultured seafood would be a violation.

Fluoroquinolones, nitrofurans, malachite green, and gentian violet also are not generally recognized as safe when used in a manner that could reasonably be expected to result in their becoming a component of an aquacultured seafood product, nor are they approved for such use. Therefore, when used in this manner, these compounds are unsafe food additives within the meaning of Section 409 of the FFDCA.

## COMMERCIAL IMPORTATION AND  ENTRY VIOLATIONS

From October 1, 2006, through April 30, 2007, FDA repeatedly found residues of unapproved new animal drugs and unsafe food additives in aquacultured products imported from China.  During that period, FDA tested 145 samples of catfish, basa, tilapia, shrimp, dace, and eel from approximately 3,473 entries of seafood from China. Twenty of the samples were found to contain an unapproved new animal drug residue or unsafe food additive (14%).  The substances found include: nitrofurans in shrimp at levels above 1 ppb; malachite green in dace, tilapia, eel, and catfish at levels ranging from 2.1 ppb to 19.1 ppb; and gentian violet in eel at levels ranging from 17.0 ppb to 26.9 ppb.  None of the substances is approved for use in aquacultured products in the U.S.  (**See TAB A**).

From October 1, 2006, to April 30, 2007, roughly 365 catfish, basa, shrimp, tilapia, dace, and eel processing firms in China offered products for import into the U.S.  These processors are located in 13 provinces along the eastern shore in mainland China.  The 20 violative samples discussed above were shipped by 18 firms.  These firms are located in the following nine provinces: Fujian (1 firm), Guangdong (7), Guangxi (1), Hainan (2), Jiangsu (2), Jiangxi (2), Lianoning (1), Zhejiang (1), and Shanghai (1) (autonomous city).  **(See TAB B & C)**.

Currently, there are 32 seafood processors from China listed on three FDA active Import Alerts (IA) due to the presence of unapproved new animal drugs or unsafe food additives in species covered by this memorandum.  The three IAs are as follows:
- IA#16-124 for unapproved animal drugs in seafood products[1]
- IA#16-129 for nitrofurans in shrimp[1]
- IA#16-130 for malachite green in eel[2]

Unapproved new animal drug residues and unsafe food additives have also been found in testing performed by other government agencies.  On April 25, 2007, the Alabama Department of Agriculture and Industry issued a "stop-sale order" on imported Chinese catfish due to contamination with fluoroquinolones, specifically enrofloxacin.  Twenty samples of catfish were collected for analysis by the Alabama Department of Agriculture and Industry's Food and Drug Laboratories, between February 13 and March 29, 2007.  Fourteen of the 20 samples (70%) were contaminated with

---

1 Chinese firms currently listed on 16-124 and 16-129 will be transferred to this Import Alert
2 Upon issuance of this Import Alert, IA#16-130 will be cancelled

fluoroquinolones at levels ranging from 1.14 to 20.6 ppb. (**See TAB G**). 43% of the results meet or exceed 5 ppb, which is FDA's limit of detection. We note that FDA has not reviewed the worksheets for these samples.

During a recent 12 month period (April 1, 2006 to March 31, 2007), the Canadian Food Inspection Agency (CFIA) found aquacultured seafood products from China to be contaminated with nitrofuran or malachite green residues. Fifty-eight shipments were rejected due to nitrofurans and 15 shipments were rejected due to malachite green, out of a total of 678 shipments examined (11%). These rejections included one shipment of catfish, two shipments of tilapia, and five shipments of dace due to malachite green; and 47 shipments of shrimp and three shipments of eel due to nitrofurans. FDA has not reviewed the worksheets for these samples. Currently, 22 processors are listed on the CFIA Import Alert list of Chinese processors/shippers with violative product. Of these processors, three are listed on FDA's active import alerts and five have shipped product into the U.S. over the last six months. (**See TAB E & F**).

**CHARGES**

CFSAN has determined that the appropriate charges to be used in the country-wide Import Alert (**see TAB H**) are as follows:

"The article is subject to refusal of admission pursuant to Section 801(a)(3), in that it appears to bear or contain a food additive that is unsafe within the meaning of Section 409 [Adulteration, Section 402(a)(2)(C)(i)]."

AND/OR

"The article is subject to refusal of admission pursuant to Section 801(a)(3), in that it appears to bear or contain a new animal drug (or conversion product thereof) that is unsafe within the meaning of Section 512 [Adulteration, Section 402(a)(2)(C)(ii)]."

**CHINA'S CONTROLS**

FDA has information from two sources to suggest that China does not have an adequate system in place to ensure that aquacultured seafood intended for the U.S. market is free from unapproved new animal drugs and unsafe food additives.

In September 2006, a team of experts from the then-Office of Seafood visited China to evaluate China's overall control of drug usage in aquacultured products. The FDA team concluded that China's current residue control program for products exported to the U.S. is not effective. Observations noted during the visit include the following: organized groups forging Sanitary or Export Certificates; shipments originating from untraceable lots; identified adulterated lots diverted into domestic market distribution, with no further controls to prevent export; and uncertified servicing laboratories performing sampling and analysis of drug residues. The expert team also found that there is no preventative system in place whereby the aquaculture industry (e.g.,

farmers, processors, and exporters) are trained on food safety issues as it relates to aquaculture operations. (**See TAB D**).

On May 22, 2007 representatives of CFSAN and CVM met with representatives of the General Administration of Quality Supervision, Inspection and Quarantine of the People's Republic of China (AQSIQ), lead by Li Yuanping, Director General of the Import and Export Food Safety Bureau. During the meeting, Mr. Li asserted that aquacultured products legally exported from China are tested for malachite green and nitrofurans, and, consequently, any positive findings by FDA for these substances in aquacultured product would have had to been in product illegally shipped from China. Mr. Li acknowledged that that statement suggests that a very considerable proportion of aquacultured product leaving China is moving through illegal channels. He indicated that enterprising individuals in China had apparently founds ways to illegally exploit the differences between Chinese and U.S. control systems (e.g., AQSIQ reliance on testing and certificates for export control and U.S. disregard for certificates, differences in drugs that are approved for use and therefore available to the grower). He suggested that if FDA demanded AQSIQ certificates as a condition of entry for all Chinese aquacultured products, the problem with unapproved aquaculture drugs in these products would be solved.

The FDA representatives explained that review of certificates is logistically problematic for FDA because of: 1) the large number line items received from China and the need to compare certificates to entry documents to ensure that all line items are covered; 2) the fact that much entry decision making is done electronically, making paper certificates incompatible with the process; 3) the possibility of certificate falsification. The FDA representatives further pointed out that certificate falsification was acknowledged as a problem during the September 2006 audit. The AQSIQ representatives reconfirmed the problem. The FDA representatives also explained that FDA could not make demands at time of entry for certificates or other evidence that the product was not adulterated until a determination had been made by the agency that there was an appearance of adulteration for all such products, which would ordinarily result in a country-wide Import Alert instructing detention without physical examination. It was further explained that FDA was exploring with other countries the establishment of a system whereby the Competent Authority (CA) would provide, and periodically update, a list of firms in regulatory good standing with the CA. U.S. importers with submit an attestation code on entry documents indicating that the product that they were offering for entry was from a firm on the CA's list. FDA would then take that information into account when making its entry decision.

The FDA representatives explained that, while no decision had yet been reached by the agency with respect to Detention without Physical Examination for Chinese aquacultured products, should a decision be reached to proceed with such an action, it might be possible to accept listing of an exporter on an AQSIQ list of firms in regulatory good standing as a substitute for U.S. importer testing for unapproved drugs that may be present. This could have the effect of driving the illegal commerce into the AQSIQ-controlled system.

## SUMMARY

### Countrywide DWPE:

Based on the evidence stated above, the following criteria warrant imposing a countrywide DWPE on aquacultured seafood products, catfish, basa, shrimp, tilapia, dace, and eel, imported from China:

1. China is the largest aquaculture producer in the world, accounting for 70% of the total production, and is the third largest exporter of seafood to the U.S.

2. Despite China's ban on the use of specific unapproved new animal drugs (nitrofurans and malachite green) in seafood farm operations, FDA continues to find unapproved new animal drugs and unsafe food additives in shipments of aquacultured seafood products from China.

3. From October 1, 2006, to April 30, 2007, FDA tested 173 samples of aquacultured seafood products from China for nitrofurans, fluoroquinolones, malachite green, and gentian violet. Twenty of the samples (14%) contained unapproved new animal drug residues or unsafe food additives. The violative products were from 18 different firms.

4. The Alabama Department of Agriculture and Industries detected residues of fluoroquinolones in 14 of 20 catfish samples (70%) from different Chinese processors in April 2007.

5. The Canadian Food and Inspection Agency refused 73 of 678 inspected shipments of aquacultured seafood (11%) because they contained residues of nitrofurans or malachite green between April 1, 2006, and March 31, 2007.

6. The FDA assessment of China's current residue control program for products exported to the U.S found the program to be ineffective.

CFSAN acknowledges that, based on FDA sampling alone, we do not meet the criteria set out in Chapter 9 of the Regulatory Procedures Manual for countrywide detention without physical examination (DWPE), in that the shipments found violative do not represent at least 25% of the total shipments of the products examined. CFSAN believes that DWPE is, nonetheless, justified in this case, given the totality of the evidence. There is clearly a continued pattern of importation of articles that violate the FFDCA, as demonstrated by analytical results reported by FDA and other government agencies. In addition, China's own quality organization has admitted that the controls in that country are inadequate to ensure that aquacultured seafood products offered for entry into the U.S. meet U.S. requirements.

## RECOMMENDATION

CFSAN recommends imposing countrywide detention without physical examination on catfish, basa, shrimp, tilapia, dace, and eel from China based on the evidence presented. Future shipments of these products offered for entry from China will appear to be adulterated pursuant to Section 801(a)(3) and 402(a)(2)(C)(i) or 402(a)(2)(C)(ii) of the FFDCA.

