**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ALLIED PACIFIC FOOD (DALIAN),
COMPANY LIMITED,
a foreign Limited Company,

        Plaintiff,

vs.

U. S. FOOD AND DRUG
ADMINISTRATION, ANDREW C. VON
ESCHENBACH, M.D., Commissioner,
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, and
MICHAEL O. LEAVITT, Secretary,

        Defendants.

_____/

Civil Action No.: 07-1982(HHK)

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT**

Andrew S. Ittleman, Esq.
Attorney of Record for
Allited Pacific Food (Dalian) Co., Ltd.
Florida Bar No. 802441
Fuerst Humphrey Ittleman, PL
1001 Brickell Bay Drive
Suite 2002
Miami, FL  33131
(305) 350-5690
(305) 371-8989 Fax
aittleman@fuerstlaw.com

Eric Bloom, Esq.
DC Bar No. 417819
Winston & Strawn LLP
1700 K Street, N.W.
Washington, DC  20006-3817
(202) 282-5000
(202) 282-5100 Fax
ebloom@winston.com

March 24, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iii

INTRODUCTION.....................................................................................1

ARGUMENT...........................................................................................2

I.     Import Alert 16-131 Is A Substantive Rule That Required Notice-And-Comment Rulemaking Under The APA...............................................................2

     A.  An Overview of the Import Alert.....................................................4

         1.  The Import Alert's Purported "Guidance" of FDA Field Agents........5

         2.  The Import Alert's Purported "Guidance" of United States Importers of Chinese Aquaculture Products...............................5

         3.  The Import Alert's Purported "Guidance" of Third-Party Laboratories................................................................6

         4.  The Exemption List .....................................................7

     B.  The Binding Effect of the Import Alert.............................................8

         1.  Related Comments of the FDA..........................................8

         2.  The Import Alert's Burden Shifting.....................................10

         3.  The Exemption Provision................................................12

             a.    Form...........................................................12
             b.    Practice.......................................................13

     C.  The Discretion Accorded to the FDA At Large...................................17

II.     This Case Is Ripe.............................................................19

     A.  Final Agency Action Is Present In This Case......................................21

         1.  The Enactment of the Import Alert Was Final Agency Action.........22

         2.  DIOP's Rejection of Allied's Application for Exempt Status Constituted Final Agency Action.......................................23

B.  Both the Import Alert Itself, and DIOP's Rejection of Allied's Application for Exemption, Have Had – And Will Continue To Have – A Direct And Immediate Effect on Allied's Day-To-Day Business Practices……………………………..24

C.  The Issue Presented In This Case Is A Purely Legal One Which Would Not Benefit From A More Concrete Setting…………………………………………..25

III.    To The Extent That It May Have Been Required, Exhaustion Of Administrative Remedies In This Case Would Have Been Undeniably Futile………………….26

A.    The "Purely Legal" Nature Of Allied's Challenge………………….29

B.    The Futility Of Further Resort To FDA's Administrative Process………31

IV.    Allied's Due Process Claim Is Cognizable…………………………………..34

CONCLUSION………………………………………………………………………..38

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967)……………………………………..20, 21

*Aircraft & Diesel Equipment Corp. v. Hirsch*, 331 U.S. 752 (1947)……………………..26

*American Bus Association v. United States*, 627 F.2d 525 (D.C. Cir. 1980)………….3, 17

*American Federation of Gov't Employees v.  Acree*, 475 F.2d 1289 (D.C. Cir. 1973)….27

*Andrade v. Laurer*, 729 F.2d 1475 (D.C. Cir. 1984)……………………………………..26

*Athlone Industries v. Consumer Product Safety Comm'n,* 707 F.2d 1485
(D.C. Cir. 1983)………………………………………….....26, 27, 30, 31, 32, 33*

*Baker Hughes v. Kirk*, 921 F.Supp. 801 (D.C. Cir. 1995)……………..……20, 21, 22, 26*

*Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45 (D.C. Cir. 2000)……………...23

*Barlow v. Collins,* 397 U.S. 159 (1970)…………………………………………………...31

*Beins v. United States*, 224 U.S. App. D.C. 397, 695 F.2d 591 (D.C. Cir. 1982)……….27

*Bellarno Int'l Ltd. v. FDA*, 678 F.Supp. 410 (E.D.N.Y. 1988)………………....3, 10, 11*

*Better Government Assoc. v. Department of State*, 780 F.2d 86 (D.C. Cir. 1986)…..22, 23

*Bowen v. City of New York*, 476 U.S. 467 (1986)…………………………………….…..28

*Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir. 1986)………...3, 17, 18

*Burroughs Wellcome Co., v. Schweiker*, 649 F.2d 221 (4th Cir. 1981)…………………11

*Buttfield v. Stranahan*, 192 U.S. 470………………………………………………….…..36

*Citizen Health Research Group v. Comm'r*, FDA, 740 F.2d 21 (D.C. Cir. 1984)………21

*Ciba-Geigy v. EPA*, 801 F.2d 430 (D.C. Cir. 1986)………………………..22, 23, 24, 25*

*Cerro Metal Products v. Marshall*, 620 F.2d 964 (3d Cir. 1980)…………………….…..27

*Cohens v. Virginia,* 19 U.S. 264 (1821)……………………………………………….…..28

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976)………28

*Committee for GI Rights v. Callaway*, 518 F.2d 466 (D.C. Cir. 1975)............30, 32, 33

*Community Nutrition Institute v. Young*, 818 F.2d 943 (D.C. Cir. 1987)....2, 3, 8, 12, 13*

*Continental Air Lines, Inc. v. Civil Aeronautics Board*, 522 F.2d 107
(D.C. Cir. 1975)....................................................................................20, 21

*Cutler v. Hayes*, 818 F.2d 879 (D.C. Cir. 1987)...................................................27

*Dooley v. Ploger*, 491 F.2d 608 (4th Cir. 1974).................................................32

*Eagle-Picher Indus. v. EPA*, 759 F.2d 905 (D.C. Cir. 1985)................................20

*EEOC v. Lutheran Social Services*, 186 F.3d 959 (D.C. Cir. 1999)........................28

*Etelson v. Office of Personnel Management*, 684 F.2d 918 (D.C. Cir. 1982)..........27

*Guardian Federal Savings & Loan Ass'n v. FSLIC*, 589 F.2d 658
(D.C. Cir. 1978)....................................................................................3, 17, 18

*Haitian Refugee Center v. Smith*, 676 F.2d 1023 (5th Cir. Unit B 1982)...................27

*Hardin v. Kentucky Utilities Co.*, 390 U.S. 1 (1968)............................................31

*Houghton v. Shafer*, 392 U.S. 639 (1968)..........................................................32

*Lodge 1858, American Federation of Government Employees v. Paine*,
436 F.2d 882 (D.C. Cir. 1970)..................................................................32, 33

*Mathews v. Eldridge*, 424 U.S. 319 (1976).........................................................29

*McCarthy v. Madigan*, 503 U.S. 140 (1992)........................................................28

*McKart v. United States*, 395 U.S. 185 (1969).................................................26, 27

*Midwestern Gas Transmission Co. v. Federal Energy Regulatory Comm'n*, 589 F.2d 603
(D.C. Cir. 1978).........................................................................................21

*Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41 (1938)................................26

*Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423 (D.C. Cir. 1996)......20

*NEC Corp. v. United States Department of Commerce*, 151 F.3d 1361
(Fed. Cir. 1998)....................................................................................36, 37

*Patsy v. Board of Regents of Fla.,* 457 U.S. 496 (1982)………………………………….28

*Reynolds Metals Co. v. Rumsfeld,* 564 F.2d 663 (4th Cir. 1977*), cert. denied,* 435 U.S. 995, 56 L. Ed. 2d 84, 98 S. Ct. 1646 (1978)…………………………………………..11

*Skinner & Eddy Corp. v. United States,* 249 U.S. 557 (1919)………………………...29

*Taylor v. United States Treasury Dep't, IRS,* 127 F.3d 470 (5th Cir. 1977)…………...32

*United States v. California Care Corp.,* 709 F.2d 1241 (9th Cir. 1983)………………27

*Vinyard v. Wilson,* 311 F.3d 1340 (11th Cir. 2002)……………………………….35, 36

*Wallace v. Lynn,* 165 U.S. App. D.C. 363, 507 F.2d 1186 (D.C. Cir. 1974)………….…26

**STATUTES**

5 U.S.C. § 553…………………………………………………………………………..2

**OTHER AUTHORITIES**

CRS Report RL34080, *Food and Agricultural Imports from China,* by Geoffrey S. Becker…………………………………………………………………………………..9

Import Alert 16-131…………………………………………….1, 2, 4, 12, 17, 18, 19, 24*

*Some Tentative Thoughts on Public Participation in the Making of Interpretative Rules and General Statements of Policy under APA,* 23 Admin. L. Rev. 101 (1970-71)……..11

COMES NOW the Plaintiff, ALLIED PACIFIC FOOD (DALIAN) COMPANY LIMITED ("Allied"), by and through undersigned counsel, and files this memorandum of points and authorities in opposition to the Defendants' motion to dismiss Allied's Amended Complaint. In support thereof, Allied respectfully states as follows:

## INTRODUCTION

From the opening paragraph of their motion to dismiss Allied's Amended Complaint, the Defendants attempt to persuade this Court into believing that Allied somehow wishes to "challenge[] the discretion of the U.S. Food and Drug Administration ('FDA') to determine the admissibility of foreign seafood into United States commerce." The lion's share of the Defendants' motion – including their entire opening argument – is dedicated to that false position, and it ultimately serves to do little more than confuse the record. This case is simply not about what the Defendants push this Court to believe.

In this case, Allied challenges FDA's creation of a substantive rule, guised as an Import Alert (Import Alert 16-131), enacted in contravention of the Administrative Procedures Act ("APA"), which since the date of its enactment has led to the detention without physical examination of every single United States-bound shipment of Allied's product. Import Alert 16-131 is a substantive rule which binds the discretion of the FDA and requires its agents to detain without physical examination every United States-bound shipment of shrimp grown in the People's Republic of China.

In other words, contrary to what the Defendants would lead this Court to believe, Allied does not wish to challenge the discretion of the FDA to determine the admissibility of any particular food product. Indeed, as the Defendants in this case well know, Allied maintains an unparalleled compliance program and would not benefit by challenging any individual

1

admissibility decision. Instead, Allied has challenged a rule designed by FDA to create an environment in which Allied can simply no longer ship its product into the United States.

## ARGUMENT

### I.    IMPORT ALERT 16-131 IS A SUBSTANTIVE RULE THAT REQUIRED NOTICE-AND-COMMENT RULEMAKING UNDER THE APA

Pursuant to Section 553 of the APA, agency rules must be issued after notice-and-comment rulemaking procedures; 5 U.S.C. § 553. The Import Alert at issue in this case, Import Alert 16-131, was not enacted pursuant to such procedures, and the Defendants do not contend that it was. Rather, the Defendants assert in their motion to dismiss that Import Alert 16-131 did not need to be implemented pursuant to such procedures because the Import Alert – which the Defendants label as a mere "communication" – does "not constitute a substantive rule." *See*, Defendants' Motion to Dismiss, at p. 38.

The question that therefore arises in this case is whether Import Alert 16-131 is, as the Defendants articulate, something other than a substantive rule (i.e. an "interpretative rule" or a "policy statement") which did not need to be vetted through APA notice-and-comment rulemaking procedures, or, as Allied has alleged in its Amended Complaint, a substantive rule which did. The case law guiding this Court's jurisprudence, the language of the Import Alert itself, and the practices employed by the FDA in enacting and enforcing the Import Alert reveal that the Import Alert is, in fact, a substantive rule. Because the Import Alert – a substantive rule in disguise – was not enacted through APA notice-and-comment rulemaking procedures, it is unlawful. FDA's enforcement of its binding provisions should therefore be enjoined.

As articulated by the Court in *Community Nutrition Institute v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987), "[t]he distinction between legislative rules and interpretative rules or policy statements has been described at various times as 'tenuous,' 'blurred,' and, perhaps most

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

picturesquely, 'enshrouded in considerable smog.'" *Id., internal citations omitted.* Consequently, "it has fallen to the courts to discern the line through the painstaking exercise of, hopefully, sound judgment." *Id., citing Guardian Federal Savings & Loan Ass'n v. FSLIC,* 589 F.2d 658, 667 (D.C. Cir. 1978).

"There is no axiom to distinguish between a regulation and general statements of policy." *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 536-37 (D.C. Cir. 1986). In order to distinguish between interpretative rules and policy statements which need not be passed via the APA's notice-and-comment rulemaking procedures, and legislative rules which do, "[c]ourts have generally used two factors…" *Bellarno Int'l Ltd. v. FDA*, 678 F.Supp. 410, 412 (E.D.N.Y. 1988). The first factor that Courts must study is the "binding effect" of the pronouncement. As held by the Court in *Community Nutrition Institute,*

> if a statement has a present-day binding effect, it is legislative. Mere pronouncements of what the agency intends, whether for the present or for the future, which do not have a binding effect, are properly slassified as interpretative rules. **Thus, it is the binding effect, not the timing, which is the essence of criterion one.**

*Community Nutrition Institute,* 818 F.2d at 946, n.4; [Emphasis added].

In *American Bus Association v. United States,* 627 F.2d 525, 529 (D.C. Cir. 1980), the Court described the second factor that Courts must study when determining whether an agency pronouncement is an interpretative or substantive rule as follows:

> The second criterion is whether a purported policy statement genuinely leaves the agency and its decision-makers free to exercise discretion. A purported policy statement which did not do so could not be an "(announcement of) the general policy which the commission hopes to establish in subsequent proceedings."

*Id., quoting Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33, 41 (1974).

3

An analysis of Import Alert 16-131 under both of the factors articulated above reveals that Import Alert 16-131 is neither an interpretative rule nor a policy statement of the FDA. Nothing about it is tentative. It instructs, rather than guides, FDA officials. Import Alert 16-131 is a substantive rule which needed to be passed through APA's notice-and-comment rulemaking procedures prior to being implemented.

A.    **An Overview of the Import Alert**

Attached hereto as Exhibit 1 is a copy of Import Alert 16-131. Beginning at page 2, the Import Alert includes an extended description of why, exactly, the Import Alert was created. According to the Import Alert, "[a]s the aquaculture industry continues to grow and compete with wild-caught seafood products, concerns regarding the use of unapproved animal drugs and unsafe chemicals and the misuse of animal drugs in aquaculture operations have increased substantially." Import Alert, at 2-3. The Import Alert then describes with specificity the types of problems associated with Chinese aquaculture imports, including the names of the antibiotics that have allegedly been found in such imports, the particular FDA-regulated statutes that such imports violate, and what FDA has done to date to locate and stop the problem. Import Alert, at 3-4. The Import Alert's "Reason for Alert" section concludes:

> Although the use of some animal drugs (nitrofurans and malachite green) in aquaculture has been prohibited by Chinese authorities since 2002, FDA continues to find residues of these and other animal drugs in shipments of aquacultured seafood products from China.

Import Alert, at 4.

Having thus described the problem, the Import Alert continues organically into its "Guidance" section, wherein the Import Alert purports to "guide" FDA field agents, Chinese aquaculture manufacturers, importers of Chinese aquaculture products, and laboratories.

4

According to Ms. Margaret Glavin, FDA's Associate Commissioner for Regulatory Affairs, the purpose of this purported guidance is to "put the burden on either the importing country or the importing processor, not on ourselves so that we can use our resources elsewhere."[1]

### 1. The Import Alert's purported "guidance" of FDA field agents.

The Import Alert's guidance of FDA field agents is limited to one sentence:

> Districts may detain without physical examination, ***all*** shipments of aquacultured catfish, Basa (Pangasius sp), shrimp, dace, and eel from the People's Republic of China (CN) ***except for the firms identified on the attachment to this alert***.

Import Alert, at p.4; [Emphasis added].

The only firm identified on the attachment to the Import Alert is Zhangjiang Goulian Aquatic Products Co., Ltd. from Guangdong, China ("Goulian"); Import Alert, at 9. In other words, the Import Alert may be properly read to instruct FDA field agents as follows: Although you may detain without physical examination all Chinese aquaculture products, ***you may not***, however, detain without physical examination the aquaculture products manufactured by Goulian.

### 2. The Import Alert's purported "guidance" of United States importers of Chinese aquaculture products.

Because the Import Alert instructs its field agents to detain without physical examination all imports of Chinese aquaculture products – except, of course, those manufactured by Goulian – the Import Alert also instructs the United States importers that they (the importers) need to take certain steps in order to secure the release of such imports. The Import Alert provides as follows:

> In order to secure release of an individual shipment subject to this Import Alert, the importer should provide the results of a third-party laboratory analysis of a representative sample of the lot

---

[1]    Attached hereto as Exhibit 2 is the transcript of the "FDA Press Conference on Seafood Imported from China." Ms. Glavin's comment is found at p.25.

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

> verifying that products do not contain malachite green and its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet or fluoroquinolones.

Import Alert, at 5.

As such, the burden of the FDA regulatory process has been shifted to the United States importers of Chinese aquaculture products. The Import Alert notices the United States importers of Chinese aquaculture products that *when* such imports are detained without physical examination by FDA, the only way that the importer may secure the release of the import is to hire a third-party laboratory to analyze the import and confirm that it is not, in fact, tainted contrary to Import Alert 16-131.

### 3.  The Import Alert's purported "guidance" of third-party laboratories.

The Import Alert, at pp. 5 through 7, inclusive, details for the benefit of the third party laboratories which importers must hire when Chinese aquaculture imports are detained without physical examination by FDA how to examine the detained aquaculture imports. The testing procedures outlined in the Import Alert instruct the third-party laboratories as to:

a.    what residues should be tested for each species of imported aquaculture;

b.    what types of samples should be taken and tested for each type of import;

c.    how samples should be collected and prepared; and

d.    how "mixed product" entries should be sampled;

The testing procedures outlined in the Import Alert instruct with a high level of detail and specificity how Chinese aquaculture imports must be tested.

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

### 4. The Exemption List

Finally, the Import Alert explains how Chinese aquaculture manufacturers (like Allied) may become exempt (like Goulian) "from detention without physical examination." In order to become an exempt firm, the Import Alert instructs firms as follows:

> In order to remove a firm from detention without physical examination, information should be provided to FDA to adequately assess whether a manufacturer has the appropriate controls and processes in place to ensure the quality of the product, the firm or shipper should provide the following information (In English):
>
> > 1)      Documentation showing that <u>a minimum of five (5) consecutive entries</u> have been released by FDA based on third-party laboratory analysis of a representative sample of the lot verifying that products do not contain malachite green and its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet and fluoroquinolones.   The chart provided above identifies which residues should be screened for each species.   Third-party laboratory must use methods acceptable to FDA (e.g., see http://www.cfsan.fda.gov/seafood1.html); and
> >
> > 2)      Documentation, from an appropriate third-party (e.g. a government inspection authority such as AQSIQ) demonstrating that an inspection of the processor was conducted and that the seafood was processed in accordance with FDA's Seafood HACCP regulations, 21 CFR part 123, including controls for aquaculture drugs.   See 21 CFR 123.12(a).
> >
> > Documentation should include test results of any products sampled during the course of the inspection, demonstrating that the products do not contain malachite green or its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet or Fluoroquinolones; and
> >
> > 3)      Documentation that the processor is in compliance with all Chinese government

7

requirements for exporting aquacultured seafood to the U.S.

Documentation should include copies of any registration that may be required by the Chinese government.

Documentation should include copies of any registration that may be required by the Chinese government.

In short, if firms other than Goulian do not provide FDA with the documentation and other evidence required by the Import Alert, such firms cannot be removed "from detention without physical examination."

### B.    The Binding Effect of the Import Alert

In their motion to dismiss, the Defendants argue that the Import Alert is nothing more than a "communication." Motion to Dismiss, at p.38. In other words, according to the Defendants, "[t]he import alert is a mechanism for headquarters to communicate information and policy to FDA field personnel and the regulated industry." *Id.* But the Import Alert is much more than a mere "communication," and the FDA has itself acknowledged as much. The Import Alert plainly has "a present-day binding effect." *Community Nutrition Institute*, 818 F.2d at 946, n.4. Numerous factors point to the binding effect of the Import Alert.

### 1.    Related comments of the FDA

First, attached hereto as Exhibit 3 is the June 28, 2007 press release issued by the FDA upon the enactment of the Import Alert. The press release, entitled "FDA Detains Imports of Farm-Raised Chinese Seafood," states in pertinent part as follows:

The [FDA} today announced a broader import control of all farm-raised catfish, basa, shrimp, dace (related to carp), and eel from China. **FDA will start to detain these products at the border until the shipments are proven to be free of residues from**

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

**drugs that are not approved in the United States for use in farm-raised aquatic animals.**

[Emphasis added]. That statement is expressed in similar terms as the statements of two FDA representatives who spoke on behalf of FDA during the June 28, 2007 press conference:

By: David Acheson: …**FDA is not allowing** the import of these Chinese farmed seafood products until the importers can prove that the seafood is free from harmful contaminants.

Exhibit 2, at p.07; [Emphasis added].[2]

By: Sandra Young (CNN): Yes, does this mean – just to clarify – does this mean that no shrimp or catfish or any of these other types of fish that are farm raised from China can come into the U.S.? Or is this supplier by supplier basis?

By: Margaret Glavin: This means **none** of these products from China can come into the U.S. until a particular supplier proves that the product that he is trying to import is safe.

Exhibit 2, at p.16; [Emphasis added].[3]

Additionally, attached hereto as Exhibit 4 is the Congressional Research Service's (CRS) July 17, 2007 Report for Congress entitled *Food and Agricultural Imports from China*.[4] In that Report, at p.1, CRS advises Congress as follows:

In late June 2007, the U.S. Food and Drug Administration (FDA) announced that it was detaining all imports of farm-raised seafood from China (specifically, shrimp, catfish, basa, dace, and eel) until the shippers of these products could confirm that they are free of unapproved drug residues.