Joseph R. Baca

**Attachments:**

TAB A - PROC Seafood Violative Samples as of April 30, 2007

TAB B - Map of China - Location of Violative Aquacultured Seafood Product Processors

TAB C - CN Aquacultured Seafood Product Manufacturers & Shipments (Oct. 1, 2006 to April 30, 2007)

TAB D - U.S. FDA China Chemotherapeutic Residues Trip Report September 12-28, 2006

TAB E - CFIA Results for Unapproved Drug Residues in Imports from China, April 01, 2006-March 31, 2007

TAB F - CFIA Import Alert list of Chinese processors/shippers with violative product (Oct 2006-April 2007)

TAB G - Alabama Department of Agriculture and Industries

TAB H - Draft "IMPORT ALERT #16-XX, "DETENTION WITHOUT PHYSICAL EXAMINATION OF AQUACULTURED CATFISH, BASA, SHRIMP, TILAPIA, DACE, AND EEL PRODUCTS FROM CHINA DUE TO THE PRESENCE OF UNAPPROVED NEW ANIMAL DRUG RESIDUES OR UNSAFE FOOD ADDITIVES"

## DECISION:

**Countrywide DWPE for Aquacultured Catfish, Basa, Shrimp, Tilapia, Dace, and Eel from China Due to the Presence of Unapproved New Animal Drugs or Unsafe Food Additives**

Approved ________________ Disapproved ______________ Date________

cc:

HFA-224 (Records)
HFC-100 (Ralston)
HFC-150 (Morrison)
HFC-170 (Siddiqui)
HFS-1 (Brackett)
HFS-1 (Landa)
HFS-3 (Oliver)
HFS-300 (Kramer)
HFS-325 (Jones, Creeden, Montwill)
HFS-600 (Baca)
HFS-605 (Thomas)
HFS-606 (Pace, Jordan)

---

R/D: HFS-606: G.Jordan: 5/21/07
Edits: HFS-606: M.Stuckey: 5/22/07
Rev: HFS-606: R.Pace: 5/23/07
Edits: HFS-606: G.Jordan: 5/24/07
Rev: HFS-605: JAThomas: 5/29/2007
Edits: HFS-606: R.Pace: 5/29/07
Rev & comment: HFS-325: D.Kraemer: 5/29/07
Edits: HFS-605: JAThomas: 5/30/2007
Rev & comment: HFV-1: M.Smith & F.Pell: 5/31/07
Edits: HFS-606: G.Jordan: 5/31/07
Rev & comment: HFS-1: MLanda: 6/4/2007
Edits: HFS-605: JAThomas: 6/4/2007

---

Electronic file: p:\Division of Enforcement\IMPORTS\JORDAN\Import Alerts & Bulletins\China aqua drugs\Action Memo-Aquaculture drugs in CN seafood



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service
Food and Drug Administration

# Memorandum

Date:     November 26, 2007

From:     Compliance Officer, Product Adulteration Branch, Division of Enforcement, Office of Compliance, Center for Food Safety and Applied Nutrition, HFS-606

Subject:   Countrywide Detention without Physical Examination for Aquacultured Seafood Products from China Due to the Presence of Unapproved New Animal Drugs and Unsafe Food Additives – –Explanation of Product Coverage and Entry Violation Revisions

To:       File

In a memorandum dated June 5, 2007, the Center for Food Safety and Applied Nutrition (CFSAN) recommended that FDA issue an Import Alert for unapproved drug residues (nitrofurans, fluoroquinolones, malachite green, and gentian violet) in aquacultured seafood products originating from China. The recommendation included six varieties of aquacultured seafood – catfish, basa, shrimp, dace, eel, and tilapia. The recommendation reported analytical results obtained from October 1, 2006 through April 30, 2007.  As stated in the recommendation memorandum from Joseph Baca, the violation rate for these six seafood products was 10.5%.

After submission of the initial recommendation, FDA engaged in additional internal discussion. During this discussion, we decided to omit tilapia from the Import Alert because the violation rate for tilapia (145 of 1,935 shipments or 7.5%) was lower than for other species of seafood.

Subsequent to the submission of the recommendation, CFSAN obtained additional analytical data, through May 31, 2007. The data presented in the Import Alert reflects both the removal of tilapia and the updated analytical results; however, the recommendation memorandum was not updated. The violation rate for the five remaining seafood products was 25%. Import Alert (IA) 16-131, was issued on June 28, 2007.

With the updated numbers, the June 5, 2007 memo would have read, in part:

> *From October 1, 2006, through May 31, 2007, FDA repeatedly found residues of unapproved drugs in aquacultured products imported from China. During that period, FDA tested 89 samples of catfish, basa, shrimp, dace, and eel from China. Twenty-two of the samples were found to contain an unapproved drug (25%).  The unapproved drugs include: nitrofurans in shrimp at levels above 1 ppb; malachite green in dace, eel, and catfish at levels ranging from 2.1 ppb to 122 ppb; gentian violet in catfish and eel at levels ranging from 2.5 ppb to 26.9 ppb and fluoroquinolones in catfish/basa at level ranging from 1.9 to 6.5 ppb.*

In all other respects, the June 5, 2007 memo accurately describes the reasoning behind IA 16-131.

Giselle Jordan

**Attachments:**

Revised PROC Seafood Violative Samples as of May 31, 2007

Updated CN Aquacultured Seafood Product Manufacturers & Shipments (Oct. 1, 2006 to May 31, 2007)

# Attachment A

## PROC Seafood Violative Samples as of May 31, 2007

Total number of samples collected and tested: 211 (89 samples of catfish, basa, dace, eel, and shrimp)
Number of samples tested positive for drug residues: 22 of 211 (10.5%);
22 of 89 (25%)

| L.p. | Sample # | District | Product | Date Collected | Residue Level | Mfr FEI # | Mfr Name | Mfr Address | Mfr City | CIQ certificate |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 393215 | LOS | Shrimp | 10/3/2006 | NF (AOZ&SC) | [redacted] | [redacted] | [redacted] | Shantou, Guangdong | N/A |
| 2 | 394287 | LOS | Shrimp | 10/13/2006 | NF (SC) | [redacted] | [redacted] | [redacted] | Shantou, Guangdong | N/A |
| 3 | 395569 | LOS | Eel | 10/24/2006 | 26.9 ppb GV | [redacted] | [redacted] | [redacted] | Jiangxi | YES |
| 4 | 396412 | NYK | Shrimp | 10/31/2006 | NF (AOZ) | [redacted] | [redacted] | [redacted] | Haikou City, Hainan | N/A |
| 5 | 396532 | LOS | Eel | 10/31/2006 | 17.0 ppb GV | [redacted] | [redacted] | [redacted] | Shanghai | YES |
| 6 | 399482 | LOS | Catfish | 11/27/2006 | 3.5 ppb MG | [redacted] | [redacted] | [redacted] | Chang City, Fuzhou, Fujian | N/A |
| 7 | 400561 | LOS | Eel | 12/5/2006 | 2.3 ppb MG | [redacted] | [redacted] | [redacted] | Qingyuan | N/A |
| 8 | 402052 | SAN | Dace | 12/14/2006 | 3.6 ppb MG | [redacted] | [redacted] | [redacted] | Zhongshan City, Guangdong | N/A |
| 9 | 403995 | SWID | Catfish | 1/9/2007 | 2.85 ppb MG | [redacted] | [redacted] | [redacted] | Dafeng City | N/A |
| 10 | 409295 | SWID | Channel Catfish | 2/14/2007 | 2.9 ppb MG | [redacted] | [redacted] | [redacted] | Jiangsu Province | N/A |
| 11 | 409297 | SWID | Catfish | 2/14/2007 | 2.9 ppb MG | [redacted] | [redacted] | [redacted] | Jiangsu Province | N/A |
| 12 | 388100 | LOS | Dace | 8/21/2006 | 19.1 ppb MG | [redacted] | [redacted] | [redacted] | Guangdong | YES |
| 13 | 407966 | LOS | Shrimp | 2/6/2007 | NF (AOZ) | [redacted] | [redacted] | [redacted] | Shantou, Guangdong | N/A |
| 14 | 406853 | LOS | Shrimp | 1/30/2007 | NF (AOZ) | [redacted] | [redacted] | [redacted] | Shantou, Guangdong | N/A |
| 15 | 410566 | FLA | Catfish | | 4.6 ppb MG | [redacted] | [redacted] | [redacted] | Nanning, Guangxi | YES |
| 16 | 415079 | FLA | Catfish | 3/23/2007 | 1.6 ppb MG | [redacted] | [redacted] | [redacted] | Jiangsu | YES |
| 17 | 413482 | DET | Catfish | 3/15/2007 | 3.05ppb MG | [redacted] | [redacted] | [redacted] | Jiangxi | N/A |
| 18 | 411165 | LOS | Shrimp | 2/27/2007 | NF | [redacted] | [redacted] | [redacted] | Guangdong | N/A |
| 19 | 421442 | NWE | Catfish | 5/02/2007 | 2.0 ppb MG | [redacted] | [redacted] | [redacted] | Dafeng City | N/A |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Jiangsu Province, | |
| 20 | 421202 | SWI | Catfish | 5/01/2007 | 2.5 ppb GV | | | Tongi Road | Xinhua City | N/A |
| 21 | 421990 | SWI | Catfish | 5/07/2007 | 122 ppb MG | | | Meixin, Meihua Town | Changle City | N/A |
| 22 | 415772 | LOS | Shrimp | 3/27/2007 | NF | | | Longtian Industrial Estate | Fuqing, Fujian Province | N/A |

**TAB B: Map of China - Location of Violative Aquacultured Seafood Product Processors**

Heilongjiang
Jilin
Inner Mongolia
Liaoning
Xinjiang
Hebei
Beijing
Shandong
Shanxi
Ningxia
Yellow Sea
Qinghai
Gansu
Jiangsu
Shaanxi
Henan
Shanghai
Xizang
Anhui
Hubei
Sichuan
Zhejiang
East China Sea
Jiangxi
Hunan
Fujian
Guizhou
Taiwan
Yunnan
Guangxi
Guangdong
Hainan
South China Sea

| Province or City(*) | Product | Violative Firms |
|---|---|---|
| | | |
| Fujian | Catfish | 1 |
| Guangdong | Shrimp, Dace, Tilapia | 7 |
| Guangxi | Catfish | 1 |
| Hainan | Shrimp, Tilapia | 2 |
| Hebei | Eel | -- |
| Hongkong (*) | Eel | -- |
| Hubei | Eel | -- |
| Hunan | Eel | -- |
| Jiangsu | Catfish | 2 |
| Jiangxi | Eel, Catfish | 2 |
| Liaoning | Eel | 1 |
| Shandong | Eel | -- |
| Shanghai (*) | Eel | 1 |
| Zhejiang | Catfish | 1 |
| **Total** | | **18** |

Aquacultured eel processing farms
Aquacultured catfish/Basa, shrimp, dace, tilapia, and/or eel processing farms

IA16-131 000022

**Updated Aquacultured Seafood from CN**
**10/1/06 to 5/31/07**
(Compared with previous TAB C up to 4/30/07 without Tilapia)

| Seafood | As Of Date | Manufacturers | Shipments |
|---|---|---|---|
| Basa | 4/30/2007 | 6 | 11 |
| | 5/31/2007 | 6 | 11 |
| Catfish | 4/30/2007 | 66 | 391 |
| | 5/31/2007 | 70 | 417 |
| Dace | 4/30/2007 | 17 | 50 |
| | 5/31/2007 | 18 | 51 |
| Eel | 4/30/2007 | 79 | 263 |
| | 5/31/2007 | 83 | 292 |
| Shrimp | 4/30/2007 | 52 | 823 |
| | 5/31/2007 | 57 | 915 |
| **Totals** | **4/30/2007** | **220** | **1,538** |
| | **5/31/2007** | **234** | **1,686** |
| **Increment** | | **14** | **148** |

| % Violation | | |
|---|---|---|
| | **4/30/2007** | **10.5** |
| | **5/31/2007** | **25** |