Further, at p.14, CRS comments:

Under [Import Alert 16-131], **FDA will detain** all covered products until the importing firm demonstrates, through testing by an independent laboratory, that a representative sample of their product is free from contaminants. Although the FDA has long

---

[2]  Mr. David Acheson is FDA's Assistant Commissioner for Food Protection.
[3]  As previously stated, Ms. Glavin is FDA's Associate Commissioner for Regulatory Affairs.
[4]  CRS Report RL34080, *Food and Agricultural Imports from China*, by Geoffrey S. Becker.

9

issued these types of alerts for various imports, they generally are more limited in scope, for example, to a particular firm or product.

[Emphasis added].

All of these comments reveal the fact that the Import Alert was designed to immediately bind the FDA, Chinese manufacturers, United States importers and third party laboratories to the standards set forth in the Import Alert.

### 2.    The Import Alert's Burden Shifting

By requiring Chinese manufacturers, United States importers and third party laboratories to comply with the terms set forth in the Import Alert before shipments which have been detained without physical examination can be released, the binding effect of the Import Alert becomes readily apparent; *see also*, Exhibit 2, at p.25. All imports of Chinese-grown aquaculture products *will* be detained without physical examination, and the manufacturers, suppliers and laboratories have each been dealt new and substantial burdens which must be carried before detained shipments will be released.

The issue of "burden-shifting" resulting from import alerts has been litigated before. In *Bellarno*, 678 F.Supp. 410, a New Jersey-based importer of pharmaceuticals ("Bellarno") sued the FDA after the FDA implemented an import alert (Import Alert #66-14) which called for the detention of "all" pharmaceuticals made in the United States, exported for foreign sale, and then offered for reimport in the United States. *Id.,* at 410.

The import alert at issue in *Bellarno* and the Import Alert at issue in this case are strikingly similar, not unlike the statements made by FDA in enacting and enforcing both of them. For instance, when studying the binding effects of the Import Alert in *Bellarno*, the Court quoted Frank E. Young, FDA's then-Commissioner to the House Subcommittee on Oversight and Investigations, who stated that Import Alert #66-14 "placed the burden on the owner or

10

consignee to show that [AGR pharmaceuticals] entries are legal." *Id.,* at 414. Mr. Young's 1986 comments mirror those of Margaret Glavin in 2007: "At some point we put the burden on either the importing country or the importing processor, not on ourselves so that we can use our resources elsewhere." Exhibit 2, at p.25.

As Allied has done in this case, Bellarno alleged in that case that Import Alert #66-14 was unlawful because it was a substantive rule not promulgated in conformity with the APA; *Id.,* at 412. And, as the Defendants in this case have done, the FDA in *Bellarno* contended that "it was not required to conduct notice-and-comment procedures because Import Alert #66-14 [was] an 'interpretative rule' or a 'general statement of policy' within the meaning of § 553(b)(3)(A)." *Id.*

The *Bellarno* Court ultimately held that the import alert was a substantive rule, binding "not only the agency, but the importers as well." *Id.,* at 414. According to the Court, "it [was] clear that by requiring the importer to comply with the terms set forth in Import Alert #66-14, the FDA has imposed new and substantive obligations." *Id.,* at 414, n.4; *citing See Burroughs Wellcome Co., v. Schweiker, 649 F.2d 221, 224 (4th Cir. 1981)* (a statement is a rule when it "'makes a substantive impact of the rights and duties of the person subject to regulation.'") (*quoting Reynolds Metals Co. v. Rumsfeld, 564 F.2d 663, 669 (4th Cir. 1977), cert. denied, 435 U.S. 995, 56 L. Ed. 2d 84, 98 S. Ct. 1646 (1978). See also Noel v. Chapman, supra, at 1030* ("'[legislative] rules are directed primarily at the public in an effort to impose obligations on them.'") (quoting Bonfield, *Some Tentative Thoughts on Public Participation in the Making of Interpretative Rules and General Statements of Policy under APA*, 23 Admin. L. Rev. 101, 115 (1970-71). In this case, where the Import Alert very clearly sets forth "new and substantive obligations" for the FDA, Chinese manufacturers, United States importers, and third party

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

laboratories, thereby binding each of them, Import Alert 16-131 parallels the import alert at issue in *Bellarno*.

### 3.    The Exemption Provision

In both a) form and b) practice, the exemption list itself is perhaps the most shining example of how the the FDA is bound by the Import Alert.

### a.    Form

In order to become exempt from detention without physical examination, manufacturers must submit to the FDA the evidence outlined at Page 8 of the Import Alert. These requirements are not unlike the "action levels" at issue in *Community Nutrition Institute v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987).

In *Community Nutrition Institute*, the FDA established "action levels" designed to inform "food producers of the allowable levels of unavoidable contaminants" in food. *Id.*, at 943. The action level at issue in that case set the maximum allowable level for aflatoxins in corn at 20 parts per billion (ppb). In establishing the action level for corn, FDA did not follow the APA's notice-and-comment rulemaking procedures because it believed that such procedures were not required. Instead, FDA alleged that the action levels were mere "policy statements." *Id.*, at 946-47.

The Court disagreed with the FDA's position, and held that "[t]his view of action levels – as having a present, binding effect – is confirmed by the fact that FDA considers it necessary for food producers to secure *exceptions* to the action levels." *Id.*, at 947. The Court explained that 21 C.F.R. § 109.8(a) permitted the FDA to "exempt from regulatory action and permit the marketing of any food that is unlawfully contaminated with a poisonous or deleterious substance" so long as certain conditions existed. *Id.* Therefore, because the action level at issue

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

in *Community Nutrition* set the benchmark for what was lawful, the language of § 109.8(a) "implie[d] that in the absence of an exemption, food with aflatoxin contamination over the action level [was] 'unlawful.'" *Id.* The action level was a substantive rule with a binding effect which needed to be implemented pursuant to the APA.

The Court's logic in *Community Nutrition* applies with equal force in this case. There, the Court held that "[i]f, as the agency would have it, action levels did indeed 'not bind courts, food producers or FDA,' ***it would scarcely be necessary to require that 'exceptions' be obtained.***'" *Id., internal citations omitted*; [Emphasis added]. If, as the Defendants in the instant case argue, the Import Alert does not bind the FDA, "it would scarcely be necessary" for the Import Alert to contain an exemption provision. In other words, why would the Import Alert contain an exemption provision if detention without physical examination of all Chinese aquaculture imports was not binding or mandatory?[5] The Import Alert's exemption provision itself is direct proof that the Import Alert has a present-day binding effect.

### b.    Practice

According to the Import Alert, firms may become exempt from detention without physical examination by offering to the FDA 1) documentation showing that a minimum of five consecutive entries have been released by FDA based on third-party laboratory analysis..., 2) documentation from an appropriate third party...demonstrating that an inspection of the processor was conducted and that the seafood was processed in accordance with FDA's seafood HACCP regulations, and 3) documentation that the processor is in compliance with all Chinese government requirements of exporting aquacultured seafood to the U.S. *See*, Import Alert, at 8.

---

[5] Under well-established principles of statutory construction, the Court must not, if reasonably possible, interpret a statute in such a way as to render provisions superfluous or meaningless; *see, e.g. Connecticut v. United States Dep't of the Interior*, 228 F.3d 82, 88 (2d Cir. 2000); *Auburn Housing Auth. v. Martinez*, 277 F.3d 138, 145-46 (2d Cir. 2002) (listing cases).

13

In practice, however, the FDA demands far more. Rather than using the Import Alert as a guideline to understand what types of firms may be appropriate candidates for exemption, the FDA has used the Import Alert like a trick floor.

To be sure, Allied has twice attempted to become an exempt firm under the Import Alert. On October 31, 2007 and December 7, 2007, respectively, Mr. Domenic Veneziano, the Director of FDA's Division of Import Operations & Policy (DIOP), responded on behalf of the FDA and rejected the good-faith applications filed by Allied. Mr. Veneziano's October 31, 2007 letter is attached hereto as Exhibit 5 and his December 7, 2007 letter is attached hereto as Exhibit 6. Both letters reveal why the Import Alert is a binding rule.

Following Allied's first application for exempt status, Mr. Veneziano wrote in his October 31, 2007 letter that Allied's submission was inadequate because a) the samples of Allied's shrimp submitted by a third-party laboratory contained traces of nitrofurans that exceeded FDA's permitted limit of detection, b) Allied's HACCP plans were insufficient, and c) Allied had not submitted adequate proof that its HACCP auditors had the requisite knowledge and experience to audit Allied's Chinese facilities. *See*, Exhibit 5. In Mr. Veneziano's words, **"Allied...has not met the criteria for removal from DWPE at this time."** *Id.*; [Emphasis added].

In response to Mr. Veneziano's October 31, 2007 letter, Allied amended its HACCP plans, furnished those plans to FDA, and submitted itself to a successful HACCP audit conducted by the United States Department of Commerce ("USDOC"). Allied's re-application for exempt status was dated November 13, 2007. Via letter dated December 7, 2007 (Exhibit 6), Mr. Veneziano rejected Allied's re-application, articulating among other things that a) USDOC's

14

audit of Allied was insufficient because it was conducted on a "fee for service basis" [6], *Id.*, at 4, and b) that without an on-site inspection of Allied's Chinese facilities conducted by FDA itself, Allied could never attain exempt status, *Id.* None of Mr. Veneziano's concerns find any support in the Import Alert.

As such, despite the fact that it has unquestionably satisfied the prerequisites for exemption as listed in the Import Alert, Allied remains indefinitely subject to detention without physical examination. According to Mr. Veneziano in his December 7, 2007 letter to Allied, "in addition to reviewing a processing plant's HACCP paperwork and a third-party's credentials, FDA believes it would be prudent, at this early stage of this program, to conduct its own on-site audits of the auditor's work until it gains confidence that the specific auditor or auditors are properly applying HACCP principles." *Id.* Of course, such an "on-site audit" of Allied's Chinese facilities would require FDA to make a trip to China. According to Mr. Veneziano,

> FDA is currently planning its next trip to China to perform a series of audits of several aquaculture firms and their third party inspectors. Although we seek to make that trip as soon as (sic) practicable (our current target is January or February of 2008), there are factors outside of FDA's control that may limit our ability to do so.

---

[6] Mr. Veneziano's mentioning of USDC's "fee-for-service" inspection as a basis for believing that the USDC audit is somehow incredible is simply jaw dropping. Virtually all governmental agencies – including the FDA itself in a variety of contexts, as well as the USDA, the Federal Aviation Commission, the Coast Guard, the Department of Agriculture, the Department of Homeland Security, and others – regularly inspect the products and facilities of private entities on a "fee-for-service" basis. Mr. Veneziano's statement is not, however, new. In the United States Government Accountability Office's 2005 Report, GAO-05-213, at pp.18-19, entitled "Oversight of Food Safety," GAO noted that FDA had levied similar "conflict of interest" allegations against USDA/NMFS, which also accepted fees for certain inspections. GAO's review of that particular issue concluded as follows: "If FDA were to recognize the results of NMFS inspection findings in targeting its resources, it could decrease or eliminate inspections at facilities that NMFS inspectors find are in compliance with sanitation and HACCP regulations."

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

As of today's date, FDA has visited neither China nor Allied's Chinese facilities. FDA has repeatedly justified its failure to visit Allied's facilities based upon "factors outside" of FDA's control.

Nevertheless, once FDA published Mr. Veneziano's letter to Allied, it became clear that Allied's exhaustive, good-faith efforts to become an exempt firm under the Import Alert had been nothing more than a fool's errand. Indeed, when FDA enacted the Import Alert, FDA provided that if firms such as Allied satisfied certain criteria, those firms could become exempt under the Import Alert. Although Allied has plainly satisfied each of the Import Alert's criteria, now, based upon arbitrary, bureaucratic considerations found nowhere in the text of the Import Alert, Allied has been a) forced to force one governmental agency (USDOC) to provide information to another (FDA), b) overcome the institutional skepticism that one governmental agency (FDA) has for another (USDOC), and c) satisfy indefinitely the criteria that FDA continually manufactures on top of the Import Alert. FDA refuses to grant Allied the exempt status it plainly deserves.

Thus, Allied – which has already satisfied the criteria for exemption set forth in the Import Alert – may only become exempt under the Import Alert when the FDA conducts an onsite examination of Allied's facilities at some undisclosed, hypothetical future date and time. So long as the FDA proceeds in this manner, i.e. manufacturing laws and related requirements and punishing Allied for not living by them, FDA will continue to detain without physical examintation all United States entries of Allied's product. All of this is proof that the FDA, in practice, is completely bound to the Import Alert, and that the detention without physical examination "policy" of the Import Alert is, in both form and practice, mandatory.

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

C.    **The Discretion Accorded to the FDA at Large**

The Defendants' wooden reliance on the word "may" contained in the Import Alert (i.e. FDA Districts "may detain without physical examination all shipments")  does little, if anything, when set against the backdrop of the manner by which FDA has enforced the Import Alert.

Allied concedes, as the Defendants pointed out in their brief, that Courts have "given decisive weight to the agency's choice between the words 'may' and 'will.'" *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 538 (D.C. Cir. 1986) (Scalia, J.); *citing American Bus Ass'n v. United States,* 627 F.2d 525, 532 (D.C. Cir. 1980); *Guardian Fed. Sav. & Loan Ass'n v. Federal Sav. & Loan Ins. Corp.* 589 F.2d 666, 668 (D.C. Cir. 1978). Nevertheless, FDA's use of the word "may" in this case is plainly distinguishable from its use of the word "may" in *Brock*. In *Brock*, "may" meant "may." In this case, "may" is nothing but a ruse. Pursuant to the Import Alert, FDA *will* detain all United States imports of Chinese aquaculture and the FDA has readily acknowledged that fact..

In *Brock*, the Court held that a policy statement issued by the Secretary of the Department of Labor was *not* a substantive rule and thus did not need to be promulgated pursuant to the APA. *Id.,* at 538-39. However, it is the factors that distinguish *Brock* from the instant case which reveal why, exactly, Import Alert 16-131 is a substantive rule which affords little, if any, discretion to those charged with the duty of enforcing it; *see, e.g. Guardian Federal Savings and Loan Assoc. v. Federal Savings and Loan Ins. Co.*, 589 F.2d 658, 666-67 (D.C. Cir. 1978) ("If it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administrative discretion, it will be taken for what it is – a binding rule of substantive law.")

To be sure, the *Brock* case was decided following the enactment of a group of statutes and regulations distinguishing "operators" from "independent contractors," and the liability

associated with each upon violations of the Federal Mine Safety and Health Act of 1977 ("Mine Act"). *Id.,* at 534-35. Following the enactment of the Mine Act, the Secretary published a series of guidelines entitled "Enforcement Policy and Guidelines for Independent Contractors," which was designed to be used by Labor Department inspectors "as guidance in making individual enforcement decisions." *Id.*, at 535. The guidance at issue in *Brock* provided as follows:

> [A]s a general rule, a production-operator may be properly cited for a violation involving an independent contractor: (1) when the production-operator has contributed by either an act or an omission to the occurrence of a violation in the course of an independent contractor's work, or (2) when the production-operator has contributed by either an act or an omission to the continued existence of a violation committed by an independent contractor, or (3) when the production-operator's miners are exposed to the hazard, or (4) when the production-operator has control over the condition that needs abatement.

*Id.,* at 536.

Accordingly, the Court characterized the language of the policy guidelines at issue in *Brock* as interpretative: "It seems to us well within the language of the document for the secretary to maintain, as he has, that he did not establish a 'binding norm,' but merely 'announced his tentative intentions for the future,' *Pacific Gas*, 506 F.2d at 38, leaving himself 'free to exercise his informed discretion,' *Guardian Federal*, 589 F.2d at 666." *Id.*, at 538.

The Import Alert at issue in this case accords FDA agents no such discretion. There is nothing "tentative" about it. Indeed, whereas the policy guidelines in *Brock* offered mine inspectors a series of factors to review in deciding whether to cite an independent contractor for a mine safety violation, *see Brock* at 536, the Import Alert in this case is far more rigid. On the one hand, Import Alert 16-131 directs FDA inspectors that they "may" detain without so much as examining "*all*" imports of Chinese aquaculture products, and on the other, it provides that the

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

only imports of Chinese aquaculture products that FDA inspectors may not detain are those imported by Goulian. *See* Exhibit 1.

The Import Alert's use of the word "may" is further contradicted by the comments of the FDA when the Import Alert was enacted, and the Congressional Research Service commenting to Congress about the purpose, scope and effect of the Import Alert; *see, e.g.* Exhibits 2, 3 and 4. Each of these statements reflected what FDA "will" do, thereby spoiling any defense based on the word "may" that the Defendants have raised in this case.

Further examples of how Import Alert 16-131 leaves no discretion to those charged with enforcing it are found in the Import Alert's directions regarding a) how individual detained shipments may be released and b) how individual Chinese manufacturers may become exempt from detention without physical examination. In other words, the Import Alert not only strips FDA agents of discretion with respect to the actual detention of Chinese aquaculture products, it also strips them of discretion with respect to the release of detained shipments and the exemption of Chinese firms.

The Defendants' motion to dismiss Allied's Amended Complaint based on the grounds that Import Alert 16-131 is not a substantive rule should therefore be denied.

## II. THIS CASE IS RIPE.

Prior to the filing of the Amended Complaint in this case, Allied participated in exhaustive discussions with the FDA concerning Import Alert 16-131, its impact on Allied's ability to do business, and its exemption provision. Via undersigned counsel, Allied vetted its concerns to the highest levels of the FDA, including FDA's Deputy Chief Counsel for Litigation (Eric Blumberg, Esq.), the Director of FDA's Division of Import Operations & Policy (DIOP) (Mr. Domenic Veneziano), and a panoply of other high ranking FDA officials. On both

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

occasions that Allied applied to the FDA to become an exempt firm under the Import Alert, Allied's applications were denied via letters written by DIOP, care of Mr. Veneziano. Accordingly, Allied still remains subject to all of the requirements of the Import Alert. Mr. Veneziano's letters rejecting Allied's applications for exemption under the Import Alert constituted "final agency action" rendering this case ripe for judicial review.

In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967), the Supreme Court set forth a two-pronged inquiry regarding ripeness. A court should examine "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 149. The rationale behind the ripeness doctrine is "twofold." *Baker Hughes v. Kirk*, 921 F.Supp. 801, 805 (D.C. Cir. 1995). The ripeness doctrine helps courts avoid premature adjudication of abstract issues that have not yet developed into a tangible controversy between the parties, and it protects the agency decision-making process from premature interference, that is, until the effects of the administrative action are "felt in a concrete way by the challenging parties." *Abbott Laboratories*, at 148-49; *see also Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) ("Prudentially, the ripeness doctrine exists to prevent the courts from wasting our resources by prematurely entangling ourselves in abstract disagreements. . . ."). The "primary focus" of the prudential aspect of the ripeness doctrine is to balance "the petitioner's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Eagle-Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985).

Evaluation of ripeness is "very much a matter of practical common sense," rather than a rigid process requiring inflexible adherence to rules. *Continental Air Lines, Inc. v. Civil*

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

*Aeronautics Board*, 522 F.2d 107, 124 (D.C. Cir. 1975). The Court in *Baker Hughes*, at 805, deemed the ripeness inquiry "not a formalistic inquiry but rather a pragmatic balancing of relevant interests." Hence, the two factors articulated in *Abbott Laboratories*, i.e. the appropriateness of judicial review and the hardship to the parties, are balanced against each other, and if the interests of those seeking review outweigh the interests of the agency in postponing review, the matter is considered ripe for review. *Continental Air Lines*, at 124.

Under the *Abbott Laboratories* test, a court should seek first to determine whether the agency action is "sufficiently final or definitive so that [the court] would have no interest in postponing review until the issues are more concrete." *Midwestern Gas Transmission Co. v. Federal Energy Regulatory Comm'n*, 589 F.2d 603, 618 (D.C. Cir. 1978). Yet, even where the court is "disinclined to find finality, '[it] must then weigh this consideration against the immediate impact of the actions on the challengers, and whether that impact is so harmful that present consideration is warranted." *Citizen Health Research Group v. Comm'r*, FDA, 740 F.2d 21, 30 (D.C. Cir. 1984) ("*PCHRG*"). In other words, in certain circumstances, even in the absence of final agency action, if the "interest of those who seek relief from the challenged action's 'immediate and practical impact' upon them," outweighs the Government's interest in postponing review, then judicial review is proper. *Continental Airlines*, 522 F.2d at 125.

### A.    Final Agency Action is Present in this Case.

Final agency action is present in this case for two reasons, neither of which have anything to do with the admissibility of any particular shipment of shrimp. First, FDA's enactment of the Import Alert itself – which was little more than a substantive rule in disguise – was final agency action. Additionally, FDA's position *vis á vis* Allied's application for exempt status under the Import Alert is "definitive" and has a "direct and immediate effect on the day-to-day business"

21

of Allied. *Baker Hughes, supra* at 806; *quoting Ciba-Geigy v. EPA*, 801 F.2d 430, 436 (D.C. Cir.

1986). Allied applied to FDA for exempt status under the Import Alert, and Mr. Domenic

Veneziano, via letter dated December 7, 2007, formally rejected Allied's application. Worse, Mr.

Veneziano's letter set forth terms and conditions which Allied is powerless to satisfy; Allied

cannot become an exempt firm and is therefore indefinitely subject to detention without physical

examination under the terms of the Import Alert. FDA has made it impossible for Allied to

become an exempt firm and has thereby made it impossible for Allied to continue shipping its

product into the United States.