**Updated CN Basa Entries**
**10-01-06 to 05-31-07**

| Submission Date | Product Code Description | Product Code | Entries Count |
|---|---|---|---|
| 11/03/2006 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XFD43 | 1 |
| 11/30/2006 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 01/25/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 02/21/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 02/25/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 02/26/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGD43 | 1 |
| 03/01/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 03/08/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGD43 | 1 |
| 03/08/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 03/13/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGT43 | 1 |
| 04/24/2007 | Non-Ictalurus Fish, Aquaculture, Fresh Water | 16XGD43 | 1 |
| | | | 11 |

| | |
|---|---|
| **Total manuf** | **6** |
| **Total shipments** | **11** |

IA16-131 000025

**Updated CN Catfish Entries**
**10-01-06 to 05-31-07**

| Submission Date | Product Code Description | Product Code | Entries Count |
|---|---|---|---|
| 10/02/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 10/02/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/03/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 10/04/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 10/04/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/06/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/06/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/06/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/09/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 10/10/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 10/10/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 10/10/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/10/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/11/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 10/11/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| | | | |
|---|---|---|---|
| 10/12/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 10/13/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/13/2006 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 2 |
| 10/17/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 10/17/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/18/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 10/19/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/19/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/19/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/19/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/24/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 10/25/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 10/25/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 10/25/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/26/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/26/2006 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 10/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| | | | |
|---|---|---|---|
| 10/28/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 10/30/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 10/30/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 3 |
| 10/31/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/31/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 10/31/2006 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 11/01/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 11/01/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/02/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/03/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/06/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 11/06/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 5 |
| 11/07/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/08/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/08/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/09/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/09/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| | | | |
|---|---|---|---|
| 11/10/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 11/13/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 11/13/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/14/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/14/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 11/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/17/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/17/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/18/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 11/20/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 11/20/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/20/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/20/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/21/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/22/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/23/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| | | | |
|---|---|---|---|
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 6 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 11/28/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 11/28/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 11/28/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/01/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/01/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/01/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 3 |
| 12/01/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/03/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/04/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |

| | | | |
|---|---|---|---|
| 12/04/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 12/04/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/05/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 12/05/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/05/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/06/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 12/06/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/06/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/06/2006 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 12/07/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/07/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/08/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 12/08/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 12/08/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/09/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 12/11/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/11/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |

| | | | |
|---|---|---|---|
| 12/11/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/12/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 12/12/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/12/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/12/2006 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 12/13/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/13/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/13/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/14/2006 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 12/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/15/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/18/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/18/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 12/18/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| | | | |
|---|---|---|---|
| 12/18/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/18/2006 | Catfish, Aquaculture, Fresh Water | 16XVD02 | 1 |
| 12/19/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 3 |
| 12/19/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/20/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/20/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/20/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/22/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 12/22/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 12/22/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/22/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/24/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/24/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 12/26/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 12/27/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/28/2006 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 12/28/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| | | | |
|---|---|---|---|
| 12/29/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/29/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/29/2006 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 12/29/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/29/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/30/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 4 |
| 12/31/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 12/31/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 12/31/2006 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/02/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 01/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/03/2007 | Catfish, Aquaculture, Fresh Water | 16XGC02 | 1 |
| 01/03/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 01/03/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 01/04/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/04/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| | | | |
|---|---|---|---|
| 01/05/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 3 |
| 01/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/05/2007 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 01/07/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/08/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 3 |
| 01/09/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 01/09/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/09/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 01/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| | | | |
|---|---|---|---|
| 01/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/15/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 01/15/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/16/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/16/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/16/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/17/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 01/17/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/17/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/18/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/18/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/19/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/20/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/22/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/22/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |

| | | | |
|---|---|---|---|
| 01/22/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/22/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/22/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 3 |
| 01/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 4 |
| 01/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/23/2007 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 01/24/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 01/24/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/25/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 3 |
| 01/26/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/26/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/29/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 01/30/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/30/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 01/30/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| | | | |
|---|---|---|---|
| 01/30/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 01/30/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 2 |
| 01/30/2007 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 01/31/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/01/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 3 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/02/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 02/03/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 02/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/06/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |

| | | | |
|---|---|---|---|
| 02/06/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/06/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/06/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/07/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/08/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/08/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 02/09/2007 | Catfish, Aquaculture, Fresh Water | 16XYD02 | 1 |
| 02/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/12/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 02/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/13/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/14/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/15/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/15/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |

| | | | |
|---|---|---|---|
| 02/16/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/17/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 02/17/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 02/18/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/18/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 02/20/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/20/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/21/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/22/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 02/23/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 02/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/24/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 02/26/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 3 |
| 02/26/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 02/27/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 02/27/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| | | | |
|---|---|---|---|
| 02/28/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 02/28/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/02/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 3 |
| 03/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/02/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/02/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/03/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/03/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/04/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/04/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 03/07/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 03/07/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 03/07/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/09/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 03/09/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 03/09/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 2 |

| | | | |
|---|---|---|---|
| 03/12/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/13/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/13/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/15/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 2 |
| 03/17/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/19/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 03/19/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 03/19/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/21/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 03/26/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 03/27/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/04/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/06/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 04/07/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/10/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/13/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |

| | | | |
|---|---|---|---|
| 04/16/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 04/16/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/18/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 04/18/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 6 |
| 04/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 04/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 2 |
| 04/24/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 2 |
| 04/24/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 04/24/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 04/24/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/25/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 04/26/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 04/26/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 04/28/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 05/01/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 2 |
| 05/03/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 05/04/2007 | Catfish, Aquaculture, Fresh Water | 16XFD02 | 1 |

| | | | |
|---|---|---|---|
| 05/04/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/05/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 05/08/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 05/10/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 05/10/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 05/11/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 1 |
| 05/14/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/15/2007 | Catfish, Aquaculture, Fresh Water | 16XGD02 | 6 |
| 05/15/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/15/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/17/2007 | Catfish, Aquaculture, Fresh Water | 16XVD02 | 1 |
| 05/21/2007 | Catfish, Aquaculture, Fresh Water | 16XVT02 | 1 |
| 05/22/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/23/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/31/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |
| 05/31/2007 | Catfish, Aquaculture, Fresh Water | 16XGT02 | 1 |

| | |
|---|---|
| **Total manuf** | **70** |
| **Total shipments** | **417** |

IA16-131 000045

**Updated CN Dace Entries**
**10-01-06 to 05-31-07**

| Submission Date | Product Code Description | Product Code | Entries |
|---|---|---|---|
| 10/06/2006 | Dace | 16AGT57 | 1 |
| 10/16/2006 | Dace | 16AEE57 | 1 |
| 11/06/2006 | Dace | 16AEE57 | 1 |
| 11/09/2006 | Dace | 16AGT57 | 1 |
| 11/14/2006 | Dace | 16AGT57 | 1 |
| 11/16/2006 | Dace | 16AFT57 | 1 |
| 11/28/2006 | Dace | 16AGD57 | 1 |
| 12/05/2006 | Dace | 16AEE57 | 1 |
| 12/05/2006 | Dace | 16AFD57 | 1 |
| 12/07/2006 | Dace | 16AGD57 | 1 |
| 12/13/2006 | Dace | 16AEN57 | 1 |
| 12/14/2006 | Dace | 16AFD57 | 1 |
| 12/14/2006 | Dace | 16AGD57 | 1 |
| 12/14/2006 | Dace | 16AGT57 | 1 |
| 12/15/2006 | Dace | 16AGD57 | 1 |
| 12/19/2006 | Dace | 16AGT57 | 1 |
| 12/21/2006 | Dace | 16AGD57 | 1 |
| 12/28/2006 | Dace | 16AGD57 | 1 |
| 12/28/2006 | Dace | 16AGT57 | 1 |
| 01/02/2007 | Dace | 16AGD57 | 1 |
| 01/02/2007 | Dace | 16AGT57 | 1 |
| 01/03/2007 | Dace | 16AGD57 | 1 |
| 01/04/2007 | Dace | 16AGD57 | 1 |
| 01/05/2007 | Dace | 16AHN57 | 1 |
| 01/10/2007 | Dace | 16AGD57 | 1 |
| 01/10/2007 | Dace | 16AGD57 | 1 |
| 01/11/2007 | Dace | 16AGT57 | 1 |
| 01/16/2007 | Dace | 16AGT57 | 2 |
| 01/17/2007 | Dace | 16AGD57 | 1 |
| 01/17/2007 | Dace | 16AGD57 | 1 |
| 01/18/2007 | Dace | 16AGD57 | 1 |
| 01/18/2007 | Dace | 16AGT57 | 1 |
| 01/25/2007 | Dace | 16AGD57 | 1 |
| 01/25/2007 | Dace | 16AGT57 | 1 |
| 01/26/2007 | Dace | 16AEE57 | 1 |
| 01/26/2007 | Dace | 16AGT57 | 1 |
| 02/01/2007 | Dace | 16AGD57 | 1 |
| 02/02/2007 | Dace | 16AGD57 | 1 |
| 02/05/2007 | Dace | 16AEN57 | 1 |
| 02/08/2007 | Dace | 16AGD57 | 1 |
| 02/24/2007 | Dace | 16AGD57 | 1 |
| 02/26/2007 | Dace | 16AGD57 | 1 |
| 03/12/2007 | Dace | 16AGN57 | 1 |
| 03/26/2007 | Dace | 16AET57 | 4 |
| 03/27/2007 | Dace | 16AGD57 | 1 |
| 04/23/2007 | Dace | 16AET57 | 1 |