### 1. The Enactment of the Import Alert was Final Agency Action.

In *Better Government Assoc. v. Department of State*, 780 F.2d 86, 93 (D.C. Cir. 1986),

the Court "rejected the proposition that if an agency labels its action an 'informal' guideline it

may thereby escape judicial review under the APA." *Ciba-Geigy*, 801 F.2d at 48. The

"guidelines" at issue in *Better Government* were used by the Justice Department to determine

whether an individual or organization "requesting information under [FOIA] [was] entitled to a

waiver of search and copying fees." *Better Government*, 780 F.2d at 86. The Court summarized

the guidelines as follows:

> The DOJ guidelines at issue have been in effect well over two
> years. Both appellee departments assert that they will continue to
> rely upon the DOJ guidelines in their evaluation of FOIA fee
> waiver requests. Neither appellee has indicated that it intends to
> subject the guidelines to public notice and comment; nor has
> Interior suggested that it intends to take steps to adopt revised or
> different regulations. In other words, on the present record, it
> seems clear that Interior and State have utilized and will continue
> to utilize the standards at issue in their present form. From what
> appellees have said, no further procedural or substantive evolution
> is expected.

*Id.,* at 93.

22

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

The Court's holding in *Better Government* is particularly poignant in the instant case. In *Better Government*, the Court held that "[w]here, as here, the agency has stated that the action in question *governs and will continue to govern* its decisions, such action must be viewed as final in our analysis of ripeness." *Id.* In this case too, the FDA has readily acknowledged that it will continue to be governed by the detention without physical examination "guidance" contained in the Import Alert. As such, the moment the FDA enacted the Import Alert contrary to the APA, the FDA took final agency action and thereby rendered this case ripe and justiciable.

### 2. DIOP's Rejection of Allied's Application for Exempt Status Constituted Final Agency Action

Much like FDA's enactment of the Import Alert itself, DIOP's rejection of Allied's application for exempt status constituted final agency action, and the fact that DIOP rejected Allied's application via letter should be of no moment in these proceedings.

In *Ciba-Geigy,* 801 F.2d at 436, the Court considered whether letters sent from EPA's Director of Pesticide Programs to the Ciba-Geigy Corporation, a manufacturer and seller of pesticides, constituted final agency action. The letters at issue in *Ciba-Geigy* instructed the Ciba-Geigy Corporation to modify the label of a particular pesticide and cautioned the corporation that its failure to follow the directives contained in the letter could lead to an EPA misbranding action. *Id.,* at 432-33. The Court held that because the letters "unequivocally stated EPA's position," "admit[ed] no ambiguity," "gave no indication that it was subject to further agency consideration or possible modification," "emphatically required Ciba-Geigy's compliance," and were written by an official authorized to speak on behalf of EPA on that issue, the letters constituted final agency action. *Id.,* at 436; *see also Barrick Goldstrike Mines, Inc. v. Browner,* 215 F.3d 45, 48 (D.C. Cir. 2000).

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

Mr. Veneziano's letters in this case are no different than the EPA correspondence at issue in *Ciba-Giegy*. Mr. Veneziano, in his December 7, 2007 letter rejecting Allied's application for exempt status, articulated that no firm may be exempted from detention without physical examination unless, and until, FDA conducts its own on-site inspection of such firm's Chinese facilities. However, Mr. Veneziano also acknowledged that such a visit to China was largely hypothetical, because "there are factors outside of FDA's control that may limit our ability to do so." Exhibit 6, at p.4. Accordingly, Allied must carry all of the burdens placed upon it by the Import Alert for the foreseeable future, and there is nothing that Allied can do to change that fact. FDA's rejection of Allied's application for exemption under the Import Alert therefore constituted final agency action.

> **B.    Both the Import Alert Itself, and DIOP's Rejection of Allied's Application for Exemption, Have Had – and Will Continue to Have – a Direct and Immediate Effect on Allied's Day-to-Day Business Practices.**

The next "branch of the ripeness inquiry requires consideration of the hardship" that Allied "will incur if judicial review is postponed." *Ciba-Geigy,* 801 F.2d at 438. Import Alert 16-131 has rendered Allied incapable of continuing to ship its product into the United States, and as such, Allied has been forced out of the United States shrimp market.

To be sure, as the Defendants in this case are well aware, from the date of the enactment of the Import Alert, every single shipment of Allied's shrimp was detained without physical examination upon entry into the United States. Upon detention, as the Import Alert provides, the importers of record for each Allied shipment were required to hire a third-party laboratory to test Allied's shrimp for antibiotics. The testing process cost many thousands of dollars and delayed the clearance time for each entry by a factor of no less than two.

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

The more serious problem, however, manifested itself in the testing and clearing process because a) the third party laboratories did not understand how to test the shrimp entries, b) FDA did not understand how to read the test reports submitted by the third party laboratories, and c) neither Allied nor the importers was permitted to participate in the administrative process prior to a release or refusal.[7] Additionally, all of this took place with a draconian sword hanging over Allied: each FDA refusal of a shrimp entry is immediately posted to FDA's OASIS webpage, and the Chinese government – as FDA is well aware – maintains a policy whereby if a Chinese manufacturer has one of its shipments refused, that manufacturer loses its exporting privileges for a period of one year. Accordingly, refusals are tantamount to a death sentence for Allied. The ramifications of the Import Alert could not be more serious. Thus, Allied's injury "clearly constitutes a distinct and palpable injury that fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Ciba-Geigy*, 801 F.2d at 439, n.10.

### C.     The Issue Presented in this Case is a Purely Legal One Which Would Not Benefit from a More Concrete Setting.

Contrary to the Defendants' oft-repeated protestations to the contrary, Allied does not wish to challenge the discretion of the FDA to determine the admissibility any particular

---

[7] In one instance, Adpen Laboratories, a Florida-based company, was hired to test shipments of Allied's shrimp. Only after Adpen submitted bogus test results to FDA did Allied learn that Adpen employed a noncompliant, rogue, and un-validated methodology whereby it sampled only three sub-samples, despite Import Alert 16-131's requirement that a "minimum of 12 individual sub-samples" be tested for each shrimp entry. Although FDA compliance officers could not properly interpret the Adpen reports, they did so anyway. Accordingly, in an effort to interpret Adpen's noncompliant test results against the Import Alert's requirement that each laboratory test a "minimum of 12 individual sub-samples" of each shrimp entry, FDA compliance officers actually multiplied the laboratory results *by a factor of four* thereby yielding the erroneous conclusion that the prohibited antibiotics were present at *four times their actual levels*. Such quadruple-counting obviously finds no support in either the Import Alert or in any related guidance materials, and but for the herculean efforts of Allied's United States attorneys to undo what Adpen and FDA had done, Allied would have been destroyed. Such is the environment created by the Import Alert.

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

shipment of shrimp. "As the Supreme Court has noted, when the issue presented is one of statutory interpretation, 'judicial review would not be significantly aided by an additional administrative decision.'" *Athlone Industries v. Consumer Product Safety Comm'n,* 707 F.2d 1485, 1489 (D.C. Cir. 1983); *quoting McKart v. United States*, 395 U.S. 185, 199 (1969); *see also, Baker Hughes*, 921 F.Supp. at 806 ("[t]his is not a case where further factual development will help to clarify the issue.") FDA is not presently detaining any of Allied's shipments, and, in fact, so long as the Import Alert is in place, Allied has no intentions of resuming its formerly robust United States business. In this case, Allied challenges FDA's creation of a substantive rule, guised as an Import Alert (Import Alert 16-131), and enacted in contravention of the APA.

The Defendants' motion to dismiss Allied's Amended Complaint based on the grounds that Allied's claims are not ripe should therefore be denied.

### III.   TO THE EXTENT THAT IT MAY HAVE BEEN REQUIRED, EXHAUSTION OF ADMINISTRATIVE REMEDIES IN THIS CASE WOULD HAVE BEEN UNDENIABLY FUTILE.

The Defendants maintain in their motion to dismiss that because Allied did not file a Citizens Petition with the FDA pursuant to 21 C.F.R. § 10.25, "Allied should be precluded from seeking judicial review until after it presents its claims and contentions to the agency." Motion to Dismiss, at 36. This argument fails for several reasons.

In *Andrade v. Laurer*, 729 F.2d 1475, 1484 (D.C. Cir. 1984), the Court described "exhaustion of available administrative remedies [as] in general a prerequisite to obtaining judicial relief for an actual or threatened injury." *Id., citing Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938); *Aircraft & Diesel Equipment Corp. v. Hirsch*, 331 U.S. 752, 767 (1947); *Athlone Industries v. CPSC*, 228 707 F.2d 1485, 1488 (D.C. Cir. 1983); *Wallace v. Lynn*, 165 U.S. App. D.C. 363, 507 F.2d 1186 (D.C. Cir. 1974).

26

The Court also articulated, however, that "the exhaustion requirement is not in general jurisdictional in nature," *Id., citing Beins v. United States*, 224 U.S. App. D.C. 397, 695 F.2d 591, 599 (D.C. Cir. 1982); *United States v. California Care Corp.*, 709 F.2d 1241, 1248 (9th Cir. 1983); *Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1034 (5th Cir. Unit B 1982); *Cerro Metal Products v. Marshall*, 620 F.2d 964, 970 (3d Cir. 1980), "but rather must be applied in accord with its purposes." *Citing, McKart v. United States*, 395 U.S. 185, 193-195 (1969); *Athlone Industries, supra*, 707 F.2d at 1488; *American Federation of Gov't Employees v. Acree*, 475 F.2d 1289 (D.C. Cir. 1973) (*per curiam*). "When the reasons supporting the doctrine are found inapplicable, the doctrine should not be blindly applied." *Id., quoting Committee for GI Rights v. Callaway*, 518 F.2d 466, 474 (D.C. Cir. 1975).

Because the exhaustion requirement – as the Defendants note in their brief at p.35, n.24 – is not jurisdictional, courts apply it "flexibly" and "with an eye towards its underlying purposes." *Cutler v. Hayes*, 818 F.2d 879, 890-91 (D.C. Cir. 1987); *quoting Etelson v. Office of Personnel Management*, 684 F.2d 918, 923 (D.C. Cir. 1982); *accord McKart v. United States*, 395 U.S. 185, 193 (1969). In *Athlone*, 707 F.2d at 1488, the Court described the exhaustion as serving three primary purposes:

> First, it preserves the autonomy of the administrative agency by allowing the agency to apply its expertise and exercise its discretion in appropriate circumstances, by giving the agency a chance to discover and correct its own errors, and by discouraging "frequent and deliberate flouting of administrative processes [which] could weaken the effectiveness of an agency." Second, application of the exhaustion doctrine aids judicial review which "may [otherwise] be hindered by the failure of the litigant to allow the agency to make a factual record, or to exercise its discretion or apply its expertise." Third, requiring exhaustion in appropriate cases promotes judicial and administrative efficiency by prohibiting repeated interruptions of the agency proceeding and by increasing the possibility that no judicial decision will be

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

> necessary, since the complaining party's rights may ultimately be
> vindicated at the agency level.

*Id., internal citations omitted.*

Furthermore, because the exhaustion requirement is not jurisdictional, the Supreme Court in *McCarthy*, 503 U.S. at 146, held as follows: "Notwithstanding these substantial institutional interests, federal courts are vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817-818 (1976). 'We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.' *Cohens v. Virginia,* 19 U.S. 264, 404 (1821)." The *McCarthy* Court thus summarized the issue as follows: "Where Congress specifically mandates, exhaustion is required. **But where Congress has not clearly required exhaustion, sound judicial discretion applies.**" *McCarthy,* 503 U.S. at 144; [Emphasis added]; *internal citations omitted*; *see also, EEOC v. Lutheran Social Services,* 186 F.3d 959, 963-964 (D.C. Cir. 1999); *citing McCarthy,* 503 U.S. at 144 ("Exhaustion is 'a rule of judicial administration,'…and unless Congress directs otherwise, rightfully subject to crafting by judges") (*quoting Patsy v. Board of Regents of Fla.,* 457 U.S. 496, 518 (1982) (White, J., concurring in part)).

Where, as in this case, none of the purposes underlying the exhaustion requirement would be furthered by requiring strict adherence, the exhaustion requirement should be waived. *Id.* "In determining whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992). "Application of this balancing principle is '***intensely practical***,' because attention is directed to both the nature of the claim presented and the characteristics of the particular administrative procedure provided." *Id., quoting Bowen v. City of New York*, 476 U.S. 467, 484 (1986), *citing*

28

*Mathews v. Eldridge*, 424 U.S. 319, 331, n.11 (1976); [Emphasis added]. Application of the exhaustion doctrine in this case would be inappropriate based upon the "purely legal nature of the issue presented" and the unquestionable "futility" of further resort to the FDA's administrative decision making process. *Anthlone*, 707 F.2d at 1489.

A.    The "Purely Legal" Nature of Allied's Challenge

Courts have deemed the exhaustion requirement to be unnecessary when the claims presented by petitioners – such as Allied in this case – are based upon questions of law. For instance, in *Skinner & Eddy Corp. v. United States*, 249 U.S. 557, 562-63 (1919) (Brandeis, J.), the Court held that the District Court for the District of Oregon had properly assumed jurisdiction of a lawsuit filed by a railroad carrier company against the United States for purposes of enjoining "an increase in carload rates on iron and steel products from Pittsburgh to Seattle." *Id.,* at 558. Upon the filing of the lawsuit, the United States contended that Skinner & Eddy had not exhausted its administrative remedies before the Interstate Commerce Commission, and that therefore, the District Court lacked the requisite subject matter jurisdiction to hear the case. The Court disagreed with the government's position and held as follows:

> This contention proceeds apparently upon a misapprehension of plaintiff's position.  If plaintiff had sought relief against a rate or practice alleged to be unjust because unreasonably high or discriminatory, the remedy must have been sought primarily by proceedings before the Commission, and the finding thereon would have been conclusive, unless there was lack of substantial evidence, some irregularity in the proceedings, or some error in the application of rules of law. But plaintiff does not contend that 75 cents is an unreasonably high rate or that it is discriminatory or that there was mere error in the action of the Commission. **The contention is that the Commission has exceeded its statutory powers; and that, hence, the order is void.  In such a case the courts have jurisdiction of suits to enjoin the enforcement of an order, even if the plaintiff has not attempted to secure redress in a proceeding before the Commission.**

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

*Id.,* at 562; [Emphasis added]; *see also, Athlone,* 707 F.2d at 1489, n.24 ("As the Supreme Court has noted, when the issue presented is one of statutory interpretation 'judicial review would not be significantly aided by an additional administrative decision.'); *quoting McKart,* 395 U.S. at 199.

Similarly, at issue in *Committee for GI Rights v. Callaway,* 518 F.2d 466, 473 (D.C. Cir. 1975) was "Circular 600-85" which was enacted by the United States Army in Europe (USAREUR) following Congress's directions to the Secretary of Defense to "prescribe and implement procedures" to curb drug and alcohol abuse among military servicemen abroad; *Id.,* at 467. Circular 600-85 not only defined "abusers" of alcohol and drugs, but it also outlined a three-step program – identification, evaluation and rehabilitation – designed to treat them. *Id.,* at 468-69. In response to the Circular, the Committee for GI Rights filed a class action lawsuit on behalf of the affected servicemen alleging that the Circular licensed, among other things, "warrantless drug inspections...without a showing of probable cause." *Id.,* at 470. The Government contended that the District Court lacked subject matter jurisdiction because the Class had failed to exhaust its available administrative remedies. *Id.,* at 473. The Court ruled as follows:

> In this case no significant interest is served by forcing the plaintiffs-appellees to proceed through military channels. The issues involved are purely legal, requiring no exercise of military discretion or expertise. **The federal courts are in a better position to consider the constitutional issues presented than are the various military bodies referred to by the appellants.** Moreover, the military tribunals are not designed to handle actions involving so large a class and seeking declaratory and injunctive relief. Rather, actions before the Inspector General as well as court martials and other military proceedings are designed primarily to deal with cases involving some specific misconduct by or complaint on the part of an individual GI. To require exhaustion of military remedies would merely delay a decision by the federal courts. We hold that exhaustion of military remedies was not necessary.

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

*Id.*, at 474; [Emphasis added].

In each of the above-described circumstances, each of the several purposes of the exhaustion requirement are set aside because the "'[the controversy] presents issues on which courts, and not [administrators] are relatively more expert.'" *Athlone*, 707 F.2d at 1489; *quoting Barlow v. Collins*, 397 U.S. 159, 166 (1970) (quoting *Hardin v. Kentucky Utilities Co.,* 390 U.S. 1, 14, (1968) (Harlan, J., dissenting) (brackets in the original)).

In this case, as previously articulated – and in sharp contrast to the manner by which the Defendants in this case have framed Allied's complaint – Allied challenges FDA's creation of a substantive rule, guised as an Import Alert (Import Alert 16-131) which was enacted in contravention of the APA. Accordingly, in a very large sense, the factors which render this dispute ripe for judicial review likewise render the exhaustion requirement unnecessary in this case. For purposes of simplicity and judicial economy, Allied rests on the assertions it has already made in this brief describing the Import Alert itself and why the Import Alert is a substantive rule crafted in contravention of the APA. Such issues, which are purely legal in nature, did not need to be vetted to the FDA prior to the filing of the complaint in this case. This Court is far better suited than the FDA to resolve them.

**B.     The Futility of Further Resort to FDA's Administrative Process**

To the extent that this Court finds that the purely legal nature of Allied's claims do not render unnecessary the exhaustion doctrine, Allied reminds the Court that prior to the filing of its Amended Complaint, it participated in exhaustive discussions with the FDA towards the end of being placed on the list of importers exempt from detention without physical examination. These discussions involved the highest levels of the FDA regulatory authority – including FDA's Deputy Chief Counsel for Litigation and the directors of numerous individual divisions of FDA –

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

and ultimately proved fruitless. Despite the fact that Allied has plainly satisfied the prerequesites for exemption included in the Import Alert, Allied is still subject to detention without physical examination, and it will be so subject (inclusive of all of the burdens imposed upon it by the Import Alert) until FDA pays a hypothetical visit to China. FDA's position *vis-à-vis* Allied's application for exemption under the Import Alert was unquestionably final. Returning to the decision makers who already denied Allied's application for exemption would be an exercise in futility.

Courts have previously recognized that the exhaustion doctrine may be necessary in circumstances where "exhaustion of administrative remedies would be futile because the administrative agency will clearly reject the claim." *Taylor v. United States Treasury Dep't, IRS*, 127 F.3d 470, 477 (5th Cir. 1977); *see also McCarthy*, 503 U.S. at 148 ("an administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it.") In other words, as held by the Court in *Athlone*, "[w]hen resort to the agency would in all likelihood be futile, the cause of overall efficiency will not be served by postponing judicial review, and the exhaustion requirement need not be applied." *Athlone*, 707 F.2d at 1489; *citing Committee for GI Rights v. Callaway*, 518 F.2d 466, 474, n.20 (D.C. Cir. 1975); *Dooley v. Ploger*, 491 F.2d 608, 614-15 (4th Cir. 1974) ("While exhaustion applies as long as there is an available, unused remedy which may result in relief, we have never required exhaustion where the outcome would predictably be futile") (*internal citation omitted*); *Lodge 1858, American Federation of Government Employees v. Paine*, 436 F.2d 882, 896 (D.C. Cir. 1970) (dictum) and cases cited therein n.97.

*Houghton v. Shafer*, 392 U.S. 639 (1968) is particularly relevant in the instant case. In *Houghton*, the petitioner, a Pennsylvania state prisoner, filed a lawsuit in the District Court

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

alleging that his "legal materials were confiscated pursuant to prison rules forbidding the possession of articles not sold through the canteen or approved by the authorities..." *Id.,* at 640. The petitioner, however, failed to exhaust all of the administrative remedies available to him. *Id.,* at 640. The unanimous Court held as follows:

> As we understand the submission of the Attorney General of Pennsylvania in this Court, the rules of the prison were validly and correctly applied to petitioner; these rules are further said to be strictly enforced throughout the entire correctional system in Pennsylvania. In light of this it seems likely that to require petitioner to appeal to the Deputy Commissioner of Correction, the Commissioner, or to the Attorney General would be to demand a futile act.

*Id.*

Similarly, in *Committee for GI Rights*, 518 F.2d at 473, n.20, outlined *supra*, the Court held that the Class did not need to exhaust its administrative remedies prior to challenging the "Circular" drafted and implemented by the Secretary of the Defense, in part, because "in view of the fact that the Army prepared the Circular in direct response to the District Court's order that the Army clarify its position, exhaustion would in all likelihood be futile and therefore is unnecessary." *Id*; *see also Athlone*, 707 F.2d at 1489 (finding exhaustion unnecessary where "it [was] highly unlikely that the Commission would change its position if the case were remanded to it.")

Accordingly, in this case, where Allied has previously vetted each of the issues raised in its complaint at the highest levels of the FDA, and where the FDA has on multiple occasions rejected Allied's applications and proved itself to be completely wedded to the binding provisions of the Import Alert, a return trip to the FDA would be unquestionably futile. The doctrine of exhaustion should not be held to apply in this case, and the Defendants' motion to

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

dismiss Allied's Amended Complaint on the ground that Allied did not exhaust administrative remedies should be denied.

## IV.     ALLIED'S DUE PROCESS CLAIM IS COGNIZABLE.

Pursuant to the Import Alert, Exhibit 1 at pp. 4-5, upon FDA's detention without physical examination of all shipments of Chinese aquaculture imported into the United States, the importer of record for each detained shipment is required to hire a third-party laboratory to analyze "a representative sample of the lot verifying that products do not contain malachite green and its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet or fluoroquinolones." *Id.,* at p.5. FDA bases its admissibility determinations *entirely* upon these third party analyses and maintains a rule whereby each detained shipment can be tested only once, and each test of each detained shipment can lead to only one laboratory report. FDA maintains this policy even when in possession of evidence showing that a particular test or a particular report was indisputably wrong.

In Count Four of Allied's Amended Complaint, Allied alleged that FDA's "One Test – One Report" policy is violative of Allied's Fifth Amendment Due Process rights. In essence, what Allied has alleged is that it has not been offered a meaningful opportunity to participate in the administrative processes which can ultimately lead to refusals of Allied's shrimp shipments, and ultimately, the complete destruction of Allied as a going concern.