| 05/03/2007 | Dace | 16AGT57 | 1 |
|---|---|---|---|
| | | | 51 |

| | |
|---|---|
| **Total manuf** | **18** |
| **Total shipments** | **51** |

**Updated CN Eel Entries**
**10-01-06 to 05-31-07**

| Submission Date | Product Code Description | Product Code | Entries Count |
|---|---|---|---|
| 10/02/2006 | Eel | 16AGC15 | 1 |
| 10/02/2006 | Eel | 16AGT15 | 1 |
| 10/02/2006 | Eel | 16AGT15 | 1 |
| 10/04/2006 | Eel | 16AGT15 | 1 |
| 10/05/2006 | Eel | 16AGN15 | 1 |
| 10/06/2006 | Eel | 16AGN15 | 1 |
| 10/06/2006 | Eel | 16AGT15 | 1 |
| 10/06/2006 | Eel | 16AGT15 | 1 |
| 10/06/2006 | Eel | 16AGT15 | 1 |
| 10/10/2006 | Eel | 16AGN15 | 1 |
| 10/10/2006 | Eel | 16AGN15 | 1 |
| 10/10/2006 | Eel | 16AGT15 | 1 |
| 10/10/2006 | Eel | 16AVH15 | 1 |
| 10/11/2006 | Eel | 16AGN15 | 1 |
| 10/11/2006 | Eel | 16AGT15 | 1 |
| 10/12/2006 | Eel | 16AVT15 | 1 |
| 10/13/2006 | Eel | 16AGT15 | 1 |
| 10/13/2006 | Eel | 16AGT15 | 1 |
| 10/13/2006 | Eel | 16AVY15 | 1 |
| 10/16/2006 | Eel | 16AGC15 | 1 |
| 10/16/2006 | Eel | 16AGD15 | 1 |
| 10/18/2006 | Eel | 16AGC15 | 1 |
| 10/18/2006 | Eel | 16AVT15 | 1 |
| 10/20/2006 | Eel | 16AGC15 | 1 |
| 10/20/2006 | Eel | 16AYY15 | 1 |
| 10/23/2006 | Eel | 16AGN15 | 1 |
| 10/23/2006 | Eel | 16AGN15 | 1 |
| 10/23/2006 | Eel | 16AHF15 | 1 |
| 10/23/2006 | Eel | 16AVT15 | 1 |
| 10/25/2006 | Eel | 16AVN15 | 1 |
| 10/26/2006 | Eel | 16AGT15 | 1 |
| 10/26/2006 | Eel | 16AGT15 | 1 |
| 10/27/2006 | Eel | 16AGN15 | 1 |
| 10/29/2006 | Eel | 16AGT15 | 1 |
| 10/30/2006 | Eel | 16AGD15 | 1 |
| 10/30/2006 | Eel | 16AGN15 | 1 |
| 10/30/2006 | Eel | 16AGT15 | 1 |
| 10/31/2006 | Eel | 16AVY15 | 1 |
| 11/01/2006 | Eel | 16AFN15 | 1 |
| 11/01/2006 | Eel | 16AGT15 | 1 |
| 11/02/2006 | Eel | 16AGC15 | 1 |
| 11/04/2006 | Eel | 16AVT15 | 1 |
| 11/06/2006 | Eel | 16AFN15 | 1 |
| 11/07/2006 | Eel | 16AFN15 | 1 |
| 11/07/2006 | Eel | 16AGT15 | 1 |
| 11/07/2006 | Eel | 16AGT15 | 1 |

| | | | |
|---|---|---|---|
| 11/09/2006 | Eel | 16AGT15 | 1 |
| 11/09/2006 | Eel | 16AVT15 | 1 |
| 11/13/2006 | Eel | 16AGN15 | 1 |
| 11/13/2006 | Eel | 16AGT15 | 1 |
| 11/13/2006 | Eel | 16AGT15 | 1 |
| 11/14/2006 | Eel | 16AGT15 | 1 |
| 11/14/2006 | Eel | 16AVN15 | 1 |
| 11/14/2006 | Eel | 16AVT15 | 1 |
| 11/15/2006 | Eel | 16AFN15 | 1 |
| 11/16/2006 | Eel | 16AGC15 | 1 |
| 11/16/2006 | Eel | 16AVN15 | 1 |
| 11/16/2006 | Eel | 16AYT15 | 1 |
| 11/16/2006 | Eel | 16AYY15 | 1 |
| 11/17/2006 | Eel | 16AFN15 | 1 |
| 11/17/2006 | Eel | 16AGD15 | 1 |
| 11/17/2006 | Eel | 16AGN15 | 1 |
| 11/17/2006 | Eel | 16AGT15 | 1 |
| 11/17/2006 | Eel | 16AGT15 | 1 |
| 11/17/2006 | Eel | 16AVT15 | 1 |
| 11/20/2006 | Eel | 16AEE15 | 1 |
| 11/20/2006 | Eel | 16AGC15 | 1 |
| 11/20/2006 | Eel | 16AGT15 | 1 |
| 11/20/2006 | Eel | 16AVT15 | 1 |
| 11/21/2006 | Eel | 16AGC15 | 1 |
| 11/21/2006 | Eel | 16AGN15 | 1 |
| 11/24/2006 | Eel | 16AGC15 | 1 |
| 11/24/2006 | Eel | 16AGT15 | 1 |
| 11/25/2006 | Eel | 16AGT15 | 1 |
| 11/27/2006 | Eel | 16AGN15 | 1 |
| 11/29/2006 | Eel | 16AGT15 | 1 |
| 11/29/2006 | Eel | 16AVT15 | 1 |
| 11/30/2006 | Eel | 16AGD15 | 1 |
| 11/30/2006 | Eel | 16AGT15 | 1 |
| 12/01/2006 | Eel | 16AFN15 | 1 |
| 12/01/2006 | Eel | 16AGC15 | 1 |
| 12/01/2006 | Eel | 16AVN15 | 1 |
| 12/01/2006 | Eel | 16AVT15 | 1 |
| 12/01/2006 | Eel | 16AYY15 | 1 |
| 12/04/2006 | Eel | 16AGT15 | 1 |
| 12/04/2006 | Eel | 16AGT15 | 1 |
| 12/05/2006 | Eel | 16AFN15 | 1 |
| 12/05/2006 | Eel | 16AGD15 | 1 |
| 12/05/2006 | Eel | 16AGT15 | 1 |
| 12/05/2006 | Eel | 16AGT15 | 1 |
| 12/06/2006 | Eel | 16AGT15 | 1 |
| 12/07/2006 | Eel | 16AFN15 | 1 |
| 12/07/2006 | Eel | 16AGT15 | 1 |
| 12/08/2006 | Eel | 16AGD15 | 1 |
| 12/08/2006 | Eel | 16AGN15 | 1 |
| 12/08/2006 | Eel | 16AGT15 | 1 |
| 12/11/2006 | Eel | 16AGN15 | 1 |
| 12/11/2006 | Eel | 16AGT15 | 1 |

| 12/11/2006 | Eel | 16AVT15 | 1 |
|---|---|---|---|
| 12/12/2006 | Eel | 16AVT15 | 1 |
| 12/13/2006 | Eel | 16AGT15 | 1 |
| 12/15/2006 | Eel | 16AGD15 | 1 |
| 12/15/2006 | Eel | 16AGT15 | 1 |
| 12/15/2006 | Eel | 16AGT15 | 1 |
| 12/18/2006 | Eel | 16AVT15 | 1 |
| 12/18/2006 | Eel | 16AYD15 | 1 |
| 12/19/2006 | Eel | 16AGD15 | 1 |
| 12/19/2006 | Eel | 16AGN15 | 1 |
| 12/19/2006 | Eel | 16AGT15 | 1 |
| 12/19/2006 | Eel | 16AVT15 | 1 |
| 12/21/2006 | Eel | 16AFN15 | 1 |
| 12/21/2006 | Eel | 16AGD15 | 1 |
| 12/21/2006 | Eel | 16AGT15 | 1 |
| 12/21/2006 | Eel | 16AVN15 | 1 |
| 12/22/2006 | Eel | 16AGT15 | 1 |
| 12/22/2006 | Eel | 16AVN15 | 1 |
| 12/23/2006 | Eel | 16AGT15 | 1 |
| 12/25/2006 | Eel | 16AGT15 | 1 |
| 12/26/2006 | Eel | 16AGD15 | 1 |
| 12/26/2006 | Eel | 16AGD15 | 1 |
| 12/26/2006 | Eel | 16AVT15 | 2 |
| 12/26/2006 | Eel | 16AVT15 | 1 |
| 12/26/2006 | Eel | 16AVY15 | 1 |
| 12/27/2006 | Eel | 16AGD15 | 1 |
| 12/27/2006 | Eel | 16AVT15 | 1 |
| 12/28/2006 | Eel | 16AFN15 | 2 |
| 12/28/2006 | Eel | 16AGH15 | 1 |
| 12/28/2006 | Eel | 16AGT15 | 1 |
| 12/28/2006 | Eel | 16AYT15 | 1 |
| 01/02/2007 | Eel | 16AGN15 | 1 |
| 01/02/2007 | Eel | 16AGT15 | 1 |
| 01/03/2007 | Eel | 16AGD15 | 1 |
| 01/03/2007 | Eel | 16AGD15 | 1 |
| 01/03/2007 | Eel | 16AVN15 | 1 |
| 01/04/2007 | Eel | 16AGT15 | 1 |
| 01/04/2007 | Eel | 16AGT15 | 1 |
| 01/05/2007 | Eel | 16AFN15 | 1 |
| 01/05/2007 | Eel | 16AGT15 | 1 |
| 01/08/2007 | Eel | 16AGC15 | 1 |
| 01/08/2007 | Eel | 16AGN15 | 1 |
| 01/08/2007 | Eel | 16AGT15 | 1 |
| 01/09/2007 | Eel | 16ABT15 | 1 |
| 01/09/2007 | Eel | 16AGD15 | 1 |
| 01/10/2007 | Eel | 16AGT15 | 1 |
| 01/11/2007 | Eel | 16AGD15 | 1 |
| 01/12/2007 | Eel | 16AGN15 | 1 |
| 01/15/2007 | Eel | 16AGN15 | 1 |
| 01/15/2007 | Eel | 16AGT15 | 1 |
| 01/16/2007 | Eel | 16AGD15 | 1 |
| 01/16/2007 | Eel | 16AVT15 | 1 |