In its motion to dismiss, the Defendants contend that Allied's claim is not cognizable because Allied does not have a cognizable property interest "to import products into the United States." Motion to Dismiss, at 43. The Defendants rely on a group of decisions which purportedly stand for that broad sweeping proposition. *Id.* However, because the Defendants

34

failed to distinguish between substantive and procedural due process rights in their motion, their argument fails. Companies such as Allied do have procedural due process rights.

Substantive due process rights, which the Defendants focus on in their motion, are different from procedural due process rights. In *Vinyard v. Wilson*, 311 F.3d 1340, 1356 (11th Cir. 2002), the Court described substantive due process rights as follows:

> "The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) (quoting Palko v. Connecticut, 302 U.S. 319, 325 (1937)). Substantive due process rights are created by the constitution, and "no amount of process can justify [their] infringement." *McKinney*, 20 F.3d at 1557. **In order to have a substantive due process claim, Vinyard must have a substantive right created by the Constitution.** *McKinney*, 20 F.3d at 1556.

*Id.,* [Emphasis added]. Reviewing the Eleventh Circuit's description in *Vinyard* of substantive due process rights clarifies the Defendants' argument. The Defendants argue, in short, that because Allied does not have a substantive – or Constitutionally protected – right to ship its products into the United States, Allied does not have any due process rights at all.

But procedural due process rights are different; they do not stem directly from the Constitution. Rather, as the *Vinyard* Court explained:

> "Procedural due process requires notice and an opportunity to be heard before any governmental deprivation of a property interest." *Zipperer v. City of Fort Myers*, 41 F.3d 619, 623 (11th Cir. 1995). Property interests for the purposes of procedural due process are not created by the Constitution; "rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Morley's Auto Body, Inc. v. Hunter*, 70 F.3d 1209, 1213 (11th Cir. 1995) (*quoting Board of Regents v. Roth*, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)). **"As a result, these...rights constitutionally may be rescinded so long as the elements of procedural - not substantive - due process are observed."** *McKinney*, 20 F.3d at 1556.

*Vinyard*, 311 F.3d at 1356; [Emphasis added].

Thus, the question that must be addressed is whether Allied has ***procedural*** due process rights to not only ship its products into the United States, but to participate in FDA administrative processes once Allied's product has reached United States soil. Allied plainly possesses such rights.

In *NEC Corp. v. United States Department of Commerce*, 151 F.3d 1361 (Fed. Cir. 1998), the Court considered the due process rights of an importer of Japanese supercomputers in an antidumping dispute with the Department of Commerce. In *NEC*, much like in the instant case, NEC claimed "that the determination of certain contested facts regarding the pending antidumping investigation against it was tainted by prejudgment." *Id.,* at 370. The Court understood NEC's claim to be "a procedural due process claim of the kind generally cognizable under the Fifth Amendment of the Constitution." *Id.,* at 1370.

In deciding NEC's claim, the Court immediately acknowledged that "[i]ndisputably, engaging in foreign commerce is not a fundamental right protected by notions of substantive due process." *Id.,* at 1369 – 1370; *citing Buttfield v. Stranahan*, 192 U.S. 470, 492-93. However, as in *Vinyard*, the Court in *NEC* opined that the question of whether NEC had procedural due process rights was different and was based upon separate considerations. "The right to an impartial decision maker is unquestionably an aspect of procedural due process. This applies to administrative proceedings as well." *Id.* The Court ruled as follows:

> There can be no doubt that arbitrary administration of the law is subject to judicial intervention; it is enough for us to here conclude that NEC is due a fair and honest process; the question that remains, then, is what process is due.

*Id.*

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

In *NEC*, the Court ultimately held that the antidumping investigation procedures developed by Congress adequately protected NEC's procedural due process rights, and in so doing, noted a wide array of safeguards intrinsic in antidumping investigations, *Id.*, at 1373-75, which are clearly absent from decisions made by FDA pursuant to the Import Alert. Most notably, and in stark contrast to FDA's "One Test – One Report" rule,

> ...the investigation within Commerce proceeds in two stages – a preliminary determination and a final determination. The purpose of the preliminary determination is to ascertain whether there is a reasonable basis to believe or suspect that the subject merchandise is being sold, or is likely to be sold, at [less than fair value]. This triggers an opportunity for the affected parties to participate actively in the process, after which Commerce proceeds to make its final determination.

*Id.*, at 1374; *internal citations omitted*. Additionally, prior to Commerce's final determination, Commerce is **required by statute** to afford importers robust protections, including a) a hearing at the request of any interested party wherein b) Commerce must address arguments regarding the methodology for the dumping calculation, c) interested parties may submit oral and written evidence, d) interested parties may submit factual information to rebut, clarify, or correct the submissions of other interested parties, and e) Commerce is required to verify all information relied upon in making a final determination of an investigation. *Id., internal citations omitted.*

When FDA makes admissibility decisions pursuant to the Import Alert, the only evidence that it accepts is the unverified test reports of third-party laboratories. Once FDA receives such a report, it accepts no others, even if it knows that such a report is based on rogue methodologies, is incomprehensible, or is otherwise deficient. And, FDA believes that it is free to use such bogus reports for purposes of making final admissibility decisions, which are immediately posted to FDA's OASIS website and can lead to catastrophic consequences for Chinese firms like Allied.

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

Such is the basis of Count Four of Allied's amended complaint. The Import Alert – and the manner by which the Import Alert is enforced – affords Allied no due process rights whatsoever. Count Four of Allied's Amended Complaint is cognizable. Thus, the motion to dismiss as to Allied's Fourth cause of action should also be denied.

### CONCLUSION

For the foregoing reasons, the Plaintiff, Allied Pacific Food (Dalian) Company, Limited, respectfully requests that the Court deny the motion to dismiss filed by the Defendants.

Dated this 24th day of March, 2008.

Respectfully submitted,


*Andrew S. Ittleman, Esq.*
Andrew S. Ittleman, Esq.
Attorney of Record for
Allied Pacific Food (Dalian) Co., Ltd.
Florida Bar No. 802441
Fuerst Humphrey Ittleman, PL
1001 Brickell Bay Drive,
Suite 2002
Miami, FL 33131
305-350-5690 (o)
305-371-8989 (f)
aittleman@fuerstlaw.com


*Eric Bloom, Esq.*
Eric Bloom, Esq.
DC Bar No. 417819
Winston & Strawn LLP
1700 K. Street, N.W.
Washington, D.C. 20006-3817
T: (202) 282-5000
F: (202) 282-5100
ebloom@winston.com

38

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I caused a copy of the foregoing Memorandum of Points and

Authorities in Opposition to the Defendants' Motion to Dismiss the Plaintiff's Amended

Complaint to be served via the District Court's electronic filing system upon:

Andrew E. Clark
Senior Trial Counsel
Office of Consumer Litigation
U.S. Department of Justice
PO Box 386
Washington, DC 20044
andrew.clark@usdoj.gov

this 24th day of March, 2008.

*Eric Bloom, Esq.*

FUERST, HUMPHREY, ITTLEMAN, PL
1001 BRICKELL BAY DRIVE, STE. 2002, MIAMI, FL 33131 • T: 305.350.5690 • F: 305.371.8989 • WWW.FUERSTLAW.COM

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

# EXHIBIT 1

IA #16-131, 8/3/07, IMPORT ALERT #16-131, "DETENTION WITHOUT PHYSICAL EXAMINATION OF AQUACULTURED CATFISH, BASA (Pangasius sp), SHRIMP, DACE, AND EEL PRODUCTS FROM THE PEOPLE'S REPUBLIC OF CHINA DUE TO THE PRESENCE OF NEW ANIMAL DRUGS AND/OR UNSAFE FOOD ADDITIVES", ATTACHMENT 9/18/07

NOTE:     This revision includes additional sampling guidance. Changes are bracketed by asterisks.

TYPE OF
ALERT:     DETENTION WITHOUT PHYSICAL EXAMINATION (DWPE)

(Note: This import alert represents the Agency's current guidance to FDA field personnel regarding the manufacturer(s) and/or products(s) at issue.  It does not create or confer any rights for or on any person, and does not operate to bind FDA or the public).

PRODUCT:     Aquacultured seafood products

PRODUCT
CODE:          Catfish (Ichtalurus sp.)
          16X[][]02
          16A[][]10, 16B[][]10, 16C[][]10, 16I[][]10, 16S[][]10
          16A[][]67, 16B[][]67, 16C[][]67, 16I[][]67, 16S[][]67

          Shrimp
          16X[][]21
          16J[][]05, 16K[][]05, 16L[][]05

          Basa (Pangasius sp.)
          16X[][]43
          16A[][]82, 16B[][]82, 16C[][]82, 16I[][]82, 16S[][]82

          Dace - 16A[][]57, 16B[][]57, 16C[][]57, 16I[][]57, 16S[][]57

          Eel - 16A[][]15, 16B[][]15, 16C[][]15, 16I[][]15, 16S[][]15

          Aquaculture Harvested Fishery/Seafood Products, N.E.C.
          16X[][]99

          (*Dace and eel may also be coded as aquaculture harvested product, N.E.C.; i.e. 16X[][]99)

PROBLEM:     Unapproved drug residues

Unsafe food additives

PAF:            ANT (Drug residues)
                FAD (Food Additive)

PAC:            04018

COUNTRY:        China, People's Republic of (CN)

MANUFACTURER
FEI#:           All

IMPORTER'S
ID#:            N/A

CHARGES:        "The article is subject to refusal of admission pursuant to
                Section 801(a)(3), in that it appears to bear or contain a
                food additive that is unsafe within the meaning of Section
                409 [Adulteration, Section 402(a)(2)(C)(i)]."
                (OASIS CHARGE CODES:  UNSAFE ADD)

                            AND/OR

                "The article is subject to refusal of admission pursuant to
                Section 801(a)(3), in that it appears to bear or contain a
                new animal drug (or conversion product thereof) that is
                unsafe within the meaning of Section 512 [Adulteration,
                Section 402(a)(2)(C)(ii)]."
                (OASIS CHARGE CODES:  VETDRUGRES)

RECOMMENDING
OFFICE:         OFS/DSS, HFS-325
                OC/DE, HFS-606

REASON FOR
ALERT:          There has been extensive commercialization and increased
                consumption of aquaculture seafood products worldwide.
                Aquacultured seafood has become the fastest growing sector
                of the world food economy, accounting for approximately half
                of all seafood production worldwide.  Approximately 80% of
                the seafood consumed in the U.S. is imported from
                approximately 62 countries. Over 40% of that seafood comes
                from aquaculture operations.  As the aquaculture industry
                continues to grow and compete with wild-caught seafood
                products, concerns regarding the use of unapproved animal

drugs and unsafe chemicals and the misuse of animal drugs in aquaculture operations have increased substantially.

China is the largest producer of aquacultured seafood in the world, accounting for 70% of the total production and 55% of the total value of aquacultured seafood exported around the world. China is currently the third largest exporter of seafood to the U.S. Shrimp and catfish products represent two of the top ten most consumed seafood products in the U.S.

The use of unapproved antibiotics or chemicals in aquaculture raises significant public health concerns. There is clear scientific evidence that the use of antibiotics or chemicals, such as malachite green, nitrofurans, fluoroquinolones, and gentian violet during the various stages of aquaculture can result in the presence of residues of the parent compound or its metabolites in the edible portion of the aquacultured seafood. The presence of antibiotic residues may contribute to an increase of antimicrobial resistance in human pathogens. Moreover, prolonged exposure to nitrofurans, malachite green, and gentian violet has been shown to have a carcinogenic affect.

In the United States, use of malachite green, nitrofurans, fluoroquinolones, or gentian violet as drugs in food-producing animals would require an approved new animal drug application under Section 512 of the Federal Food, Drug, and Cosmetic Act (FFDCA). FDA has not approved these antibiotics for use as drugs in aquacultured animals. Therefore, if they are used in aquaculture with an intent that they treat disease in, or affect the structure or function of, any aquacultured animal, they are considered to be unsafe new animal drugs within the meaning of Section 512, and the presence of their residues in seafood adulterates the seafood under 402(a)(2)(C)(ii) of the FFDCA.

Furthermore, malachite green, nitrofurans, fluoroquinolones and gentian violet are not generally recognized as safe under any conditions of intended use that may reasonably be expected to result in their becoming a component of food. Therefore, if intended for any such use, they are unsafe food additives within the meaning of section 409 of the FDCA and would render the food adulterated under section 402(a)(2)(C)(i).

FDA has several existing Import alerts related to unapproved
drugs in seafood dating back to November of 2001 (IA #16-124
DWPE of Seafood Products Due to Unapproved Drugs, IA #16-129
DWPE of Seafood Products Due to Nitrofurans, and IA #16-130
DWPE of Eel from China Due to the presence of Malachite
Green).  Based on an increased monitoring of imported
aquacultured seafood from October 1, 2006, through May 31,
2007, FDA continued to find residues of unapproved new
animal drugs and/or unsafe food additives in seafood
imported from China.  During that period, FDA tested 89
samples consisting of catfish, Basa, shrimp, dace and eel
from China.  Twenty two (22) of the 89 samples (25%) were
found to contain drug residues.  These residues include
nitrofurans detected in shrimp at levels above 1 ppb;
malachite green detected in dace, eel and catfish/Basa fish
at levels ranging from 2.1 to 122 ppb; gentian violet
detected in eel and catfish at levels ranging from 2.5 ppb
to 26.9 ppb and fluoroquinolones in catfish/Basa at level
ranging from 1.9 to 6.5 ppb.  Furthermore, Chinese
authorities have acknowledged permitting the use of
fluoroquinolones in aquaculture

Although the use of some animal drugs (nitrofurans and
malachite green) in aquaculture has been prohibited by
Chinese authorities since 2002, FDA continues to find
residues of these and other animal drugs in shipments of
aquacultured seafood products from China.

GUIDANCE:    Districts may detain without physical examination, all
shipments of aquacultured catfish, Basa (Pangasius sp),
shrimp, dace, and eel from the People's Republic of China
(CN) except for the firms identified on the attachment to
this alert.

Screening criteria has been set into OASIS.

If a firm, shipper, or importer believes that their product
should not be subject to detention under this import alert
they should forward information supporting their position to
FDA at the following address:

Food and Drug Administration
Division of Import Operations and Policy (HFC-170)
5600 Fishers Lane, Room 12-36

Rockville, MD 20587

In order to secure release of an individual shipment subject
to this Import Alert, the importer should provide the
results of a third-party laboratory analysis of a
representative sample of the lot verifying that products do
not contain malachite green and its metabolite
leucomalachite green, nitrofurans, gentian violet,
leucogentian violet or fluoroquinolones.  The chart provided
below identifies which residues should be screened for each
species.

Third-party laboratories may use any methods that are found
acceptable to FDA.  (e.g., see
http://www.cfsan.fda.gov/seafood1.html

The following residues should be tested for each species.

| SPECIES | RESIDUE |
|---|---|
| Catfish, Basa, and Other Pangasius | Malachite Green Fluoroquinolones Gentian Violet |
| Shrimp | Malachite Green Fluoroquinolones Nitrofurans Gentian Violet |
| Dace | Malachite Green Gentian Violet |
| Eel | Malachite Green Gentian Violet |

*** NOTE:  The samples taken should be representative of the
shipment.  The following provides guidance on what may be
considered a representative sample.

Import sampling plan

Single product type entry

Shrimp    The sample should consist of a minimum of 12
          sub-samples.  When an entry consists of multiple

lines of similar products (e.g., multiple sizes of headless shrimp), the sample should be representative of the entire entry and should be collected across all lines, with a minimum of two sub-samples per line.  The sampling should be proportional based on the quantity of product (e.g. more sub-samples should be obtained from larger lines, fewer sub-samples from smaller lines).   Obtaining 12 sub-samples from a single line or a limited number of lines when multiple lines of similar products are offered for the entry will not provide a representative sample for that entry.

If an entry contains only one line of aquacultured product, then a minimum of 12 sub-samples should be obtained from that single line.  If the entry includes multiple date codes, the sample should reflect a range of date codes (e.g., all sub-samples should not be collected from a single date code).

Each sample should consist of 12 sub-samples, minimum 225g (0.5 lb.) per sub-sample, total 2.7 kg (6.0 lb.) of product. If the product unit size is larger than 225g (0.5 lb.) and less than or equal to 3 lb., collect one product unit per sub-sample.  If the unit size is less than 225g. (0.5 lb.), collect an adequate number of units so that the amount collected per sub-sample equals a minimum of 225 grams (0.5 lb.).

For units (block frozen) larger than 3 lbs. only:  If the units must be sampled and shipped intact, collect 6 sub-samples (units).  Alternatively, sub-samples of at least 225g (0.5 lb.) may be broken/sawed off (keep frozen) from each of 12 units, and the twelve (12) 225 g sub-samples shipped to the analyzing lab.

Analysis for Nitrofuran should be conducted on individual subsamples.

Analyses for all other residues should be conducted on a composite sample.

Catfish, Basa, Dace, Eel

The sample should consist of a minimum of 12 sub-samples and be representative of the entry. If the entry contains multiple lines, each line should be sampled separately. A sample, consisting of a minimum of 12 sub-samples, should be collected from each line. If the entry consists of multiple date codes, the samples should be representative of a range of date codes. Analyses should be conducted on a composite sample from each line.

Each sample should consist of a minimum of 12/225 gram (0.5 lb.) sub-samples, totaling 2.7 kg (6.0 lb.) of product. If the container size is larger than 225 grams (0.5 lb.), collect one container per sub-sample. If the container is less than 225 grams (0.5 lb.), collect an adequate number of containers so that the amount collected per sub-sample equals a minimum of 225 grams (0.5 lb.).

Mixed products entry

If the entry consists of mixed aquacultured seafood products, a minimum of 12 sub-samples should be obtained from each line. For example, if an entry includes one line of headless shrimp and one line of basa fillets, two samples should be obtained   one sample, consisting of a minimum of 12 sub-samples, of shrimp; and one sample, consisting of a minimum of 12 sub-samples, of basa.

Analyses should be conducted on a sample from each line as described above, depending on the commodity.***

Sample Preparation

Prepare one composite from an equal amount of each subsample for the testing of malachite green, fluoroquinolones, and gentian violet.

Shrimp are to be analyzed on an individual sub basis for nitrofurans. When sampling guidance directs the collection of six subsamples, two portions from each of the six subsamples should be individually analyzed. ***

For questions or issues concerning science, science policy, analysis, preparation, or analytical methodology, contact the Division of Field Science at (301) 827-7605.

In order to remove a firm from detention without physical examination, information should be provided to FDA to adequately assess whether a manufacturer has the appropriate controls and processes in place to ensure the quality of the product, the firm or shipper should provide the following information (In English):

1)  Documentation showing that a minimum of five (5) consecutive entries have been released by FDA based on third-party laboratory analysis of a representative sample of the lot verifying that products do not contain malachite green and its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet and fluoroquinolones.  The chart provided above identifies which residues should be screened for each species.  Third-party laboratory must use methods acceptable to FDA (e.g., see http://www.cfsan.fda.gov/seafood1.html);

and

2)  Documentation, from an appropriate third-party (e.g. a government inspection authority such as AQSIQ) demonstrating that an inspection of the processor was conducted and that the seafood was processed in accordance with FDA's Seafood HACCP regulations, 21 CFR part 123, including controls for aquaculture drugs.  See 21 CFR 123.12(a).

Documentation should include test results of any products sampled during the course of the inspection, demonstrating that the products do not contain malachite green or its metabolite leucomalachite green, nitrofurans, gentian violet, leucogentian violet or fluoroquinolones.

and

3)  Documentation that the processor is in compliance with all Chinese government requirements for exporting aquacultured seafood to the U.S.

Documentation should include copies of any registration that may be required by the Chinese government.

All requests for removal (exemption) from DWPE will be
forwarded by DIOP to CFSAN (HFS-606) for evaluation.

PRIORITIZATION
GUIDANCE:        I

FOI:            No purging required

KEYWORDS:       Nitrofurans, Fluoroquinolones (ciprofloxacin and
                enrofloxacin), malachite green, leucomalachite green,
                gentian violet, aquaculture,

PREPARED
BY:             Barbara Montwill, CFSAN/OFS/DSS/SAPB (HFS-325), 301-436-1426
                Giselle Jordan, CFSAN/OC/DE/PAB (HFS-606), 301-436-1576
                Ted Poplawski, DIOP, (301) 443-6553

REVISED
BY:             Virginia L. Meeks, DIOP, (301) 594-3845

DATE LOADED
INTO FIARS:        August 3, 2007

                ATTACHMENT TO IMPORT ALERT #16-131        9/18/07

        Firms and products exempt from DWPE recommendation

FIRM                                    PRODUCT/PRODUCT CODE

Zhangjiang Guolian Aquatic Products        Shrimp
  Co., Ltd.                                16J[][]05/16K[][]05
6 Yongping S. Rd.                          16L[][]05/16X[][]21
Pingle Industry Development Region         9/18/07
Zhangjiang, Guangdong, China
FEI# 3004097215



OCT 3 1 2007

Food and Drug Administration
Rockville MD 20857 .

Ms. Christine Humphrey
Fuerst Humphrey Ittleman PL
1001 Brickell Bay Drive, Ste. 2002
Miami, FL 33131

Dear Ms. Humphrey:

This is in reply to your request dated September 10, 2007, concerning the removal shrimp
processed by Allied Pacific Foods Co., Ltd., Dalian, China, from detention without physical
examination (DWPE) under Import Alert# 16-131, ""Detention Without Physical Examination Of
Aquacultured Catfish, Basa (Pangasius Sp), Shrimp, Dace, And Eel Products From The People's Republic
Of China Due To The Presence Of New Animal Drugs And/Or Unsafe Food Additives."