| | | | |
|---|---|---|---|
| 01/17/2007 | Eel | 16AGD15 | 1 |
| 01/18/2007 | Eel | 16AGN15 | 1 |
| 01/19/2007 | Eel | 16AGD15 | 1 |
| 01/19/2007 | Eel | 16AGD15 | 1 |
| 01/19/2007 | Eel | 16AGT15 | 1 |
| 01/19/2007 | Eel | 16AVT15 | 1 |
| 01/22/2007 | Eel | 16AGC15 | 1 |
| 01/22/2007 | Eel | 16AGT15 | 1 |
| 01/22/2007 | Eel | 16AGT15 | 1 |
| 01/22/2007 | Eel | 16AVN15 | 1 |
| 01/25/2007 | Eel | 16AGT15 | 1 |
| 01/25/2007 | Eel | 16AVN15 | 1 |
| 01/29/2007 | Eel | 16AVN15 | 1 |
| 01/30/2007 | Eel | 16AGN15 | 1 |
| 01/30/2007 | Eel | 16AGT15 | 1 |
| 02/01/2007 | Eel | 16AGD15 | 1 |
| 02/01/2007 | Eel | 16AGE15 | 1 |
| 02/02/2007 | Eel | 16AFN15 | 1 |
| 02/02/2007 | Eel | 16AGT15 | 1 |
| 02/02/2007 | Eel | 16AGT15 | 1 |
| 02/05/2007 | Eel | 16AVN15 | 1 |
| 02/07/2007 | Eel | 16AGD15 | 1 |
| 02/12/2007 | Eel | 16AGT15 | 1 |
| 02/13/2007 | Eel | 16AGN15 | 1 |
| 02/13/2007 | Eel | 16AGT15 | 1 |
| 02/13/2007 | Eel | 16AYT15 | 1 |
| 02/14/2007 | Eel | 16AGD15 | 1 |
| 02/14/2007 | Eel | 16AGN15 | 1 |
| 02/14/2007 | Eel | 16AGT15 | 1 |
| 02/15/2007 | Eel | 16AFN15 | 1 |
| 02/15/2007 | Eel | 16AGT15 | 1 |
| 02/15/2007 | Eel | 16AVN15 | 2 |
| 02/16/2007 | Eel | 16AGN15 | 1 |
| 02/16/2007 | Eel | 16AGT15 | 1 |
| 02/19/2007 | Eel | 16AVN15 | 2 |
| 02/20/2007 | Eel | 16AGN15 | 1 |
| 02/20/2007 | Eel | 16AGT15 | 1 |
| 02/22/2007 | Eel | 16AGT15 | 1 |
| 02/22/2007 | Eel | 16AVN15 | 1 |
| 02/26/2007 | Eel | 16AGN15 | 1 |
| 02/26/2007 | Eel | 16AGN15 | 1 |
| 02/27/2007 | Eel | 16AFY15 | 1 |
| 02/27/2007 | Eel | 16AGN15 | 1 |
| 03/01/2007 | Eel | 16AGT15 | 1 |
| 03/01/2007 | Eel | 16AGT15 | 1 |
| 03/01/2007 | Eel | 16AVN15 | 1 |
| 03/02/2007 | Eel | 16AGT15 | 1 |
| 03/02/2007 | Eel | 16AGT15 | 1 |
| 03/05/2007 | Eel | 16AVN15 | 1 |
| 03/06/2007 | Eel | 16AVN15 | 1 |
| 03/07/2007 | Eel | 16AGT15 | 1 |
| 03/07/2007 | Eel | 16AGT15 | 1 |

| | | | |
|---|---|---|---|
| 03/08/2007 | Eel | 16AGT15 | 1 |
| 03/08/2007 | Eel | 16AGT15 | 1 |
| 03/12/2007 | Eel | 16AGN15 | 1 |
| 03/15/2007 | Eel | 16AGT15 | 1 |
| 03/16/2007 | Eel | 16AGD15 | 1 |
| 03/19/2007 | Eel | 16AGT15 | 1 |
| 03/20/2007 | Eel | 16AGC15 | 1 |
| 03/21/2007 | Eel | 16AGT15 | 1 |
| 03/22/2007 | Eel | 16AFN15 | 1 |
| 03/22/2007 | Eel | 16AGT15 | 1 |
| 03/22/2007 | Eel | 16AVN15 | 4 |
| 03/23/2007 | Eel | 16AGN15 | 1 |
| 03/25/2007 | Eel | 16AGC15 | 1 |
| 03/27/2007 | Eel | 16AGN15 | 1 |
| 03/28/2007 | Eel | 16AHT15 | 1 |
| 03/28/2007 | Eel | 16AVN15 | 4 |
| 03/30/2007 | Eel | 16AGN15 | 1 |
| 03/30/2007 | Eel | 16AVN15 | 1 |
| 04/02/2007 | Eel | 16AVT15 | 1 |
| 04/02/2007 | Eel | 16AVT15 | 1 |
| 04/03/2007 | Eel | 16AGN15 | 1 |
| 04/03/2007 | Eel | 16AVN15 | 1 |
| 04/06/2007 | Eel | 16AGN15 | 1 |
| 04/09/2007 | Eel | 16AGD15 | 1 |
| 04/09/2007 | Eel | 16AGH15 | 1 |
| 04/10/2007 | Eel | 16AGN15 | 1 |
| 04/10/2007 | Eel | 16AGN15 | 1 |
| 04/10/2007 | Eel | 16AGT15 | 1 |
| 04/11/2007 | Eel | 16AGD15 | 1 |
| 04/11/2007 | Eel | 16AGD15 | 1 |
| 04/11/2007 | Eel | 16AGN15 | 1 |
| 04/11/2007 | Eel | 16AGT15 | 1 |
| 04/12/2007 | Eel | 16AVT15 | 1 |
| 04/13/2007 | Eel | 16AFN15 | 1 |
| 04/13/2007 | Eel | 16AVN15 | 1 |
| 04/14/2007 | Eel | 16AGT15 | 1 |
| 04/16/2007 | Eel | 16AGT15 | 1 |
| 04/16/2007 | Eel | 16AYT15 | 1 |
| 04/17/2007 | Eel | 16AGD15 | 1 |
| 04/17/2007 | Eel | 16AGE15 | 1 |
| 04/17/2007 | Eel | 16AVD15 | 1 |
| 04/18/2007 | Eel | 16AGN15 | 1 |
| 04/18/2007 | Eel | 16AGT15 | 1 |
| 04/19/2007 | Eel | 16AGC15 | 1 |
| 04/20/2007 | Eel | 16AGH15 | 1 |
| 04/24/2007 | Eel | 16AGT15 | 1 |
| 04/27/2007 | Eel | 16AVN15 | 1 |
| 04/29/2007 | Eel | 16AGT15 | 1 |
| 04/30/2007 | Eel | 16AGN15 | 1 |
| 04/30/2007 | Eel | 16AGN15 | 1 |
| 04/30/2007 | Eel | 16AVT15 | 1 |
| 05/02/2007 | Eel | 16AVT15 | 1 |

| | | | |
|---|---|---|---|
| 05/02/2007 | Eel | 16AVT15 | 1 |
| 05/04/2007 | Eel | 16AGN15 | 1 |
| 05/07/2007 | Eel | 16AGC15 | 1 |
| 05/07/2007 | Eel | 16AGT15 | 1 |
| 05/08/2007 | Eel | 16AGT15 | 1 |
| 05/08/2007 | Eel | 16AGT15 | 1 |
| 05/08/2007 | Eel | 16AGT15 | 1 |
| 05/08/2007 | Eel | 16AVT15 | 1 |
| 05/09/2007 | Eel | 16AGN15 | 1 |
| 05/09/2007 | Eel | 16AGT15 | 1 |
| 05/10/2007 | Eel | 16AGN15 | 1 |
| 05/11/2007 | Eel | 16AVT15 | 1 |
| 05/14/2007 | Eel | 16AGT15 | 1 |
| 05/15/2007 | Eel | 16AGD15 | 1 |
| 05/15/2007 | Eel | 16AGN15 | 1 |
| 05/16/2007 | Eel | 16AVT15 | 1 |
| 05/16/2007 | Eel | 16AVT15 | 1 |
| 05/17/2007 | Eel | 16AGD15 | 1 |
| 05/22/2007 | Eel | 16AVT15 | 1 |
| 05/23/2007 | Eel | 16AYD15 | 1 |
| 05/24/2007 | Eel | 16AGN15 | 1 |
| 05/25/2007 | Eel | 16AGN15 | 1 |
| 05/25/2007 | Eel | 16AVT15 | 1 |
| 05/28/2007 | Eel | 16AGN15 | 1 |
| 05/28/2007 | Eel | 16AVN15 | 1 |
| 05/29/2007 | Eel | 16AVN15 | 1 |
| 05/30/2007 | Eel | 16AGN15 | 1 |
| 05/30/2007 | Eel | 16AGT15 | 1 |
| | | | 292 |

**Total manuf** **83**
**Total shipments** **292**

**Updated CN Shrimp Entries**
**10-01-06 to 05-31-07**

| Submission Date | Product Code Description | Product Code | Entries Count |
|---|---|---|---|
| 10/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 10/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 3 |
| 10/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 10/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |

| | | | |
|---|---|---|---|
| 10/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 10/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 10/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 10/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |

| | | | |
|---|---|---|---|
| 10/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/07/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGP21 | 1 |
| 10/07/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/07/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 3 |
| 10/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |
| 10/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 10/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 10/10/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 10/10/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 10/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 10/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

| | | | |
|---|---|---|---|
| 10/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 10/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 10/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 2 |
| 10/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 10/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |

| | | | |
|---|---|---|---|
| 10/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 6 |
| 10/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 10/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 10/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 10/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGY21 | 1 |
| 10/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 10/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 10/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 10/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 10/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 10/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 10/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 10/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 10/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 10 |
| 10/22/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/23/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 10/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 3 |

| | | | |
|---|---|---|---|
| 10/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/25/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/25/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 9 |
| 10/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 10/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 11 |

| | | | |
|---|---|---|---|
| 10/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 10/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 10/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 10/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 10/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |

| | | | |
|---|---|---|---|
| 10/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/30/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 10/30/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/30/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 10/31/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 3 |
| 10/31/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 10/31/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 10/31/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 11/01/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 5 |
| 11/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 11/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 11/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 11/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/03/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 7 |

| | | | |
|---|---|---|---|
| 11/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 11/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 12 |
| 11/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 11/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 11/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 7 |
| 11/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 11/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 11/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/09/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/10/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/10/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 11/10/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 11/10/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 9 |
| 11/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 10 |
| 11/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |
| 11/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |

| | | | |
|---|---|---|---|
| 11/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 11/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 11/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 11/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 11/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/16/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 11/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 11/17/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 4 |
| 11/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XDD21 | 1 |
| 11/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 2 |
| 11/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 5 |
| 11/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |

| | | | |
|---|---|---|---|
| 11/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 2 |
| 11/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 11/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 6 |
| 11/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 8 |
| 11/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/22/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/22/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 11/22/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/23/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 11/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 5 |
| 11/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 11/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 7 |
| 11/24/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 11/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 11/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 4 |

| | | | |
|---|---|---|---|
| 11/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 11/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 11/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 10 |
| 11/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 11/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

| | | | |
|---|---|---|---|
| 11/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 11/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 11/30/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 12/01/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 12/01/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 12/01/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 6 |
| 12/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 12/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 5 |

| | | | |
|---|---|---|---|
| 12/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/02/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 2 |
| 12/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 12/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 4 |
| 12/04/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 12/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |

| | | | |
|---|---|---|---|
| 12/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |
| 12/05/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/06/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 6 |
| 12/07/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 3 |
| 12/07/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 12/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 12/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 8 |

| | | | |
|---|---|---|---|
| 12/08/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 12/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 2 |
| 12/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 12/11/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |
| 12/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 2 |
| 12/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 6 |
| 12/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |

| | | | |
|---|---|---|---|
| 12/12/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 12/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 12/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 12/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 12/13/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 12/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

| | | | |
|---|---|---|---|
| 12/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 12/14/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 12/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 4 |
| 12/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/15/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |

| | | | |
|---|---|---|---|
| 12/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 12/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/18/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 12/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 12/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/19/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 12/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 12/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 12/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 12/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/20/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGY21 | 1 |
| 12/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 9 |
| 12/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 10 |