A review of the information submitted with your request and Food and Drug Administration
(FDA) records indicates that shrimp processed by Allied Pacific Foods Co., Ltd., 888 Yong
Zheng Industrial Area, Dalain, China, has not met the criteria for removal from DWPE at this
time.

The private laboratory analysis submitted with your request for entry AQZ-2510860-6 indicated
that nitrofurans (specifically, 1-aminohydantoin hydrochloride (AH)) were present at 1.98 ppb
and 7.75 ppb, which are above the limit of detection (LOD). Further, the FDA district's review
of the private lab analysis for line entries AQZ-0251860-6/1/1 and AQZ-0251619-6/1/1 found
the samples to have levels of nitrofurans above the LOD.

The submission includes HACCP plans for breaded shrimp, breaded skewered shrimp, and pre-
fried tempura shrimp. Antibiotic residues are identified as a hazard and controlled at the
Receiving raw materials critical control point. Residues listed include nitrofurans (NF)
(furazolidone, furaltadone, furacilinum, nitrofurantoin), fluroquinolones (FQ) (flumequine,
ciprofloxacin, enrofloxacin, dinofloxacin), malachite green, leuchomalachite green, gentian
violet (GV), and leuchogentian violet (LGV). The critical limit "No (residue) should be used" is
adequately set for all residues. All residue limits of detection (LOD) are adequate except for GV
and LGV which is set at 1.5 ppb above the FDA acceptable limit of detection of 1.0 ppb.

Imported raw materials are sampled for antibiotics. Residue-free certificates are required for
domestic raw materials according to the firm's HACCP plan. Tabs 1-16, sub-tab 'c' include a
"Raw Material Antibiotic Test Report" for domestic raw materials received by the firm. All
reports show "Not Detected" for all residues tested; however, GV and LGV are tested at a LOD
of 1.5 ppb. The firm verifies by sending two samples to a third-party lab every month. Third
party lab analyses for all residues have LODs equal to FDA except for GV and LGV. The levels
for GV and LGV are set at 1.5 ppb, which is inadequate.

Third-parties Cook & Thurber and Surefish Seafood Quality Specialists (Lynnwood, WA) conducted audits on June 22, 2007 and May 15 & 16, 2007, respectively, prior to the issuance of the import alert on June 28, 2007. Although these audits were conducted prior to the issuance of the import alert, the results were acceptable as they represent the firm's current HACCP system implementation. However, the package fails to include a adequate description of Cook & Thurber and Surefish Seafood Quality Specialists functions, knowledge, and experience; and the CV, qualifications and experience for both auditors, Mark D. Neely and Roger Helgerson.

The firm provided testing reports issued by the PROC Provincial Entry-Exit Inspection and Quarantine Bureau, Food Testing Center (CIQ), for five entries under Tab 2, A – E. The translated reports are incomplete as they do not specify the analytical methods used.

If you have any questions concerning this request, feel free to contact Ted Poplawski at (301) 443-6553.


Sincerely yours,

Domenic Veneziano
Director
Division of Import Operations
  & Policy

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

# EXHIBIT 2

# Transcripts of FDA Press Conference on Seafood Imported from China

## FTS-HHS-FDA

### Moderator: Michael Herndon
### June 28, 2007
### 1:00 pm CT

Man:            Thank you. A coordinator will assist you momentarily.

Coordinator:    Good afternoon and thank you for standing by. At this time all participants are in a listen-only mode. After the presentation we will conduct a question and answer session. To ask a question, please press star 1.

                Today's conference is being recorded. If you have any objections you may disconnect at this time.

                I'd like to introduce your host for today's conference, Miss Julie Zawisca. Ma'am you may begin.

Julie Zawisca:  Thank you (Lorreen). Good afternoon ladies and gentlemen and welcome to FDA's briefing on food imports.

                I'm Julie Zawisca, Assistant Commissioner for Public Affairs and we're very pleased that you could join us for this call this afternoon.

Today FDA is announcing additional import controls for several species of seafood imported from China that contain unauthorized animal drugs and food additives.

Here to talk with you about this action today are Miss Margaret Glavin who is the Associate Commissioner for Regulatory Affairs with FDA and Dr. David Acheson Assistant Commissioner for Food Protection with FDA.

And we also have several other FDA experts here to answer questions during the Q&A segment of today's call.

We have Dr. Stephen Sundlof and Dr. (Steven Solomon) and we have Mr. (Dominic Venucciano) and Mr. Donald Kraemer.

At this time I would like to turn this briefing over to Dr. David Acheson.

David Acheson:    Thank you. This is David Acheson, Assistant Commissioner for Food Protection at the FDA.

FDA is initiating an import alert against several species of imported Chinese farmed seafood because of numerous cases of contamination with drugs and unsafe food additives.

This means that FDA is not allowing the import of these Chinese farmed seafood products until the importers can prove that the seafood is free from harmful contaminants.

The species are catfish, (basa), shrimp, dace - that's spelled d-a-c-e- and eel. Again that's catfish, (basa) - spelled b-a-s-a-, shrimp, dace and eel.

The contaminants included a number of antimicrobial agents, specifically malachite green, nitrofurans, gentian violet and fluoroquinolone.

None of these drugs is approved for use in farmed seafood in the United States.

Some of these drugs are carcinogenic - that means that they can cause cancer - when fed to laboratory animals for prolonged periods of time.

Fluoroquinolone, specifically, when used in food-producing animals, can result in antibiotic resistance in pathogens or bacteria that could infect humans.

Despite China's ban on the use of specific drugs like nitorfurans and malachite green in seafood farm operations, these and other unapproved drugs continue to be found in farmed seafood from China.

FDA is taking this action at this point in time for a number of reasons.

Firstly, there's been a continued pattern of violation with no signs of abatement.

Secondly, we've seen the involvement of multiple exporters and hence the need to broaden this to a country-wide alert.

And thirdly, we have concern about multiple types of seafood contaminated, as I've already mentioned, with a variety of compounds as I've already listed.

FDA is taking this action to protect the public health of the American people from unsafe substances in imported Chinese farmed seafood.

I want to emphasize that there is no imminent threat to public health because of the low levels of contaminants.

However the banned substances could cause serious health problems if consumed over a long period of time as I've already mentioned.

This action is the result of a targeted investigation which include increase testing of products imported from China.

China is the world's largest producer of farmed fish, with 70% of total production and is the third largest exporter of seafood to the United States.

Because of evidence of problems over a period of years, FDA has increased its scrutiny of imported Chinese farmed seafood.

In 2006 FDA issued an import alert for eel from China because of contamination with malachite green.

From October 1, 2006 to May 31, 2007 FDA conducted increased testing of farmed seafood from China for nitrofurans, fluoroquinolone, malachite green and gentian violet and found over 15% of the tested products were contaminated with one or more of these drugs.

The contaminated products were from 18 different companies.

FDA has been working with the Chinese authorities to improve the safety of Chinese farmed seafood.

FDA appreciates the efforts of the Chinese authorities and we look forward to continuing to work together to resolve these issues as we move into the future.

I will not turn this over to Maggie Glavin, Associate Commissioner for Regulatory Affairs.

Margaret Glavin:  Thank you David.

FDA investigators have found consistent problems with farmed fished products produced in China and exported to the U.S.

Since 2001, some products from some Chinese processors and manufacturers have been identified and placed under import alert.

As (David) indicated, an import alert means that products from these processors are detained and refused entry into the U.S. until the importer can demonstrate that the product is safe and in compliance with applicable U.S. regulations.

In November of last year, FDA placed a country-wide alert on all Chinese eel due to finding residues of malachite green.

Over the past several months, FDA investigators have continued to monitor by conducting additional targeting of farmed fish products from China.

Despite extensive communications between FDA and appropriate Chinese authorities to correct the problem, we have continued to find residues of certain veterinary drugs or food additives that are not permitted for use in the U.S. in farmed fish products produced in China and exported to the U.S.

For this reason, FDA has now issued this country-wide import alert for certain farmed fish products from China.

In order to secure release of an individual shipment subject to this alert, the importer should provide the results of a third party lab analysis of a representative sampling of the lot verifying that products do not contain any of these ingredients.

In order to remove a firm and product from detention without physical examination, the following will need to be provided:

First, documentation that a minimum of five consecutive entries have been released by the FDA based on third party lab analyses of representative samples of the lots for the previously mentioned antimicrobial agents.

Second, documentation from the appropriate third party, for example, a government inspection authority, such as the Administration of Quality Supervision, Inspection and Quarantine of the People's Republic of China demonstrating that an inspection was conducted and verifying that the seafood was processed in accordance with FDA's seafood HACCP regulation.

And third, documentation that the processor is in compliance with all Chinese government requirements for exporting farm raised seafood to the United States.

Thank you.

Julie Zawisca:    Thank you Miss (Glavin).

Ladies and gentlemen I know some of you dialed in late or couldn't get in the queue before we started, so we'd like to take just a moment to briefly go over our announcement.

And I'd like to ask Dr. Acheson to give us just an excerpt of his opening remarks, please.

David Acheson:    Sure, thank you. This is David Acheson again.

Key points are as follows: FDA is initiating an import alert against five species of imported Chinese farmed fish because of numerous cases of contamination with drugs and unsafe food additives.

This means that FDA is not allowing the import of these Chinese farmed seafood products until the importers can prove that the seafood is free from harmful contaminants.

The species in this import alert are catfish, basa, shrimp, dace and eel.

The contaminants include antimicrobials such as malachite green, nitrofurans, gentian violet, and fluoroquinolone.

None of these drugs is approved for use in farmed seafood in the United States.

While there is no imminent threat to public health because the levels of these contaminants is low, the banned substances could cause serious health problems if consumed over a long period of time.

Julie Zawisca:    Thank you Dr. Acheson.

Ladies and gentlemen at this time we'd like to move to the Q&A segment of this briefing.

And I would like to remind you that this segment is for credentialed media only and I would ask you to state your name and affiliation and also will limit each round to one question and one follow-up question.

Thank you. First question please.

Coordinator:    Thank you. If you would like to ask a question, please press star 1. Please unmute your line and record your name clearly when prompted. Your name is required to introduce your question.

To withdraw your question, you may press star 2.

Our first question comes from (Deidra Henderson), the Boston Global. Your line is open.

(Deidra Henderson):    Hi. This is (Deidra Henderson) with the Boston Globe. Thanks very much for doing this call.

Some of the same fish that are on your list and some of the same banned chemicals were found earlier this year by testing done by another of Southern states.

Is there any overlap between the FDA investigation and their investigation?

Julie Zawisca:    Miss Glavin?

Margaret Glavin:   We - the FDA has been investigating these issues for some time. We are in close contact with our state counterparts and we often will test products for them. So we're certainly aware of the work that they've been doing.

It is not a joint investigation but we certainly are aware of what they're doing and they are aware of our efforts and we often join forces.

(Deidra Henderson):   I have a short follow up just in terms our housekeeping. Do you have a sense of the scope of the impact of this alert? I mean I know that shrimp is - the amount of shrimp that comes in from China is huge. But can you give a sense for the five fish how much comes in each year?

Margaret Glavin:   I can't give you that but China is the third largest importer of farmed seafood into this country.

(Deidra Henderson):   Thank you very much.

David Acheson:   This is David Acheson if I could just add one extra point to that is FDA does not track those sorts of economic issues and we're doing this in terms of protecting public health.

(Deidra Henderson):   Thank you.

Julie Zawisca:   Thank you. Next question.

Coordinator:   (Marian Falco), CNN.

(Marian Falco):   Hi, I've got a couple of questions. Thanks for taking them.

Number one, how much of this product has actually reached the market and since the FDA doesn't have the ability to test that much that's coming in anyway - usually I believe it's about 1% - how can you be sure that you know how much is even in this country?

Margaret Glavin: Well we don't know how much of this product is in this country but we do target our inspections at the border and in fact seafood, as a relatively risky product, is tested at about five percent.

And we have been focusing - as I indicated in my earlier remarks - we've been focusing on these farmed seafood products from China because of the results of our earlier testing which showed that there was a potential for a problem there.

We also get information from other countries as they test product coming into their borders and so that's shared and that also helps us to target our work.

(Marian Falco): But the - if I'm a consumer and I go to the supermarket can I tell where my fish came from? Will I as a consumer be able to make the distinction before I buy a product/

Margaret Glavin: It is not required that these products be - have country of origin labeling. Some of them do.

David Acheson: This is David Acheson and again, as a follow up on that, what this action is going to do is essentially put a hold on these products of concern at the port of entry. And until there is evidence that they are safe to proceed they are not going to be on the shelves for consumers to have that choice unless we know that they're safe.

So what this has done is essentially shift the burden of proof back onto the importer to demonstrate to us that it is safe so that safe products will go onto the shelf.

Julie Zawisca:    Thanks. Let's take the next question.

Coordinator:    (David Curley), ABC News.

(David Curley):    Hi. There was some criticism when those Southern states tested and banned some of the fish that FDA was not moving quickly enough, that's why they had to take action on their own.

I'd like you to respond to that.

And secondly the Chinese have done quite a bit here in the last few weeks. What is your response to what they've done with some of the food manufacturing within their country?

David Acheson:    Well let me take a first stab at that.

FDA's action is essentially a nationwide, country-wide alert. What an individual state chooses to do based on the information they have is entirely up to them.

We were moving through this progressively and have not reached a point where we need to take the action and hence the action that we've taken.

As I say what a state may do is independent of what we would do.

And your second question again, sorry?

11

Julie Zawisca:    David you're talking about actions the Chinese authorities…?

David Acheson:    Yes, I beg your pardon, yes. We certainly applaud the actions that the Chinese authorities are taking. They're certainly working hard to try to address food safety issues in China.

We have been working with them on this particular issue for some time, and other issues related to food safety. And we look forward to continuing to work with them as we move forward.

However, our goal is to protect the American consumer and we believe that this is the appropriate action today to do that with regards to farmed seafood from China.

So even though the Chinese are taking some very positive steps, and we will continue to work with them, we feel this action is still necessary.

Julie Zawisca:    Thank you. Let's take the next question.

Coordinator:    (Andrew Martin) of the New York Times.

(Andrew Martin):    Hi. You had said earlier, Miss Glavin, that 5% of the seafood imports are inspected. A NGO called Food and Water Watch did a study in May that said less than 1% were actually inspected in the lab and I think about 2% received any kind of inspection at all.

Can you explain that discrepancy?

Margaret Glavin:    Yes. I'm sorry I was talking about seafood from China at the 5% rate.

(Andrew Martin): And is that since you had this issue with the eels back in the fall?

Margaret Glavin: It's actually since – it's actually been over the past several years that we have begun to ramp it up as we began to see more and more products from more and more processors and manufacturers we began to take a broader look at these products coming in from China.

(Andrew Martin): And you said – do you have any sense of how long, how far back you started seeing these sorts of problems with farm raised seafood from China?

Margaret Glavin: The most – in recent years the longest alert was put on in 2001 which was an import alert for products from certain processors in China. So that's – it – this goes back before 2001 because we were gathering data before that that led to that alert.

Julie Zawisca:    Thank you. Next question.

Coordinator:    (Phyllis Schmidt), USA Today.

(Phyllis Schmidt): Yes, hi, thank you. Mr. Acheson you say that there's no immediate threat to public health because the levels being found are low. But then you add they could cause serious health problems if consumed over a long period of time.

Could you be a little bit more specific – I mean a long period of time being fish every day for two weeks, or these types of fish every day for three years at four or five pounds a day? I mean or do we even know?

David Acheson:    Thank you. This is David Acheson. Thank you for clarifying that point.

The studies for in terms of the cancer-causing properties of these drugs have been done in lab animals. And in order to get cancer in lab animals, you have to feed fairly high levels of the drugs - certainly higher than the levels we're seeing - for prolonged periods.

In terms of the length of time relative to the lifespan of a particular lab animal I don't know. Dr. Sundlof sitting next to me may be able to provide more specifics of that.

But it is a long term exposure. I think we're talking not days, weeks, not even months but years of exposures. And it's certainly possible that at these low levels you'd never reach that point. But it's clearly a chance that we wouldn't want to take.

Julie Zawisca:      (Phyllie) do you have a follow up? Okay. Anything else on that? Can you please give the mic to Dr. Sundlof?

Stephen Sundlof:  No, just that - this is Steve Sundlof - the studies that were done to look at the cancer-causing effects of these drugs were done in laboratory mice for a full lifetime study - over two years.

Julie Zawisca:      Thank you Dr. Sundlof. Next question, please.

Coordinator:       (Mike Malier) News Hour with Jim Lehrer.

(Mike Malier):    Yes, thank you for taking my question. Some of it's already been answered. But just to get a better sense of the timeline, I mean how long ago were the first tests to show some of these products coming through? And how quickly do you guys anticipate the farming techniques to be able to change to not be able to use them in China, or have these?

14

From what I've heard some of these drugs are used just to combat some of the pollution in the water there. If you can clarify some of that, like how, I mean, just how long we've had the first testing of it and the possible length for which the companies may need to comply.

Margaret Glavin: We began to see these problems in farmed fish from China pre-dating 2001.

Julie Zawisca: Anything else, (Andrew)? Or - I'm sorry - (Mike Malier). Pardon me. (Mike), anything else?

(Mike Malier): No, just do you guys have any estimates on how long you think, you know, compliance will take for this - for us to start seeing shrimp and catfish from China coming back for these importers to prove to you guys that they're safe and the procedures are working well?

David Acheson: This is David Acheson. Clearly the addition of these drugs is - it's a deliberate event that the farmers are using. They're adding the drugs to the fish, to the seafood, to the water ostensibly to treat conditions that the fish may have.

If they stop adding them, then the problem is going to go away.

I don't think we can speak to how quickly they're going to do that but that's the solution.

And I think, you know, to the broader point, that's what we're striving to do working with the Chinese authorities is to achieve that point where safe product can be imported into the United States.

Julie Zawisca: Thank you. Next question.

15

Coordinator:        (Sandra Young), CNN.

(Sandra Young):    Yes, does this mean - just to clarify - does this mean that no shrimp or catfish
                   or any of these other types of fish that are farm raised from China can come
                   into the U.S.? Or is this supplier by supplier basis?

Margaret Glavin:   This means none of these products from China can come into the U.S. until a
                   particular supplier proves that the product that he is trying to import is safe.

(Sandra Young):    So they could come back in on a supplier by supplier basis but right now it's a
                   blanket.

Margaret Glavin:   They could come - well there's several ways they can come back in.

                   First they can come back in on a shipment basis if they can prove the
                   particular shipment is safe they can come in.

                   Then there are ways for a particular supplier to get off the list.

                   And that - those are the three different things that I mentioned in my opening
                   remarks - documentation of five consecutive clean entries, documentation
                   from an appropriate third party, and that's usually a government authority
                   demonstrating that that third party has inspected the supplier and has verified
                   that the seafood was processed in accordance with FDA seafood HACCP regs.

                   And thirdly documentation that the processor is in compliance with all
                   Chinese government requirements for exporting farm raised seafood into the
                   U.S.

That's how a supplier gets off the list.

(Sandra Young):    How much of our shrimp comes from China? That's going to hit the shrimp industry here pretty hard, the restaurants and such, isn't it?

Margaret Glavin:    I don't know the answer to that.

(Sandra Young):    Okay, thank you.

Julie Zawisca:    Next question, please.

Coordinator:    (Richard Knox), National Public Radio.

(Richard Knox):    Yes, thanks very much.

Since this problem has been fairly long standing, you've been seeing it for some years, and since you say that it does require prolonged exposure, how would we know – how can we know – if we're already seeing health effects from people exposed over several years to shrimp and catfish and so on?

What kind of surveillance is being done or could be done to be sure that you're right?

David Acheson:    This is David Acheson. I think that's a very difficult question to address.

As with any long-term exposures to potential carcinogens in the environment or in food or in any other way, making the connection between cause and effect is extremely difficult.

17

If you draw the parallel with the complexities of trying to link certain industrial carcinogens or even several carcinogens in tobacco smoke with lung cancer, that was not easy and was not quick.

So it's extremely complex to show cause and effect.

The Centers for Disease Control do monitor cancer in the U.S. population, looking for changes in trends, changes in levels, and certainly I think if we saw any significant change there would be questions raised as to why.

At the end of the day the risks here are really based on animal studies where as Dr. Sundlof said it was long-term exposure to lab mice that resulted in tumors.

And I think we don't want to be alarmist here and create a sense that this is a high likelihood in exposed populations in the United States. It's not. It's a very low likelihood.

But it nevertheless is the correct move in the context of protecting the public from a potential risk.

(Richard Knox):    Would difficulties in antibiotic resistance be any easier to spot?

David Acheson:    That's a different issue, correct. The fluoroquinolone use does have a different layer of concerns. That's not a cancer concern, that's a antibiotic resistance concern.

And again, I mean we see a progressive change in antibiotic resistance, not just in the United States but throughout the world.

And antibiotic usage both for humans and for animals contributes to that and there are certainly examples of how there's been impacts there and shifts and changes based on different uses.

Again I think trying to determine what the contribution of this particular use is to overall fluoroquinolone resistance in the United States would be a next to impossible epidemiological task.

But what we do know is that this type of usage in farm animals can contribute. And therefore, again, it's a prudent thing to do based on that risk.

Dr. Sundlof, I don't' know whether you can provide more specifics.

Steve Sundlof:    I'll just give you a little bit of background.

In - where we do have fluoroquinolone approved for livestock - and in the United States it's only cattle - we used to have them approved for poultry and we found that continued used of fluoroquinolone in poultry did result in resistance to one of the food Bourne pathogens, (campelobacter), to the point that we withdrew the drug from the market.

The problem with imported products and especially seafood is that we're not monitoring for resistance bacteria in seafood. We're - so there could be resistance that develops that could infect people.

We have no systems in place for monitoring for that. And so as a result of that we have banned, in the United States, all uses of fluoroquinolone in animals that have not been approved for that very reason.

Julie Zawisca:    Thank you Dr. Sundlof. Next question please.