| | | | |
|---|---|---|---|
| 12/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/21/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/22/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/22/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 12/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/26/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 12/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 12/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 12/27/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 12/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 4 |
| 12/28/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |

| | | | |
|---|---|---|---|
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 5 |
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 12/29/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/31/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 12/31/2006 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 01/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |

| | | | |
|---|---|---|---|
| 01/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 01/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 2 |
| 01/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 01/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 4 |
| 01/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |

| | | | |
|---|---|---|---|
| 01/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 01/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 01/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 01/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/06/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 01/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFD21 | 1 |
| 01/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 01/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 5 |
| 01/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |
| 01/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 01/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 3 |
| 01/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 01/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 01/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 01/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 01/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |
| 01/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 01/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 01/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 4 |
| 01/13/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |

| | | | |
|---|---|---|---|
| 01/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 01/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 01/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 01/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 01/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 01/21/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 01/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XFN21 | 1 |
| 01/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 01/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 01/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XHD21 | 1 |
| 01/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 01/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 01/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 01/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/30/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 3 |
| 01/31/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 01/31/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |

| | | | |
|---|---|---|---|
| 02/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 02/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 02/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 5 |
| 02/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/06/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 02/06/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 02/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |

| | | | |
|---|---|---|---|
| 02/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 5 |
| 02/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 02/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 02/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 02/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 4 |
| 02/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 4 |
| 02/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 4 |

| | | | |
|---|---|---|---|
| 02/14/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGP21 | 1 |
| 02/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 02/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 02/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 02/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 02/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 02/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |

| | | | |
|---|---|---|---|
| 02/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/20/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 02/20/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

| | | | |
|---|---|---|---|
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/23/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 02/23/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

| | | | |
|---|---|---|---|
| 02/23/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 02/23/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/23/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 02/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 02/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 02/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 02/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 02/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 02/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 02/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 02/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 02/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |

| | | | |
|---|---|---|---|
| 03/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 03/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 03/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 03/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/06/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 03/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 03/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/13/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/15/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |

| | | | |
|---|---|---|---|
| 03/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |
| 03/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 03/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 03/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 03/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |
| 03/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 03/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

| | | | |
|---|---|---|---|
| 03/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 03/30/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 04/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 3 |
| 04/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 04/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 04/05/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/06/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 04/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 4 |
| 04/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 04/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 04/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 04/13/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 2 |
| 04/13/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/15/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 04/15/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 04/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGP21 | 1 |
| 04/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

| | | | |
|---|---|---|---|
| 04/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 04/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 04/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 04/20/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 04/20/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/20/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 04/21/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 04/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 04/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 04/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 04/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 04/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 4 |
| 04/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 04/26/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 04/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 04/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/28/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 04/30/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |

| | | | |
|---|---|---|---|
| 04/30/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 04/30/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |
| 05/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 05/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/01/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGC21 | 1 |
| 05/02/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 6 |
| 05/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 4 |

| | | | |
|---|---|---|---|
| 05/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/03/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/04/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/07/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 6 |
| 05/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 05/08/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 05/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/09/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 05/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/10/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XVT21 | 1 |
| 05/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |

| | | | |
|---|---|---|---|
| 05/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 05/11/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 05/12/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/13/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |
| 05/13/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/14/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/15/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 05/15/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/16/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 05/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 05/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 05/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |
| 05/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/17/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 3 |

| | | | |
|---|---|---|---|
| 05/18/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/19/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/20/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/21/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 2 |
| 05/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 05/22/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 2 |
| 05/24/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |

| | | | |
|---|---|---|---|
| 05/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 05/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| 05/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 2 |
| 05/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 3 |
| 05/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/25/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/27/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGD21 | 1 |

| | | | |
|---|---|---|---|
| 05/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/29/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGT21 | 1 |
| 05/30/2007 | Shrimp and prawns, Aquaculture Harvested Fishery/Seafood Products | 16XGN21 | 1 |
| | | | 915 |

| | |
|---|---|
| **Total manuf** | **57** |
| **Total shipments** | **915** |

# U.S. FDA China Chemotherapeutic Residues Trip Report
**September 12-28, 2006**

## Final Report - Summary

### 1. Introduction

This mission took place in the People's Republic of China from September 12-28, 2006. The mission team consisted of Brett Koonse and Barbara Montwill from the U.S. Food and Drug Administration (FDA).

### 2. Objectives and Scope of Mission

The objective of the mission was to evaluate China's overall control of chemotherapeutic residues in aquacultured products exported to the US.

In terms of scope, the mission looked at the legal, administrative, and regulatory measures the competent authorities have implemented to control the use and availability of antibiotics; the controls farms and processing facilities have implemented to control drug residues; the availability of antibiotics at retail stores that sell veterinary medicinal products (VMP); and the operation and performance of the laboratories that analyze for the presence of drug residues in catfish, shrimp, eel, and crab meat.

In pursuit of this objective, the following sites were visited and meetings held:

| **COMPETENT AUTHORITY VISITS** | | # meetings |
|---|---|---|
| Competent Authority | Central | 2 |
| Provincial Competent Authorities | Regional Provincial | 3 |
| Local CIQ and MOA officials | Local | 6 |
| **LABORATORYY VISITS** | | 3 |
| Central/reference | | |
| **LIVE ANIMAL CONTROL SITES** | | 9 |
| Farms | | |

| | |
|---|---|
| **ESTABLISHMENTS** | 7 |
| Processing facilities | |
| **OTHERS** | 5 |
| VMP retailer | 3 |
| Farm association meetings | 2 |

### 3. China Aquaculture Production and Exports to the US

The United States imports 70% of the seafood it consumes and over 40% percent of this seafood is from aquaculture operations. Three of the most popular seafood items are also three of the top aquaculture imports: shrimp, salmon, and tilapia. Together, they represented over two billion pounds of seafood imported into the U.S. in 2004.

It is estimated that 90 percent of shrimp, the number one seafood consumed in the US, is imported, and almost all of the tilapia is imported as well. China is the largest aquaculture producing country in the world, accounting for 70% of the total quantity and 55% of the total value of aquacultured seafood bought and sold around the world. China is currently the third largest exporter of seafood to the US and includes, shrimp, catfish, and tilapia. China's market share in the U.S has steady increased from 5 percent in 1995 to 11 percent in 2004. With its rapidly growing aquaculture industries, China may soon surpass Canada and Thailand as the leading supplier of seafood products to the U.S.

### 4. Overall Comments on Competent Authorities

The control of animal residues in China is rather complicated. There does appear to be overlapping responsibilities of several government agencies.

In General:

- China General Administration of Quality Supervision, Inspection and Quarantine, AQSIQ, has the overall responsibility for aquacultured products exported from China;
- Ministry of Agriculture, MOA, has the overall responsibility for aquaculture operations and for the products used on aquaculture farms (e.g., VMPs);
- Certification and Accreditation Administration, CNCA, has overall responsibility for HACCP compliance of seafood processing facilities;
- Entry-Exit Inspection and Quarantine Bureau, CIQ, has local responsibility for inspecting and sampling aquaculture farms and seafood processors that export.
- Local or municipal branches of CIQ conduct many of the inspecting and sampling functions on aquaculture farms intended for export
- Local or municipal Ocean and Fishery Bureaus are responsible for implementation the national NRCP and the local residue control programs.

### 5. Conclusions:

Overall, the FDA team concluded that China's current unapproved residue control program for products exported to the U.S. is neither satisfactory nor effective. China is a very large country with the world's largest aquaculture industry producing 70% of the world's aquaculture products. There is no preventative system in place whereby the aquaculture industry (e.g., farmers), processors, and exporters are trained about food safety as it relates to aquaculture operations and the rely too heavily on an inadequate product testing scheme.

A significant concern is that MG and its metabolite Leucomalachite Green residues appear to be currently in the eel in China, both those eel still in ponds or that is frozen after processing, because of past practices. The reasons are its historical use in China, CIQ's relatively recent testing methods and product testing schemes, eel's relative long grow-out period, and MGs long residual time in fish tissue.

There are also concerns with using other drugs in aquaculture products that are not approved in the US e.g. nitrofurans, fluoroquinolones.

Other Concerns:

1. In China, processors collect and analyze their own pre-harvest samples in their own laboratories.

2. Chinese government officials stated that there have been reports of an organized group developing and providing forged Sanitary or Export Certificates which are the guarantee that the product had been manufactured under sanitary conditions and is in compliance with the US regulations.

3. Numerous lots (product from one pond, from one farm, on any given day) make up "shipments" but only a relatively few sub-samples are taken to assure aquaculture products are free for unapproved residues.

4. Feed, fingerlings, or product found to contain unapproved drug residues may not be destroyed or tracked to assure the product does not get into the export country market. It may be sold into the domestic market or as animal feed and may make its way back into the export market.

5. Most of the aquaculture products are being analyzed at local CIQ laboratories. We received limited information as to the capacity for these laboratories to test inspectional samples. However, it appeared to us that there are too few routine or local laboratories capable of testing for drugs that are prohibited for use in aquaculture. This includes the lack of routine or local laboratories that are capable of analyzing for NF and MG.

6. All four drugs (furazolidone, furaltadone, nitrofurazone and nitrofurantoin) belonging to the group of nitrofuran antibacterial agents have been widely used as veterinary drugs

in China. However, some local government laboratories and processor laboratories use and rely on results from commercially available laboratory screening methods for NF that can only detect metabolites of furazolidone (AOZ) and furaltadone (AMOZ). A confirmatory test is not employed. Furthermore, some laboratories listed in the National Residue Control Program tested only for the metabolite furazolidone (AOZ). This limitation may result in a failure to detect residues of NF in the product and cast doubt on China's ability to control the use of this drug in aquaculture production.

7. In China, the approved analytical method for detection of MG and its metabolite of Leucomalachite Green is still not widely used in all laboratories. In addition, the method that was developed in September 2005 and implemented in January 2006 has a sensitivity of 2µg/kg (as indicated in the NRCP) which does not meet the U.S. expectation for a detection level for the presence of this illegal drug residue.

8. The standard methods used in China are only recommended methods and AQSIQ laboratories can select any method that meets their needs and capability as long as the selection is validated according to the Quality Control Guideline for Analysis of Residues. This may result in inconsistent results.

9. In some instances various methods for specific drug residue testing might be available. Laboratories might modify the standard method according to their capability (e.g. instrumentation, personnel and workload) and will develop their own SOPs. This may make it difficult for inter-laboratory comparison and may affect the reliability and quality of the analytical data generated.

10. There appeared to be limited communication between AQSIQ and MOA laboratories involved in seafood product safety control.