Coordinator:          (Bob Orr), CBS News.

(Bob Orr):            Yes, hi. I just wonder if you could clarify - what does this mean for any
                      Chinese seafood products that's already here? In other words would
                      restaurants have to do anything? Would stores have to take anything off
                      shelves? What does it mean for people with products at home? What should
                      they do?

Margaret Glavin:  We're not asking for this product to be withdrawn from the market or for
                      people to take it out of their freezers and return it or throw it away.

                      This is a long-term health concern. It is not an acute health concern. And so
                      we are not - we're stopping the future arrival in this country of these
                      (unintelligible) products.

(Bob Orr):            And should anybody at home have any concerns about consuming what they
                      already have?

Margaret Glavin:  They should not have concerns about these products.

Julie Zawisca:        Anything else (Bob)?

(Bob Orr):            No, I think that's about it. Thank you.

Julie Zawisca:        Okay. Next question, please.

Coordinator:          (Ricardo Alonso Saldovar), L.A. Times.

(Ricardo Alonso Saldovar):   Okay. Thank you. My question was just answered. It was the question that (Bob) asked. But I'm kind of surprised that you don't have any information about the scope of the action that you're taking.

I mean what share - shrimp and catfish are both popular. I don't know about the other types of fish involved. But you cannot shed any light whatsoever on the scope of the consequences?

David Acheson:   This is David Acheson. It's just simply not something that FDA tracks. I think there are other parts of the federal government that could give you a better answer to that.

You're right - catfish and shrimp are two of the 10 most frequently consumed seafood species in the United States. Farm products is up there. And I have no doubt that this is not an insignificant part of the market. But I can't put a number on it for you.

And I don't want to emphasize that that really is part of the calculation here. The equation is not based on that kind of an impact. It really is based on a public health move.

(Ricardo Alonso Saldovar):   Okay. And to follow up, can you give us an idea what the other three are used for? You mentioned dace, basa and something else.

David Acheson:   We said catfish and basa, eel, shrimp and dace.

(Richard Alonso Saldovar):   Okay so now what are basa and shrimp - I'm sorry - basa and dace used for? What are those?

David Acheson:    I'm going to refer that question to Mr. Don Kraemer who can probably give you a more accurate answer.

Don Kraemer:    Thanks. Basa is a species very similar to catfish and it's used....

(Richard Alonso Saldovar):    Very similar to what, now?

Don Kraemer:    Catfish. And it's used similar to that species. Dace is a species similar to carp and it would be used in manners that carp would be used.

Julie Zawisca:    Anything else, (Ricardo)?

(Ricardo Alonso Saldovar):    So would this be like a processed seafood product or just as a, you know, separate individual serving of these kind of fish?

Don Kraemer:    Well these are being brought into the country as whole or filleted fish and forms similar to that, not as processed into another form, although it certainly could be further processed when it gets into the country.

(Ricardo Alonso Saldovar):    But you expect it's the kind of thing that would be consumed as whole or filet fish?

Don Kraemer:    It could be either. It could be served in a restaurant. It could be purchased, you know, in a supermarket in a variety of different market forms.

Julie Zawisca:    Next question, please.

Coordinator:    (Jennifer Corbits), Dow Jones.

(Jennifer Corbits): Yes hi. I was just asking if - first of all I haven't seen a press release cross - I don't know if something's gone across - and this malachite green, can somebody tell me what that is?

Julie Zawisca:     (Jennifer) we are going to be putting out a press release shortly.

(Jennifer Corbits): Okay. Thank you.

David Acheson:    Malachite green is used to treat fungal infection.

(Jennifer Corbits): Okay. And I'm assuming though that it's not allowed in fish.

David Acheson:    Correct, in the United States that's correct.

(Jennifer Corbits): Okay.

Julie Zawisca:     (Jennifer) I'm being told our press release may in fact be online at this moment. We don't have our blackberries near us because they would interfere with the (unintelligible).

(Jennifer Corbits): Okay. I'm just having a rough time spelling some of these names, so which is tough for a wire reporter, but....

Julie Zawisca:     Next question, please.

Coordinator:       (David Kirsch), (unintelligible).

(David Kirsch):    Partly answered in the previous question was how a consumer ultimately - or I should say most likely - encounter these products. I understand your answer to be really in any form - fresh, frozen, processed, at home or in restaurants.

23

Is that correct?

David Acheson:    That's correct.

(David Kirsch):    The - understanding also in the beginning you said that despite extensive communication with the Chinese authorities you continue to find residues of these products.

But why is it being done now? And to what extent is it linked to the sort of avalanche that we've seen of products from China drawing closer scrutiny?

David Acheson:    Well let me start and then turn to Maggie Glavin to add to that.

It's - there is nothing special about the timing now. As you've heard, this has been a steady progression of ongoing testing, increasing concern. The import alerts have been going on for a long time. And what we've been doing here is to add one company at a time when we've found a problem to the import alert.

We've now reached a point where, as you heard, from the recent testing where between October last year and the end of May this year over 15% of the samples that we tested were positive. That basically reaches a point where we're saying we need to set up controls that are broader than company by company.

We could continue to do that but it basically reaches a point where the optimal way to protect the public health in America is to broaden it to country wide.

Again as you heard we did the same sort of thing with eel. We began with companies. It broadened to a country wide alert.

And in fact just recently we did exactly the same thing with melamine. It started with a couple of companies and it broadened to a country wide.

So this is not an unusual track of events where we start with some companies. We do more, we learn more. And we make the determination that the best way to protect public health is to broaden it.

Maggie?

Margaret Glavin:    Well, and the other thing I would add to that is that is how we make the best use of our resources. At some point we put the burden on either the importing country or the importing processor, not on ourselves so that we can use our resources elsewhere.

(David Kirsch):    Would you quarrel at all with what will most likely be the popular reactions, and certainly the characterization of this that this is just another event related to China and food and drug safety?

Margaret Glavin:    It certainly is another event in food safety.

David Acheson:    Yes, it is. It's an event related to food safety and it's an event related to China. I suspect that's not where you're going with your question.

(David Kirsch):    No, not at all. You suspect where I'm not going. I imagine you suspect where I am going.

David Acheson:    Well be more specific.

25

(David Kirsch):    Well, you know, the consumer ultimately or the folks that are consuming our news are going to look at this and say that ultimately that Chinese - make a perhaps a general overreach - that all Chinese products are not safe, that this is being done slowly in recognition that Chinese foods and drug products are not safe and that it's a slow response.

David Acheson:    Well import alerts are a strategy that we use, and they are not just focused on China.

If you were to look at the import alert that FDA publishes, it covers numerous other places.

And it's a strategy that we use where we focus in on the areas that we think are of concern with regard to risks and public health perspective. And as Maggie Glavin said, it essentially shifts the burden in terms of the use of resources.

So clearly yes the focus recently has been on Chinese products but if you were to look at the list of other countries where we have import alerts, there are many other places over the years where we have posted import alerts.

It just happens to be right now this today is one focused on China.

So, you know, we will continue to take the same approach - the same strategy - of looking for the problems where we think they exist, doing testing, imposing import alerts as and when we think it's appropriate.

Julie Zawisca:    Thank you. We're going to have to move on to the next caller. Next question, please.

Coordinator:        (Frank Lopes), the Washington Times.

(Frank Lopes):      Thanks. This may have been partly answered but I'm not entirely sure.

                    Why does anybody use the contaminants you laid out in fish products?

David Acheson:      They use them because the - several of them are purported to treat fungal
                    infections, particularly malachite green and gentian violet.

                    The fluoroquinolone are typically used to treat bacterial infection and I'm not
                    aware of the pros and cons of their value for use in that regard but that's what
                    they're used for.

(Frank Lopes):      Okay so they make a fish healthier.

                    What about other countries? Have we found other countries doing the same
                    thing?

David Acheson:      Maggie, do you know?

Margaret Glavin:    Yes we have found some other countries doing the same thing and we have
                    import alerts on the Philippines, on Mexico and several others.

                    These are not country wide alerts. They're on particular firms. I think - I can
                    see on this list half a dozen countries from which individual firms are on
                    import alert.

(Frank Lopes):      And the same contaminants, the same chemicals?

Margaret Glavin:    Same general class of chemicals, yes.

(Frank Lopes):     Thank you.

Julie Zawisca:     Next question, please.

Coordinator:     (Emery Picash), Market Watch. Your line is open.

(Emery Picash):     Thank you very much. I was wondering who is your counterpart either in China or representing China in the states who you are working on with this?

David Acheson:     We're working with numerous individuals in China on this at multiple levels.

Julie Zawisca:     Thank you.

(Emery Picash):     Okay. And also if I may, you said testing goes back to 2001. Why did it take about six years to now issue these health alerts?

Margaret Glavin:     Well as has been said, we in 2001 put some products from particular manufacturers under import alert. In 2006 we put a country wide alert on all Chinese eel. And now we're doing a country wide alert on a larger range of products.

So as we see these problems and put alerts on we look harder to see whether there are other problems or whether the problem is broader or whether it is growing.

And some combination of those factors have lead us to this point in time.

(Emery Picash):     And if I may, one last question.

Julie Zawisca: Quickly, because there are other people.

(Emery Picash): Okay. How long will it take for these contaminants to clear out of like a fish system?

David Acheson: Dr. Sundlof?

Stephen Sundlof: Okay, thank you. This is Steve Sundlof. It depends on the fish species. It depends on the contaminant. There's a lot of things that are involved and it actually depends on the water temperature and the quality of the water. So there are numerous factors that can impact the length of time that these drugs stay in the fish.

Julie Zawisca: Thank you. Next question.

Coordinator: (Jane Zann), Wall Street Journal.

(Jane Zann): Hi. Thanks for taking my call. What do you think will, you know, will be the trade complications if there's any? And also what do you think this move will affect the prices of seafood? Thank you.

David Acheson: I can answer both of those fairly quickly by saying I don't know. You know, I want to emphasize one more time that this is being done for protection of the American public and for no other reason. So I wouldn't question that those are valid questions. I don't happen to know the answers to them.

Julie Zawisca: (Jane) anything else?

(Jane Zann): No. Thank you.

29

Julie Zawisca:    Okay. You're welcome. Thank you.

Ladies and gentlemen this concludes our briefing today and we hope that you found this information useful.

I'd like to thank our speakers, Miss Glavin and Dr. Acheson and the other FDA participants and thank all of you for joining us today.

You should have received a press release. It is online on the topics that were discussed this afternoon.

And if you do have any follow up questions please contact Michael Herndon in the Press Office at 301-827-6242 or just shoot him an email at michael.herndon@fda.hhs.gov.

Thanks again and have a pleasant afternoon.

END

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

# EXHIBIT 3

**FDA**  **U.S. Food and Drug Administration**  U.S. Department of Health and Human Services

# FDA News

**FOR IMMEDIATE RELEASE**
June 28, 2007

**Media Inquiries:**
Michael Herndon, 301-827-6242
**Consumer Inquiries:**
888-INFO-FDA

## FDA Detains Imports of Farm-Raised Chinese Seafood
### *Products Have Repeatedly Contained Potentially Harmful Residues*

*En Español* | 中文

The Food and Drug Administration (FDA) today announced a broader import control of all farm-raised catfish, basa, shrimp, dace (related to carp), and eel from China. FDA will start to detain these products at the border until the shipments are proven to be free of residues from drugs that are not approved in the United States for use in farm-raised aquatic animals.

This action by FDA, a part of the U.S. Department of Health and Human Services, will protect American consumers from unsafe residues that have been detected in these products. There have been no reports of illnesses to date.

"We're taking this strong step because of current and continuing evidence that certain Chinese aquaculture products imported into the United States contain illegal substances that are not permitted in seafood sold in the United States," said Dr. David Acheson, FDA's assistant commissioner for food protection. "We will accept entries of these products from Chinese firms that demonstrate compliance with our requirements and safety standards."

During targeted sampling from October 2006 through May 2007, FDA repeatedly found that farm-raised seafood imported from China were contaminated with antimicrobial agents that are not approved for this use in the United States.

The contaminants were the antimicrobials nitrofuran, malachite green, gentian violet, and fluoroquinolone. Nitrofuran, malachite green, and gentian violet have been shown to be carcinogenic with long-term exposure in lab animals. The use of fluoroquinolones in food animals may increase antibiotic resistance to this critically important class of antibiotics.

None of these substances is approved for use in farm-raised seafood in the United States, and the use of nitrofurans and malachite green in aquaculture is also prohibited by Chinese authorities. Chinese officials have acknowledged that fluoroquinolones are used in Chinese aquaculture and are permitted for use in China.

The levels of the drug residues that have been found in seafood are very low, most often at or near the minimum level of detection. FDA is not seeking recall of products already in U.S. commerce and is not advising consumers to destroy or return imported farm-raised seafood they may already have in their homes. FDA is concerned about long term exposure as well as the possible development of antibiotic resistance.

The FDA action includes conditions under which an exporter can be exempted from FDA's detention action by providing specified information to the agency. This information must demonstrate the exporter has implemented steps to ensure its products do not contain these substances and that preventive controls are in place. The additional import controls placed on seafood from China will last as long as needed.

FDA may allow the entry into the United States and subsequent distribution into the marketplace of individual shipments of the Chinese farm-raised seafood products if the company provides documentation to confirm the products are free of residues of these drugs.

####

**Additional Information**
Import Alert
Timeline: Farm-Raised Fish Imported from China
Questions and Answers on FDA's Import Alert on Farm-Raised Seafood From China
Consumer Article on How FDA Regulates Seafood
Seafood Imports

RSS Feed for FDA News Releases [what is RSS?]

Get free weekly updates about FDA press releases, recalls, speeches, testimony and more.

FDA Newsroom

FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility

FDA Website Management Staff

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

# EXHIBIT 4

# CRS Report for Congress

## Food and Agricultural Imports from China

**Updated July 17, 2007**

Geoffrey S. Becker
Specialist in Agricultural Policy
Resources, Science, and Industry Division



**Congressional
Research
Service**

Prepared for Members and
Committees of Congress

# Food and Agricultural Imports from China

## Summary

U.S. food and agricultural imports have increased significantly in recent years, causing some in Congress to question whether the U.S. food safety system can keep pace. A series of recent incidents have raised safety concerns about the many foods, medicines, and other products from China in particular. For example, in early 2007, evidence began to emerge that adulterated pet food ingredients from China had caused the deaths of an unknown number of dogs and cats. In late June 2007, the U.S. Food and Drug Administration (FDA) announced that it was detaining all imports of farm-raised seafood from China (specifically, shrimp, catfish, basa, dace, and eel) until the shippers of these products could confirm they are free of unapproved drug residues.

U.S. imports of all Chinese food, agricultural, and seafood products have increased from nearly 0.411 million metric tons (MMT) in 1996 to 1.833 MMT in 2006, a 346% rise. The increase by value was 375%, from $880 million in 1996 to $4.2 billion in 2006. China was the sixth leading foreign supplier of agricultural products to the United States and the second leading seafood supplier in 2006. When seafood values are combined with food and agricultural products, China was the third leading foreign supplier, after Canada and Mexico.

Two federal agencies — FDA and the U.S. Department of Agriculture's (USDA's) Food Safety and Inspection Service (FSIS) — are primarily responsible for the government's food regulatory system, although a number of other federal, state, and local agencies also have important roles. For imports, FSIS (which has oversight over most meat and poultry) relies on a very different regulatory system than FDA (which has oversight over other foods). Although all imported food products must meet the same safety standards as domestically produced foods, international trade rules permit a foreign country to apply its own, differing, regulatory authorities and institutional systems in meeting such standards, under an internationally recognized concept known as "equivalence."

Despite recent statements by China that it is moving aggressively to improve its food safety system and close unsafe plants, some Members of Congress have expressed sharp criticism of both China's food safety record and U.S. efforts to insure the safety of imports. Congressional committees have held, or are planning, hearings on food safety concerns generally and on the China situation particularly. On May 2, 2007, Senator Durbin won unanimous approval of an amendment to the Senate-passed FDA Revitalization Act (S. 1082) that would require domestic and foreign facilities to notify FDA of food safety problems, and would require FDA to establish a central registry for collecting information and notifying the public about adulterated foods, and for notifying the public about adulterated human or animal foods. The amendment includes elements of his proposed Human and Pet Food Safety Act of 2007 (S. 1274), introduced as H.R. 2108 by Representative DeLauro. Separate bills (S. 1776 and H.R. 2997) would, among other things, impose new user fees on food imports to help cover the cost of their screening. More comprehensive bills (H.R. 1148/S. 654) would combine current federal food safety oversight under a new food safety administration.

## Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Import Trends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S. Import Safeguards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    FSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    FDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

FDA Import Refusals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Overview and Limitations of Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Refusals of Imports from China . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Chinese Food Safety Challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Chinese Efforts to Address Food Safety . . . . . . . . . . . . . . . . . . . . . . . . . 12
    U.S. Efforts to Improve Import Compliance . . . . . . . . . . . . . . . . . . . . . . 13

Congressional Consideration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## List of Tables

Table 1. Leading Suppliers of U.S. Agricultural and Seafood Imports, CY2006 . 2
Table 2. Selected Agricultural and Seafood Imports from China, CY2006 . . . . . 3
Table 3. Number of Import Refusals by Country, May 2006-April 2007 . . . . . . . 8

# Food and Agricultural Imports from China

## Introduction

Food and agricultural imports have increased significantly in recent years, causing some in Congress to question whether the U.S. food safety system can keep pace. Analysts point out that domestically sourced foods also can pose safety problems, as evidenced by recent outbreaks of illness linked to consumption of raw produce and by continuing recalls of meat and poultry products due to bacterial contamination.[1]

However, a series of recent incidents have raised safety concerns about the many foods, medicines and other products from China in particular. For example, in early 2007, evidence began to emerge that adulterated pet food ingredients from China had caused the deaths of an unknown number of dogs and cats. Furthermore, some ingredients also were fed to U.S. food animals, although federal officials claimed that humans were not at risk. In late June 2007, the U.S. Food and Drug Administration (FDA) announced that it was detaining all imports of farm-raised seafood from China (specifically, shrimp, catfish, basa, dace, and eel) until the shippers of these products could confirm that they are free of unapproved drug residues.

Although it has strongly defended its record, the Chinese government also has announced a variety of steps to improve the safety of its food and drug exports, including planned major revisions in its regulations, new inspections, and the closure of nearly 200 problem plants.

These and other developments have greatly heightened public and congressional scrutiny not only of China's own food safety regime, but also of the adequacy of U.S. import safeguards. In the 110th Congress, a number of congressional committees have held hearings on or launched investigations of food imports from China and elsewhere and the U.S. laws and regulations designed to ensure their safety. Bills also have been introduced aimed at clarifying and expanding federal authorities and/or reorganizing agency responsibilities. FDA officials claim that they are examining how best to determine relative risks among products (imported and domestically produced) and among exporting countries. Underlying all of these efforts is the question of whether the agency has sufficient money and staff to address these risks.

## Import Trends

U.S. imports of agricultural and seafood products from all countries increased from 32.9 million metric tons (MMT) in calendar year 1996 to 46.7 MMT in 2006, or by 42%. The increase by value was 98%, from $40.1 billion in 1996 to $78.5

---

[1] See CRS Report RL32922, *Meat and Poultry Inspection: Background and Selected Issues*, by Geoffrey S. Becker; and CRS Report RL33722, *Food Safety: Federal and State Response to the Spinach E. coli Outbreak*, by Donna V. Porter.

billion in 2006. Among the product categories that at least doubled in volume during the period were live animals, wine/beer, fruit/vegetable juices, wheat, coffee, snack foods, and various seafood products.[2]

Not all agricultural imports enter the human food supply; some products are used as ingredients in pet food and animal feed, in manufactured goods (e.g., rubber), and in the nursery plant trade. Nonetheless, consumers are obtaining a growing portion of their diets from overseas. In 2005, nearly 15% of the overall volume of U.S. food consumption was imported, compared with 11%-12% in 1995. The proportions (volume) for some food product categories are much higher: in 2005 as much as 84% of all U.S. fish and shellfish was imported (55% in 1995); 43% of all noncitrus fresh fruits (34% in 1995); 37% of all processed fruits (20% in 1995); and 54% of all tree nuts (40% in 1995).[3]

U.S. imports of Chinese agricultural and seafood products have increased far more rapidly than the global increase, from nearly 0.411 MMT in 1996 to 1.833 MMT in 2006, a 346% rise. The increase by value was 375%, from $880 million in 1996 to $4.2 billion in 2006.

In 2006, China was the sixth leading foreign supplier of agricultural products to the United States (after Canada, Mexico, Italy, Australia, and Ireland, in that order) and the second leading seafood supplier (after Canada). When seafood values are combined with agricultural products, China was the third leading foreign supplier, after Canada and Mexico (see **Table 1**, below).

### Table 1. Leading Suppliers of U.S. Agricultural and Seafood Imports, CY2006
(value in billion U.S. dollars)

| Country | Agricultural | Seafood | Total |
|---|---|---|---|
| Canada | $13.433 | $2.184 | $15.617 |
| Mexico | 9.390 | 0.454 | 9.844 |
| China | 2.262 | 1.922 | 4.184 |
| Thailand | 1.812 | 1.334 | 3.146 |
| Italy | 2.802 | .009 | 2.811 |
| Indonesia | 2.023 | 0.778 | 2.801 |
| Chile | 1.774 | .952 | 2.726 |
| Australia | 2.487 | .091 | 2.578 |
| Brazil | 2.237 | .130 | 2.367 |
| Ireland | 2.354 | .008 | 2.362 |
| World Total | 65.333 | 13.143 | 78.475 |

**Source:** USDA, Foreign Agricultural Service (FAS), BICO Import Commodity Aggregations.

---

[2] U.S. Department of Agriculture (USDA), Foreign Agricultural Service (FAS), U.S. Trade Internet System, BICO (Bulk, Intermediate, and Consumer-Oriented) data.