**Attachment E**

**CFIA Results for Unapproved Drug Residues in Imports from China, April 01, 2006-March 31, 2007**

Source: CFIA Report: Number of Lots Inspected and Number of Lots Rejected for Drug Residues between 2006/04/01 and 2007/03/31 (Sorted by Country of Origin, Foreign Processor and Species)

| Species | Analyte | # Firms Inspected | # Shipments Inspected | # Unacceptable Shipments | Rejection Rate |
|---|---|---|---|---|---|
| Shrimp | Malachite green | 11 | 15 | 0 | 0% |
| Bream | | 3 | 6 | 0 | 0 |
| Catfish | | 3 | 3 | 1 | 33.3% |
| Croaker | | 21 | 63 | 3 | 4.8% |
| Dace/Carp | | 8 | 34 | 5 | 14.7% |
| Eel | | 17 | 71 | 3 | 4.2% |
| Mullet | | 2 | 4 | 0 | 0% |
| Salmon | | 3 | 5 | 0 | 0% |
| Tilapia | | 20 | 42 | 2 | 4.8% |
| Pompano | | 3 | 5 | 1 | 20% |
| Other fish | | 14 | 18 | 0 | 0% |
| **Total** | | | **266** | **15** | **5.6%** |
| | Nitrofurans | | | | |
| Shrimp | | 42 | 345 | 47 | 13.6% |
| Eel | | 8 | 10 | 3 | 30.0% |
| Tilapia | | 9 | 11 | 0 | 0% |
| Croaker | | 8 | 8 | 1 | 12.5% |
| Dace/Carp | | 5 | 5 | 0 | 0% |
| Catfish | | 3 | 3 | 0 | 0% |
| Salmon | | 3 | 4 | 0 | 0% |
| Bass Sea | | 1 | 1 | 0 | 0% |
| Squid | | 1 | 2 | 0 | 0% |
| Crawfish | | 1 | 1 | 0 | 0% |
| Other fish | | 9 | 22 | 7 | 31.8% |
| **Total** | | | **412** | **58** | **14.1%** |

# Attachment F

**CFIA Import Alert list of Chinese processors/shippers with violative product (Oct 2006-April 2007)**

**Source: CFIA website http://active.inspection.gc.ca/scripts/fispoi/ial/IALFront.asp?lang=e**

| Country | Processor | Product | Analyte Residue | Date Listed |
|---|---|---|---|---|
| China | [redacted] | All products | Malachite green | 1/23/2007 |
| China | [redacted] | All products | Malachite green | 1/26/2007 |
| China | [redacted] | All products | Nitrofuran | 2/5/2007 |
| China | [redacted] | All products | Nitrofuran | 2/8/2007 |
| China | [redacted] | All products | Nitrofuran | 2/19/2007 |
| China | [redacted] | All products | Nitrofuran | 2/26/2007 |
| China | [redacted] | All products | Nitrofuran | 2/26/2007 |
| China | [redacted] | All products | Nitrofuran | 2/27/2007 |
| China | [redacted] | All products | Nitrofuran | 3/1/2007 |
| China | [redacted] | All products | Nitrofuran | 3/13/2007 |
| China | [redacted] | All products | Nitrofuran | 3/13/2007 |
| China | [redacted] | All products | Nitrofuran | 3/14/2007 |
| China | [redacted] | All products | Nitrofuran | 3/20/2007 |
| China | [redacted] | All products | Florfenicol | 3/29/2007 |
| China | [redacted] | All products | Nitrofuran | 4/10/2007 |
| China | [redacted] | All products | Nitrofuran | 4/10/2007 |
| China | [redacted] | All products | Nitrofuran | 4/11/2007 |
| China | [redacted] | All products | Malachite green | 5/8/2007 |
| China | [redacted] | All products | Nitrofuran | 11/2/2006 |
| China | [redacted] | All products | Malachite green | 11/29/2006 |
| China | [redacted] | All products | Nitrofuran | 11/30/2006 |
| China | [redacted] | All products | Nitrofuran & Malachite green | 12/22/2006 |

**Marked in red: processors with product that tested positive under FDA program**

**Marked in green: processors that shipped product to US in the last 6 months**

## Attachment G

On April 25, 2007 Alabama Department of Agriculture and Industry issued an automatic "Stop Sale" order for all catfish from China. The decision was made after the results of tests conducted on samples of imported fish from China revealed the presence of Enrofloxicin, a drug that belongs to the class of Flouoroqinolones, antibiotics not approved for use in aquatic food producing animals in the United States. Twenty samples of catfish collected for analysis were obtained from nine different food storage warehouses between February 13, 2007 and March 29, 2007. Information on the manufacturer/shipper in China was not available.
Tests were conducted in the Alabama Department of Agriculture and Industry's Food and Drug Laboratory. Of the twenty samples, fourteen were positive. Levels of Enrofloxacin residue in fish tissue ranged from 1.2 to 20.6 ppb. The presence of this drug residue in catfish was detected by LC/MS/MS with a method sensitivity of 1.0 ppb. Ciprofloxacin and Sarafloxacin were not detected in any sample.

Detailed lab results are provided below.

| Date sampled | Level (ppb) | |
|---|---|---|
| | Detected | Confirmed |
| 3/29/07 | 1.57 | 1.68 |
| 3/29/07 | 1.59 | 1.78 |
| 2/27/07 | 1.20 | 1.21 |
| 3/09/07 | 1.14 | 1.28 |
| 3/09/07 | 2.90 | 2.99 |
| 3/09/07 | 3.34 | 2.85 |
| 3/09/07 | 3.19 | 2.85 |
| 3/01/07 | 7.61 | 7.26 |
| 3/09/07 | 13.4 | 12.6 |
| 3/09/07 | 15.0 | 15.1 |
| 3/09/07 | 5.20 | 5.10 |
| 3/06/07 | 24.4 | 20.6 |
| 3/06/07 | 8.28 | 8.43 |

# EXHIBIT 2

Case 1:07-cv-01982-HHK Document 12-3 Filed 03/12/2008 Page 2 of 3

section 9, the section under consideration, are to be accepted as official and constitute the basis of criminal prosecution in the courts, or is the question of fact open for consideration in the courts?

Mr. MANN. Why, it is certainly open for consideration in the courts, but this is the basis for the criminal prosecution. It is absolutely necessary that there should be some standard fixed before anybody can determine on the part of the Government whether prosecution shall be inaugurated or not, but, of course, it finally rests with the court to determine whether, as a matter of fact, the article is adulterated or is unwholesome, under the provisions of the act.

Mr. CRUMPACKER. Then, an indictment or information would not be good under this bill, if it charged simply that a person failed to comply with the food or drug standard, as fixed by the law?

Mr. MANN. It would not.

Mr. CRUMPACKER. What does the phrase mean, in line 22, "and for the information of the courts?" If the standard is to be fixed officially and it is not to constitute a basis of an indictment or a penal prosecution, why do you say "for the information of the courts?"

Mr. MANN. That it may be introduced in evidence in the courts.

Mr. CRUMPACKER. It is to be admissible in evidence, is it?

Mr. MANN. That is what it amounts to.

Mr. CRUMPACKER. I do not believe this section makes it admissible. It does not provide it shall be admissible in evidence.

Mr. MANN. I think "for information of the courts" will admit it in evidence when presented in proper form. I have no doubt of that.

Mr. CLARK of Missouri. I would like to ask the gentleman, Does the gentleman undertake to make a certificate of the Secretary of Agriculture evidence against a defendant in a criminal case?

Mr. MANN. Evidence that that is the standard which has been fixed by the Secretary of Agriculture; not evidence that the person is guilty of a misdemeanor.

Mr. PAYNE. That is not involved in this amendment, is it?

Mr. MANN. It is not particularly involved in it.

Mr. PAYNE. Now, the gentleman from Indiana is talking about that which seems to be harmless. See if we can not get time to amend the other part of it.

Mr. CRUMPACKER. That is not harmless; it has a good deal of significance when read in connection with other provisions.

Mr. PAYNE. It does not make much difference whether we get at this or not if we leave the other in——

Mr. CLARK of Missouri. Mr. Chairman, if the gentleman will permit me, when we get to that part of the bill I will move to strike it out, because it is contrary to the Constitution of the United States and the constitution of every State in the Union.

Mr. CRUMPACKER. And of every individual in the country.

Mr. GROSVENOR. If the gentleman will allow me a word, I think I can say to my friend——

The CHAIRMAN. The time of the gentleman has expired.

Mr. CRUMPACKER. I ask unanimous consent for five minutes more.

The CHAIRMAN. Is there objection? [After a pause.] The Chair hears none.

Mr. GROSVENOR. The text as it stands: I would like to have the gentleman from Missouri take a copy of the bill and look at page 23: "It shall be the duty of the Secretary of Agriculture, for the purpose of aiding him in determining as to the wholesomeness or unwholesomeness of food." Now, that is all there is of it. It need not have been put there at all. He might have used their advice for any purpose. But in order to limit the Secretary of Agriculture so that he should not permit the board to become a finality the limitation is put and——

Mr. CRUMPACKER. It seems, by implication at least, to provide that the Secretary of Agriculture is to fix a standard which shall be a basis for criminal prosecutions——

Mr. GROSVENOR. That is true.

Mr. CRUMPACKER. The text as it stands will not bear that construction, in my judgment—will not bear that interpretation. I certainly do not believe we ought to confer upon the Secretary of Agriculture the power to fix a standard and then convict a man of crime, fine him, and send him to prison because he does not comply with the standard. That would be department-made law.

Mr. ADAMS. Will the gentleman permit me?

Mr. CRUMPACKER. I believe the law ought to provide that whoever sells forbidden kinds of foods or drugs or medicines may be amenable to the penal provisions in the bill.

Mr. ADAMS. Will the gentleman allow me to offer a suggestion?

Mr. CRUMPACKER. I will.

Mr. ADAMS. The object of this bill is to frame a law which will enable the Secretary of Agriculture to get all possible information, so that when he desires to prosecute he will have all of the information he can get. It does not confer any additional authority of law upon him.

Mr. CRUMPACKER. It authorizes the Secretary of Agriculture to collect this information and fix standards for foods and drugs, among other things, for the information of the courts. What is the business of the courts in this connection? To try criminals, men who are put on trial for violating its provisions.

Mr. ADAMS. Will the gentleman permit me to answer the question? It does not make any difference whether the phrase "for the information of the court" goes in or not. This commission is established for the purpose of endeavoring to arrive at a series of correct standards as nearly as possible by scientific judgment for the information of the Secretary and for the purposes of prosecution. Now, when the Secretary of Agriculture goes into court and undertakes to try a case, the opinion of that commission comes in there simply as a part of the evidence, just as the gentleman from Illinois says. It is not conclusive. You can not make it conclusive.

Mr. CRUMPACKER. If the gentleman from Wisconsin is correct in his interpretation of the law, I have no criticism to make of it, but if this section of the bill will authorize the Secretary of Agriculture to fix a standard, the violation of which shall subject citizens to fine and imprisonment, then I object to it.