[3] USDA, Economic Research Service (ERS), unpublished data, obtained May 11, 2007. Other data including that provided by FDA indicate that the current percentage for seafood is somewhat lower than 84%.

Table 2, below, shows the major types of food and agricultural imports from China in 2006. Seafood products, including shrimp, other shellfish (mollusks), and salmon, were the leading food-related (i.e., agricultural and seafood) imports. Fruits, fruit juices, vegetables, tree nuts, teas, and spices also were high on the list.

## Table 2. Selected Agricultural and Seafood Imports from China, CY2006

| Import | Value ($1,000) | (metric tons unless specified) |
|---|---|---|
| Other fish & products (not listed below) | $1,076,631 | 332,714 |
| Shrimp & prawns | 331,935 | 68,364 |
| Mollusks | 245,607 | 62,727 |
| Misc. horticultural products | 226,047 | 109,910 |
| Fruit, processed | 207,427 | 247,554 |
| Fruit juices (kiloliters) | 201,935 | 933,566 |
| Other crustaceans | 159,352 | 22,051 |
| Feed, ingredients & fodders | 147,850 | 59,988 |
| Misc. industrial use | 143,780 | 12,574 |
| Vegetables, prepared or preserved | 122,854 | 131,002 |
| Poultry, misc.[a] | 120,765 | 15,436 |
| Sugar & related products | 104,611 | 46,429 |
| Salmon | 97,792 | 26,482 |
| Vegetables, dried/dehydrated | 93,254 | 68,516 |
| Edible tree nuts | 80,853 | 10,070 |
| Fresh vegetables, excluding potatoes | 77,555 | 76,296 |
| Other oilseeds products, nonagricultural | 75,645 | 27,857 |
| Grains and feed, misc. | 75,495 | 46,422 |
| Misc. meat products[a] | 69,673 | 15,672 |
| Tea, excluding herbal | 68,174 | 24,007 |
| Misc. hair, industrial use | 59,781 | 13,513 |
| Vegetables, frozen | 54,513 | 67,893 |
| Spices | 49,929 | 43,156 |
| Cocoa & cocoa prods. | 48,278 | 11,661 |
| Misc. sugar and tropical | 46,606 | 13,433 |
| Essential oils | 40,249 | 3,896 |
| Fruit, dried | 39,766 | 7,349 |
| Rice | 36,428 | 104,894 |

Source: USDA, FAS, FAS Import Commodity Aggregations. Not all products listed.
a. Primarily species not subject to FSIS inspection. (FSIS coverage is of the major commercial red meat and poultry species and their products, while FDA has jurisdiction over any meat and poultry not inspected by FSIS.)

The broader categories in **Table 2** mask some specific products that the United States imports from China. For example, The United States received $941 million in various types of fish fillets. Mushrooms accounted for at least $37 million of the dried vegetable category in 2006.

A recent report by Food and Water Watch, a consumer advocacy organization, noted that China became the leading exporter of seafood to the United States in 2004. Aquaculture has facilitated this growth in exports, particularly of shrimp and tilapia. Catfish, eel, and crab imports also have risen significantly.[4]

# U.S. Import Safeguards

## Overview

Although all food products imported into the United States must meet the same safety standards as domestically produced foods, international trade rules permit a foreign country to apply its own, differing, regulatory authorities and institutional systems in meeting such standards, under an internationally recognized concept known as "equivalence."[5]

Two federal agencies — the U.S. Department of Agriculture's (USDA's) Food Safety and Inspection Service (FSIS) and the U.S. Department of Health and Human Services' Food and Drug Administration (FDA) — are primarily responsible for the government's food regulatory system, although a number of other federal, state, and local agencies also have important roles. For imports, FSIS relies on a very different regulatory system than FDA, including a different approach to addressing equivalence, as described in the following sections.[6]

## FSIS

Under Section 20 of the Federal Meat Inspection Act (FMIA) as amended (21 U.S.C. 601 et seq.) and Section 466 of the Poultry Products Inspection Act (PPIA) as amended (21 U.S.C. 451 et seq.), FSIS is responsible for determining the equivalence of other countries' meat and poultry safeguards.[7] A foreign plant cannot

---

[4] *Import Alert: Government Fails Consumers, Falls Short on Seafood Inspections.* Food and Water Watch, May 2007. Accessed on the Internet on June 5, 2007, at [http://www.foodandwaterwatch.org/press/publications/reports/import-alert].

[5] This concept is embodied in Article 4 of the Agreement on the Application of Sanitary and Phytosanitary Measures (the SPS Agreement), which entered into force January 1, 1995, for member nations of the World Trade Organization (WTO). For a more detailed explanation, see CRS Report RL33472, *Sanitary and Phytosanitary (SPS) Concerns in Agricultural Trade*, and the WTO website at [http://www.wto.org/english/tratop_e/sps_e/sps_e.htm].

[6] The two systems are described in more detail in CRS Report RS22664, *U.S. Food and Agricultural Imports: Safeguards and Selected Issues*, from which this section is adapted.

[7] FSIS coverage is of the major commercial red meat and poultry species and their products, (continued...)

ship products to the United States unless FSIS has certified that its country has a program that provides a level of protection that is at least equivalent to the U.S. system.[8] In addition, FSIS operates a reinspection program at U.S. border entry points. Generally, agency inspectors review all import records, assisted by a computerized statistical sampling program, the Automated Import Inspection System (AIIS), that enables targeting of some shipments for actual inspection — examining their physical condition, labeling, and documentation. China is not yet certified to ship FSIS-regulated meat and poultry products (the major commercial species) to the United States.

Meat and poultry imports from other countries, however, have increased significantly, from nearly 2.3 billion pounds presented for inspection in FY1996 to 4.3 billion pounds in FY2005. FSIS has estimated that it physically examined approximately 20% of all such imports in FY1996 and 9.7% in FY2005 (after implementation of the AIIS in the early 2000s).

## FDA

Under Section 801 of the Federal Food, Drug, and Cosmetic Act (FFDCA), as amended (21 U.S.C. 301 *et seq.*), FDA can refuse entry to any food import if it "appears," based on a physical examination or otherwise, to be adulterated, misbranded, or in violation of the law.[9] In exercising its oversight, the agency relies on a system of prior notifications by importers and document reviews at points of entry (ports). Importers must have an entry bond and file a notification for every shipment. Import information is entered into FDA's database, the Operational and Administrative System for Import Support (OASIS). This system helps inspectors to determine a shipment's relative risk and whether it needs closer scrutiny (i.e., actual examination and/or testing). FDA inspectors work closely with Customs and Border Protection officials from the Department of Homeland Security on these tasks.[10]

The volume of FDA-regulated imports has more than tripled in the past decade. The agency received more than 10 million imported food lines (shipments) in FY2006, compared with less than 2.8 million shipments in FY1996. Just over 1% of these shipments were physically examined in FY2006, compared with 1.7% in

---

[7] (...continued)
while FDA has jurisdiction over any meat and poultry not inspected by FSIS.

[8] A list of the 38 currently certified countries can be accessed on the FSIS website at [http://www.fsis.usda.gov/regulations_%26_policies/Eligible_Foreign_Establishments/index.asp].

[9] 21 U.S.C. § 381(a); see also [http://www.fda.gov/ora/compliance_ref/rpm_new2/ch9auto.html].

[10] The Public Health Security and Bioterrorism Preparedness and Response Act of 2002 (P.L. 107-188) expanded the prior notification requirements for FDA-regulated imported foods. It also now requires any imported or domestic facility that manufactures, processes, packs, or holds food for U.S. consumption to register with the FDA; farms and retail establishments are among those exempted. Further, the act requires records sufficient to identify the immediate supplier as well as the subsequent recipient of the product.

FY1996. A food line is a single shipment, regardless of size — whether a single carton or a large carlot — making it difficult if not impossible to determine the share of the total volume of imports that is actually being examined.

FDA's ability to operate within other countries appears to be more limited than that of FSIS. FDA can, and does, periodically visit foreign facilities to inspect their operations, but usually in response to a concern and only with the permission of the foreign government. Furthermore, the agency asserts that it lacks the staff and funding to increase its presence overseas, regardless of whether it might have the legal authority to do so.[11] The FDA's Center for Food Safety and Applied Nutrition (CFSAN) had a total budget of $450 million and staff of 2,843 (full-time equivalent or FTE) in FY2006, of which $285 million and 1,962 FTEs were in the field.[12]

FDA theoretically has the authority to require equivalency standards for Chinese imports, but the agency's situation is significantly more complex than that of FSIS (which regulates fewer types of food products), as stated by David Acheson, the FDA's Assistant Commissioner for Food Protection, at a May 9, 2007, hearing before the House Agriculture Committee. An equivalence-type approach is one possible option for the future, he added.[13] The Government Accountability Office (GAO) in 1998 had concluded that border inspections alone were ineffective and also asserted that FDA lacks the statutory authority to mandate equivalency.[14]

# FDA Import Refusals

## Overview and Limitations of Analysis

Using the OASIS data, the FDA compiles a monthly "Import Refusal Report" for food shipments that it rejects. Such products have to be either re-exported or destroyed by the importer. The agency posts these monthly refusal reports on its website, but only for the most recent 12 months (i.e., only one year's worth of

---

[11] An FDA website notes that "[f]ull equity in foreign inspections is far beyond the resources of FDA." Accessed May 15, 2007, at [http://www.cfsan.fda.gov/~comm/intl-toc.html].

[12] House Appropriations Committee Hearings, Agriculture Appropriations for FY2007. A further breakdown of field staff involved with imported foods was not immediately available, although CRS had reported it to be 595 FTEs out of a total of 1,452 field staff in FY1996 (in out-of-print CRS Report 98-850, *The Safety of Imported Foods: The Federal Role and Issues Before Congress*, by Donna U. Vogt, available from the author).

[13] "Officials defend federal response to melamine contamination," *Food Chemical News*, May 14, 2007. In a July 11, 2007 conference call, Dr. Acheson reportedly reiterated his concern about the complexity of trying to seek food safety equivalency agreements with the approximately 150 countries that ship products to the United States (*Food Chemical News*, July 13, 2007).

[14] GAO Report RCED-98-103, *Food Safety: Federal Efforts to Ensure the Safety of Imported Foods Are Inconsistent and Unreliable*. April 1998.

refusals).[15]  The refusals for each month can be searched by country or by product category, but not by both at the same time.  Data for only 12 months, from May 2006 through April 2007, appeared on the website as of May 2007, and the months were not aggregated into annual figures.[16]

For each line (shipment), the system provides the name of the source company and the reason for refusal.  As noted earlier, the size of each shipment in the OASIS database varies.  Therefore, it is not possible to calculate the volumes of products being rejected, either as an absolute quantity or as a proportion of total imports.  Also, the types or categories of imports do not necessarily correspond to the categories reported through the FAS trade databases (see **Tables 1** and **2**, above).

Mindful of these caveats, CRS prepared a tabulation of the refusals, focusing on nearly 40 categories of FDA-regulated food and food-related products.[17]  For the one-year period available at the time of this CRS tabulation (May 2006-April 2007), FDA logged a total of approximately 8,200 refusals.  Of these, more than 700 separate shipments were from China.  Two other countries had more shipments refused:  Mexico with nearly 1,300 and India with more than 1,100 (see **Table 3**).[18]

It is important to note that a higher relative number does not necessarily indicate that one country's products are less safe, or its food safety system less rigorous, than another country's.  The country simply might be a more important source of U.S. agricultural and/or seafood imports.  On the other hand, Canada, which imports much more to the United States than any other country, had far fewer refusals than either China or Mexico, the second most important U.S. importer in dollar value.  India had the second highest number of refusals, even though it is not among the top 10 exporters of food, agricultural, and seafood products to the United States.[19]

Because of technical problems with OASIS at the time this report was prepared, FDA officials said they could not immediately respond in detail to CRS questions about the database that might have shed additional light on the significance, if any, of the numbers in **Table 3**.  For example, the information published on the FDA website does not include the overall number of shipments.  Thus, CRS could not calculate for this report the percentage of overall shipments that had been refused for

---

[15] FDA website, accessed May 31, 2007, at [http://www.fda.gov/ora/oasis/ora_oasis_ref.html].

[16] CRS did not examine FSIS import refusals.  China currently is not certified by FSIS to export meat or poultry products to the United States.  A proposed rule in the November 23, 2005, *Federal Register* to permit some types of processed poultry is pending.

[17] Also listed in the OASIS refusal reports, but not examined here, are other FDA-regulated products, e.g., human and animal drugs, medical devices, and vitamins.

[18] *The New York Times* reportedly compiled a more recent 12-month tabulation (July 2006 to June 2007), which indicated that refusals were higher during the period:  1,763 for India, 1,480 for Mexico, and 1,368 for China.  See "China Not Sole Source of Dubious Food," *New York Times*, July 12, 2007.

[19] Nonetheless, India's exports to the United States were valued at a significant $1.4 billion in calendar 2006.

a given month, country, or product. However, FDA did receive a total of nearly 15 million import shipments of all types of FDA-regulated products, including but not limited to foods, during FY2006, or an average of approximately 1.25 million shipments per month.[20]

## Table 3. Number of Import Refusals by Country, May 2006-April 2007

| | | | | | |
|---|---|---|---|---|---|
| Argentina | 59 | Guatemala | 97 | Peru | 39 |
| Australia | 34 | Honduras | 113 | Philippines | 153 |
| Bangladesh | 54 | Hong Kong | 52 | Poland | 76 |
| Brazil | 123 | India (2) | 1,109 | Russia | 26 |
| Canada | 193 | Indonesia (5) | 334 | South Africa | 42 |
| Chile | 35 | Iran | 26 | Spain | 75 |
| China (3) | 720 | Italy (8) | 228 | Sri Lanka | 72 |
| Colombia | 45 | Jamaica | 36 | Syria | 70 |
| Costa Rica | 35 | Japan (7) | 295 | Taiwan | 165 |
| Dominican Republic (4) | 593 | Korea (South) | 111 | Thailand (9) | 218 |
| Ecuador | 56 | Lebanon | 26 | Turkey | 81 |
| Egypt | 47 | Malaysia | 35 | Ukraine | 25 |
| El Salvador | 25 | Mexico (1) | 1,271 | United Kingdom (10) | 206 |
| France | 178 | Netherlands | 54 | Vietnam (6) | 335 |
| Ghana | 49 | Pakistan | 140 | | |

Source: FDA Import Refusal Reports for OASIS. See text for caveats on use of data. Countries with fewer than 25 refusals are omitted here.

Note: Numbers in parentheses indicate top ten countries by rank of number of import refusals.

Reviewing refusals by industry, vegetables/vegetable products and seafood products appear to have been the most frequently refused products (at approximately 1,700 shipments from all countries for each of these two product types). Fruits/fruit products from all countries accounted for nearly 900 refusals. Candy products accounted for nearly 600, and spices/flavors/salts for more than 500. Many fruit and vegetable product refusals originated in the Dominican Republic, Mexico, and several other Latin American and Caribbean nations; a frequently cited reason was pesticide contamination. Bacterial contamination (e.g., Salmonella) or filthy condition was cited numerous times.

Fish and shellfish were refused for a variety of reasons, often bacterial contamination, filthy condition, and/or veterinary drug residues. These products most frequently appear to have originated in Asian countries, not only China but also Vietnam, India, Bangladesh, and others. The recent report by Food and Water Watch analyzed the FDA OASIS refusals of seafood in more detail, and for all calendar

[20] FDA e-mail communication to CRS, June 6, 2007.

years from 2002 to 2006. Among its findings were that more than 70% of all imported seafood products were processed. More than 20% of all seafood refusals were due to Salmonella, of which 40% were shrimp. It also observed that more seafood is being refused for veterinary drug residues.[21]

Many refusals of foods of all types also appear to be due to concerns about mislabeling, failure to register, or failure to document that the product had complied with safe manufacturing practices (e.g., HACCP for low acid canned foods or seafoods).[22]

## Refusals of Imports from China

Of the 720 refused shipments from China, nearly half (340) were seafood products, and approximately one-third of these products were eel. The most frequently cited reason for rejecting the eel shipments was a concern about adulteration by unsafe levels of veterinary drug residues. Catfish products also were often refused, usually because of concerns about veterinary drug residues. A wide variety of other types of finfish, from tilapia fillets to cod and salmon products, was refused for numerous apparent concerns, including veterinary drug residues, filthy appearance, and Salmonella contamination. More than three dozen separate shrimp shipments were refused because of filthy appearance, the presence of nitrofuran (a banned antibiotic), or Salmonella. Other examples of refused seafoods were scallops, crawfish, and squid.

FDA also refused a total of 221 shipments of various fruits and vegetables from China, including processed products. Approximately one-fourth of these shipments were of mushrooms, often in dried form; these were most frequently rejected for filthy appearance. Other reasons for refusing fruit and vegetable product shipments ranged from concerns about the presence of violative levels of pesticides or other unacceptable ingredients, including unsafe color additives, to the lack of proper documentation and/or labeling.

Seafood products and fruit and vegetable products together constituted the majority of refused shipments from China. Examples of other types of food products that were refused, although in fewer numbers, were certain candies, bean curd and bean paste, teas, and various nuts and spices.

Chinese officials strongly defend their safety record. One official asserted at a May 31, 2007, news conference that U.S. inspectors had approved "99 percent" of all Chinese food and medical shipments over the last three years and that recent reports of rejected Chinese shipments had been sensationalized. He further argued that most of those that had been rejected were unauthorized shipments that had skirted Chinese controls.[23] Other Chinese officials have declared that U.S. importing

---

[21] *Import Alert: Government Fails Consumers, Falls Short on Seafood Inspections.*

[22] The FDA website defines each of these terms, which are among approximately 180 possible specific reasons for refusal.

[23] Li Yuanping, director general of the Chinese Import and Export Food Safety Bureau, as
(continued...)

companies need to look beyond their emphasis on low prices and communicate more clearly what their standards are.[24]

FDA officials said they could not immediately respond to a CRS request for the number of food and agricultural shipments from China during the period examined (May 2006-April 2007). They did state that in FY2006, the overall refusal rate for shipments from China (food and all other types of FDA-regulated shipments) was 0.15%. They cautioned that the 99.85% of shipments were not necessarily in compliance, because the agency only has the resources to examine 1% of all line entries (shipments) into the country (see discussion above).[25]

William Hubbard, a former FDA deputy commissioner, recently told National Public Radio (NPR) that total "individual shipments of food and ingredient exports from China to the United States have gone from 82,000 in 2002 to 199,000 in 2006. And I'm told by FDA officials that they're rapidly reaching up to 300,000 this year."[26] However, the same NPR report said that FDA inspectors had blocked 257 food imports from China in April 2007 alone; that number actually represented refused shipments of all FDA-regulated food, drug, and medical products, not foods alone.

## Chinese Food Safety Challenges

As noted, the FDA OASIS database does not provide answers as to whether Chinese imports are any less safe than those from other countries. Nonetheless, the country has come under intense criticism in the wake of several widely publicized incidents involving adulterated food, agricultural, and medical exports. For example, in early 2007 pet food ingredients from China that contained the chemical melamine — apparently added to boost the ingredients' protein levels — sickened or killed an unknown number of dogs and cats in North America. The ingredients subsequently were found in some hog, chicken, and fish feed. A risk assessment indicated the problem posed virtually no risk to humans, USDA and FDA officials asserted. Another incident attracted attention in early May 2007, when the Mississippi Commissioner of Agriculture ordered a number of stores there to stop selling catfish from China after samples tested positive for antibiotics banned in the United States.

---

[23] (...continued)
quoted in various news reports including "China Says Food Export Inspections Are Effective," *Washington Post*, June 1, 2007. Also see "China Confronts Crisis Over Food Safety," *Wall Street Journal*, May 30, 2007.

[24] "U.S., Chinese leaders try to advance trade, food safety issues," *Agri-Pulse*, May 30, 2007.

[25] FDA e-mail communication to CRS, June 6, 2007.

[26] "Q&A: Why China Tops the FDA Import Refusal List," accessed May 25, 2007, at [http://www.npr.org/templates/story/story.php?storyID=10410111].

Such concerns are not new. An FDA import inspector was quoted in 1991: "Some countries we almost never have problems with.... But others, such as India, Thailand, China, Korea, and many countries in Africa, require constant vigilance."[27]

A number of analysts has examined the food safety challenges China faces as it becomes a major agricultural exporter. USDA economists recently wrote:

> China emerged in the 1990s as a low-cost exporter of food products such as vegetables, apples, seafood, and poultry. But in recent years, China's exports slowed when shipments of vegetables, poultry and shrimp were rejected for failing to meet stringent standards in Japan, Europe, and other countries, revealing a gap between Chinese and international food safety standards.[28]

Some analysts contend that China's problems in complying with other — usually more developed — countries' safety requirements are typical of those faced by most developing countries. They point to a number of specific obstacles the Chinese have encountered in upgrading their safeguards, including:

- the difficulty of standardizing and monitoring production practices at the farm production level, to which many safety problems can be traced due to widespread noncompliance with existing regulations such as environmental rules, and which is composed of 200 million households typically farming on plots of one to two noncontiguous acres;
- heavy use of fertilizers and pesticides to counteract intensively cultivated soils and large pest pressures;
- wide use of antibiotics to control diseases in intensive livestock, poultry, and aquaculture systems;
- industrialization, lax environmental controls, and untreated human and animal waste in fields and waters, which raise concerns about toxic, metal, and microbial contaminants in food;
- a fragmented marketing system dominated by millions of small firms handling small volumes, often on a cash basis with no documentation or ability to trace products;
- a fragmented regulatory and oversight structure involving 10 national government ministries and little coordination with lower levels of government, which often have their own, differing standards for food products; and

---

[27] Sharon Snider, "From Psyllium Seeds to Stoneware: FDA Insures the Quality of Imports," *FDA Consumer Magazine*, March 1991.