Mr. ADAMS. It does not.

Mr. PAYNE. Why does not my friend from Indiana [Mr. CRUMPACKER] let the amendment pass? It has no effect upon his proposition. After the committee amendments are agree to he can then make a motion.

Mr. CRUMPACKER. I will let it pass. I do not think I can help it in any way.

The CHAIRMAN. The question is on agreeing to the amendment.

The question was taken; and the amendment was agreed to.

Mr. MANN. Mr. Chairman, I desire to offer an amendment.

The CHAIRMAN. The gentleman from Illinois offers an amendment, which the Clerk will report.

The Clerk read as follows:

On page 23, at the end of line 23, insert the following:

"Foods complying with the standards fixed by the Secretary of Agriculture, as provided in this section, may bear upon the label the inscription 'United States Standard,' but such inscription, or words of similar import, shall not be used as descriptive of any article of food which does not comply with the standard so fixed, under penalty of being deemed misbranded under the provisions of this act."

The CHAIRMAN. The question is on agreeing to the amendment.

The question was taken, and the amendment was agreed to.

Mr. MANN. Mr. Chairman, I desire to offer an amendment.

The CHAIRMAN. The gentleman from Illinois [Mr. MANN] offers an amendment, which the Clerk will report.

The Clerk read as follows:

On page 26 strike out section 14 and insert as section 14 the following:

"The Secretary of the Treasury shall deliver to the Secretary of Agriculture, upon his request from time to time, samples of foods and drugs which are being imported into the United States or offered for import, giving notice thereof to the owner or consignee, who may appear before the Secretary of Agriculture and have the right to introduce testimony, and if it appear from the examination of such samples that any article of food or drug offered to be imported into the United States is adulterated or misbranded within the meaning of this act, or is otherwise dangerous to the health of the people of the United States; or is of a kind forbidden entry into, or forbidden to be sold or restricted in sale in the country in which it is made or from which it is exported, or is otherwise falsely labeled in any respect, the said article shall be refused admission, and the Secretary of the Treasury shall refuse delivery to the consignee and shall cause the destruction of any goods refused delivery which shall not be exported by the consignee within three months from the date of notice of such refusal under such regulations as the Secretary of the Treasury may prescribe: *Provided*, That the Secretary of the Treasury may deliver to the consignee such goods pending examination and decision in the matter on execution of a penal bond for the amount of the full invoice value of such goods, together with the duty thereon, and on refusal to return such goods for any cause to the custody of the Secretary of the Treasury, when demanded, for the purpose of excluding them from the country, or for any other purpose, said consignee shall forfeit the full amount of the bond: *And provided further*, That all charges for storage, cartage, and labor on goods which are refused admission or delivery shall be paid by the owner or consignee, and in default of such payment shall constitute a lien against any future importation made by such owner or consignee."

Mr. MANN. Mr. Chairman, the amendment is substantially an amendment that is already in the bill, but redrafted in conformity with the opinion of the Treasury Department in connection with various provisions.

BEST COPY AVAILABLE

Mr. CRUMPACKER. I understand under this provision the Secretary of Agriculture has power to decide whether a cargo of goods imported from a foreign country is adulterated or misbranded, that his decision is final, and that the goods must be destroyed or exported and returned without any further investigation or power of review. That is true, is it not?

Mr. MANN. The gentleman has about the same understanding of the matter that I have. That is the existing law.

[Cries of "Vote!"]

Mr. COOPER of Wisconsin. Who fixes the invoice value?

Mr. MANN. The invoice value is first fixed by the person who makes the entry and, second, by the board of appraisers, which determines the invoice value if it is requested.

Mr. COOPER of Wisconsin. Then, if he gives a bond for the invoice value with the duty added, he takes the goods and sells them, provided he will pay the bond?

Mr. MANN. He may.

Mr. COOPER of Wisconsin. Although the goods are misbranded and fraudulent in every way, as well as poisonous?

Mr. MANN. It is within the discretion of the Secretary of Agriculture to advise that that be done.

Mr. COOPER of Wisconsin. Does not the gentleman think that that bond, in view of the fact that the undervaluation was apparently indulged in by the importer's false invoicing, ought to be very much larger than the face value, when it will permit him to take false, fraudulent, and poisonous goods and sell them at that invoice value?

Mr. MANN. I do not think that if it were made ten times more than the value we could recover any more than the value. The amount was stated by the Agricultural officials who have charge of the existing law which covers the case, and the form of the proposition was suggested by the Treasury Department, which deals with the matter.

Mr. PAYNE. If the gentleman will allow me to suggest, "appraised value" would be better than "invoice value."

Mr. MANN. The "invoice value" is the suggestion of the Treasury Department.

Mr. PAYNE. With all due deference, "appraised value" would be better.

Mr. MANN. I am not familiar with that.

Mr. FITZGERALD. In the investigations the gentleman made, does he know of any instance in which food was delivered under the provisions of this existing law, the bond given, and the product sold, and the goods were afterwards adjudged to be improperly imported?

Mr. MANN. The law as it now exists does not provide for the delivery of the goods; but the Agricultural Department requested that provision be inserted in the law, because they said in many cases it was a great hardship to hold goods in storage instead of delivering them to the parties.

Mr. HINSHAW. I would like to ask the gentleman a question, because I do not know that I understand this provision yet. If these goods are refused admission, then the entryman may give a bond, and the bond stands in lieu of the goods. Now what may he do with the goods?

Mr. MANN. He may do whatever he pleases with them.

Mr. HINSHAW. He can not bring them into this country.

Mr. MANN. They are already in the country, provided the Secretary of the Treasury delivers them to him, which he is not required to do, and probably will not do, unless it is suggested that it should be done by the Department which has charge of that matter; and the Agricultural Department and the Treasury Department have authority under this section to stop the goods. If the Agricultural Department advises the goods be turned over by the Secretary of the Treasury to the consignee, it will be done upon giving a bond; and if the goods finally, for any reason—usually misbranding—are held not to be subject to import, the man must either return the goods or pay to the Government the full value. I think it sufficiently guards against bringing goods into the country which are adulterated.

Mr. HINSHAW. In the meantime the adulterated goods may have been sold.

Mr. MANN. That is true.

Mr. HINSHAW. As pure goods.

Mr. MANN. That is true. We take that chance.

Mr. HINSHAW. This is simply a penalty, but that does not protect the man that bought them.

Mr. MANN. That is true.

The question was taken and the amendment was agreed to.

Mr. MANN. I offer the following amendment.

The Clerk read as follows:

On page 28 strike out section 16 and insert as section 16 the following:

"SEC. 16. That this act shall be in force and effect from and after its passage: *Provided, however,* That no penalties herein named for misbranding shall be imposed until after the expiration of eighteen months from the passage of the act, except the penalties provided in section 14."

Mr. GAINES of Tennessee. I would like to ask the gentleman a question about a provision here. The section, in effect, says that when the goods have been properly examined and passed with the regular label on the package, and the package gets into the State and comes in there in the regular, original, unbroken package, would it interfere with the power of the State to take charge of it if it had spoiled? Suppose that in transmission it becomes deleterious; suppose it has undergone some change by reason of the atmosphere or otherwise; suppose it is in a condition of fermentation, or from any condition that you may discover by looking at it or otherwise examine it it had become deleterious. Is there anything in this bill that prevents the State from absolutely taking charge and destroying it?

Mr. MANN. I would suggest to my friend from Tennessee that if it becomes fermented or deleterious to health it at once becomes subject to the provisions of the act, and is covered by that provision of the section.

Mr. GAINES of Tennessee. What provision?

Mr. MANN. It is deleterious goods.

Mr. GAINES of Tennessee. Suppose it becomes deleterious of its own act while in transmission?

Mr. MANN. Then it does not fully comply with the provisions of the act.

Mr. GAINES of Tennessee. In that condition, does the State take charge of it, or the Federal Government?

Mr. MANN. Either one.

Mr. GAINES of Tennessee. I am afraid your section does not say that.

Mr. MANN. We do not need to say that to the State authorities. They have control, although the section does expressly provide against interfering with the police powers of the State. The United States authorities would have control of it if they obtain possession of it first. It would be a violation of both the Federal and State law, if there be a State law on the subject. It is a violation of this law, in any event.

Mr. GAINES of Tennessee. With that explanation I feel more satisfied than I was. I want to help the gentleman.

The CHAIRMAN. The question is on agreeing to the amendment.

The question was taken; and the amendment was agreed to.

Mr. MANN. Mr. Chairman, I move that the committee do now rise.

The motion was agreed to.

The committee accordingly rose; and the Speaker having resumed the chair, Mr. CURRIER, chairman of the Committee of the Whole House on the state of the Union, reported that that committee had had under consideration the bill S. 88, and had come to no resolution thereon.

## ENROLLED BILLS SIGNED.

Mr. WACHTER, from the Committee on Enrolled Bills, reported that they had examined and found truly enrolled bills of the following titles; when the Speaker signed the same:

H. R. 10200. An act to modify the requirements of the act entitled "An act to promote the education of the blind," approved March 3, 1871;

H. R. 15513. An act to declare and enforce the forfeiture provided by section 4 of the act of Congress approved March 3, 1875, entitled "An act granting to railroads the right of way through the public lands of the United States;"

H. R. 20210. An act to authorize the city of St. Louis, a corporation organized under the laws of the State of Missouri, to construct a bridge across the Mississippi River;

H. R. 118. An act to amend sections 713 and 714 of "An act to establish a code of law for the District of Columbia," approved January 31 and June 30, 1902, and for other purposes;

H. R. 20119. An act to authorize the village of Oslo, Marshall County, Minn., to construct a bridge across the Red River of the North;

H. R. 10181. An act to grant a certain parcel of land, part of the Fort Robinson Military Reservation, Nebr., to the village of Crawford, Nebr., for park purposes; and

H. R. 16785. An act giving preference right to actual settlers on pasture reserve No. 3 to purchase land leased to them for agricultural purposes in Comanche County, Okla.

The SPEAKER announced his signature to enrolled bills of the following titles:

S. 4109. An act to increase the efficiency of the Bureau of Insular Affairs of the War Department; and

S. 6146. An act to authorize the Back River Bridge Company to construct a bridge across the west or smaller division

COPY AVAILABLE

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALLIED PACIFIC FOOD (DALIAN) COMPANY, LIMITED,

Plaintiff,

v.

UNITED STATES FOOD AND DRUG ADMINISTRATION, *et. al*.,

Defendants.

Civil Action No. 07-1982 (HHK)

**ORDER**

Upon consideration of the Defendants' Motion to Dismiss Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and all memoranda in support thereof and in opposition thereto, it is hereby ORDERED that the defendants' motion is GRANTED.

The above-captioned case is hereby DISMISSED with prejudice.

SO ORDERED this _____ day of ______________________, 2008.

______________________________
UNITED STATES DISTRICT JUDGE