[28] Linda Calvin et al., "Food Safety Improvements Underway in China," *Amber Waves*, November 2006, USDA, ERS. The Codex Alimentarius Commission is the major international body for encouraging international trade in food while promoting the health and economic interest of consumers. Codex is a subsidiary of the Food and Agriculture Organization and the World Health Organization. One of its key functions is to develop standards, codes of practice, and guidelines for the safety of foods, in accordance with the SPS Agreement. The Codex website is at [http://www.codexalimentarius.net].

- for many commodities and industries, outdated or nonexistent standards, or standards that are inconsistent with internationally accepted ones.[29]

## Chinese Efforts to Address Food Safety

To overcome such obstacles, the Chinese government announced it has undertaken a number of major initiatives to bolster its food safety system. For example, officials announced their intention to update a 1995 consumer food law, and in 2006 the Chinese legislature adopted a national framework for building an agricultural product safety system. The Chinese say they now require registration of all land and processing facilities used for exported products, and exporters must have facilities that can test for pesticide residues. The government also samples and tests products for export to help ensure they meet foreign buyers' standards.[30]

China also has been encouraging investment, including foreign direct investment, in production and processing to improve technology, marketing and management skills, and transportation and infrastructure. Six types of processed foods — canned food, aquatic products, meat and meat products, frozen vegetables, fruit/vegetable juice, and some frozen convenience foods — reportedly are to be manufactured under HACCP (hazard analysis and critical control point) standards.[31] HACCP is a system of assessing risks, determining the points at which they might occur during production, and instituting measures to prevent them.[32]

China announced that it will unveil, by the end of 2007, national regulations for recalling adulterated food. At a May 31, 2007, news conference, a Chinese official also pointed to the death sentence handed down to the former head of the government's food and drug safety agency, as an example of its determination to improve product oversight. The agency head had been convicted of taking bribes for approving potentially dangerous drugs. He reportedly was executed on July 10, 2007.[33]

In late June, one Chinese government agency reportedly announced the closure of 180 food manufacturers that it said had been using industrial materials such as dyes, mineral oils, hydrochloric acid, paraffin, and formaldehyde in a variety of food products, including flour, candies, seafood, pickles, and biscuits. Another agency reportedly claimed to have closed 152,000 unlicensed food manufacturers and retailers in 2006 for making counterfeit or low-quality products.

---

[29] Calvin. Also, Fengxia Dong and Helen H. Jensen, "Challenges for China's Agricultural Exports: Compliance with Sanitary and Phytosanitary Measures," *Choices*, 1st quarter 2007.

[30] Calvin.

[31] Dong.

[32] FDA information on HACCP is at [http://www.cfsan.fda.gov/~lrd/haccp.html].

[33] "China Executes Former Head of Food Safety Agency," *Wall Street Journal*, July 10, 2007.

The Chinese also are seeking to demonstrate that they are protecting their own consumers from unsafe products, whether domestic or imported. On July 13, 2007, for example, they announced that meat and poultry imports shipped by some U.S. companies were being suspended. These include chicken products that they assert contained *Salmonella* bacteria (although U.S. interests have long noted that proper cooking destroys the bacteria), and pork products that contained an unapproved feed additive (which appears to be legal in the United States).[34]

## U.S. Efforts to Improve Import Compliance

At May 15 and May 17, 2007, media briefings on adulteration of plant proteins from China, FDA Assistant Commissioner for Food Protection Acheson reported that he was currently reviewing all aspects of the U.S. food safety system, including imports from all countries. At the time, he and other FDA officials declined to provide specifics on ongoing efforts to secure food safety agreements of any kind with China but did point out that, after shipments of Mexican cantaloupes with Salmonella contamination several years ago, the U.S. and Mexican governments had developed an agreement to improve agricultural practices in Mexico.

Dr. Acheson reportedly stated in a July 11, 2007 conference call that FDA officials were working on a proposed memorandum of understanding (MOU) with China that could include such elements as improving training for Chinese food safety officials and more data sharing on problems.[35]

FDA's Center for Food Safety and Nutrition (CFSAN) website indicates that it is aggressively pursuing both formal and informal agreements with foreign government counterparts to achieve mutual recognition of equivalence of regulatory systems. Another FDA website lists more than 90 "International Arrangements" with approximately 30 separate foreign entities, of which 36 appear to be directly food-related. Roughly a third of these address aspects of shellfish or other seafood safety.[36] FDA's agreements with China apparently do not include any for food, but are in place for lead in tableware.

During a May 22-24, 2007, economic summit with China, the U.S. government requested a meeting soon, possibly in the fall, specifically on food safety. It asked the Chinese to respond to the following specific requests:

- to provide detailed information on Chinese food safety control measures, including the procedures, methodology, and technology for testing and quarantine of suspect products;
- to provide raw data from the testing the Chinese government has conducted on regulated products;

---

[34] Various news reports, including *Food Chemical News*, July 2, 2007; *The Wall Street Journal*, July 16, 200; and Reuters, July 15, 2007.

[35] "FDA in talks with China over food safety MOU, says Acheson," *Food Chemical News*, July 16, 2007.

[36] Both websites accessed May 15, 2007, at [http://www.cfsan.fda.gov/~comm/intl-toc.html].

- to provide the ongoing results of all tests for melamine in ingredients destined for humans or animals;
- to impose a registration requirement for all Chinese firms intending to export food and feed products to the United States, and to prohibit exports from unregistered firms;
- to publish a regularly updated list of the registered Chinese firms;
- to issue necessary clearances including multi-year and multi-entry visas for FDA personnel to conduct health-related inspections in China and to audit systems confirming that Chinese firms are meeting U.S. requirements.[37]

In perhaps the most significant move to date, the FDA on June 28, 2007, issued an import alert ordering the "Detention Without Physical Examination" of all of the following aquacultured products from China: catfish, basa (related to catfish), shrimp, dace (related to carp), and eel.[38] FDA said it issued the notice after targeted sampling during October 2006 through May 2007 "repeatedly found that farm-raised seafood imported from China were contaminated with antimicrobial agents that are not approved for this use in the United States." The agents are nitrofuran, malachite green, and gentian velvet, which have been found to be carcinogenic to laboratory animals; and fluoroquinolones, which when used in food animals may increase antibiotic resistance in humans, the agency said.

Under such an import alert, FDA will detain all covered products until the importing firm demonstrates, through testing by an independent laboratory, that a representative sample of their product is free of these contaminants. Although the FDA has long issued these types of alerts for various imports, they generally are more limited in scope, for example, to a particular firm or product.

The import alert reiterates that approximately 80% of U.S. seafood consumption is from imports and that over 40% of these imports come from aquaculture operations. Shrimp and catfish are two of the top 10 most frequently consumed seafood products. China is the largest aquaculture producer in the world, with 70% of total production, and the third largest exporter to the United States. The alert observes: "As the aquaculture industry continues to grow and compete with wild-caught seafood products, concerns regarding the use of unapproved animal drugs and unsafe chemicals and the misuse of animal drugs in aquaculture operations have increased substantially."

## Congressional Consideration

Some Members of Congress have expressed sharp criticism both of China's food safety record and of U.S. efforts to insure the safety of that country's imports. The House Agriculture Committee held a hearing on May 9, 2007, to take testimony

---

[37] "Actions Requested of the People's Republic of China by the U.S. Government to Address the Safety of Food and Feed," USDA Fact Sheet accessed May 25, 2007, at [http://www.usda.gov].

[38] FDA Import Alert #16-13, which may be viewed at [http://www.fda.gov/ora//fiars/ora_import_ia16131.html]

on the topic from FDA and FSIS officials. Several other panels have held hearings on China import concerns and/or the broader topic of U.S. food safety efforts, most recently the House Energy and Commerce Oversight and Investigations Subcommittee and the Senate Commerce Committee (both during the week of July 17, 2007). Additional hearings on the China situation and on food safety generally are anticipated in both chambers during the 110th Congress.

On May 2, 2007, Senator Durbin won unanimous approval of an amendment to the Senate-passed FDA Revitalization Act (S. 1082) that would require domestic and foreign facilities to notify FDA of food safety problems; would require FDA to establish a central registry for collecting information on adulterated foods, and for notifying the public about adulterated human or animal foods; and would require FDA to implement uniform national standards and labeling for pet foods. The amendment includes elements of his proposed Human and Pet Food Safety Act of 2007 (S. 1274), introduced as H.R. 2108 by Representative DeLauro. The two lawmakers also have introduced more comprehensive bills (H.R. 1148/S. 654) to combine current federal food safety oversight under a new food safety administration.

Senator Durbin in July also introduced S. 1776, which would impose new user fees of $20 per line item of imports to help defray the costs of inspections, increase the number of inspectors, and pay for research into new testing methods. Further, the measure would require foreign governments or firms that want to import food into the United States to be certified by FDA as having equivalent food safety programs. The certifications would be valid for five years, among other provisions. A similar House bill (H.R. 2997) was introduced by Representative Kaptur.

Recent developments with food imports also have spurred calls for speedier implementation of mandatory country-of-origin labeling (COOL) for fresh meats, produce and peanuts, now scheduled to take effect on September 30, 2008. H.R. 357 and S. 404 would mandate COOL by September 30, 2007. A provision in the draft USDA appropriation for FY2008, pending in the House Appropriations Committee the week of July 16, 2007, would set a timeline aimed at ensuring USDA implementation by the currently legislated deadline. (For further information on COOL, see CRS Report 97-508, *Country-of-Origin Labeling for Foods*).

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

# EXHIBIT 5

Food and Drug Administration
Rockville MD 20857 .

OCT 3 1 2007

Ms. Christine Humphrey
Fuerst Humphrey Ittleman PL
1001 Brickell Bay Drive, Ste. 2002
Miami, FL 33131

Dear Ms. Humphrey:

This is in reply to your request dated September 10, 2007, concerning the removal shrimp
processed by Allied Pacific Foods Co., Ltd., Dalian, China, from detention without physical
examination (DWPE) under Import Alert# 16-131, "'Detention Without Physical Examination Of
Aquacultured Catfish, Basa (Pangasius Sp), Shrimp, Dace, And Eel Products From The People's Republic
Of China Due To The Presence Of New Animal Drugs And/Or Unsafe Food Additives."

A review of the information submitted with your request and Food and Drug Administration
(FDA) records indicates that shrimp processed by Allied Pacific Foods Co., Ltd., 888 Yong
Zheng Industrial Area, Dalain, China, has not met the criteria for removal from DWPE at this
time.

The private laboratory analysis submitted with your request for entry AQZ-2510860-6 indicated
that nitrofurans (specifically, 1-aminohydantoin hydrochloride (AH)) were present at 1.98 ppb
and 7.75 ppb, which are above the limit of detection (LOD). Further, the FDA district's review
of the private lab analysis for line entries AQZ-0251860-6/1/1 and AQZ-0251619-6/1/1 found
the samples to have levels of nitrofurans above the LOD.

The submission includes HACCP plans for breaded shrimp, breaded skewered shrimp, and pre-
fried tempura shrimp. Antibiotic residues are identified as a hazard and controlled at the
Receiving raw materials critical control point. Residues listed include nitrofurans (NF)
(furazolidone, furaltadone, furacilinum, nitrofurantoin), fluroquinolones (FQ) (flumequine,
ciprofloxacin, enrofloxacin, dinofloxacin), malachite green, leuchomalachite green, gentian
violet (GV), and leuchogentian violet (LGV). The critical limit "No (residue) should be used" is
adequately set for all residues. All residue limits of detection (LOD) are adequate except for GV
and LGV which is set at 1.5 ppb above the FDA acceptable limit of detection of 1.0 ppb.

Imported raw materials are sampled for antibiotics. Residue-free certificates are required for
domestic raw materials according to the firm's HACCP plan. Tabs 1-16, sub-tab 'c' include a
"Raw Material Antibiotic Test Report" for domestic raw materials received by the firm. All
reports show "Not Detected" for all residues tested; however, GV and LGV are tested at a LOD
of 1.5 ppb. The firm verifies by sending two samples to a third-party lab every month. Third
party lab analyses for all residues have LODs equal to FDA except for GV and LGV. The levels
for GV and LGV are set at 1.5 ppb, which is inadequate.

Third-parties Cook & Thurber and Surefish Seafood Quality Specialists (Lynnwood, WA) conducted audits on June 22, 2007 and May 15 & 16, 2007, respectively, prior to the issuance of the import alert on June 28, 2007. Although these audits were conducted prior to the issuance of the import alert, the results were acceptable as they represent the firm's current HACCP system implementation. However, the package fails to include a adequate description of Cook & Thurber and Surefish Seafood Quality Specialists functions, knowledge, and experience; and the CV, qualifications and experience for both auditors, Mark D. Neely and Roger Helgerson.

The firm provided testing reports issued by the PROC Provincial Entry-Exit Inspection and Quarantine Bureau, Food Testing Center (CIQ), for five entries under Tab 2, A – E. The translated reports are incomplete as they do not specify the analytical methods used.

If you have any questions concerning this request, feel free to contact Ted Poplawski at (301) 443-6553.

Sincerely yours,

Domenic Veneziano
Director
Division of Import Operations
  & Policy

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

# EXHIBIT 6

U.S. FOOD AND DRUG ADMINISTRATION
DIVISION OF IMPORT OPERATIONS & POLICY

PHONE NUMBER: 301-443-6553
FAX NUMBER: 301-594-0413

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: Mitchell Fuerst / Christine Humphrey | FROM: Ted Poplawski |
| COMPANY: FHI PL | DATE: 12/6/2007 |
| FAX NUMBER: 305 371-8989 | TOTAL NO. OF PAGES INCLUDING COVER: 5 |
| PHONE NUMBER: 305 350-5690 | SENDER'S PHONE NUMBER: 301 594-3849 |
| RE: Allied Pacific Food Co. response | |

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS:

5600 FISHERS LANE, 12TH FLOOR, SUITE 36 – ROCKVILLE, MARYLAND 20857



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**    Public Health Service

Food and Drug Administration
Rockville MD 20857

DEC 0 7 2007

Mr. Mitchell Fuerst
Ms. Christine Humphrey
Fuerst, Humphrey, Ittleman, PL
1001 Brickell Bay Drive
Suite 2002
Miami, Florida 33131

Dear Mr. Fuerst and Ms. Humphrey:

This is in response to documents provided to the Food and Drug Administration (FDA) in further
support of your request on behalf of Allied Pacific Food Company for removal of the firm from
Detention Without Physical Examination (DWPE) under Import Alert 16-131, "Detention
Without Physical Examination of Aquacultured Catfish, Basa (Pangasius Sp), Shrimp, Dace, and
Eel Products From The People's Republic Of China Due to the Presence of New Animal Drugs
and/or Unsafe Food Additives." This letter addresses only the documentation provided
regarding the firm's Hazard Analysis Critical Control Point (HACCP) system; it does not
address any remaining issues related to private laboratory analytical documentation, which will
be responded to separately.

On November 13, 2007, you provided FDA with the firm's revised HACCP plans dated
November 12, 2007, for breaded shrimp, breaded skewered shrimp, and pan-fried tempura
shrimp. The package also included two letters dated November 12, 2007, from the U.S.
Department of Commerce (USDoC) Seafood Inspection Program, attesting to the completion of
audit inspections conducted at the firm on November 3 and 8, 2007. On November 15, 2007,
you provided the qualifications for Robert Helgerson and Mark Neely, auditors representing
Cook and Thurber and Surefish, respectively. On November 21, USDoC provided their
inspection reports to FDA. The audits covered an examination of the firm's HACCP plan, the
operation of the plan, including the standard sanitation operating procedures, for compliance
with FDA's Seafood HACCP regulation at 21 CFR part 123.

FDA has reviewed the additional documentation you provided and has the following comments:

Revised HACCP Plans

The three HACCP plans identify aquaculture drugs as a potential hazard at the receiving step.
The processor receives raw material from two sources: imported aquacultured shrimp and
domestically farm-raised shrimp. According to the three HACCP plans, each lot of imported
shrimp is tested by a third-party laboratory using rapid screening kits, ELISA and CHARM II,
and each lot of domestic farm-raised shrimp is accompanied by a certificate indicating proper
drug usage.

The verification step in the HACCP plans for imported shrimp requires evaluation of third-party laboratory testing results on a monthly basis. The HACCP plans do not, however, provide information describing how the firm evaluates the third-party laboratory testing results or what methodology is used. For domestic shrimp, the verification step in the HACCP plans requires a weekly review of monitoring records, corrective actions, and in-house laboratory results for the domestic shrimp. It is unclear what is meant by the "in-house" laboratory and what methodology is used by the "in-house" laboratory. FDA cannot fully review the verification steps for imported and domestic shrimp without this information.

Because the imported shrimp is routinely tested only by rapid screening method, for the verification step for imported shrimp, FDA recommends, including monthly or quarterly verification testing using methods recommended by FDA or AOAC.

## Auditor Paper Credentials

The documentation provided for Mr. Helgerson indicates experience in auditing and in HACCP generally; however, there is no information in the documentation provided to demonstrate that Mr. Helgerson has any training or experience in seafood HACCP. If Mr. Helgerson does have this training or experience, please provide documentation of this. FDA has no additional comments or questions regarding Mr. Neely's documentation.

## USDoC Seafood Inspection Program Audits

The November 3 and 8, 2007 audit reports from USDoC provided a broad evaluation of the firm's overall implementation of the firm's HACCP system. No detailed information was provided regarding the adequacy of controls in place for unapproved veterinary drugs used in aquacultured shrimp. If available, the USDoC should provide this information.

The November 3 audit evaluated the September 1, 2007, HACCP plan. In the November 8 audit, the auditor does not indicate what HACCP plan was evaluated, that is, whether it was the same or a revision of the September 1, 2007, HACCP plan audited on November 3. This should be clarified.

## Audit Inspection

As you are aware, IA 16-131 states that if a firm wishes to request removal from DWPE for Chinese aquaculture, the firm should provide information to FDA that demonstrates that the "manufacturer has the appropriate controls and processes in place to ensure the quality of the product" it produces. IA 16-131 further describes the information that may satisfy that standard to include documentation from "an appropriate third-party ... demonstrating that an inspection of the processor was conducted and that the seafood was processed in accordance with ... 21 CFR part 123...." As FDA has begun to process requests to be removed from DWPE under IA 16-131, FDA has given additional consideration to what it means for the third party auditor to be "appropriate" in this context.

-2-

As we discussed during our November 13 meeting, FDA has been contemplating whether to conduct on-site inspections of third party auditors in order to evaluate the adequacy of their submissions, i.e., whether the third party is an "appropriate" auditor. The Seafood HACCP regulation, 21 CFR part 123, is an innovative rule in the regulation of food safety, in that it places the burden on processors of fish and fishery products to identify hazards that are reasonably likely to occur and to develop suitable controls for those hazards. Making these HACCP assessments properly requires a solid scientific background, a thorough understanding of the particular food and how it is processed, and a working knowledge of HACCP principles. The transition to a HACCP control system has proven to be a significant challenge for much of the U.S. and foreign fish and fishery products industry as well as for many state, federal, and foreign regulatory officials. Indeed, FDA has found that industry representatives, investigators, and consultants who understand these concepts in theory do not always apply them properly in the processing plant environment. For this reason as well as other concerns, FDA plans to apply the same standards and processes to inspections conducted by USDoC, which conducts inspections under a fee-for-service structure, as it does to inspections conducted by other third parties.

The evidence summarized in the Import Alert suggests that a significant portion of the Chinese aquaculture processing industry had not properly implemented HACCP controls as required. For example, during the period October 1, 2006 through May 31, 2007, 25% of the aquacultured catfish, Basa (Pangasius sp), shrimp, dace, and eel from China that FDA tested contained drug/food additive residues. If appropriate and effective controls were in place, they would have prevented this routine, documented occurrence of unapproved new animal drugs or unsafe food additives in the finished products from China. Because many Chinese aquaculture processors may have sufficient HACCP plans on paper but may not appropriately implement them, as has been the case elsewhere, and because FDA does not have the resources to itself inspect every foreign producer on an ongoing basis, FDA believes that third party audits of the foreign processors will play an important role in FDA's assessment whether a manufacturer has the appropriate controls and processes in place.

However, given the learning curve experienced by regulators around the world in shifting to HACCP-based inspections, FDA's current view is that, before it can be confident in the quality of a given auditor, it should verify that the auditor understands the science, the product, the processing technology, and the principles of HACCP and can apply them in different processing plant settings. Thus, in addition to reviewing a processing plant's HACCP paperwork and a third-party's credentials, FDA believes it would be prudent, at this early stage of this program, to conduct its own on-site audits of the auditors' work until it gains confidence that the specific auditor or auditors are properly applying HACCP principles. This process would enable FDA to verify that the third party will apply standards consistent with the Agency's standards on the suitability of controls in place at a processing facility to ensure that residues of drugs/food additives will be appropriately controlled. FDA has followed this inspect-the-auditor process for the one firm that has been removed from DWPE under Import Alert 16-131 to date.

FDA does not believe it should forego inspections to verify the ability of auditors to conduct appropriate HACCP inspections simply because a company may have had several third party audits of its processes. Cumulative audits are only as reliable as the quality of the auditors who

-3-

perform them. Thus, multiple audits will not provide FDA with the assurance that HACCP principles are being properly applied unless and until FDA gains confidence with at least one of the specific auditors.

FDA is currently planning its next trip to China to perform a series of audits of several aquaculture firms and their third party inspectors. Although we seek to make that trip as soon a practicable (our current target is January or February 2008), there are factors outside of FDA's control that may limit our ability to do so. If Allied is able to address the HACCP-related issues raised in this letter above, and provided that there are no other significant adverse developments related to Allied's request in the meantime, FDA intends to make every effort to include Allied in that next trip.

If you have any questions concerning this letter, please contact Mr. Ted Poplawski at 301-594-3849 or ted.poplawski@fda.hhs.gov.

Sincerely,

Domenic J. Veneziano, CDR/USPHS
Director, Division of Import Operations & Policy

- 4 -